**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| | § | |
| | § | |
| BENEFICIAL INNOVATIONS, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 2:11-CV-229-JRG-RSP |
| ADVANCE PUBLICATIONS, INC., | § | |
| ET AL., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |
| | § | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

**BACKGROUND**

Plaintiff, Beneficial Innovations, Inc. (hereinafter "BI") filed suit against Defendants on April 20, 2011, asserting U.S. Patent No. 6,712,702 ("the '702 Patent"), entitled "Method and System For Playing Games On A Network," and U.S. Patent No. 7,496,943 ("the '943 Patent"), entitled "Network System For Presenting Advertising." Collectively, the '702 Patent and the '943 Patent are referred to herein as "the patents-in-suit."

On June 25, 2013, the Court held a *Markman* hearing in the case (Dkt. 315.) This Memorandum and Order provides the Court's construction of the disputed claim terms at issue and the Court's determination of other disputed issues presented by the parties related to construction of the asserted claims of the '702 and '943 Patents including Defendants' Motion for Summary Judgment of Indefiniteness (Dkt. 307).

**LEGAL PRINCIPLES**

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be

2

read in view of the specification, of which they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).  Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).  In *Phillips*, the court set forth several guideposts that courts should follow when construing claims.  In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id.*  The ordinary and customary

meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313.  This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art.  *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*  Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."  *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978).  Thus, the *Phillips* court emphasized the specification as being the best guide for construing the claims.  *Id.* at 1314-17.  As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims."  *Bates v. Coe*, 98 U.S. 31, 38 (1878).  In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.  The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes.*Phillips*, 415 F.3d at 1319-24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321.*Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

5

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112 ¶ 6 "mandates that such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (quoting 35 U.S.C. § 112 ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple inquiries. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "[t]he next step is to determine the corresponding structure described in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or

6

prosecution history clearly links or associates that structure to the function recited in the claim." *Braun*, 124 F.3d at 1424.

"While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). "The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008). Further, the identified structure needs to be more than a "black box." *See Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1382-82 (Fed. Cir. 2009). The structure needs to be described in detail and not abstraction. *See id.*

When a contention is made that a claim is invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2, inquiry must be made as to whether the claim fails to particularly point out and distinctly claim the subject matter that the applicant regards as the invention. The party seeking to invalidate a claim under 35 U.S.C. § 112 ¶ 2 as indefinite must show by clear and convincing evidence that one skilled in the art would not understand the scope of the claim when read in light of the specification. *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

Where computer-implemented inventions are at issue and claimed using means-plus-function limitations, the Federal Circuit "has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328,

1333 (Fed. Cir. 2008). Rather, the patent must disclose sufficient algorithmic structure (or some other description) explaining how the computer performs the claimed function. *See id.* at 1332-37; *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371, 1383-84 (Fed. Cir. 2009); *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). The term "algorithm" in computer systems has broad meaning and encompasses "in essence a series of instructions for the computer to follow," *In re Waldbaum*, 457 F.2d 997, 998 (CCPA 1972), whether in mathematical formula, or a word description of the procedure to be implemented by a suitably programmed computer. *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011) ("i.e.,…a step-by-step procedure for accomplishing a given result.").

The patentee may express that algorithm in any understandable way: a mathematical formula, in prose, as a flow chart, or in any other manner that provides sufficient structure. *Id.* But, "simply reciting 'software' without providing some detail about the means to accomplish the function is not enough." *Id.* at 1340-41. Further, even though the algorithm may be expressed in any understandable way, "an algorithm is still a step by-step procedure for accomplishing a given result." *Ergo Licensing*, 673 F.3d at 1365 (internal citations and quotations omitted).

In limited circumstances, a general purpose computer may suffice as structure for a ***generic*** function (such as "processing") if the function is "coextensive with the structure disclosed." *Katz Interactive Call Processing Patent Litig. v. Am. Airlines, Inc. (In re Katz Interactive Call Processing Patent Litig.)*, 639 F.3d 1303, 1316 (Fed. Cir. 2011). However, a construction narrowing the functions to "***specific*** computer-implemented functions" requires corresponding algorithms to be disclosed. *Id.* at 1317.

8

If the patentee fails to disclose in the patent any algorithmic structure corresponding to the claimed function, the claim is invalid for indefiniteness under 35 U.S.C. § 112 ¶ 2.

The preamble of a claim is not limiting if a structurally complete definition of the invention is provided in the body of the claim and the preamble only states a purpose or intended use of the invention. However, a preamble term can be a limitation if a term in the preamble provides antecedent basis for a limitation appearing in the body of the claim or if a preamble term was used as a claim limitation to overcome prior art during prosecution. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808-810 (Fed. Cir. 2002).

## U.S. PATENT NOS. 6,712,702 and 7,496,943

A.      The Disclosures of the Patents-in-Suit

The '702 and '943 patents have nearly identical specifications and are directed to presenting a user with advertisements while the user is playing a game of chance on-line over the Internet (e.g., blackjack).

Much of the disclosure of the patents-in-suit is directed to subject matter ancillary to the claimed subject matter. For example, Fig. 2 shows a gaming station for playing blackjack. Such gaming stations are interfaced to a blackjack game controller as shown in Fig. 1. A more specific version for playing blackjack over the Internet is shown in Fig. 3.

