# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   GOOGLE, INC.                    *   Civil Docket No.
                                     *   2:11-CV-229
 4   VS.                             *   Marshall, Texas
                                     *
 5                                   *   January 21, 2014
     BENEFICIAL INNOVATIONS, INC.    *   12:45 P.M.
 6
                      TRANSCRIPT OF JURY TRIAL
 7          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                  UNITED STATES DISTRICT JUDGE
 8

 9   APPEARANCES:

10   FOR THE PLAINTIFF:      MS. CHRISTA ANDERSON
                             MS. JENNIFER HUBER
11                           Keker & Van Nest
                             633 Battery Street
12                           San Francisco, CA    94111

13
                             MR. MICHAEL JONES
14                           MR. ALLEN GARDNER
                             Potter Minton Firm
15                           110 North College Street
                             Suite 500
16                           Tyler, TX    75702

17

18   APPEARANCES CONTINUED ON NEXT PAGE:

19

20

21   COURT REPORTERS:        MS. SHELLY HOLMES, CSR
                             MS. SUSAN SIMMONS, CSR
22                           Official Court Reporters
                             100 East Houston, Suite 125
23                           Marshall, TX   75670
                             903/935-3868
24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

1  Q.  And Google never lost any customers or
2  partners because of that complaint, right?
3  A.  Correct.
4  Q.  Now, the key issue in this case is the
5  settlement agreement.  And I want you to take a look at
6  Exhibit 1.  I think this is the first document in your
7  binder.
8      Do you have that in front of you, sir?
9  A.  Yes, sir.
10 Q.  What role did you play in negotiating the
11 terms of this agreement?
12 A.  I was one of the Google attorneys involved.
13 Q.  And your role was just to be one of the
14 attorneys, or did you have a -- a more significant role?
15 A.  I worked on drafting this agreement, and like
16 I said earlier, my day-to-day supports was to be
17 responsible for these matters.
18 Q.  Part of your role was trying to get the best
19 license and deal that you could get for Google for the
20 money that Google was paying, correct?
21 A.  Yes.
22 Q.  And at the time that you were negotiating with
23 respect to the terms of this license agreement, did you
24 have in your mindset that you wanted to get the best
25 possible deal for Google's partners?

1  You were also asked a series of questions
2 about what you know about what Beneficial did or did not
3 do in preparing complaints in connection with the
4 lawsuits.
5  Do you remember that line of questions?
6 A. Yes, ma'am.
7 Q. Do you have knowledge as to what Beneficial
8 did or didn't do in preparing its words in accusing
9 Google and customers of infringement?
10 A. I only know the Court requirements, ma'am.
11 Q. Okay. And what are those?
12 A. The Court requirements require that a
13 Plaintiff, before setting -- or filing a lawsuit, do
14 their best investigation and -- and -- and -- and access
15 all publicly available information to state their case.
16 Q. And is there some information available
17 publicly about DoubleClick?
18 A. Yes, ma'am.
19 Q. And for how long has information been
20 available publicly about DoubleClick?
21 A. For as long as DoubleClick's been a product.
22 That's all before my time at Google.
23 Q. You were also asked some questions about
24 whether or not Google lost any partners as a result of
25 Beneficial's lawsuit?

1  A. Yes, ma'am.

2  Q. Are you the person at Google who would know
3  whether or not a customer was lost as a result of the
4  lawsuit?

5  A. No, ma'am.

6  Q. And why is that?

7  A. I'm on the legal side of -- the sales people
8  who handle the day-to-day relationships with the
9  customers in their -- that organization would be
10 better -- better positioned.

11 Q. Okay. You were also asked some questions
12 about the language in the settlement agreement called a
13 covenant not to sue and whether or not there were
14 promises not to sue certain partners.

15     Do you remember those questions?

16 A. Yes, ma'am.

17 Q. Do you have a view as to whether or not the
18 license provisions in the settlement agreement provide
19 any protection against lawsuits to anyone?

20 A. Yes, ma'am.

21 Q. And why is that?

22 A. There are two different things. The license,
23 as we discussed, is limited, whereas the covenant not to
24 sue is not. The covenant not to sue is very broad,
25 covering any kind of infringement, patent or otherwise,

1  point to Beneficial's beliefs and their contentions
2  early in the case to show that providing DoubleClick
3  would constitute indirect infringement, you would agree
4  that you have no other source of evidence to point to
5  that would satisfy this condition, right?
6      A.   Correct.
7      Q.   You were asked some questions about the harm
8  issue.  Do you remember that?
9      A.   Yes, sir.
10     Q.   And one of the things I asked you on cross was
11 whether or not any of your customers left or you lost
12 business based on the lawsuits, right?
13     A.   Yes.
14     Q.   And on redirect, Counsel asked you whether or
15 not you were the person that would know that
16 information, right?
17     A.   Correct.
18     Q.   Who made the decision to appoint you to be
19 Google's representative here?  Was it you?
20     A.   Yes.
21     Q.   You yourself made the decision that says:  I
22 will represent and come here on behalf of Google, right?
23     A.   Yes.
24     Q.   Now, when you made that decision, you
25 understood Google's theories of the case, right?

1   A.   Yes, sir.
2   Q.   You understood how Google was intending to
3 show it was harmed, right?
4   A.   Yes, sir.
5   Q.   When -- when you -- when you made the decision
6 to be its representative and doing your full scope, you
7 didn't think: Well, if I don't know if our customers
8 left, maybe I should find it out from someone?
9   A.   I can't know the future, sir. No, sir.
10  Q.   Well, all right. So you know -- as you sit
11 here today, you know for sure no customers have left as
12 of today, right?
13  A.   That's correct.
14       MR. ADAMS: No further questions, Your
15 Honor.
16       THE COURT: Additional direct?
17       MS. ANDERSON: Just briefly, Your Honor.
18 Thank you.
19       THE COURT: All right.
20               REDIRECT EXAMINATION
21 BY MS. ANDERSON:
22  Q.   Mr. Trinh, you were asked questions about
23 whether it -- about Beneficial's infringement contention
24 allegations. Do those contentions and allegations have
25 any value in your eyes in terms of proving that

217

## CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____     ___1/21/14_____
SHELLY HOLMES, CSR                          Date
Official Court Reporter
State of Texas No.:   7804
Expiration Date   12/31/14


/s/_____     ___1/21/14_____
SUSAN SIMMONS, CSR                          Date
Official Court Reporter
State of Texas No.:   267
Expiration Date   12/31/14