Only embodiments later described in the specification in relation to Figs. 6 and 8 provide for presentation of advertising to game players. See '702 Patent at col. 22:1 to col. 30:62; '943 Patent at col. 21:33 to col. 30:7.

B.     The Claims of the '702 Patent

Only claim 53 of the '702 patent is asserted.

Claim 53 reads as follows with disputed terms shown in italics:

53. An apparatus for a service on a communications network, comprising:

a store for storing user identification, for first and second users, said store accessible by a service providing network accessible node (SPNAN);

a network interface for transmitting, via the network, from the SPNAN, first information related to communications between: (a1) the SPNAN, and (a2) a first network accessible node from which the first user communicates with the SPNAN;

wherein said first information is utilized in subsequent network communications between the SPNAN and the first network accessible node, and wherein said first information is stored on the first network accessible node so that it is available in a subsequent different network connection by the first user;

wherein said network interface receives, via the network, first responsive information *indicative of said first information being present* on said first network accessible node;

wherein said first responsive information is used for one or more of: (b1) providing the first user with access to a service offered by the SPNAN, (b2) *determining that a network transmission received at the first network accessible node will be processed in a predetermined expected manner*, and (b3) determining that the first network accessible node has a predetermined program element available;

a controller for providing access to an instance of a first service to the first user, wherein one or more corresponding service display representations of the first service are transmitted from the SPNAN to the first user via the first network accessible node, wherein at least most of the service display representations are interactive with the first user for providing corresponding responsive transmissions on the network via the SPNAN during the instance of the first service;

wherein said SPNAN provides a second instance of a service with the second user, wherein one or more corresponding service representations for the second instance are transmitted from the SPNAN to a second network accessible node for presenting the service representations of the second instance to the second user, wherein the service representations of the second instance are transmitted to the second network accessible node while the first user is interacting with the instance of the first service;

one or more programmatic elements for combining *advertising related information* with service related information to obtain a resulting combination that is in a format: (a) acceptable for being transmitted on the network by the SPNAN to at least the first user, and (b) processed by the first network accessible node so that, as a consequence of such processing, a display of an *advertising presentation* corresponding to said advertising information is provided on said first network accessible node, said display

occurring concurrently with a display of one of the corresponding service representations for the instance of the first service, said advertising presentation presenting advertising related to a purchase of a product or service;

wherein said SPNAN receives said first responsive information for identifying the first user, and said SPNAN receives said first responsive information when the first user has reconnected the first network accessible node to the network after (i) and (ii) following: (i) said first information has been stored on the first network accessible node, and (ii) said first network accessible node has disconnected from the network.

C.       The Claims of the '943 Patent

Claims 1, 49 and 67 of the '943 patent are asserted.

Claim 1 reads as follows with disputed terms shown in italics:

1.   A method of advertising on the Internet, wherein:

for each of one or more users accessing the Internet in *a corresponding Internet connection for the user*, the following occur during said corresponding Internet connection:

a request, from the user, is transmitted on the Internet, via a user node, for contacting a *providing node of the Internet*, said providing node provides access to information for an *interactive service*, wherein said request has associated therewith an Internet address that identifies the providing node, and wherein said interactive service is interactive on the Internet with the user;

the user node receives, via the providing node, said information for said interactive service;

wherein two or more *display presentations* from the information are presented on at least a portion of a display of the user node, wherein at least two of said display presentations are successively displayed, and there is a user input to one of said at least two display presentations, P.sub.1, wherein for the user input, there is a transmission on the Internet to which a latter one of said at least two display presentations, P.sub.2, is a response;

*overlapping with* a display of said one of the *display presentations*, P.sub.1, at the user node is a display of a first one or more *advertising presentations* for providing information related to one or more of a product and a service, *wherein said first one or more advertising presentations are received, via the Internet, in response to Internet transmissions by the providing node, and displayed on at least a portion of said display during the presentation of the two or more display presentations at the user node*;

one or more additional *advertising presentations* are presented at the user node following the first one or more *advertising presentations*, each said additional advertising

presentation for providing information related to one of a product and a service, ***wherein at least one of said additional advertising presentations is:***

(a) ***received at the user node, via the Internet, in response to Internet transmissions by the providing node during the presentation of the two or more display presentations***,

(b) displayed on at least a portion of said display without the user providing an input: (i) for which a consequence includes the presenting of said additional ***advertising presentations***, and (ii) for which said first ***advertising presentations*** are not a consequence, and

(c) provides Internet addressing information for obtaining additional information about one or more purchasable products or purchasable services, comprising:

activating one or more programmatic elements, at the providing node, for combining: (1) the information for the ***interactive service***, and (2) ***advertising related information*** for use in presenting one of: (i) the first ***advertising presentations***, and (ii) the additional advertising presentations; and

transmitting a resulting combination of (1) and (2) on the Internet to the user.

Claim 49 reads as follows with disputed terms shown in italics:

49. The method of claim 1, further including:

transmitting, via the Internet, data related to communications between: (a) the ***interactive service***, and (b) the user;

wherein the transmitting step results in first information being stored on the user node so that it is available in a subsequently established ***Internet connection session*** by the user at the user node; and

***after the user node has established the subsequent Internet connection session***, a step of receiving for the ***interactive service***, a ***responsive Internet transmission indicative of the first information being present*** on the user node.

Claim 67 reads as follows with disputed terms shown in italics:

67. A method of communicating with a ***service providing node of the Internet***, comprising:

for each of one or more users accessing the Internet, the following steps (A) through (D) are performed:

(A) first receiving, from the user via a corresponding Internet user node, a request on the Internet for contacting a ***service providing node of the Internet***, said service providing node providing access to two or more ***display presentations*** for a service, and

said service providing node being one of a plurality of nodes of the Internet each having a corresponding Internet address to which the user has Internet access independently of the other of the plurality of nodes, wherein said request has associated therewith the Internet address of a terminal destination for identifying the service providing node, and wherein said service is interactive on the Internet with the user;

(B) transmitting, via the Internet, data related to communications between the service providing node, and the user; wherein the transmitting step results in first information being stored on the user node so that it is available in a subsequently established *Internet connection session* by the user via the user node;

(C) *after the user node has established the subsequent Internet connection session*, a step of second receiving for the service, an Internet transmission *indicative of the first information being present* on the user node; and

(D) outputting one or more Internet transmissions, on the subsequent *Internet connection session*, for presenting particular *display presentations* for the service;

wherein said particular *display presentations* for the service are presented on at least a portion of a display of the user node, wherein the particular *display presentations* are successively displayed, and there is a user input to one of the particular *display presentations*, P.sub.1, for the service, the user input resulting in a transmission on the Internet to the service providing node, and to which a subsequent one of the *display presentations*, P.sub.2, is a response;

wherein first *advertising related information* is received by the user node, via the subsequent *Internet connection session*, as a consequence of Internet transmissions by the service providing node for displaying the particular display presentations, wherein the first *advertising related information* is combined, prior to transmission to the user node, with information for displaying the particular display presentation P.sub.1, *said first advertising related information replaceable with alternative information without changing a content: (i) of the particular display presentation P1, and (ii) to which the user input is responsive for the service*;

wherein one or more additional *advertising presentations* are presented at the user node after presentation of a first advertising presentation corresponding to the first *advertising related information*, each said additional advertising presentation being for providing information related to one of a product and a service, wherein at least one of said additional *advertising presentations* is received by the user node, as a consequence of Internet transmissions by the service providing node;

wherein an action by the user, in response to an advertisement being one of: said first advertising presentation and one of said additional *advertising presentations*, results in resulting data being transmitted via the Internet, wherein said resulting data is transmitted: (a) from said user node, and (b) to a *terminal destination node of the Internet*, said destination node identified at said user node by destination Internet link information received with the advertisement;

wherein a response to the action by the user is received at the user node, via the Internet, the response providing another presentation for presenting to the user at said user node.

13

**STIPULATED TERMS**

The parties have agreed to the following term meanings:

**U.S. Patent No. 7,496,943**

| Claim Term/Phrase/Clause | Agreed Definition |
|---|---|
| user node | a user's device |
| information | data that can be processed |
| display | a visual representation of |
| "first" and "second" | The terms "first" and "second" are used to distinguish repeated instances of the same element or limitation |
| following | taking place later in time |
| provides Internet addressing information | provides information, such as a URL, that identifies a location on the Internet |
| programmatic elements | computer readable instructions to perform a specific function |
| data related to communications between: (a) the interactive service, and (b) the user | data having a relationship or causal connection to communications between: (a) the interactive service, and (b) the user |
| first information | first data that can be processed |
| service | beneficial activity provided to a user |
| data related to communications between the service providing node, and the user | data having a relationship or causal connection to communications between the service providing node and the user |
| wherein a response to the action by the user is received at the user node, via the Internet | the user node receives, via the Internet, a response to the user action |

**U.S. Patent No. 6,712,702**

| Claim Term/Phrase/Clause | Agreed Definition |
|---|---|
| service | beneficial activity provided to a user |
| communications network | interconnected computers or devices that transfer and exchange information between the service providing network accessible node ("SPNAN") and the first and second network accessible nodes |
| a store for storing user identification | a medium that stores data used to identify a user |
| "first" and "second" | the terms "first" and "second" are used to distinguish repeated instances of the same element or limitation |
| service providing network accessible node | a device used for providing a service that is accessible via the communications network |

| first information | first data that can be processed |
|---|---|
| first network accessible node | a user's device that can be accessed via the communications network |
| first responsive information | a response related to the first information |
| said first responsive information is used for one or more of | the first responsive information is used for at least one or more of |
| instance | occurrence |
| programmatic elements | computer readable instructions to perform a specific function |
| display | a visual representation of |
| SPNAN receives said first responsive information when the first user has reconnected the first network accessible node to the network | SPNAN receives said first responsive information at the time that the first user reestablishes a subsequent different network connection with the communications network |

(*See* Dkt. 216 at 2-3.)).

## CONSTRUCTION OF DISPUTED TERMS

I.      "a corresponding Internet connection for the user"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary.<br><br>Alternate construction: "an Internet connection related to the user"<br><br>Alternate construction for "Internet connection": "(a) a connection path over the Internet, or (b) the physical connection between the user device and the first endpoint on the Internet, or (c) the entire physical pathway to a particular destination on the Internet, or (d) the logical pathway to a particular destination on the Internet, or (e) the TCP connection between applications on the Internet, or (f) the UDP communications between applications on the Internet, or (g) the HTTP connection | A connection that allows the user to access the Internet |

| between a client (e.g., a web browser) and a server (e.g., a website) or (h) any other logical connection between applications as defined using a particular application layer protocol" | |
|---|---|

BI contends that no construction is necessary but, if the term is construed, the construction should include the full scope of its meaning. BI argues, relying on its expert's declaration, that one of skill would understand that an internet connection can be achieved by any of the several listed ways. BI further contends that Defendants' construction is wrong because it is limited to a physical connection to the Internet. (Dkt. 241 at 6-9.

Defendants argue that the specification describes users accessing the Internet via an "Internet connection." Thus, Defendants argue that, when the term is read in view of the specification disclosure as it must be, their construction obtains. (Dkt. 258 at 9-10.)

Defendants further contend that BI's construction does not provide a definition of the term but rather sets forth a list of various types of communications that can establish a connection between computers that are connected to one another over the Internet. (Dkt. 258 at 10-12.)

The parties' dispute is essentially whether the term merely means accessing a website as BI contends. The claim language specifies "for each of one or more users *accessing the Internet* in a corresponding Internet connection for the user." The claim itself restricts the scope of the term to a connection that allows a user to access the Internet and not access a website. As is well-known, a user must first access the Internet through an Internet Service Provider (ISP) before specifying a particular website's Uniform Resource Locator (URL).

16

The '943 patent specification describes at col. 25:22-27, in relation to Fig. 7, navigating a game/advertisement website. But, not accessing the Internet. In connection with Figs. 8A and 8B, the specification does describe accessing Internet 324 using Internet Service Provider (ISP) 810. In col. 28:34-47 and again in col. 29:12-23, there is a specific description of providing Internet access to users, which indicates a physical connection via an ISP. Thus, the Internet access connection is to an ISP and not to a website.

Defendants are correct that BI seeks to give a laundry list of types of communications protocols and a construction that is beyond the scope of the term itself. The Court rejects BI's contention that each individual data transfer between a user and a website is "a corresponding Internet connection for the user."

The term **"a corresponding Internet connection for the user"** means **"a connection that allows the user to access the Internet."**

The parties also agree that dispute XI is only as to the construction of "Internet connection." (Dkt. 241 at 25; Dkt. 258 at 29-30.)   Thus, the above construction also resolves dispute XI.

II.      "providing node of the Internet/service providing node of the Internet"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "device or devices used for providing a service that is accessible via the Internet" | "a device that provides the service, which is identified by an Internet address and which responds to requests sent over the internet to that address" |

17

BI argues that "a" means "one or more." Thus, BI says, Defendants' construction is overly limiting. (Dkt. 241 at 10.) BI further argues that Defendants' construction improperly includes an Internet address requirement that is otherwise set forth in the claim and includes an extraneous limitation of responding to requests. (Dkt. 241 at 10-11.)

Defendants contend that the node is a single device. Defendants argue that BI's contention for "a" merely means "one or more providing nodes" does nothing to define the term "node" as being one or more devices. Defendants point out the meaning that follows from BI's argument is only that there is "one or more providing nodes" and says nothing about the node itself. (Dkt. 258 at 13.)

According to Defendants, the context of the claims indicates that "a providing node" is used as a singular structure wherein there are back-and-forth communications between two nodes on the Internet (a user node and a provider node). (Id.) Further, Defendants argue for a specific reference to Internet address because, by definition, a "node" is an addressable device. (Dkt. 258 at 14.)

The claim language specifies that a request has associated therewith an Internet address that identifies the providing node. Thus, restatement in Defendants' proposed construction of "is identified by an Internet address and which responds to requests sent over the internet to that address" is unnecessary.

The term "node" appears in the claim in the context of a user request for contacting a providing node using an Internet address that identifies the providing node. Thus, the claim indicates a node-to-node link, which indicates a single device. Also, by

specifying an Internet address, the claim indicates that communication is with a single device.

Further, in communication networks, the term "node" is understood to designate a single connection point in the network. That is, it is a single physical active electronic device capable of sending, receiving, or forwarding information over the network. The '943 patent is consistent in illustrating the network topology of Internet connection points 308 and 318 in Fig. 6b.

The Court finds BI's construction is so overly broad as to read on a website. Accordingly, BI's construction must be rejected.

The terms **"providing node of the Internet"** and **"service providing node of the Internet"** mean **"device used for providing a service."**  The Court recognizes, however, that a single device may be made up of a number of electronic components.

III.    "interactive service" and "wherein said service is interactive on the Internet with the user"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "a service for which a user may provide an input and receive a response to that input" | "an information exchange service within a gaming context" |
| "the service is one for which a user may provide an input and receive a response to that input on the Internet" | "the service involves an information exchange service within the gaming context" |

BI argues that limiting the term to a gaming context is improper. BI says that such limiting fails to observe the ordinary meaning of the term, violates the doctrine of claim

differentiation, and imports a limitation from the preferred embodiment. (Dkt. 241 at 12-13.)

Defendants contend that the term cannot be broadened beyond the scope of the specification. Defendants point to the Field of the Invention as characterizing the "present invention" as providing an information exchange service within a gaming context. In addition, they say the specification identifies "users" as "players." Further, Defendants argue that a prior art rejection was overcome on the basis that the playing of games combined with advertising during the game was not obvious. (Dkt. 258 at 15-17.)

Defendants' construction imposes a particular context of use limitation (i.e., application of the claimed method) that is overly limiting of the term. Defendants say this situation is similar to that in *Verizon Servs. Corp. v. Vonage Holdings Corp.,* 503 F. 3d 1205 (Fed. Cir. 2007), In *Verizon*, the scope of the written description was held to limit the scope of the claims. However, unlike the situation in *Verizon*, the playing of games is not a structural aspect or a functional aspect; it is merely contextual for purposes of providing an illustrative example. In *Verizon*, a gateway system was required to be one having functionalities of compress/decompress and packetize voice signals based on a description in the specification that the present invention had to have those functional capabilities. Such similar restrictions are not presented here. The specification does not say the invention is a game service. The statement is merely to the effect that the invention can be used in a game service context. Defendants' constructions are rejected.

The Court finds the term **"interactive service"** means **"a service for which a user may provide an input and receive a response to that input."**

The Court finds the term **"wherein said service is interactive on the Internet with the user"** means **"the service is one for which a user may provide an input and receive a response to that input on the Internet."**

IV.    "display presentations"

The parties' positions:

| BI's Construction | Defendants' Construction |
| --- | --- |
| "visual representations of a service" | "display images that are displayed on the user's device" |

BI argues that Defendants fail to provide construction of "display." Further, BI says, Defendants' construction is so overly broad as to include an advertising presentation. (Dkt. 241 at 14.) BI contends its construction constitutes the ordinary meaning of the term in the context of the claim. (Dkt. 241 at 15.)

Defendants argue that their construction is a logical extension of the agreed construction of "advertising presentation" (i.e., advertising image that is displayed on the user's device).  Defendants contend that BI's construction wrongly and unnecessarily includes the limitation of "of a service." (Dkt. 258 at 18.)

The Court notes that neither party disputes that the display presentations are tied to the service, as is required by the context of the claim.  However, Defendants' construction, contrary to Plaintiff's argument of being overly broad, is of proper scope when read along with the surrounding claim language. The display presentations are limited to being from "the information," which refers to information for an interactive service as distinguished from later recited "advertising representations for providing information related to one or more of a product and a service."  Because the limitations

21

sought by Plaintiff are already contained in the surrounding claim language, it is unnecessary to include that tie in the construction of the term "display presentation."  The term "advertising presentation" is separately construed.

The Court adopts Defendants' construction. The term **"display presentations"** means **"display images that are displayed on the user's device."**

V.      "overlapping with" (Claim 1, '943 Patent)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "overlapping in time with" | "extending over or past and covering a part of" |

BI argues that the term carries a meaning of "in time" such that multiple display representations overlap in time with advertising presentations. BI disputes that they physically overlap on the display screen. According to BI, the prosecution history compels its construction, because it says, an express definition was given. (Dkt. 241 at 16.)

Defendants rely upon the claim language surrounding the term. That language, they say, requires the advertising presentations to be displayed "during" the presentation of the display presentations (i.e., interactive service presentations). According to Defendants, a reference to time by "overlapping with" as in BI's construction is inconsistent with the time reference elsewhere set forth in the claim. (Dkt. 258 at 20.)

Defendants contend that the prosecution history shows the examiner understood the claims to require an "overlay presentation." Defendants characterize BI's reference to

the applicants' statements after allowance as being without any citation of accompanying support in the specification and outside a direct exchange with the examiner on the topic. (Dkt. 258 at 21-22.)

In reply, BI reconciles its construction with the claim language "during" the presentation of the display presentations (i.e., interactive service presentations) on the basis that the "during" requirement is another limitation as to the period of time that time overlapping occurs. In reply, BI also points to other claim language "displayed on at least a portion of said display" as negating Defendants' screen space construction. (Dkt. 263 at 8-9.)

 The claim language as a whole indicates a spatial sense of the term "overlap" rather than a temporal sense.  The claim clearly reads that an advertising representation is displayed on a portion of the display while a display representation is being presented. This indicates that an advertising representation is shown overlaying the display presentation. Essentially, BI seeks to rewrite the claim to read "simultaneously with."

Defendants' construction is consistent with a common sense reading of the claim language as a whole.

The term **"overlapping with"** means **"extending over or past and covering a part of."**

VI.   "wherein said first one or more advertising presentations are received, via the Internet, in response to Internet transmissions by the providing node, and displayed on at least a portion of said display during the presentation of the two or more display presentations at the user node" (Claim 1, '943 Patent)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary<br><br>Alternate: "wherein one or more advertising presentations are received, via the Internet, in response to Internet transmissions by the providing node, and displayed on at least a part or section of the display during the presentation of P1 and P2" | "the user node receives, via the Internet, the first one or more advertising presentations in response to Internet transmissions by the providing node, and displays the first one or more advertising presentations on at least a portion of the display of the user node during the presentation of P1 and during the presentation of P2" |

BI argues that, because terms within the phrase are separately construed, there is no need to construe the phrase as a whole. BI also contends that the specification confirms that "a portion of said display" carries its ordinary meaning of some part or section of the display. (Dkt. 241 at 18-19.) As to "during the presentation of the two or more display representations," BI contends it means that an advertisement need be received only once during the single presentation of P1 and P2. (Dkt. 241 at 19.) Finally, BI says, "the user node receives" limitation added by Defendants improperly includes a requirement that is nowhere grounded in the claim language. (Dkt. 241 at 20.)

Defendants contend that the construction of "a portion" offered by BI as "a part or section" is unnecessary. (Dkt. 258 at 25.) Also, Defendants argue that BI's construction fails to confirm that "said display" means the user node's display. Thus, the limitation of "the user node receives" is entirely appropriate. (Dkt. 258 at 26.)

Defendants agree with BI that P1 and P2 are display representations. But, Defendants say that the claim language requires an advertisement to be displayed during P1 and again during P2 and not just displayed during either P1 or P2 as BI contends.

24

Defendants point to the claim language of "two or more" rather than a recitation of "at least one of the two or more" as being controlling. (Dkt. 258 at 23.)

The claim says that two display presentations P1 and P2 are successively displayed to the user. Then the claim says a user gives an input to P1. Following P1, P2 is returned in response. Further, the claim specifies that an advertisement is displayed during the time P1 is displayed and during the time P2 is displayed. The claim necessarily requires display of an advertisement during P1 because it is required to overlap with P1. As Defendants point out, the claim does not say "at least one of the two or more display presentations."  Defendants' construction is correct.

The phrase means **"the user node receives, via the Internet, the first one or more advertising presentations in response to Internet transmissions by the providing node, and displays the first one or more advertising presentations on at least a portion of the display of the user node during the presentation of P1 and during the presentation of P2."**

VII.   "advertising presentations" (the '943 Patent, claims 1, 49, and 67 )/
"advertising presentation" (the '702 Patent, claim 53)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "visual representations of advertisements" | "advertising images that are displayed on the user's device" |

BI asks to construe the term similarly to its construction for "display presentation." (Dkt. 241 at 20.) Defendants contend that BI's construction is overly broad in not requiring "images" in the construction. (Dkt. 258 at 26.) BI, in reply, says that the constructions are substantively the same (Dkt. 263 at 10).

Consistent with an adoption of Defendants' construction for "display representations," Defendants' construction for this term should also be adopted. BI does not appear to have a substantive objection.

The term **"advertising presentation(s)"** means **"advertising images that are displayed on the user's device."**

VIII.   "wherein at least one of said additional advertising presentations is:
(a) received at the user node, via the Internet, in response to Internet
(b) transmissions by the providing node during the presentation of the two or more display presentations"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary.<br><br>Alternate: "the user node receives at least one of the additional advertising presentations, via the Internet, in response to Internet transmissions by the providing node during the presentation of P1 and P2" | "the user node receives, via the Internet, at least one of the additional advertising presentations in response to Internet transmissions by the providing node during the presentation of P1 and during the presentation of P2" |

BI contends that no construction is necessary because all terms in the phrase are otherwise construed. BI disputes Defendants' construction on the same basis as the "wherein" clause of term VI, above. (Dkt. 241 at 20-21.)

Defendants also advance their arguments made regarding the "wherein" clause of term VI, above. (Dkt. 258 at 26-27.)

Consistent with the adoption of Defendants' construction regarding the "wherein" clause of term VI, above, Defendants' construction should also be adopted for this term.

26

The phrase means **"the user node receives, via the Internet, at least one of the additional advertising presentations in response to Internet transmissions by the providing node during the presentation of P1 and during the presentation of P2."**

IX.  "wherein at least one of said additional advertising presentations is: …(b) displayed on at least a portion of said display without the user providing an input: (i) for which a consequence includes the presenting of said additional advertising presentations, and (ii) for which said first advertising presentations are not a consequence" (the '943 Patent, Claims 1 and 49)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "wherein at least one of said additional advertising presentations is (b) displayed on at least a portion of the display without a request by the user for the advertising presentation, for which the result is the presentation of additional advertisements that were not requested by the user" | Indefinite. |

According to BI, the subparts (i) and (ii) apply to the term "input." Further, BI says, the phrase means that additional user input is not required for the presentation of additional advertisements to the user except for those advertisements presented as a consequence of the first user input. (Dkt. 241 at 22.) At the hearing, BI presented slide #23 that demonstrated BI's analysis that leads to an understanding that "where there is no user input causing the additional advertising presentations to be presented that does not cause the first advertising presentations to be presented."

In their motion for summary judgment, Defendants say the intrinsic record does not provide any basis for a narrowing of the claim language to any possible definitions. Thus, Defendants say, the claim language must be held indefinite because it is simply incomprehensible. Further, they say, making the language comprehensible in any way would require rewriting the claim, which is not permitted. (Dkt. 307 at p. 12-13).

BI's construction uses "request by a user" but the claim term at issue specifies "user providing an input" that is distinct from the claim's recitation of "a request from the user" [for contacting a providing node]. That is, there is a difference between a "user request" for service and a "user input" to a display presentation. Thus, BI's construction fails to observe that different terms in the claim have different meanings. BI's construction should be rejected.

The parties appear to agree that subpart (i) means that additional advertisements are displayed to the user without the user providing any input. BI's construction stops at sub-part (i).

The claim specifies that additional advertising is presented to the user node after the first advertising is displayed to the user and is displayed without the user being required to provide an input, i.e., the additional advertising is automatically displayed. The consequence in (i) is automatic presentation of additional advertising to the user.

The reference in subpart (ii) to "the first advertising presentations" in the context of displaying additional advertising presentations without user input is inartful, but not insolubly ambiguous. Subpart (ii) would appear to say that display of "a first advertising presentation" is not a consequence of an absence of user input (i.e., "being without the

user providing input"). In other words, display of the first advertising presentation is independent and does not occur (or cease) as a result of the user's failure to provide an input. This is supported by the remainder of the claim:  The claim previously introduces display of "a first advertising presentation." But, there is no express involvement of a user in causing its display.  The display of "a first advertising presentation" would seem to result as a consequence of a user request for service and not be a consequence of a user input to a display presentation.

Accordingly, the Court finds that the phrase means **at least one of the additional advertising presentations is displayed on at least a portion of said display as a consequence of the user not providing an input.  The display of the first advertising presentations is not a consequence of the user not providing an input**.

X.      "advertising related information" (the '943 Patent, Claims 1, 49, and 67; the '702 Patent, claim 53)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "data that is processed into the advertising presentations" | "advertising data sufficient to generate the advertising presentation by the user node" |

BI points to the parties' agreed construction for "information" (i.e., data that can be processed) and says its construction is based on it. Further, BI contends that Defendants' construction is overly limiting in requiring that the data itself is sufficient to generate the advertising presentation. (Dkt. 241 at 24-25.)

Defendants contend that their construction clarifies that the term means the information is that data which is sufficient to generate the advertising presentation. (Dkt. 258 at 28-29.)

Defendants' construction adds an extraneous limitation that excludes any other data from being used by the user node in the generation of the advertising presentation. There are no disclaimers made anywhere that serve to so limit the term. Also, Defendants' construction is vague and indefinite in regard to what is "sufficient to generate." Defendants' construction carries a meaning that no other data is used in generating the advertising presentation, but as stated above, such a requirement is overly limiting.

The Court finds BI's construction is consistent with the agreed construction of "information" and should be adopted. The term **"advertising related information"** means **"data that is processed into the advertising presentations."**

XII.    "after the user node has established the subsequent
         Internet connection session"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary. | "subsequent to and in consequence of the user node establishing the subsequent Internet connection" |

BI contends that the term "after" needs no construction. Further, BI argues that Defendants' construction improperly requires that the receiving step must be "in consequence" of the establishment of the subsequent Internet connection. (Dkt. 241 at 26.)

Defendants contend that construction of the phrase is required to give effect to a causal relationship that exists between establishing the subsequent connection and receiving the responsive transmission. That is, Defendants say, the responsive transmission occurs because a subsequent connection has been made. (Dkt. 30-31.)

There is no true dispute as to the meaning of the words used in the claims. Rather, the dispute is only as to the fact that Defendants' construction imposes an additional requirement that there be a direct causal linkage. But, that is nowhere in the claim as written. Accordingly, the Court rejects Defendants' construction.

The Court finds the language clear and has a plain and ordinary meaning, and declines to add the causal limitation proposed by the Defendants.

XIII.   "responsive Internet transmission"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary. | "Internet transmission responding to a prior transmission" |

BI merely says that the term is understood and needs no construction. (Dkt. 241 at 27.)

Defendants want clarification that the term means that the transmission responds to a prior transmission. (Dkt. 258 at 31.)

The plain and ordinary meaning of the term is what is expressed by Defendants' construction. BI offers no view to the contrary. Thus, the term **"responsive Internet transmission"** means **"Internet transmission responding to a prior transmission."**

XIV.   "indicative of the first information being present ('943 Patent)/

31

indicative of said first information being present ('702 Patent)"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "that indicates, reveals or suggests that the first information is present" | "suggestive of, and distinct from, the first information" |

BI argues that Defendants' construction is unsupported and the term does not require that the transmission is limited to information that is distinct from the first information. According to BI, the plain language of the claim does not limit the responsive Internet transmission to transmissions that are distinct from the first information. (Dkt. 241 at 27-29.)

Defendants argue that their construction is supported when the term is read in view of the specification. The operation described in the specification according to Defendants is that a user node alerts the providing node upon reconnection that the first information is still present on the user node. Defendants contend that an alert is an indication that is distinct from the information itself. (Dkt. 258 at 31-33.)

The Court observes that there is no dispute as to the meaning of the terms used in the claims, and that the only dispute is as to whether "indicative of the first information being present" requires that the indicator be "distinct from" the first information.   In requesting this construction, Defendants ask the Court to add a limitation that is not present in the plain language of the claims.   There is no reason to do so here.   Thus, the Court rejects the argument that "indicative of the first information being present" requires a transmission wholly separate and distinct from the first information.   The language carries its plain and ordinary meaning.

32

XV.   "said first advertising related information replaceable with alternative information without changing a content: (i) of the particular display presentation P1, and (ii) to which the user input is responsive for the service" (the '943 Patent, Claim 67)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary.<br><br>Alternate: "the advertising related information is capable of being replaced with alternative advertising related information without changing the content of the service display presentation that is displayed in response to the request by the user" | Indefinite |

BI contends the phrase is readily understandable and carries a meaning that the advertisement displayed together with P1 can be replaced with an alternative advertisement without changing the display content of P1. (Dkt. 241 at 29-30.)

Defendants argue that BI's construction wrongly reverses the causal relationship between the user input and content and between the user input and the interactive service. Defendants therefore contend that Plaintiff's construction rewrites the claim. (Dkt. 258 at 33-34.)

Defendants further elaborate in their Defendants' Motion For Summary Judgment of Indefiniteness. There, they say, it is entirely unclear what it means for a user input to be both "responsive for the service" and responsive "to" "a content," as the claim requires. Also, according to Defendants, it is entirely unclear how the public is supposed to tell when a given "user input" meets these requirements. (Dkt. 307 at 13.) Defendants

again make the point that BI can only make sense of the claim language by completely rewriting it because the phrase of subpart (ii) is unintelligible. (Dkt. 307 at 14.)

BI's construction refers to "request by the user." But, the claim language refers to "the user input." The "user request" for service appears in step (A). However, step (D) separately refers to "user input." As Defendants say, BI's construction rewrites the claim. Further, BI's construction does not fully address the disputed claim language. It only addresses subpart (i) and ignores subpart (ii). BI's construction must be rejected.

The subject language is not a model of grammatical clarity and precision. Nevertheless, the language is not insolubly ambiguous. The language should be understood to express: "said first advertising related information is replaceable with alternative [advertising related] information without changing the content of a particular display presentation P1 and to which display presentation P1 there is a user input for the service to be responsive in displaying a subsequent presentation P2."

The claim earlier specifies that user input to presentation P1 results in a subsequent presentation P2 by the service in response. The claim language of the wherein clause at issue specifies that first advertising related information is sent with P1 and the first advertising related material is replaceable with alternative information without changing the content of P1. User input can be made to P1 and to which the service is responsive by providing P2 as earlier set forth in the claim.

The phrase means **"said first advertising related information replaceable with alternative [advertising related] information without changing content of a particular display presentation P1 and to which display presentation P1 there is a**

**user input for the service to be responsive in displaying a subsequent presentation P2."**

XVI.   "terminal destination node of the Internet"

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| "the device or devices at the end of the communication on the Internet" | "a device that is the final destination for traffic on the Internet, distinct from the user node and service providing node" |

BI relies upon its proposed construction for "node." Also, BI argues that the term "terminal destination" does not mean the final destination for all communications but only for a particular communication. (Dkt. 241 at 30-31.)

Defendants also rely upon their proposed construction for "node" as being a single device. Further, Defendants say that the term must designate a node that is distinct from the other identified user node and service providing node. (Dkt. 258 at 34.)

The claim uses a different designation for each of the recited nodes, which makes them distinct from one another. Further, the term "terminal" specifies a final destination. Moreover, the claim requires that the terminal destination be identified at the user node by link information received with the advertisement. The claim thus describes a hyperlink embedded within the advertisement that directs a communication to a particular node on the Internet.

The term **"terminal destination node of the Internet"** means **"a device that is the final destination for traffic on the Internet, distinct from the user node and service providing node."**

35

XVII.   "determining that a network transmission received at the first network
accessible node will be processed in a predetermined expected manner"
(the '702 Patent, Claim 53)

The parties' positions:

| BI's Construction | Defendants' Construction |
|---|---|
| No construction is necessary.<br><br>Alternate: "determining that a network transmission received at the first network accessible node will be processed based on a convention or protocol used by the first network accessible node" | Indefinite |

BI contends that one of skill understands the phrase to mean that processing is on
the basis of a protocol. BI further relies upon extrinsic evidence in the Almeroth
declaration. According to BI, there is nothing subjective about "expected manner,"
because in view of the specification the term refers to the manner that the SPNAN
expects a network transmission received at the first network accessible node will be
based on the protocol used by it. (Dkt. 241 at 31-32.)

Defendants primarily rely upon their Motion For Summary Judgment Of
Indefiniteness. But, they do generally argue that BI does not show how its construction is
supported by the specification based on a failure to cite to anything in the specification.
(Dkt. 258 at 35.)

Although BI does not provide cites to the specification in support, claim 53 is
specifically directed to apparatus operable in the context of a communications network.
Inherent in a communications network is a communications protocol. Any information
transmitted by the recited network interface via the network will necessarily be arranged

36

according to a protocol that is compatible with that of the network. A citation to the specification is unnecessary.

Defendants contend the clause, because it recites "a predetermined expected manner," is entirely subjective, making it impossible for a person of skill to know with any objective certainty whether a given manner of processing a network transmission is or is not a "predetermined expected manner." Their focus is on "expected," saying it is an inherently subjective determination. They also contend the modifier "predetermined" does not provide the necessary objective guidance. (Dkt. 307 at 10-11.)

In opposition, BI says Defendants fail to offer any evidence that the terms are subjective. BI also offers an expert declaration providing an opinion that one of skill would understand the terms to be referring to the ability of the SPNAN to determine the manner in which the first network accessible node processes transmissions. Moreover, BI says, the term must be read in context, which Defendants do not do. (Dkt. 310 at 11-12.)

As discussed above, when the term is read in view of the context of the claim and the specification, which are directed to apparatus involving a communications network, inherent is a network protocol for processing network transmissions. For one of skill in the art, it is unnecessary to expressly refer in the specification to a network "protocol," because that would be a given aspect of transmitting information "via a network."

For the reasons set forth in the Court's ruling on Defendants' motion for summary judgments of indefiniteness, the term **"predetermined expected manner"** in the context of claim 53 and the specification is not indefinite. The term means **"determining that a**

**network transmission received at the first network accessible node will be processed based on a convention or protocol used by the first network accessible node."**

XVIII. Construction of Passive Phrases in Wherein Clauses

The Court finds that there is no dispute regarding the meaning of the terms in the clauses in question.

To the extent Defendants argue that the terms are "limiting," Plaintiff does not appear to dispute the basic maxim of patent law that Plaintiff must prove each element of the claim is met in order to find infringement.  The language of the claim is clear, and any dispute framed by Defendants is a factual one regarding whether their acts meet those limitations.

**SIGNED this 6th day of January, 2014.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE