```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3  GOOGLE, INC.                    *    Civil Docket No.
                                    *    2:11-CV-229
 4  VS.                            *    Marshall, Texas
                                    *
 5                                 *    January 21, 2014
    BENEFICIAL INNOVATIONS, INC.    *    12:45 P.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                 UNITED STATES DISTRICT JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:    MS. CHRISTA ANDERSON
                          MS. JENNIFER HUBER
11                        Keker & Van Nest
                          633 Battery Street
12                        San Francisco, CA   94111

13
                          MR. MICHAEL JONES
14                        MR. ALLEN GARDNER
                          Potter Minton Firm
15                        110 North College Street
                          Suite 500
16                        Tyler, TX    75702

17

18  APPEARANCES CONTINUED ON NEXT PAGE:

19

20

21  COURT REPORTERS:      MS. SHELLY HOLMES, CSR
                          MS. SUSAN SIMMONS, CSR
22                        Official Court Reporters
                          100 East Houston, Suite 125
23                        Marshall, TX    75670
                          903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANT:     MS. JULIEN ADAMS
                       Dovel & Luner
                       201 Santa Monica Blvd.
                       Suite 600
                       Santa Monica, CA   90401

                       MR. DAVID ROSEN
                       Murphy Rosen
                       100 Wilshire Blvd.
                       Suite 1300
                       Santa Monica, CA   90401

                       MS. ELIZABETH DERIEUX
                       MR. JEFF RAMBIN
                       Capshaw DeRieux
                       114 East Commerce
                       Gladewater, TX   75647


        ************************************************

                    P R O C E E D I N G S


            (Jury out.)

            COURT SECURITY OFFICER:  All rise.

            THE COURT:  Be seated, please.

            All right.  Are the parties ready to

proceed?  Is there any reason the Court shouldn't bring

in the jury?

            Any reason from the Plaintiff?

            MS. ANDERSON:  No, Your Honor.  Thank

you.

            THE COURT:  From the Defendant?

 1                    MR. ADAMS:  No, Your Honor.

 2                    THE COURT:  If you'd bring in the jury,

 3  please, Mr. McAteer.

 4                    COURT SECURITY OFFICER:  Yes, sir.

 5  All rise for the jury.

 6                    (Jury in.)

 7                    THE COURT:  Please be seated.

 8                    Welcome back, ladies and gentlemen.  We

 9  may be technically inaccurate to say ladies, since we

10  have one lady on the jury, but I'm probably going to say

11  ladies and gentlemen throughout the trial.  You'll have

12  to forgive me.

13                    Thanks for being on time.  I have some

14  preliminary instructions that I want to give you before

15  we start with opening statement from the attorneys, and

16  then we'll proceed to hear the evidence.

17                    You've now been sworn as the jurors in

18  the case, and as the jury, you are the sole judges of

19  the facts.  You will decide and determine all the facts

20  in this case.  As the Judge, I will give you

21  instructions on the law, decide questions of law that

22  may arise during the trial, and handle matters of

23  procedure and evidence.

24                    I'm responsible for managing the flow of

25  the trial and maintaining the decorum of the Court.  At

1   the end of evidence, I will give you detailed

2   instructions about the law to apply in deciding this

3   case, and I will give you a list of questions that you

4   are then to answer.

5               This list of questions is called the

6   verdict form.  Your answers to those questions will need

7   to be unanimous, and those answers will constitute the

8   verdict in this case.

9               I now want to briefly tell you about the

10  case.  This is a civil action centering around a

11  settlement agreement that the Plaintiff and Defendant

12  previously entered into.  A settlement agreement is an

13  agreement between persons or corporations to resolve a

14  dispute.  The resolution takes the form of a written

15  contract, which is legally binding on the parties who

16  sign the agreement.  If a party failed to do something

17  that the settlement agreement requires it to do or did

18  something that the settlement agreement -- that the

19  settlement agreement prohibited it from doing, and the

20  other party has suffered harm because of the first

21  party's action, then contract law allows the party who

22  has suffered the harm to recover money damages.

23              In this case, the Plaintiff, Google,

24  claims that the Defendant, Beneficial, violated their

25  settlement agreement and seeks money damages on the

1  basis of that claim.  Beneficial denies that it violated

2  the agreement and denies that Google is entitled to any

3  award of money damages.

4            While this case is about a contract

5  dispute, several underlying issues that you will need to

6  decide relate to two United States patents and are

7  governed by patent law.  I know that you've seen the

8  patent film, but I want to give you some additional

9  instruction about a patent and how one is obtained.

10           Patents are granted or denied by the

11  United States Patent and Trademark Office, which I will

12  often call simply the PTO.  A valid United States patent

13  gives the holder the right, for up to 20 years from the

14  date the patent application was filed, to prevent others

15  from making, using, offering to sell, or selling the

16  patented invention within the United States or from

17  importing it into the United States without the patent

18  holder's permission.

19           A violation of a patent holder's rights

20  is called infringement.  The patent holder may try to

21  enforce a patent against persons it believes to be

22  infringers by a lawsuit filed in federal court.  The

23  process of obtaining a patent is called patent

24  prosecution.

25           To obtain a patent, one must first file

1  an application with the PTO.  The PTO is an agency of

2  the United States government and employs trained

3  examiners who review applications for patents.

4          And the application includes what's

5  called a specification, and the specification contains a

6  written description of the claimed invention telling

7  what the invention is, how it works, how to make it, and

8  how to use it.  The specification concludes or ends with

9  one or more numbered sentences.  These numbered

10 sentences are the patent claims.

11          When the patent is eventually granted by

12 the PTO, the claims define the boundaries of its

13 protection and give notice to the public of those

14 boundaries.

15          To help the -- to help you follow the

16 evidence in the case, I'm now going to give you a

17 summary of the positions of the parties.

18          The Plaintiff in this case, Google, Inc.,

19 who I will refer to simply as Google or the Plaintiff,

20 and the Defendant in this case is Beneficial

21 Innovations, Inc., who I will also refer to simply as

22 Beneficial or Defendant, Google and Beneficial entered

23 into a settlement agreement in 2010 granting Google and

24 its customers certain rights to practice two of

25 Beneficial's patents in exchange for the payment of

1   money by Google to Beneficial.

2              In 2011, Beneficial sued a number of

3   companies for infringing those two patents and some of

4   those companies were customers of Google.  Google

5   alleges that Beneficial has breached the settlement

6   agreement by bringing a patent infringement lawsuit

7   against those Google customers.  Google claims that

8   Beneficial owes it damages as a result of Beneficial's

9   breach, and to compensate Google for its expenses

10  resulting from the enforcement of the settlement

11  agreement.

12             Beneficial denies it has violated the

13  settlement agreement -- settlement agreement and denies

14  that Google is entitled to any damages or any other

15  relief.

16             Your job, ladies and gentlemen, is first

17  to decide whether Beneficial has violated the settlement

18  agreement.  If you decide that Beneficial has violated

19  the settlement agreement and Plaintiff, Google, has

20  suffered harm because of Beneficial's violation, you

21  will then need to decide what amount of money damages

22  are to be awarded from Beneficial to Google.

23             Now, my job in this case is to tell you

24  what the law is, handle the procedure and oversee the

25  conduct of the trial as efficiently and effectively as

1  possible.  In determining the law, it is specifically my

2  job to determine the meaning of any claim language that

3  needs interpretation.

4           Claim language -- claim language is the

5  language in those numbered paragraphs or sentences at

6  the end of each patent which I identified as the claims.

7           You must accept the meanings that I give

8  you and use those meanings when you decide whether any

9  particular claim has or has not been infringed and

10  whether or not any claim is invalid.

11          For any term for which I have not

12  provided you with a definition, you should apply the

13  ordinary meaning.  If I provided you with the

14  definition, however, you are to apply my definitions to

15  those terms throughout the case.

16          Nonetheless, my interpretation of the

17  language of the claims should not be taken by you as an

18  indication that I have a personal opinion or any opinion

19  at all regarding the issues such as infringement and any

20  other issues in this lawsuit.  Those issues are yours to

21  decide alone.

22          I'll provide you with more detailed

23  instructions on the meaning of the claims before you

24  retire to deliberate and reach your verdict.

25          In deciding the issues that are before

1  you, you'll be asked to consider specific legal rules,

2  and I'll give you an overview of those rules now, and

3  I'll give you much more detailed instructions later.

4            Again, the first issue you're going to be

5  asked to decide is whether Defendant, Beneficial, has

6  violated the settlement agreement.  To prove that

7  Beneficial has violated the settlement agreement --

8  settlement agreement, Google must prove that Beneficial

9  did something that the settlement agreement prohibited

10 it from doing or failed to do something that the

11 settlement agreement required it to do.

12           If you decide that Beneficial has

13 violated the settlement agreement, then you'll need to

14 decide whether Beneficial's violation caused damages to

15 Google.  And if so, the amount, if any, of those

16 damages.  In assessing damages, you should consider the

17 amount of money that will put Google in the same

18 position that it would have been in had Beneficial not

19 violated the settlement agreement.

20           If you decide that Beneficial has

21 violated the settlement agreement, but also that Google

22 was not harmed by the violation, you may still award

23 Google nominal -- nominal damages such as $1.  I'll give

24 you more detailed instructions on the calculation of

25 damages at the conclusion of the evidence.

1            Now, ladies and gentlemen, you're going

2  to hear a number of witnesses through this trial.  And I

3  want you to keep an open mind while you are listening to

4  the evidence and not to decide any facts until you have

5  heard all of the evidence.  While the witnesses are

6  testifying, remember that you and you alone will have to

7  decide the degree of credibility and believability to

8  allocate to the witnesses and the evidence.

9            So while the witnesses are testifying,

10  you should be asking yourself things like:  Does the

11  witness impress you as being truthful?

12            Does he or she have a reason not to tell

13  the truth?

14            Does he or she have any personal interest

15  in the outcome of the case?

16            Does the witness seem to have a good

17  memory?

18            Did he or she have the ability to observe

19  accurately the things they testified about?

20            Did the witness appear to understand the

21  questions clearly and answer them directly?

22            And, of course, does the witness'

23  testimony differ from that of any other witness; and if

24  it does, how does it differ?

25            These are the kinds of things you should

1 be thinking about while you're listening to the

2 witnesses in this case -- to each witness.

3                    The court reporter in front of me is

4 taking down everything that is said in the courtroom.

5 But the written transcription of that will not be ready

6 for you to use in time when you begin your deliberations

7 in this case.  The transcript is prepared in case there

8 is an appeal from this Court to a higher court.  So that

9 being the case, you will each have to rely on your

10 memories of the evidence.

11                    In a moment, you're each going to be

12 given a juror notebook.  One of the things in the back

13 of that notebook is a legal pad full of blank pages that

14 you can use to take notes on.  It's up to each of you to

15 decide whether or not you want to take notes during the

16 trial, and if you do, how detailed you want those notes

17 to be.  But remember, those notes are for your own

18 personal use.  You will have to rely on your memory of

19 the evidence, which is why you should pay close

20 attention to the testimony of each witness.

21                    You should not abandon your own

22 recollection because somebody else's notes indicate

23 something different.  Your notes are to refresh your

24 recollection, and that's the only reason you should be

25 keeping them.

1            I'm now going to ask Mr. McAteer to pass

2    out these juror notebooks to the members of the jury.

3    Everybody have a juror notebook?

4            Okay.  In those notebooks, you'll see

5    that there are several things.  There are copies of the

6    patents that we've talked about.  There are copies of

7    the settlement agreement.  You'll also find a listing of

8    the claim terms that relate to the patents.  Those are

9    the words found in the numbered claims I've told you

10   about before.  And then there's a construction column.

11   That's the definition that the Court has given you to

12   work with in regard to those particular terms.

13           Also you'll find that you have witness

14   pages for each witness that may testify in the case, and

15   those pages contain a photograph of the witness at the

16   top of the page, along with their name so that you'll

17   have a point of reference as you recall their testimony

18   during your deliberations.

19           Those juror notebooks, ladies and

20   gentlemen, should either be with you in the jury box or

21   they should be on the table in the jury room.  They

22   should be no other place.  There may be times we'll take

23   a short recess where I'll tell you that you can leave

24   them in your chairs in the jury box, if you're only

25   going to be in recess for a few minutes.  But as a

1   general rule, they should be either in your hands or on

2   the table in the jury room when you go home at night.

3           Also as I mentioned, there's a legal pad

4   in the back for you to take notes on, and you should

5   find a pen in each of those notebooks as well.

6           Now, if you'll just close those for a

7   second, you'll have plenty opportunity to come back and

8   look at those later, but I want to give you my final

9   instructions before we hear the opening statements from

10  the attorneys in the case.

11          Each side is going to make an opening

12  statement in just a moment.  You need to understand that

13  each side's opening statement is not evidence.  What the

14  lawyers tell you is not evidence.  It's simply their

15  explanation of what they hope and expect that the

16  evidence will show.  The evidence in this case is the

17  sworn testimony of the witnesses, together with the

18  exhibits which are admitted into evidence for your

19  consideration.  That is the evidence in this case.

20          As the jury in this case, you're going to

21  be required to apply a burden of proof known as the

22  preponderance of the evidence.

23          As I mentioned to you during jury

24  selection, when a party has the burden of any claim or

25  defense by a preponderance of the evidence, it means

1  that you, the jury, must be persuaded by the credible or

2  believable evidence that that claim or defense is more

3  probably true than not true.

4            I'll say that again.  More probably true

5  than not true.  Sometimes this is talked about as being

6  the greater weight and degree of credible testimony.

7            I just gave you the illustration about

8  the Scales of Justice and the evidence throughout the

9  trial being placed on those scales, and if they tip even

10 ever so slightly in the favor -- in favor of the party

11 having the burden of proof by a preponderance of the

12 evidence, then that party has met that burden of proof.

13 So I won't go through that again in detail with you.

14            None of this is to be confused with any

15 other burden of proof, including beyond a reasonable

16 doubt, which applies only in a criminal case and will

17 have no application in this case.

18            Also, ladies and gentlemen, I want to

19 talk to you briefly about the -- the use of expert

20 witnesses.

21            When knowledge of a technical subject

22 matter may be helpful to you as the jury, a person who

23 has special training and experience in that particular

24 field -- we refer to them as -- as an expert witness --

25 is permitted to testify to you about his or her opinions

1   on technical matters.

2              However, you're not required to accept

3   those opinions at all.  It's up to you to decide whether

4   you believe an expert witness or any witness for that

5   matter and whether you believe they're correct or

6   incorrect or whether you want to believe what they say

7   or don't want to believe what they say.

8              I anticipate that there will be expert

9   witnesses in support of each side in this case.  But

10  it's up to you to listen to each expert's

11  qualifications, and when they give an opinion and

12  explain the basis for that opinion, you'll have to

13  evaluate what they say, whether you believe it, and what

14  degree, if any, you want to give weight to that opinion.

15             Also, during the trial, Ladies and

16  Gentlemen, I anticipate that testimony is going to be

17  presented to you through what are called depositions.

18             In trials such as this, it's nearly

19  impossible to get every witness to appear physically in

20  open court.  So lawyers from each side, prior to the

21  trial, take the deposition of the witnesses.

22             In a deposition, the witness is present.

23  A court reporter is present.  The witness is sworn and

24  placed under oath just as if he or she were personally

25  in court.  And then the parties ask them questions, they

1  give answers, and that process is recorded and

2  transcribed.

3          Portions of those video recordings of the

4  questions may be played back to you as part of the trial

5  in this case so that you can see the witness and hear

6  their testimony even though they're not physically here

7  in Court.

8          That deposition testimony is entitled to

9  the same consideration, and insofar as possible, is to

10 be judged as to its credibility, weighed and otherwise

11 considered by you as the jury in the same way as if the

12 witness had been present and given their testimony from

13 the witness stand in open Court.

14         Also, during the trial of this case, it's

15 possible that the lawyers for one or both sides will

16 make objections from time to time, and I'll make rulings

17 on those objections.  It's the duty of each attorney on

18 each side of the case to object if they think the other

19 side is offering testimony or evidence which is not

20 proper.

21         Upon allowing the testimony or other

22 evidence to be introduced over the objection of an

23 attorney, the Court does not, unless expressly stated,

24 indicate an opinion as to the weight or effect of such

25 evidence.

1          As I stated before, you are the sole

2   judges of the credibility of all the witnesses and the

3   weight and effect to be given to all the evidence.

4          I do want to compliment the attorneys in

5   this case, because prior to your selection this morning,

6   many hours were spent going through the exhibits in this

7   case and hearing objections as to their admissibility.

8   And those objections, many of them have been heard, and

9   the great majority have been dealt with, and that will

10  save us a lot of time during the presentation of this

11  trial.

12          Even so it's still possible that there

13  will be objections made, and if so, I'll rule on them.

14  But you can consider that if the parties publish or use

15  before you an exhibit, that the Court has already ruled

16  on its admissibility.

17          And they'll ask such questions as they

18  wish to about it to put it in context, but they have

19  saved us all a lot of time by working with the Court

20  through those issues in advance of the trial.

21          However, if there's still an objection,

22  if I sustain the objection to a question, you must

23  disregard the question entirely, and you may draw no

24  inference from its wording or speculate about what the

25  witness would have said if I had permitted them to

1  answer the question.

2           If I overrule an objection, you should

3  consider the question and the answer just as if no

4  objection had been made.

5           Now, the law in the United States permits

6  a judge in federal court to comment to the jury on the

7  evidence in the case, but such comments are only an

8  expression of the judge's opinion as to the facts, and

9  the jury has the freedom to disregard those comments in

10 their entirety, because as I remind you, again, you are

11 the sole judges of the facts in this case, the

12 credibility of each witness, and how much weight to be

13 given to the testimony.  That's your job, not mine.

14 But as I've indicated to you earlier, despite the fact

15 the law may allow me to do that, I'm going to try very

16 hard not to comment on any of the evidence or the

17 witnesses throughout the trial.

18           We're going to begin with opening

19 statements in just a few minutes, but before we do that,

20 I want to give you a brief roadmap of how the trial is

21 going to be structured.

22           After the opening statements, the

23 Plaintiff, Google, will present its evidence in support

24 of its claim that Defendant, Beneficial, has violated or

25 breached the settlement agreement.

1          Google must persuade you that it is more

2   likely than not that Beneficial violated the settlement

3   agreement, that is, by a preponderance of the evidence.

4          Google will also present its evidence on

5   damages.  Then after it has presented its evidence and

6   Google rests, the Defendant, Beneficial, will put on its

7   evidence responding to Google's proof regarding

8   violations of the settlement agreement and regarding

9   damages.

10          Then once Beneficial has rested, Google

11  may put on additional evidence responding to

12  Beneficial's evidence.  This is referred to as rebuttal

13  evidence.  The Plaintiff's rebuttal evidence may respond

14  to any evidence offered by the Defendant.

15          Then once the Plaintiff rests with regard

16  to their rebuttal case and all the evidence has been

17  presented, I will give you final instructions.  Then the

18  lawyers will prevent -- present their closing arguments.

19          And after that, you will retire to the

20  jury room to deliberate upon and reach your verdict in

21  this case.

22          To repeat my earlier instruction, you are

23  not to discuss this case among yourselves during the

24  trial.  Only when all the evidence has been heard and I

25  instruct you to retire to the jury room to deliberate on

1  your verdict, then and only then may you discuss the

2  case among yourselves.

3           All right.  I'll call for announcements

4  at this time.  In the case of Google versus Beneficial,

5  Case No. 2:11-CV-229, what says the Plaintiff?

6           MR. JONES:  We're ready to proceed, Your

7  Honor.

8           THE COURT:  What says the Defendant?

9           MR. RAMBIN:  Ready -- excuse me -- ready

10 to proceed, Your Honor.

11          THE COURT:  All right.  Counsel, if you

12 have witnesses who you know will be testifying in this

13 case and they're present and available, I'd ask them to

14 all come forward at this time, and I'll have the

15 Courtroom Deputy administer the oath to them

16 collectively.

17          If you're going to be a witness in this

18 case, please come forward and be sworn.

19          (Witnesses sworn.)

20          THE COURT:  Thank you.  You may return to

21 your prior positions.

22          All right.  Does either side wish to

23 invoke the Rule in this case?

24          MS. ANDERSON:  Yes, Your Honor, Google

25 would, with the exception of corporate representatives

1  and experts.

2                    THE COURT:  All right.  The Rule has been

3  invoked with regard to all witnesses, except those that

4  are corporate representatives or expert witnesses.

5  This means, if you are not an expert witness in this

6  case and you're not a corporate representative, but you

7  expect to testify, then you must exit the courtroom at

8  this time and remain outside of the courtroom until

9  you're called to testify.

10                    If there's anyone that falls in that

11  category in the courtroom, please exit the courtroom at

12  this time.

13                    The Court will note for the record the

14  Rule has been invoked.

15                    (Witnesses leave the courtroom.)

16                    THE COURT:  All right.  We'll proceed

17  with opening statements.

18                    The Plaintiff may make its opening

19  statement to the jury.

20                    MS. ANDERSON:  Thank you, Your Honor.

21                    THE COURT:  Would you like a warning as

22  to your time, Ms. Anderson?

23                    MS. ANDERSON:  Yes.  Thank you very much,

24  Your Honor.  Five minutes will be wonderful.

25                    THE COURT:  All right.  You may proceed.

1          MS. ANDERSON:  Good afternoon, ladies and

2    gentlemen.

3          It is a privilege to stand here with you

4    today on behalf of Google, a company that perhaps some

5    of you have seen on search engine pages.  Ladies and

6    gentlemen, I'd like to start to also thank you -- thank

7    you again for your time and the service of our country's

8    justice system.  It is a very important service, and we

9    are all very grateful for the time that you are spending

10   with us here today.

11         I'd like to begin, again, introducing the

12   people who are with us today here, lawyers for Google,

13   at our table.  Again, I'm Christa Anderson.  We have Mr.

14   Mike Jones, who you spoke with earlier, an attorney with

15   Potter Minton for Google.  Also with us is Mr. Mike

16   Trinh, an attorney employed by Google, our corporate

17   representative.  And also with us is Jennifer Huber, who

18   practices law with me as an attorney for Google at the

19   law firm of Keker & Van Nest.

20         We thank you so much for your time.

21         Ladies and gentlemen, we are here today

22   because of promises, promises that were made by

23   Beneficial to Google and promises that were broken by

24   Beneficial.

25         Now, what promises are we talking about?

1              During the course of this case, ladies

2  and gentlemen, you will hear testimony from witnesses.

3  You'll see documents that are exhibits in the case about

4  these promises.  But they fundamentally boil down to

5  four key points of evidence.

6              The first of these is that in the year

7  2010, Google and Beneficial agreed to a contract to

8  settle some lawsuits that had been filed by Beneficial

9  against Google and some of its customers.

10              You will hear evidence that Google agreed

11 to pay and, in fact, did pay almost $2 and a half

12 million.  It paid that money to Beneficial in exchange

13 for Beneficial giving Google and customers rights, known

14 as patent licenses, to use Beneficial inventions in

15 certain circumstances.  And Google paid that money for

16 freedom from litigation for itself and its customers

17 under the terms of the contract.

18              The third key point of evidence:  Google

19 paid that money for freedom from litigation to use

20 Beneficial inventions under the terms of the contract.

21              And finally, the fourth key point of

22 evidence:  Within a year, ladies and gentlemen, of

23 taking Google's money, the almost $2 and a half million

24 paid by Google, Beneficial broke its promises and sued

25 Google customers for using Google products in their

1    advertising.

2              Ladies and gentlemen, these key points of

3    evidence which you'll hear about during the course of

4    the trial will show to you that Beneficial indeed broke

5    its promises and breached its contract with Google.

6              Now, I'd like to be clear.  Google is not

7    here asking for a large award of money to it.  In fact,

8    Google is only asking for $1 in damages to be awarded by

9    this jury.  But what Google is also asking is that this

10   jury find -- find that what Beneficial did was breaking

11   its promises; find that it was a breach of contract so

12   that Beneficial doesn't do this in the future to other

13   Google customers.

14             So we're going to talk about this more in

15   detail in a few minutes, but I just wanted to show you

16   upfront, again, the settlement agreement which actually

17   is in your juror notebooks and is going to be the

18   discussion during this trial.  This is the agreement

19   between Google and Beneficial from the year 2010 and was

20   supposed to end the disputes between Google and

21   Beneficial over some lawsuits Beneficial had filed

22   against Google and customers over the way that they were

23   advertising on websites on the Internet.

24             In a nutshell, in those earlier lawsuits,

25   Beneficial was claiming that Google and its customers

1 were using Beneficial patents in the way they were doing

2 their advertising.

3            So I'd like to -- again, just to make

4 sure we focus quickly and show you some of the key parts

5 of the agreement, on the second page of the settlement

6 agreement, which you'll have before you during the

7 course of the case, there is a provision for licenses.

8 And we'll talk about this in more detail.

9            But this Section 2 entitled Licenses

10 Under the Settlement Agreement, will be the focus of

11 discussion of much of the evidence in the course of the

12 case, because it lays out the terms where Beneficial

13 made a promise that it was giving the right to Google to

14 use Beneficial inventions but also giving certain rights

15 to Google customers to use Google products as part of

16 what they were doing in their business as long as they

17 met the conditions of the contract.

18            And it's this provision, and I've

19 highlighted in yellow for you here that we're going to

20 spend a lot of time talking about during the course of

21 the case.

22            You'll also see in the settlement

23 agreement that Section 3, right after the licenses, laid

24 out how much Google was required to pay for those

25 licenses for itself and its customers, and that it, in

1  fact, did pay.

2            But within a year of Beneficial taking

3  Google's money in 2010, Beneficial turned around and

4  sued Google's customers, different Google customers but

5  nonetheless Google customers of ad products again.  That

6  is the heart of what we'll be discussing during the

7  course of this trial.

8            Now, what Google products matter in this

9  case?

10           You may be familiar with Google from your

11 use of other Google products, but the products we're

12 going to be talking about in this case relate to

13 advertising.  Google has a line of products and services

14 which are known as DoubleClick products and services.

15           As a very general matter, they're

16 products and services that allow a company that has a

17 website, that company would like to make some money by

18 carving out a piece of their website and rent it to

19 someone else to advertise there.  It's kind of like

20 perhaps a billboard where someone earns a billboard and

21 might like to earn some money renting it to another

22 company who wants to advertise there.

23           Let's see an example.  Take a country

24 news website like Country Weekly.  Country Weekly has

25 this website and might decide it would like to block out

1   some room at the top right there (indicating).  I don't

2   know if you can see, but at the top right, there's a

3   little long square advertisement for iTunes.

4            Country Weekly needed technology to be

5   able to do this.  And DoubleClick ads, products, and

6   services offered that technology to websites like

7   Country Weekly so they can earn some money renting spots

8   to companies like iTunes.  And here we just have shown a

9   little bit sort of what's going on behind the scenes,

10  and we'll hear more about this during the course of the

11  case.

12           But there's actually computer code and

13  technology, and we've shown some at the bottom here, and

14  language and things that are called ad tags, which are

15  the technology that DoubleClick offers, products and

16  services related to Google DoubleClick ad tags that

17  allow these advertisements to be made by companies like

18  Country Weekly.

19           You'll learn that Google actually bought

20  a company called DoubleClick back around 2008, and

21  purchased that company and the products that it had and

22  made it a part of Google.  So now Google offers the

23  DoubleClick ad products and services as part of the

24  products and services it offers from the company to its

25  customers.

1              Now, in the year 2007/2008, that

2    timeframe, the purchase of DoubleClick wasn't the only

3    thing that was happening relevant to this case.  The

4    other thing that happened relevant to this case in 2007

5    is that was the year that Beneficial first sued Google

6    and customers for using Beneficial inventions on

7    websites.

8              Now, I'll touch very briefly on some

9    information about patents, ladies and gentlemen, which

10   you have heard, and the Judge instructs you on all the

11   law and the Judge's instructions govern, but just

12   descriptions of patents that you've heard, patents are

13   generally given by the government for invention.  It

14   gives the owner the right to prevent others from using

15   the patented invention.

16              A violation of someone's patent is called

17   patent infringement, terms you'll hear a lot during the

18   course of this case.  And a patent owner can choose to

19   give rights to someone else to use the patented

20   invention, and that's often referred to as a license.

21              So, for example, I have a car, and I use

22   my car to go to work.  And once in a while, I might

23   decide to give my older son permission to drive the car

24   on one day.  So he has a license to do that on that day,

25   not every day, but that day, I gave him the right to do

1    it.  So something like a license.

2                The patents at issue in this case, you

3    may hear referred to shorthand as the '702 and the '943

4    patents.  And they're in your juror notebooks, but the

5    reason we call them the '702 and the '943 patent is that

6    every patent has a number.

7                And I've shown you on the slide the --

8    the cover page of each patent.  But on the cover page,

9    you'll see at the top right corner is a very long

10   number, and it's just such a mouthful that -- that we'll

11   call them by the last three numbers to make it a little

12   bit easier.

13               But as a general matter, these patents

14   are related.  They have the same inventors.  And you'll

15   learn in the course of the case, the claims that matter

16   to this case are generally related in nature of the

17   invention that they claim, a way of putting advertising

18   content and combining in-service-related content in

19   connection with viewer website.

20               So back to the lawsuits.  2007,

21   Beneficial sued Google and other companies and sued them

22   again in 2009.  The 2007 lawsuit was on the '702 patent.

23   The 2009 was on the '943 patent.  But both those cases

24   generally alleged that Google and customers infringe

25   those patents both by direct and indirect infringement.

1          And, again, the Judge will instruct you

2   on the law, and it is the Judge's instructions that

3   govern.  I believe as a general matter, the Judge will

4   tell you direct infringement generally is where someone

5   is using all the parts, all the limitations of a

6   particular claim.

7          And indirect infringement.  What does

8   indirect infringement mean?  Well, again, the Judge will

9   instruct you on the law here.  The Judge's instructions

10  govern.

11          But as a general matter, just to give you

12  a flavor of -- of the nature of what indirect

13  infringement is -- and there are -- there are lengthy

14  elements that are talked about in the instructions as to

15  what this is, but as a general matter, indirect

16  infringement comes in two flavors.

17          One of them is called inducing

18  infringement, and one of them is called contributory

19  infringement.  So the act of encouraging or instructing

20  others to infringe a patent is often referred to as

21  inducing infringement.

22          The act of contributing to the

23  infringement of others by supplying them, for example,

24  with a material component for that infringement might be

25  referred to as contributory infringement.

1          Just as an example, what does that mean?

2     Well, for example, if I -- again, I have a car, and I

3     sometimes let my son drive, and sometimes I don't, but

4     if my younger son eggs him on and encourages him to take

5     the car without permission, that might be inducing

6     infringement.  He didn't have a license to do it that

7     day.

8          But for contributory infringement, if my

9     younger son takes the keys to give my son to drive the

10    car the day he didn't have permission, that might be

11    contributory infringement, giving someone a material

12    component to do something he wasn't supposed to do.

13         So we're talking about the lawsuits that

14    Beneficial filed against Google and its customers.  When

15    Google learned it was sued, it took the allegations very

16    seriously.

17         Beneficial and Google fought for years in

18    the lawsuit, but over the years, Google eventually

19    decided it would stop fighting and instead decided to

20    pay money to Beneficial for rights to using the

21    inventions both for itself and for customers under the

22    terms in the contract.

23         So it paid that money for freedom from

24    lawsuits for those customers when they were using the

25    inventions in the ways described in the settlement

1    agreement.

2                 Let's talk about some of the important

3    provisions.  You'll see in the contract, the settlement

4    agreement, there's a definition of partners, and you'll

5    see that it includes customers.

6                 So you'll hear in the course of the case,

7    sometimes people refer to partners, sometimes customers,

8    but that's because in the agreement, the licenses go to

9    partners, and among partners is defined including

10   customers, like Google customers.

11                Again, the settlement agreement

12   provision, that will matter the most perhaps in the

13   course of the evidence you hear, and all the evidence

14   you hear, you decide on the appropriate weight for it,

15   but one important provision of this agreement is the

16   license.

17                And this is the license that Google paid

18   the $2.45 million for.  Let's break it down just a

19   little bit more for you.  It's called -- we call it

20   little sub (ii).  It's in Section 2(a).

21                And in this provision of the license, if

22   you can follow along with me, it talks about the

23   Defendants and their affiliates, past, current, and

24   future partners.  Partners include customers.

25                So Google and its affiliates are talking

1   about, among other things, Google's customers.  Those

2   customers have a license but only to the extent of that

3   partner's role in making, having made, or using,

4   selling, offering for sale, or importing any products or

5   services of the Defendants.

6                So Google's products and services would

7   be covered with respect to that.  And then going down,

8   but also only to the extent that what the partner was

9   doing here, using Google products and services would

10  constitute direct or indirect infringement of one of

11  Beneficial's patents.

12               So you'll be hearing a lot during the

13  course of the case about whether or not what the

14  customers were doing are licensed under this provision.

15  And you'll even see that the -- the settlement agreement

16  gives an example of this, making it clear that Google is

17  not claiming here that Google's customers have a

18  universal right to use Beneficial inventions whenever

19  they want.

20               But when it meets the terms of the

21  contract, when they're using Google products and

22  services and when it would constitute indirect

23  infringement were it not for the license, then this is

24  something that is licensed under the provisions of the

25  contract.

1            Now, you'll hear arguments potentially

2  from Beneficial during the course of the case claiming

3  that Google has to -- had to admit infringement as part

4  of this settlement agreement in order to have rights

5  under the licenses.  And that's not so.

6            You'll see in the course of the evidence

7  that there's a provision in the agreement making clear

8  that nothing in the agreement shall constitute an

9  admission of infringement by Google.  These are disputed

10  charges, and Google preserved as part of its rights

11  under the settlement agreement it would not have to

12  admit infringement.

13            So what happened after the 2010

14  settlement agreement?  Well, again, less than a year

15  later, another lawsuit was filed by Beneficial.

16  Beneficial sued Google customers, including Advance,

17  ALM, America Media, Autotrader, and Demand Media for the

18  way they were advertising on their websites claiming

19  they were advertising in a way that infringed the same

20  patents, the '702 and '943 patents, and -- and alleging

21  that they were infringing in just the way that Google

22  instructs them to use DoubleClick ad products and

23  services to put ads on our websites.

24            So Google learned about these lawsuits

25  and learned about them because the customers were

complaining to Google:  Hey, we've been sued.  What are you going to do about it?

So Google reached out to Beneficial and said:  Please confirm to our customers that while you may be suing them on use of other products, you're suing on the use of Google's products, and here, the way that you're suing and the allegations you're making are things that are licensed.  Please confirm you're not suing for customer's use of DoubleClick ad products and services.

But Beneficial refused to do that and continued to sue them for the use of Google DoubleClick products.

So Google hired lawyers and came to Court and asked to be part of this case in order to prove that the customers were licensed, and Beneficial never should have filed these lawsuits in the first place.

So because of their use of Google's DoubleClick products and the way it's been claimed in this case, they satisfy the terms of the settlement agreement and its license.

So how do we know that Beneficial has broken its promises?  Three important points to know here, ladies and gentlemen.

First, the first point we see up here:

1  Google customers use DoubleClick to show ads on their

2  websites.  This is not a disputed point in this case.

3  The customers that were sued, included customers that

4  one of the ways they get ads on their websites was using

5  DoubleClick ad products and services.

6           And remember, using Google products is

7  part of the license provision that we were talking about

8  a little earlier.

9           Second, the second bullet point we see

10  here is that we know that Beneficial has breached, and

11  the evidence will show that Beneficial has breached,

12  because what Google does to instruct and encourage

13  customers, the way they instruct and encourage them to

14  use their ad tags would constitute inducement of

15  infringement pursuant to what Beneficial says is

16  infringing its patents.

17           And finally, it was licensed because

18  Google contributes important components, Google

19  DoubleClick ad products and services, to the very things

20  Beneficial says are infringing.

21           Now, let's go back to -- discussing the

22  inducement question, what evidence are we going to hear

23  about to show that, in fact, Google customers are

24  licensed?  Because what Google does is inducement of

25  infringement, according to what Beneficial claims

1  infringe its patents.

2           Well, some of the key evidence you will

3  hear in the course of the case is from the words of

4  Beneficial itself.  When Beneficial sued Google's

5  customers, it was required under the court rules to

6  actually lay out in great detail in a very long document

7  all the reasons it believed Google's customers infringed

8  the patents, the Beneficial patents.

9           And what Beneficial says in that document

10 is infringing of those patents is exactly what Google

11 instructs and encourages its customers to do with Google

12 products, and that means it is licensed under -- under

13 the agreement.

14           THE COURT:  Five minutes remaining,

15 Counsel.

16           MS. ANDERSON:  Thank you, Your Honor.

17           Now, you will hear potentially arguments

18 during the course of this case that Google cannot prove

19 indirect infringement, because in this case, it denied

20 its customers were infringing.  But, ladies and

21 gentlemen, there is nothing inconsistent about that.

22 Google does not believe its customers infringe because

23 they are licensed.  They had the right to use the

24 invention.  They are not infringers.

25           You will hear evidence on the subject

1    of -- of Google and the inducement question from

2    Mr. Jonathan Bellack, director of product management at

3    Google, and he will tell you about the things that

4    Google does to instruct and encourage customers to use

5    DoubleClick in just the way Beneficial claims infringes

6    the patents, including, clear, getting-started guides

7    that instruct our customers how to use our ad tags and

8    get the ads on websites in just the way Beneficial

9    claims infringes.

10              And he will also tell you about a 24/7

11   support structure we have available.  It's there to

12   instruct and encourage customers on how to use our

13   products and get them -- get those ads on the websites.

14              Final point, ladies and gentlemen, on the

15   subject of contribution, how do we know that under

16   Beneficial's theory of what infringes its patents that

17   Google contributes to that infringement?

18              Well, we know because testimony you'll

19   hear, again, from Mr. Jonathan Bellack and the documents

20   that he will show you in the course of his testimony, he

21   will explain to you the purpose of Google's DoubleClick

22   ads is to display ads on websites.  That's what it does.

23   That's what it does.

24              Of course, that's an important component

25   of Beneficial's invention in the way they describe it.

And, in fact, you'll hear from Mr. Sheldon Goldberg, who

will tell you that what Google DoubleClick ad products

and service make possible, getting an ad on a website,

is the essence of his invention.  He explains to you.

He explained in testimony in this case that his

invention, it deals with the display of an advertisement

along with website information at the same time that the

user does.  That's generally what it does.

So Google's DoubleClick contributes

important components to what Beneficial claims infringes

its patents.  And you will hear from Beneficial and

Beneficial will argue:  Well, Google is not really

contributing to infringement under that theory, because

Google's DoubleClick has substantially non-infringing

uses.  But as you hear the evidence, you will learn that

what Beneficial claims is substantial actually is not

and requires a misreading of the patents in -- in the

way they're applying that theory.  And you'll hear more

about that.

So, ladies and gentlemen, back to the

final slide, back to the key points of evidence, these

key points of evidence, ladies and gentlemen, will show

you that what Beneficial has done here is a breach of

the contract.  They broke their promises, and they sued

customers when they shouldn't have.

1          So we will ask you to find at the end of

2   this case that what Beneficial has done is wrong and is

3   indeed a breach of contract.

4          We ask that you send this message to

5   Beneficial so that they don't sue customers in the

6   future.

7          Thank you, ladies and gentlemen.

8          THE COURT:  All right.  We'll now hear

9   opening statements from the Defendant.

10          Mr. Adams, would you like a warning on

11   your time?

12          MR. ADAMS:  Yes, Your Honor, three

13   minutes.

14          THE COURT:  All right.  Three minutes, it

15   is.  Proceed when you're ready.

16          MR. ADAMS:   Your Honor, thank you.  May

17   it please the Court.

18          Members of the Jury, good afternoon.

19          In the course of this trial, there will

20   be many things that the parties do not dispute.  We

21   don't dispute that in 2007, Beneficial Innovations sued

22   Google for infringement of one of its patents.  We don't

23   dispute that in 2009, Beneficial brought a second

24   lawsuit against Google for infringement of a second

25   patent.

1              There is no dispute that after some

2    litigation, the parties decided to resolve their

3    disputes by entering into a settlement agreement.

4              There's also no dispute that after that

5    settlement agreement was entered into, Beneficial sued

6    other companies.  There's no dispute that some of those

7    companies are what is known as partners or customers of

8    Google.

9              Where the parties diverge is whether or

10   not Beneficial was prohibited from suing those customers

11   under the terms of the license agreement.  Now, the

12   Court has placed in your juror notebooks a copy of the

13   settlement agreement.  You've also received the copies

14   of the two patents that are at issue.

15             And while the Court has told you that

16   this is a breach-of-contract case, this really is -- as

17   my colleague said to you in the voir dire, this really

18   is a case within a case.  The reason the patents are

19   there is because, when we go through the terms of this

20   settlement agreement, you will understand that whether

21   Beneficial was wrong or not depends on infringement

22   issues.

23             What I want to do is I want to put on the

24   board one of the patents.  This is the '702 patent.  The

25   next past is the '943.  You will have the patents.  In

1 the patents, there are numerous claims.  For the '702

2 patent, the claim that was asserted against Google and

3 the claim that was asserted against all the other

4 Defendants was Claim 53.

5 The '943 patent has about a hundred or so

6 claims in it, and there were three additional claims

7 that we asserted.  The claims are what sets forth the

8 invention.  So when you want to figure out whether or

9 not something was part of the invention or part of a

10 component of the invention, you look at the claims.

11 One of the things that we want to discuss

12 is whether or not DoubleClick, which is their ad-serving

13 technology, was a part or material part or any part of

14 the claims that were asserted.  And what I've done here

15 is I've placed on the board these letters.

16 And the reason I did that is this:

17 Claims are broken down into what we call limitations or

18 elements.  And when you read the patents, you'll see it

19 has a Step A, a Step B, a Step C, a Step D.  All of

20 these combine to make the invention.  What was the

21 invention?

22 Well, let's start with what I've labeled

23 here as the preamble.  The preamble is what starts off,

24 and it tells you sort of what's going on here.  And what

25 the preamble of Claim 53, for example, says:  This is an

1  apparatus for a service on a communications network

2  comprising of certain things.

3             When we talk about an apparatus, what are

4  we talking about?

5             Well, in the cases, including the case in

6  which we asserted against Google and all of the other

7  Defendants, the apparatus that we were suing, they were

8  websites.  They weren't parts of a website.  The

9  apparatus was the website.  And that's because the

10  apparatus had to be something that provided a service to

11  a user, a service such as access to streaming video,

12  access to news, access to shopping.  That was the nature

13  of the inventions that are included in both of the

14  patents.

15             The key to the invention is that the

16  apparatus had to have what we call computer -- well,

17  programmatic elements is a claim term, but the Court

18  defined it as computer readable instructions.  And

19  you'll have that in your notebook.  Those instructions

20  had to allow the website to do certain things in order

21  for the user who went to the website to see a webpage

22  that looked like this, a webpage that had services that

23  were being rendered, such as looking at a newspaper,

24  displayed concurrently with advertising.

25             That's a little bit about the invention

1  and what the lawsuits were about.

2              The question that you have to answer is

3  whether or not DoubleClick, the ad-serving ad tags,

4  whether or not they constituted a material part of this

5  invention.  We're going to show you that it doesn't.

6              Now, the key questions in this case, and

7  the only one is, did we breach the settlement agreement

8  by suing their customers.  And to answer those

9  questions, I'm going to spend a few minutes discussing

10  the scope of the license that was given.  I'll talk to

11  you about the very, very essential question in this

12  case, which is whether Google indirectly infringed the

13  patents based on its partner's use of DoubleClick.  And

14  then finally, I'm going to spend a half a minute on

15  damages.

16              What about the scope of the license?

17              Settlement agreement, you have it in your

18  notebook.  There are two things you'll learn about the

19  settlement agreement in this case.  One is, there was no

20  promise made by Beneficial not to sue Google's partners.

21              Second thing you will learn is that the

22  license that Google bargained for and the license that

23  was given was not a blanket license to their customers,

24  but it was conditional.  And we'll talk about that.

25              What about this promise?

1          Well, you'll see a lot of sections in the

2    license agreement, but I want you to focus on Section 6.

3    This is the section where the parties placed what's

4    known as a covenant not to sue.  The covenant is another

5    way of saying a promise.  So what the parties did is sat

6    down and negotiated.  They said:  Look, in this section,

7    we will say, Beneficial, you promise not to sue certain

8    people.  Read all of this language.

9          What you'll see is that the only entity

10   that Beneficial promised not to sue, after we entered

11   the license agreement, was Google and its affiliates and

12   certain other companies that were part of the case,

13   including NBC Universal.  There was no covenant, no

14   promise negotiated by any of the parties that Beneficial

15   couldn't sue Google partners.

16         Well, what did they get?  What did Google

17   bargain for?

18         Well, they bargained for a license.  And

19   what we're going to do in this case is we're going to

20   show you the terms of the license.  As Defense

21   counsel -- or Plaintiff's counsel said, the license

22   applied to their partners.  In fact, what it says here,

23   future partners, it's defined as the customers.  And in

24   the case that we were in when Google intervened, their

25   customers included these Defendants:  Advance

1  Publications, ALM Media, Auto Trader.  They were the

2  partners that were involved in our litigation.

3              The license didn't stop there, though.

4  It didn't say we're going to license their partners.

5  The language went on to say:  You're licensed but only

6  to the extent of the partner's role in using products by

7  Google.

8              We don't dispute that.  The product at

9  issue is DoubleClick, which is their ad-server

10 technology.  Now, Members of the Jury, if the license

11 stopped there, maybe Google has a claim, but it doesn't

12 stop there.

13             It goes on to say:  And only to the

14 extent that such use -- that is, the partners use of

15 DoubleClick -- would constitute either direct or

16 indirect infringement of a claim by Google.

17             Now, in this case, there's no question

18 about direct infringement.  Google doesn't contend that.

19 They don't say that the partner's use of DoubleClick

20 means that Google directly infringes.  They're arguing

21 that the use constitutes indirect infringement.  This is

22 a tricky part of the license agreement, and because it's

23 tricky, we did something else.

24             We have Section B that has a

25 for-avoidance-of-doubt section.  What this section does

1  is it further explains and clarifies exactly what the

2  parties meant the scope of the license was.  It says:

3  This license does not license your partners simply

4  because the partner uses a product or service applied by

5  the Defendants.  In this case, DoubleClick.

6          We spell it out.  Just because they're

7  using DoubleClick doesn't mean they're licensed.  There

8  are certain things that have to happen.  Well, what did

9  we say had to happen.  We gave some examples.  If a

10  partner's website infringes a claim of the '702 patent;

11  B, if the partner's website uses DoubleClick when

12  infringing; and C, if providing DoubleClick constitutes

13  indirect infringement by Google -- if those three things

14  occur, then that partner is licensed and then you can't

15  sue.  That's what these -- the -- the terms of the

16  license says.

17          So the issue here is, Google's partner is

18  licensed only if Google would indirectly infringe the

19  patents based on its partner's use of DoubleClick.

20  That's what we agreed to.

21          What's the upshot of that?

22          Well, the upshot is, is that in order for

23  you or Google to determine that we've breached, there

24  has to be some finding that use of DoubleClick

25  constitutes indirect infringement.  That needs to take

1  place.

2           Well, what's the answer to that question?

3           Let's move on to this important point.

4           To prove indirect infringement, Google

5  has to prove one of two things.  Either (a) that the use

6  of DoubleClick constituted contributory infringement; or

7  (b) that they induced infringement by giving their

8  customers DoubleClick.

9           For contribution and contributory

10 infringement, Members of the Jury, Google has the burden

11 of proof.  What I mean by that is this:  They need to

12 put forth evidence to prove certain things.  Beneficial

13 doesn't have to say a word.  It's their burden.  What do

14 they have to show?  They have to show that one of their

15 customers directly infringed the patent.  It makes

16 sense.

17          In order for them to contribute to

18 infringement, somebody has to be infringing.  That's

19 what they have to show you in this case.  They also have

20 to show you that DoubleClick is a material part of the

21 invention.  The invention, again, are the claims.

22 And they have to show you that DoubleClick is not

23 suitable for substantial non-infringing uses; another

24 way of saying DoubleClick was made to infringe.  It

25 can't be made for some other substantial non-infringing

1 use.  They've got to prove these three things.

2          In this opening, I'm not going to talk

3 about the middle part.  I'm only going to talk about two

4 of those elements, but, again, all three must be proven

5 by Google.

6          What about this issue about direct

7 infringement of the patent?

8          Here, Members of the Jury, is the

9 evidence you will not hear in this case.  There will be

10 no document; there will be no testimony from any witness

11 from any Google partner that says, yeah, we infringe.

12          In fact, Google will never admit that in

13 this trial.  The partners settled; they entered into

14 license agreements.

15          You will not hear or see any document

16 that even in those license agreements any of those

17 partners admitted that they infringe.  So now you don't

18 have an admission.

19          Well, what else can they show to prove

20 infringement?  Well, maybe there was some finding by a

21 judge in another case or a jury in another case that

22 says:  Yes, we found that when DoubleClick is being used

23 on that partner's website, that's infringement.

24          Members of the Jury, you're not going to

25 hear that either.  There will be no evidence of that.

1  They have the burden of proving to you in this case that

2  there was infringement.  That means they've got to put

3  on an infringement case.  That's typically done by

4  experts, experts who have looked at the infringing

5  website.  They've looked at the patent.  They've

6  compared the two and they've said there's infringement

7  there.

8              Google has an expert in this case.

9  They've paid an expert.  He will get on the stand.

10  Members of the Jury, that expert will not testify about

11  anything having to do with infringement.  He has no

12  opinions whatsoever.

13              Well, what are they to do?  What will

14  they do to try to show infringement?

15              Well, this is what they will do.  At

16  least I expect them to do this, and maybe they won't,

17  but this is what I expect.  They will point to the

18  complaints that we filed in the underlying action

19  against the Defendants and say:  Look, in their

20  complaint, they allege that there was infringement.  And

21  they will point to another document that you're going to

22  hear called an infringement contention.  It's a document

23  that's issued early in the case.

24              And they'll say:  Look, that's what

25  Google -- that's what Beneficial believed, and they're

1    going to want you to find from those documents that

2    infringement occurred.  And you will hear all the

3    testimony in this case, and you will hear how those

4    infringement contentions in those complaints, how they

5    apply, how they fit.  There will be no evidence of

6    direct infringement in this case.

7              Well, what about this issue of

8    substantial non-infringing uses?  Let's deal with that

9    real quickly.

10              I expect the Court to instruct you that a

11   use is substantial, if it is not unusual, if it's not

12   occasional, if it's not experimental.

13              Well, what do we know about the case?

14   What do we know about the patent?  What do we know about

15   DoubleClick?

16              This is what you're going to learn.  The

17   invention in this case applies to websites.  Not all

18   websites infringe the '702 patent.  Not all websites.

19   There are some websites that infringe.  There are some

20   websites that don't.  For example, one of the claims

21   that you look at in the '702 patent requires that the

22   website have a store for store -- storing user

23   information.

24              You're going to hear that there are some

25   websites that don't have to store.  They don't.  You

1    don't have to register.  They don't take user

2    registration.  They don't have it.  If they don't have

3    it, they don't infringe.

4                    Well, what do we know about DoubleClick?

5                    Well, this is what we know about

6    DoubleClick.  DoubleClick can be used on websites that

7    infringe, and DoubleClick not only can be used but it's

8    used on websites that don't infringe.  In fact, you're

9    going to hear from their own witnesses DoubleClick can

10   be used on any apparatus that has access to the

11   Internet.

12                   On this fact alone, there is no

13   contributory infringement, because DoubleClick has

14   substantial non-infringing uses.

15                   What else do they have to show for this

16   issue, this issue of inducement?  Well, what do we know

17   about inducement?

18                   Again, this is what DoubleClick needs to

19   show.  They need to show that a Google partner directly

20   infringed, and they also need to show that Google had a

21   specific intent to induce its partners not to use

22   DoubleClick, all right?

23                   That's not the standard.  They have to

24   have the specific intent to induce their partners to

25   infringe the claims of the patent.  Well, I've already

1  discussed this issue of whether or not they're going to

2  prove any of their customers or partners infringe.  They

3  won't.

4              So what about the specific intent issue?

5  Well, here's what we know.  When you look at the claims,

6  including the '702 and all these others, there are all

7  these elements, and there will be no dispute that

8  there's no intent to infringe any parts of this claim.

9              There was one section in here, which I

10  believe is (h), and the reason I did that is this:  This

11  is the part of the claim, Claim 53, that has some

12  connection to DoubleClick, all right?  And you're going

13  to read the claim.  There will be some testimony about

14  it, but there's a lot of words.  And what you're going

15  to notice there is this:  In all of those words, the

16  only relation to DoubleClick is this little part that

17  says advertising related information.  That's -- that's

18  it.  That's what Google contributes to this patent.

19  That's it.

20              Well, what do we know about that?

21              Well, we know, at best, Google only

22  instructs its partners how to use those ad tags.  That's

23  all they do.  They give it to them.  They say this is

24  how you do it.  There is no evidence in this case that

25  they tell them how to have a store for store user

1   identification, how they have to combine it, none of

2   that.   There will be no evidence that Google induces any

3   of its partners to infringe the claims.

4                      Well, where does that leave us?

5                      It leaves us with this:  When you're

6   asked this question, would Google indirectly infringe

7   the patents based on its partner's -- the answer at the

8   end of this case, after they've put on their case, will

9   be:  No, they don't.

10                     And if you answer that question no, then

11  the big question:  Did we breach?  It has to be no,

12  because we only breach if we sued a customer that was

13  licensed.  And as you're going to hear, those licenses

14  come with conditions, and none of those conditions

15  applied.

16                     What about damages?

17                     Well, very shortly, there will be no

18  evidence that Google has suffered any damages, any

19  actual damages.  None.  In fact, there will be no

20  evidence that they suffered any harm.  At the end of

21  this case, Members of the Jury, you're going to have to

22  find, based on the evidence, that there was no breach,

23  that Beneficial was well within the rights that it

24  bargained for in the license agreement to bring the

25  lawsuits that it did against all of the other

```
 1  Defendants, after we entered the settlement agreement.

 2              Thank you.

 3              THE COURT:  All right.  That completes

 4  the closing statements from the parties.  Is the

 5  Plaintiff prepared to call their first witness?

 6              MS. ANDERSON:  Yes, Your Honor.  We call

 7  Mr. Michael Trinh.

 8              THE COURT:  All right.

 9              MS. ANDERSON:  Your Honor, may we

10  approach for our team to distribute binders?

11              THE COURT:  Yes, you may.

12              MS. ANDERSON:  Thank you, Your Honor.

13              THE COURT:  The witness will come forward

14  and have a seat here at the witness chair.

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Have a seat.

17              THE WITNESS:  Thank you.

18              THE COURT:  All right.  Ms. Anderson, you

19  may proceed.

20              MS. ANDERSON:  Thank you, Your Honor.

21   MICHAEL TRINH, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

22                   DIRECT EXAMINATION

23  BY MS. ANDERSON:

24      Q.   Good morning, Mr. Trinh.

25      A.   Good afternoon.
```

 1      Q.   Or excuse me.  Good afternoon.  I apologize.

 2      A.   Sorry.

 3      Q.   Good afternoon.

 4           Would you please introduce yourself to the

 5  jury?

 6      A.   Hi.  My name is Michael Trinh.  I'm a Google

 7  attorney.

 8      Q.   Would you please tell the jury a little bit

 9  about yourself?

10      A.   To go through the nine questions that y'all --

11  y'all answered this morning, my name is Michael Trinh.

12  I live in San Francisco, California.  I've never been

13  married.  I have no kids.  I work at Google, and I've

14  worked there for a little over five years.

15           I -- in terms of education, I got my

16  undergraduate degree in computer science at the

17  University of North Carolina Chapel Hill where I grew

18  up, and then went to law school at Georgetown near D.C.

19  and moved out to San Francisco.  And I've never been on

20  a jury before.

21      Q.   And where are you originally for Mr. Trinh?

22      A.   I was born in Washington, D.C., or near

23  Washington, D.C., and I grew up in Raleigh, North

24  Carolina.

25      Q.   And what is your profession?

1      A.   Yes, ma'am.  I'm an attorney at Google.

2      Q.   All right.  How long have you worked at

3   Google, Mr. Trinh?

4      A.   Since August 2008.

5      Q.   And before we get into more about your current

6   position at Google, just so the jury understands the

7   focus of your testimony, do you have knowledge about an

8   agreement between Google and Beneficial?

9      A.   Yes, ma'am.

10      Q.   And what agreement are you aware of between

11   Google and Beneficial?

12      A.   A settlement agreement that resolved some

13   litigations that was signed in 2010.

14      Q.   All right.  You should have before you in your

15   binder, Mr. Trinh, a series of exhibits.

16           Would you please turn to Exhibit 1?

17      A.   Yes, ma'am.

18      Q.   Thank you.  Do you have that before you?

19      A.   Yes, ma'am.

20      Q.   What is it?

21      A.   This is that settlement agreement that we just

22   discussed.

23      Q.   All right.

24           MS. ANDERSON:  Your Honor, may I have

25   permission to display this to the jury?  I believe it is

1    preadmitted.

2              THE COURT:  Then if it's preadmitted, use

3    it without leave of the Court.

4              MS. ANDERSON:  Thank you, Your Honor.

5              THE COURT:  Uh-huh.

6         Q.   (By Ms. Anderson) Now, Mr. Trinh, would you

7    please explain to the jury if you had any job

8    responsibilities related to Exhibit 1?

9         A.   Yes, ma'am.  I worked on this agreement on

10   behalf of Google.

11        Q.   Let's talk about your current work at -- at

12   Google.  What is your current job with Google?

13        A.   I'm product counsel at -- sorry.  I'm product

14   counsel at a research group at Google called Google X.

15        Q.   All right.  And please explain what is Google

16   X?

17        A.   Google X is kind of a research lab in Google.

18   Some of the more well-known things that it does is

19   self-driving cars, contact lenses for diabetics.  What I

20   work on are aviation issues for high-altitude

21   stratosphere balloons that provide Internet service.

22        Q.   And can you give the jury just an example of

23   what you might do on a daily basis?

24        A.   I'll try.  I kind of am the legal handyman for

25   -- for the products, and I deal with a broad variety of

1  legal issues from telecom regulatory stuff to working

2  with the FAA and its components across the world, visas,

3  import/export issues, you name it.

4      Q.   What was your job at Google before you started

5  working with the Google X Division?

6      A.   Yes, ma'am.  I was a litigation attorney with

7  a patent group at Google.

8      Q.   During what period of time were you a

9  litigation attorney with the patent group at Google?

10     A.   Since I started at Google in August 2008 until

11 I left to go out to X in April of last year, 2013.

12              THE COURT:  Mr. Trinh, if I could

13 interrupt.  Would you please try to slow down a little

14 bit?

15              THE WITNESS:  Sorry, sir.

16              THE COURT:  The speed of your speech is a

17 little fast.

18              THE WITNESS:  I apologize.

19              THE COURT:  Not a problem.

20              Go ahead, Counsel.

21              MS. ANDERSON:  Thank you, Your Honor.

22     Q.   (By Ms. Anderson) What were your job

23 responsibilities at a general level during the time that

24 you were with the patent group at Google?

25     A.   Yes, ma'am.  I was responsible for handling --

1  or have primary responsibility for responding to

2  investigating and, you know, really just taking care of

3  making sure Google took care of our -- any allegations

4  of patent issues.

5      Q.   And did you have any job responsibilities that

6  related in any way to working with Google engineers?

7      A.   Yes, ma'am.  My -- my job role existed so

8  that, you know, there was an attorney responsible for

9  looking at these things instead of having our engineers

10 spend time away from coding and building products.

11     Q.   During the course of your work with the patent

12 group, did you ever have job responsibilities related in

13 any way to any Beneficial lawsuits?

14     A.   Yes, ma'am.

15     Q.   Please explain that to the jury.

16     A.   When I first arrived at Google in August of

17 2008, the -- Beneficial -- the first Beneficial lawsuit

18 was one of the first cases that I picked up.

19     Q.   Okay.  And what year was that?

20     A.   This is 2008.

21     Q.   From the work that you did in connection with

22 that, do you know whether Beneficial made accusations

23 against Google during that lawsuit?

24     A.   Yes, ma'am.

25     Q.   In a very general level, would you describe

1  the accusations made by Google -- excuse me.  Strike

2  that.

3          Would you please describe at a general level

4  what accusations Beneficial had made against Google

5  during that lawsuit?

6      A.   Yes, ma'am.  Beneficial was alleging that

7  Google and some of our websites were using or selecting

8  and presenting ads to users in a certain way that

9  infringed the Beneficial patents.

10     Q.   Okay.  What particular patents were alleged in

11 that 2007 lawsuit?

12     A.   Yes, ma'am.  It's the patent -- it's a U.S.

13 patent ending in '702 on behalf of Beneficial.

14     Q.   Okay.  Thank you.

15          I'd like to show you, if you could turn in

16 your binder, to Exhibit 29.

17     A.   Yes, ma'am.

18          MS. ANDERSON:  And if we can have that

19 displayed as well as it is preadmitted.

20     Q.   (By Ms. Anderson) Do you recognize Exhibit 29,

21 Mr. Trinh?

22     A.   Yes, ma'am.

23     Q.   And what is?

24     A.   This is one -- this is a Beneficial patent

25 that was asserted against Google in the 2007 lawsuit,

1  the '702 patent.

2      Q.    All right.  At a very general level, can you

3  describe to the jury the layout of a patent using

4  Exhibit 29?

5      A.    Yes, ma'am.  As y'all probably have seen in

6  the video, there's a couple of different sections to a

7  patent.  The first page is the face of the patent.  And

8  it has some kind of basic information on it.  On the top

9  right, you see the U.S. Patent number, which in this

10 case is U.S. 6,712,702, and that's where we get the

11 shorthand for the '702 patent.

12          Moving to the top left, you see -- you see the

13 name of the patent, the title of it, which is Method and

14 Systems for Playing Games on a Network.  You see

15 inventors listed below.  You see some other kind of

16 basic statistics or basic information about the patent.

17 And then in the pages that follow, you see -- you see

18 drawings and figures.  Then you see a section of text

19 with little numbers on the top.  And those are the --

20 that's the specification that we spoke -- that I think

21 the jury's heard about a little bit.  And that's the

22 text of the patent.

23          Towards the end of the text of that patent,

24 starting in the columns, 31, a couple pages in, is where

25 the claims of the patent start, starting with No. 1.

1              And these are -- these are where Beneficial

2   defines kind of the boundaries of their invention.

3        Q.   Thank you very much.

4        A.   Yes, ma'am.

5        Q.   Do you have knowledge as to whether Beneficial

6   ever sued Google again during the time that you were

7   serving as patent litigation counsel for Google?

8        A.   Yes, ma'am.

9        Q.   When did that happen?

10       A.   In about 2009.

11       Q.   Can you describe for the jury, at a general

12   level, what was the nature of the allegations in that

13   lawsuit?

14       A.   In that lawsuit, Beneficial asserted a second

15   patent -- or another patent against Google, the patent

16   ending '943.

17       Q.   I'd like to show you Exhibit 30, which should

18   be in your binder.

19              MS. ANDERSON:  And may we have that

20   displayed as well?  Because it was pre-admitted.

21       Q.   (By Ms. Anderson) Do you recognize Exhibit 30,

22   Mr. Trinh?

23       A.   Yes, ma'am.

24       Q.   And what is this?

25       A.   This is the '943 patent that was asserted by

1  Beneficial against Google in the second lawsuit.

2      Q.   All right.  And in a general level, is there

3  any relationship between the '702 and '943 patents

4  besides the fact that they were the subject of lawsuits

5  against Google?

6      A.   Yes, ma'am.  There are a couple.

7      Q.   And what are their relationships?

8      A.   The first is they share common -- they share

9  common inventors.

10         The second is they claim priority to the same

11  underlying patent application.

12         And the third is they generally touch on the

13  same subject matter.

14     Q.   And as relates to this case, what is that

15  subject matter?

16     A.   It's selecting and serving ads on -- on -- on

17  websites.

18     Q.   In the 2007 and 2009 Beneficial lawsuits you

19  described, did Beneficial sue any other companies for

20  infringement of those patents, along with Google, in

21  those lawsuits?

22     A.   Yes, ma'am.

23     Q.   And did any of those companies have any

24  relationship with Google?

25     A.   Yes.  There are two that I can think of.

1    Q.   Could you please name them for the jury?

2    A.   The two that I'm thinking of are, one -- the

3  first is YouTube, which is a subsidiary of Google, but a

4  separate corporate entity.  The second is NBC Universal,

5  which was a customer of Google for using DoubleClick

6  products.

7    Q.   Okay.  And what is YouTube?  Describe YouTube

8  for the jury.

9    A.   YouTube is a website where you can upload and

10  watch video online.

11    Q.   Okay.  Is YouTube a part of Google?

12    A.   Yes, ma'am.

13    Q.   All right.  What, if any, responsibilities did

14  you have during the time that you were working with

15  Google in the patent group concerning these lawsuits

16  filed against Google on this -- on the '702 patent and

17  '943 patents?

18    A.   I was the Googler with day-to-day

19  responsibility for these cases starting with when I

20  joined up until they were resolved in 2010.

21    Q.   Okay.  And you used the word Googler there.

22  What does that mean?

23    A.   Sorry.  That's a Google employee.  That's what

24  we call ourselves.

25    Q.   Okay.  Now, as part of your responsibilities

1  in managing those cases as a Google employee with the

2  patent group, did you have any responsibilities for

3  reviewing any statements made by Beneficial during the

4  course of that case -- those cases?

5      A.   Yes, ma'am.

6      Q.   And could you give the jury examples of the

7  kinds of Beneficial statements you reviewed in the

8  course of that work?

9      A.   Yes, ma'am.

10         During the course of litigation, there's an

11 extensive court process known as discovery.  And that

12 process allows parties to exchange information to

13 investigate and develop and get to the bottom of

14 disputed issues of fact.

15         Could take a couple of different forms.  We've

16 seen some written.  They can be depositions.  And as

17 part of my day-to-day responsibility, I reviewed -- I

18 reviewed much of it.

19     Q.   Did any of the materials you reviewed include

20 infringement contentions?

21     A.   Yes, ma'am.

22     Q.   And could you describe to the jury what

23 infringement contentions are.

24     A.   Infringement contentions -- and I've -- you've

25 probably seen a little bit, but they're documents where

1  a party asserting a patent has to lay out in detail what

2  claims -- what part of the patent they claim infringes,

3  what they -- what they say infringes and how.

4         They have to lay out specific theories and go

5  through the claims that -- the text of the patent on a

6  section-by-section basis.  And they have to compare

7  the -- the text of the patent with what they say

8  infringes.

9      Q.   Did Beneficial specify in the earlier lawsuits

10  what kind of infringement it was alleging against

11  Google?

12      A.   Yes, ma'am.

13      Q.   And could you specify what that is?

14      A.   They accused -- they -- they accused Google

15  and YouTube of both direct and indirect infringement.

16      Q.   All right.  And when you say that Beneficial

17  accused Google of direct infringement, what do you mean

18  by that?

19      A.   At a high level, that means that Google

20  performed every step of the claimed invention.

21      Q.   And what do you mean when you say Beneficial

22  accused Google of indirect infringement?

23      A.   That Google participated in some way with some

24  other party or parties to perform the steps of the

25  claimed invention.

1    Q.    Do you know whether DoubleClick ad products

2 and services were a part of those earlier cases in any

3 way?

4    A.    Yes, ma'am.

5    Q.    And what do you mean about that?

6    A.    They were -- DoubleClick was used by YouTube

7 in the underlying cases to provide ads on the YouTube

8 website.  And so there was extensive discovery taken

9 with DoubleClick in the prior cases.

10    Q.    Okay.  And when you say there was extensive

11 discovery, what do you mean by that?

12    A.    We -- there were -- there was documentation

13 from DoubleClick provided to Beneficial, and there was

14 examination of Google witnesses -- or Google engineers

15 who worked with DoubleClick.

16    Q.    Thank you.

17          And please tell the jury what DoubleClick is.

18    A.    DoubleClick is currently a -- a set of

19 products that Google provides to advertisers to let them

20 put -- display ads on their websites.

21    Q.    Was DoubleClick ever the name of a company as

22 well?

23    A.    Yes, ma'am.

24    Q.    All right.  Please tell the jury what

25 DoubleClick was.

1      A.    DoubleClick was a -- it was a company that

2   Google acquired which closed in about 2008, and they had

3   their own -- they had their own business, and that was

4   their business, providing these products.

5      Q.    And the company used to be called DoubleClick,

6   is that a part of Google in any way today?

7      A.    Yes.   They were -- DoubleClick merged with

8   Google in 2008.

9      Q.    Okay.   And when you say merged, does that mean

10  it's a part of Google?

11     A.    Correct, yes.

12     Q.    Thank you.

13        Can you describe very generally to the jury

14  what DoubleClick ad products and services do.

15     A.    DoubleClick is a service that allows customers

16  to basically select ads and -- and serve ads on

17  customers' websites.   And it takes care of -- it's --

18  it's -- it's a service so that a publisher with a

19  website can concentrate on their website, and then

20  DoubleClick fills in the ad for them.

21     Q.    All right.   I'd like to show you Exhibit 23,

22  which is in your binder.

23        MS. ANDERSON:   And it is also

24  pre-admitted, so if we could have that displayed.

25     Q.    (By Ms. Anderson) Do you recognize Exhibit 23,

1    Mr. Trinh?

2        A.   Give me a second, please.

3        Q.   Sure.  Take your time.

4        A.   Yes, ma'am.

5        Q.   What is Exhibit 23?

6        A.   Exhibit 23 is portions of the discovery in the

7    earlier case.

8        Q.   And Exhibit 23 is entitled Plaintiff

9    Beneficial Innovations' Response to Defendant's First

10   Set of Interrogatories.

11           Would you please tell the jury what an

12   interrogatory is.

13       A.   An interrogatory is the court name for --

14   well, it's a question that one side can ask to another

15   in written format.

16       Q.   All right.  And when it says that Plaintiff --

17   these are Plaintiff Beneficial Innovations' Response,

18   what does that mean to you?

19       A.   This is Beneficial answering questions from

20   the Defendants, the group of people that were sued in

21   the first case.

22       Q.   Did you ever review Exhibit 23 as part of your

23   job responsibilities?

24       A.   Yes, ma'am.

25       Q.   And why did do you that?

1    A.   It was part of my day-to-day responsibilities,

2  and I needed to understand the positions that Beneficial

3  was taking in that first case.

4    Q.   All right.

5         MS. ANDERSON:  I'd like to show the jury,

6  please, Interrogatory No. 7, which appears on Page --

7  the second page of the exhibit.

8              Thank you, Ben.

9    Q.   (By Ms. Anderson) You have Interrogatory No. 7

10  before you.  What is it Interrogatory No. 7?  Is it --

11  is it a question posed by a particular party?

12    A.   Yes, ma'am.

13         So this is a question posed to Beneficial from

14  the Defendants in the first case.

15    Q.   All right.

16    A.   And this question, it's here in the -- it's --

17  asked Beneficial what they're seeking and why.

18    Q.   And when you say what they're seeking, are you

19  talking about what kind of relief?

20    A.   Correct.

21    Q.   All right.

22         MS. ANDERSON:  Let's turn to the next

23  page, Page -- the third page of Exhibit 23.

24    Q.   (By Ms. Anderson) What appears here?

25    A.   This is Beneficial's answer to the question

1  posed.  And here they respond with what it is they're

2  seeking in the first lawsuit.  There's three paragraphs

3  here, and it kind of goes through their theories.

4      Q.   All right.  Did you learn anything from

5  reviewing Exhibit 23 as to whether or not Google had

6  been accused of indirect infringement during the course

7  of that original lawsuit?

8      A.   Yes, ma'am.

9      Q.   And what did you learn from that review?

10     A.   I learned that they were suing us for both

11  direct and indirect infringement, including contributory

12  and inducement of infringement, because that was the

13  basis for seeking an injunction against us.

14     Q.   And can you direct the jury where on this page

15  they should look to see that information?

16     A.   Yes, ma'am.

17         Down on the third paragraph right before that

18  signature line is:  In addition, Beneficial Innovations

19  seeks an injunction restraining and enjoining Defendants

20  from any further acts of infringement, contributory

21  infringement, or inducement of infringement of the '366

22  and '702 patents.

23     Q.   Thank you very much.

24         Now, if you would, Mr. Trinh, please turn in

25  your binder to Exhibit 22.

1              MS. ANDERSON:   And may we display this,

2   please?   It is pre-admitted.

3              Thank you.

4        Q.   (By Ms. Anderson) Do you recognize Exhibit 22,

5   Mr. Trinh?

6        A.   Yes, ma'am.

7        Q.   And what is Exhibit 22?

8        A.   Exhibit 22 is another portion of discovery

9   from the first case.   This time -- again, it's an

10  interrogatory and response.

11       Q.   All right.   And whose response is it?

12       A.   Like the previous exhibit, it's Beneficial's

13  response to interrogatories, this time from just Google

14  and YouTube.

15       Q.   I'd like to turn to the second page of Exhibit

16  22.

17              Do you have that before you?

18       A.   Yes, ma'am.

19       Q.   All right.   And what is -- what is shown here

20  on Page 2?

21       A.   So under Interrogatory No. 4, this is the

22  question that we -- that we posed to Beneficial.

23       Q.   All right.   And what did you learn from

24  Beneficial's response to this question?

25              MS. ANDERSON:   And let's display it for

1   the jury on the third page of Exhibit 22.

2        A.   Yes, ma'am.

3             So we asked Beneficial when they contended

4   that Google first learned about their -- their '702

5   patent.  And in response, they told us that they

6   believed that we knew of their patent when they filed

7   suit in December 2007.

8        Q.   (By Ms. Anderson) All right.  Thank you.

9   Let's turn our attention to the settlement agreement --

10       A.   Yes, ma'am.

11       Q.   -- Exhibit 1.

12            Now, Mr. Trinh, did there come a point in time

13   when Google and Beneficial agreed to the settlement

14   agreement and had it signed?

15       A.   Yes, ma'am.

16       Q.   Why did Google enter this agreement?

17       A.   At this point, we -- Google had been in

18   litigation against Beneficial across two lawsuits for a

19   number of years, and we wanted to put these issues -- we

20   wanted to get past these issues and put them to bed, and

21   we wanted to buy a license to kind of resolve -- resolve

22   things.

23       Q.   And for whom did Google want to buy licenses?

24       A.   We bought licenses for Google, our affiliates,

25   like YouTube, and our customers, like NBC Universal.

1      Q.   All right.  Let's go through and take a look

2  at some of the parts of the settlement agreement.

3      A.   Yes, ma'am.

4           MS. ANDERSON:  First, if we can have

5  highlighted the first paragraph on Page 1.

6      Q.   (By Ms. Anderson) What kind of general

7  information can we learn from looking at the first

8  paragraph, Mr. Trinh?

9      A.   So this is the beginning of the settlement

10  agreement, and it identifies who are parties to this

11  agreement.

12          So here you see -- it says:  This settlement

13  and license agreement -- agreement is made between

14  Beneficial Innovations, and it goes forth and identifies

15  who's signing this agreement and kind of basic contact

16  information.

17          So this shows Beneficial, Google, YouTube, and

18  NBC Universal.

19      Q.   All right.  Thank you.

20          MS. ANDERSON:  Let's go below and show

21  the jury, please, the recitals section.

22               Thank you.

23      Q.   (By Ms. Anderson) Mr. Trinh, what kind of

24  information is generally reflected in the recital

25  section?

1    A.   So this section kind of sets forth the context

2  for this -- for this agreement.  It explains that there

3  had been two lawsuits filed, kind of where those

4  lawsuits were, and what -- what the parties were doing

5  in this agreement.

6    Q.   Thank you.

7         MS. ANDERSON:  And let's jump ahead, if

8  we can, to Section 3, which appears on the third page of

9  the settlement agreement.

10   Q.   (By Ms. Anderson) What does Section 3

11 generally cover, Mr. Trinh?

12   A.   Sorry.  Let me turn to that.

13   Q.   Sure.

14   A.   Section 3 explains what Google paid to

15 Beneficial for this license agreement.

16   Q.   All right.

17   A.   And it explains some -- the procedure of how

18 we would do that and how much and where it would go.

19   Q.   And how much did Google agree to pay to

20 Beneficial under this agreement?

21   A.   As you can see here, $2,450,000.

22   Q.   And did Google, in fact, pay that money in

23 accordance with the terms of this agreement?

24   A.   Yes, ma'am.

25   Q.   Let's turn now to Section 2 entitled Licenses,

1  which appears on the second page of Exhibit 1.

2      A.   Yes, ma'am.

3      Q.   What kind of information is generally

4  reflected in the license section?

5      A.   This section lays out what Beneficial was --

6  was -- was giving to Google as a license and sets forth

7  the kind of -- the -- it sets forth the parameters of

8  that license.

9      Q.   And did the license provide license rights to

10  Google?

11      A.   Yes, in one part.

12      Q.   And could you identify for the jury in what

13  part of the license section we see the license to Google

14  itself?

15      A.   Yes, ma'am.

16          So in the paragraph labeled A, it says:

17  Beneficial and its affiliates grant a worldwide,

18  royalty-free, non-exclusive, non-transferable, except as

19  provided below, close paren, fully paid up, perpetual

20  license under the licensed patents to -- little --

21  little subsection 1 -- Google, YouTube, NBC Universal,

22  Defendants, and their past, current, and future

23  affiliates, including a license for prior activities of

24  future affiliates.

25      Q.   And where it says licensed patents in the

1  section you just read, what patents are included in the

2  definition of licensed patents?

3       A.   So to find that out, we need to turn to the

4  back of this settlement agreement where you see

5  Attachment A, and Attachment A lists the patents that

6  Beneficial licensed under this agreement.

7            And so the first line is, for example, U.S.

8  Patent No. 6,712,702.

9       Q.   And where do we see the '943 patent in that

10 license?

11      A.   If you go down a couple of lines to -- about

12 five lines down, that's Patent No. 7,496,943.

13      Q.   Thank you.

14            MS. ANDERSON:  If we could just highlight

15 that for the jury briefly.

16            Thank you.

17      Q.   (By Ms. Anderson) Now, Attachment, is that

18 referenced in any definition in the settlement agreement

19 identifying what a licensed patent is?

20      A.   Yes, ma'am.

21            If we -- if we turn back to the first page of

22 the license, we'll see in Section 1, which is labeled

23 Definitions, it contains -- it's like the dictionary of

24 this agreement.  It says -- under Section C, it says:

25 Licensed patents shall mean...

```
 1            And in Subsection 1, it says:  The patents and
 2  patent applications identified in Attachment A,
 3  parentheses, the portfolio patents.
 4       Q.   And is Attachment A what we were just looking
 5  at?
 6       A.   Yes, ma'am.
 7            THE COURT:  Let me interrupt at this
 8  point.  This is a good place, ladies and gentlemen, for
 9  us to take a short recess.
10            So I'm going to excuse you to the jury
11  room in just a couple of minutes to stretch your legs,
12  get a drink of water.  Don't expect you to be out long,
13  so you may leave your juror notebooks in your chairs, if
14  you like.
15            Don't discuss the case among each other,
16  and we'll be back in here shortly and continue with this
17  direct examination.  But you're excused to the jury room
18  for recess at this time.
19            COURT SECURITY OFFICER:  All rise.
20            (Jury out.)
21            THE COURT:  All right.  Counsel, we stand
22  in recess.  Try to make this about 10 minutes, as close
23  as we can.  We'll be back in here shortly.  We're in
24  recess.
25            MS. ANDERSON:  Thank you, Your Honor.
```

```
 1                    (Recess.)

 2                    (Jury out.)

 3              COURT SECURITY OFFICER:  All rise.

 4              THE COURT:  Be seated, please.

 5              If you want to return to the podium,

 6   Ms. Anderson.

 7              MS. ANDERSON:  Thank you, Your Honor.

 8              THE COURT:  And, Mr. McAteer, if you'll

 9   bring in the jury.

10              COURT SECURITY OFFICER:  Yes, sir.

11   All rise for the jury.

12                    (Jury in.)

13              THE COURT:  Be seated, please.

14              We'll continue with the direct

15   examination of the witness by the Plaintiff.

16              You may proceed, Counsel.

17              MS. ANDERSON:  Thank you, Your Honor.

18        Q.   (By Ms. Anderson) Let's return to Exhibit 1,

19   Mr. Trinh.

20        A.   Yes, ma'am.

21        Q.   And if we can, show for the jury Section 2,

22   the license section.  And we were discussing in your

23   earlier testimony Section 1, and you were describing

24   Google's license.

25              And just briefly, can you tell the jury what
```

1    it is -- what it means to have a license to a patent, at

2    a very general level?

3        A.    In general, it means permission to use the

4    inventions described in the patent.

5        Q.    And when there are terms or conditions

6    associated with that license, do those limit the license

7    in particular ways?

8        A.    Yes, ma'am.

9        Q.    All right.  So let's read on in Section A of

10   the license provision.

11            Is there a section of the license provision

12   that talks about licenses that apply to Google

13   customers?

14       A.    Yes, ma'am.  In the same section, 2-A, if you

15   go to the paragraph further down in subsection (ii), it

16   continues on -- it starts with the same sentence that

17   begins with -- in subsection (i), and continues in

18   subsection (ii):  Defendants and their affiliates' past,

19   current, and future partners, whether direct or

20   indirect.

21            Stop for a second.

22            The term partners is defined in Section 1

23   again.

24       Q.    All right.  And there's a lot of language in

25   this section, but could you walk the jury through it to

1  understand as a general matter what is contained in this

2  section of the license for Google customers?

3      A.   Sure.  So let me just start with the

4  definition of partners.  If you could turn to Section

5  1-B, on the first page, it defines partners.  And it

6  says:  Partners shall mean as to a particular person or

7  entity, their agents, representatives, suppliers,

8  distributors, customers, advertisers, and users, whether

9  direct or indirect.

10     Q.   Thank you.

11     A.   And then going on, the -- the text of this

12 license grant to the partners, which includes customers,

13 reads:  But only to the extent of that partner's role in

14 making, having made, using, selling, offering for sale,

15 or importing any products or services of Defendants or

16 their affiliates.

17     Q.   And if I could just stop you there, Mr. Trinh.

18 I apologize.

19          Just for clarity, when it's talking about

20 Defendants, does that or does that not include Google?

21     A.   That includes Google.  Actually the defined

22 term in Section A, that includes Google, YouTube, and

23 NBC Universal.

24     Q.   All right.  And let's continue on, then.  I

25 apologize.  Picking up where you left off after

1  affiliates.

2       A.    Yes.  And then it continues:  And only to the

3  extent such act by such partner would constitute direct

4  or indirect infringement of a claim of the licensed

5  patents by the Defendants -- or by Defendants or their

6  affiliates but for this license.

7       Q.    All right.  Now, for clarification, do Google

8  customers have the right to use the inventions under

9  this provision, if they're not using Google products and

10 services?

11      A.    This license does not cover that.  No, ma'am.

12      Q.    So please tell the jury, why would Google pay

13 for a license for its customers as part of this

14 agreement?

15      A.    This -- this license is designed to, as part

16 of this entire agreement -- designed to buy peace or a

17 resolution as to the Beneficial patents for Google

18 products, wherever they're found on our websites with

19 our partners, and the hands of our users.  It's designed

20 to put it all to rest.

21           And it's regardless of whether products or

22 services as long as they're ours, they're -- it's

23 covered under this license as long as it meets these

24 conditions set forth here.

25      Q.    Thank you.

1          And let's go on to Sections 4 and 5 of the

2    agreement.  Can you generally identify for the jury just

3    as a general level what are covered in these sections?

4          A.   Sure.  So if you turn to the next page, on

5    Page 3 -- I'll take each section in turn.  Section 4 is

6    entitled Dismissal of the Action.  And that language

7    sets forth the procedure by which how Beneficial and

8    Google would work to dismiss the ongoing court cases

9    that were pending at that time.

10          Section 5 is entitled Release, and it --

11    basically, it's the language that sets up how Beneficial

12    and the Defendants were going to release each other in a

13    mutual fashion.

14          Q.   All right.  Thank you.

15          And let's go on to Section 15.  Can you

16    explain to the jury generally what is covered in

17    Section 15?  And it starts at the bottom of one page and

18    goes on to the next.

19          A.   Yes, ma'am.  If you keep on turning and get to

20    Page 6, and it's at the very, very bottom of Page 6

21    where the title starts, it's entitled No Admission of

22    Liability.

23          And the text continues to read:  Nothing in

24    this agreement shall constitute an admission of patent

25    infringement, validity, or enforceability by Google,

1  YouTube, or NBC Universal but rather as merely the

2  resolution of disputed charges of patent infringement by

3  agreement.

4       Q.   Thank you very much.

5            And was this part of the provisions that had

6  been included in the settlement agreement?

7       A.   Yes, ma'am.

8       Q.   All right.  Let's move forward in time from

9  2010, the time of the settlement agreement.

10           After 2010, do you know whether Beneficial

11  sued Google customers over the '702 and '943 patents?

12      A.   I do.

13      Q.   And what do you know in that regard?

14      A.   Beneficial did in about May -- or April of

15  2011.

16      Q.   How did you come to learn that Beneficial sued

17  Google customers over those patents in 2011?

18      A.   The customers came complaining to me.

19      Q.   I'd like to show you Exhibits 2 through 4 in

20  your binder, and let's not put it up quite yet, because

21  we're going to focus on Exhibit 2.  But I'd like to ask

22  you to look at Exhibit 2 through 4, and we'll show them

23  one at a time.

24      A.   Yes, ma'am.  Exhibits 2 through 4 are the

25  complaints that Beneficial filed against Google

1    customers and others in April of 2011.

2        Q.   All right.

3             MS. ANDERSON:   Now, if we can show,

4    please, on the screen Exhibit 2, the cover of Exhibit 2.

5        Q.   (By Ms. Anderson) Is this one of the 2011

6    complaints that we're -- you just referred to?

7        A.   Yes, ma'am.  This is the -- this is the first

8    version of it.

9        Q.   All right.  On the first page of Exhibit 2, we

10   see on the left-hand a box with Beneficial Innovations,

11   Inc., Plaintiff, versus and then a long list of

12   companies.

13            What is that list of companies a list of?

14       A.   So this is -- you can call this -- the case

15   caption and it kind of sets up the position of the

16   parties in the lawsuit.  At the top is Beneficial

17   Innovations, Inc., which is the Plaintiff.  Below it is

18   the list of companies which are labeled as Defendants,

19   and so that shows you that, you know, companies starting

20   with Advance Media going all the way to Village Voice

21   Holdings, LLC, are who Beneficial is suing in this

22   matter.

23       Q.   Do you know from your work at Google whether

24   in 2011, the time of this suit, any of those companies

25   listed were customers of Google's DoubleClick product?

1     A.   Yes, ma'am.

2     Q.   And what do you know in that regard?

3     A.   So the parties, starting with Advance

4 Publications, Inc., ALM Media Properties, LLC, American

5 Media, Inc., Autotrader.com, Inc., and Demand Media,

6 Inc., were DoubleClick customers and are DoubleClick

7 customers.

8     Q.   Did Google seek to contact Beneficial in any

9 way about the 2011 lawsuit, when it learned about that

10 lawsuit against Google customers?

11    A.   Yes, we did.

12    Q.   And did Google make any request of Beneficial

13 in that connection?

14    A.   We contacted Beneficial to make sure that they

15 were honoring the agreement and not suing our customers

16 for their use of -- for our customers' use of our

17 products.

18    Q.   And what did Google learn?

19    A.   We learned that Beneficial wasn't -- wouldn't

20 commit that they weren't suing our customers.  They --

21 they left the issue up in the air, and they told us

22 they -- they -- they told us they would be -- that they

23 weren't excluding our products from their case.

24    Q.   Okay.  Would Beneficial agree, in response to

25 that contact, to confirm that they were not suing Google

1 customers for their use of Google products in the way

2 described in the license?

3     A.   They would not do that for us.

4     Q.   So what did Google do next?

5     A.   We -- we then intervened in this case to -- to

6 insert ourselves into this lawsuit.

7     Q.   Can you explain to the jury what you mean by

8 intervened in this case?

9     A.   Sure.  Intervention is a court procedure

10 where -- a third party like Google can become involved

11 in a lawsuit.

12     Q.   Now, as -- as part of becoming a part of the

13 current lawsuit, did Google take a position as to

14 whether or not it believed its customers were infringing

15 the '702 or '943 patents?

16     A.   We did.

17     Q.   And what was that position?

18     A.   We took the position that our customers did

19 not infringe because they were licensed.

20     Q.   All right.  I'd like to show you Exhibits 8

21 and 9 in our binder.

22            MS. ANDERSON:  And actually before we do

23 that, actually so the jury can see all the exhibits, 2,

24 3, and 4 -- we looked at Exhibit 2 -- just quickly, can

25 we display for the jury Exhibit 3, which is preadmitted?

 1        Q.    (By Ms. Anderson) Is this one of the

 2    amendments to the 2011 lawsuit?

 3        A.    Yes.   This is the first one after Exhibit 2.

 4              MS. ANDERSON:   And if we can please show

 5    Exhibit 4, also preadmitted.

 6        A.    And this is the subsequent amendment to the

 7    first and second -- or Exhibit 2 and Exhibit 3.

 8        Q.    (By Ms. Anderson) So just to -- for clarity

 9    for the record, what is Exhibit 4?

10        A.    Exhibit 4 is the second amended complaint that

11    Beneficial filed, so it kind of replaces Exhibit 2 and

12    3, but it still here lists Beneficial, Inc. --

13    Beneficial Innovations, Inc., Plaintiff, V the

14    Defendants in that -- in that matter.

15        Q.    All right.   Now, let's turn to Exhibit 8 and

16    9, and we'll start with Exhibit 8.

17              MS. ANDERSON:   If we can display the

18    front page of Exhibit 8 as it is preadmitted.

19        Q.    (By Ms. Anderson) Mr. Trinh, what is -- do you

20    recognize Exhibit 8?

21        A.    Yes, ma'am.

22        Q.    And what is it?

23        A.    This is Beneficial's infringement contentions

24    in its case against the -- the Google customers.   We've

25    previously discussed these infringement contention

1  documents, but it's where Beneficial lays forth their

2  specific theory of why they think the customers

3  infringed our patents.

4      Q.   All right.  And I'd like to then have you turn

5  to Exhibit 9 in your binder.

6           MS. ANDERSON:  And if we can display that

7  as it is preadmitted.

8      Q.   (By Ms. Anderson) Do you recognize Exhibit 9?

9      A.   Yes, ma'am.

10     Q.   What is Exhibit 9?

11     A.   This is the -- this is the supplement to the

12  previous document that we talked about that, again,

13  contains Beneficial's theories -- theories of

14  infringement against the Google customers.

15     Q.   And which of Exhibits 8 or 9 is later dated?

16     A.   9.

17     Q.   All right.  Did you review Exhibits 8 and 9 in

18  connection with your responsibilities at Google?

19     A.   Yes, ma'am.

20     Q.   And these are quite long documents.  Can you

21  please -- please explain to the jury at a high level how

22  Exhibit 9 is organized.

23     A.   Sure.

24          So Exhibit 9 and Exhibit 8 follows the same

25  format.  It's -- it is indeed lengthy but has a couple

1  different sections.

2         So in the first couple of pages of -- the

3  first three pages of Exhibit 9, Beneficial explains

4  which claims of the asserted patents are -- are the

5  heart of their allegations.

6         And so it goes through on Defendant by --

7  party-by-party basis and -- and explains exactly which

8  claim of each patent they're asserting against each

9  Defendant.

10         In total, it's Claim 53 of the '702 patent,

11  and Claims 1, 49, and 67 of the '943 patent.

12         The second section of this -- of this document

13  explains -- is where Beneficial explains what -- what

14  websites infringe -- are they accusing of infringing our

15  patent.

16         So it goes on for a couple of pages, but it

17  explains which websites they're accusing of

18  infringement.

19         Now, that goes on for maybe 40 or so pages.

20  There's a couple more sections, but at the end starting

21  at Page 50 or so is where -- is a lengthy appendix, but

22  it's where they -- it's where Beneficial lays out the

23  accused claims or alleged claims and it puts them in a

24  chart.

25         On the left side of the chart is the text of

 1   the patent.  And so on Page -- it's labeled A1, but it's

 2   about 50 pages deep or so.  It starts going through

 3   Claim 53 of the '702 patent.

 4          Now, on the left side is the language from the

 5   patent, and on the right side is what Beneficial is --

 6   is alleging satisfies that claim.

 7          And as you go through these pages, it goes

 8   through and picks up different elements, different

 9   sections of the claim special puts them on the left and

10   puts what they say infringes on the right.

11       Q.   Thank you.

12          Now, just, again, whose words are contained in

13   this document?

14       A.   These are Beneficial's.

15       Q.   And did you review the infringement

16   contentions with care, Exhibits 8 and 9?

17       A.   Yes, ma'am.

18       Q.   Why did you do that?

19       A.   This -- this combined with the complaint is my

20   best way of understanding what's at issue in this case.

21          It's -- it tells me what claims are at issue

22   and what's accused of infringement and why.  It's how --

23   it's what and why.

24       Q.   All right.  Thank you.

25          Now, after reviewing Exhibits 8 and 9, did you

1  have an understanding about whether or not Beneficial

2  was accusing Google customers for their use of Google ad

3  products and services in doing advertising?

4       A.   Yes, ma'am.

5       Q.   And what did you believe to be correct about

6  that -- actually, let me rephrase that.

7            What did you understand from reviewing

8  Beneficial's infringement contentions in Exhibits 8 and

9  9?

10      A.   Yes, ma'am.

11           This confirmed my understanding that

12 Beneficial's infringement allegations are so broad as to

13 encompassing things that we instructed and encouraged

14 our customers to do.  And it did not contain any

15 exclusion to account for the license that we had agreed

16 to.

17      Q.   Now, is there anyplace in Exhibits 8 and 9

18 where Beneficial specifically says that it is

19 specifically accusing Google customers for their

20 specific use of DoubleClick advertising products and

21 services to do advertising?

22      A.   No, ma'am.

23      Q.   Okay.  And so, again, why do you believe that

24 these allegations and what covered -- strike that.

25           Why do you believe that Beneficial was

1  accusing Google customers of infringement for use of

2  DoubleClick ad products and services?

3      A.   They were accusing DoubleClick customers,

4  while they didn't include the DoubleClick name, they --

5  they were describing these broad contentions, what

6  DoubleClick did and what we told our customers to do

7  with DoubleClick.

8      Q.   Are you able to give the jury an example from

9  the infringement contentions to describe why you thought

10  the accusations were broad in nature?

11      A.   Yes, ma'am.

12          In the exhibit -- can we go to Page -- on the

13  bottom, it's labeled 831.

14      Q.   Okay.  And which exhibit would you like, 8 or

15  9?

16      A.   9 is okay, since it's the later-in-time one.

17      Q.   Thank you.

18      A.   So there we go.

19          Here again, we see one of the detailed pages

20  from the appendix.  And the format again is on the left.

21  You see the -- the text from the patent, and on the

22  right, you see what Beneficial is saying about -- about

23  what infringes this element.

24          And actually, I should apologize, this element

25  starts at 830 and then leads into 831.

1            You know, what caught my eye here was, they

2    were explaining that -- on the right side, again, is

3    what Beneficial says infringes their patent.

4            And here it reads:  The only practical way for

5    a web portal or website to concurrently display a

6    service representation and -- and an advertising

7    presentation at a first network accessible node is to --

8    and then they go on and list elements from the patent,

9    but I'll read it here -- combine the data associated

10   with or connected in some way with the advertising

11   presentation with code associated with or connected in

12   some way with a service display representation and so

13   on, and the section continues.

14       Q.    Thank you.

15            And would you please describe to the jury,

16   what is Google's intention as to how DoubleClick ads and

17   services should be used?

18       A.    DoubleClick is about letting third-party

19   websites put up ads on their website and serving it for

20   them.   That's what we intend them to select and display

21   ads on, on a third-party website.

22       Q.    Thank you.

23            Is there any relationship between what Google

24   intends its customers to do and what Beneficial

25   describes as its view of what is infringing of the

1  patents in Exhibits 8 and 9?

2      A.   Yes, ma'am.

3      Q.   What is that relationship?

4      A.   Beneficial's theories of infringement

5  encompass everything that we tell DoubleClick customers

6  to do and, in fact, go far broader than them.

7      Q.   I'd like to show you Exhibit 12 in your

8  binder.  If you would please turn to that.

9              MS. ANDERSON:  And it is pre-admitted.

10 If we can display that, please.

11             THE COURT:  Counsel, we're not exhibiting

12 any exhibits that aren't pre-admitted, so you don't need

13 to reference it's pre-admitted every time.

14             MS. ANDERSON:  I apologize, Your Honor.

15 Thank you.

16             THE COURT:  Not a problem.

17     Q.   (By Ms. Anderson) Mr. Trinh, do you recognize

18 Exhibit 12?

19     A.   Yes, ma'am.

20     Q.   What is this?

21     A.   This is another portion of discovery, but this

22 time it's from this -- the current case.  Like the --

23 the past exhibits, it's -- it's interrogatories from

24 Google to Beneficial --

25     Q.   And --

1          A.    -- and their responses.

2          Q.    -- when you say the current case, which case

3    are you talking about?

4          A.    The case against -- that Beneficial instituted

5    against our customers.

6          Q.    Is that the one from 2011?

7          A.    Yes, ma'am.

8          Q.    Now, what kind of document is Exhibit 12?

9          A.    So this is a document from the Court discovery

10   procedure, and this document is Beneficial's responses

11   to some written questions -- or to a written question

12   from Google.

13         Q.    Where in Exhibit 12 do we see what question

14   Google posed to Beneficial?

15         A.    If you turn to the next page, you'll see

16   Interrogatory No. 1, and that's the question that --

17   that Google posed to Beneficial.

18         Q.    And would you describe to the jury, in

19   general, what was the question posed to Beneficial in

20   Exhibit 12?

21         A.    Sure.  So the -- excuse me -- the

22   interrogatory reads:  To the extent that Beneficial

23   contends that the accused Google partners infringe any

24   claims of the patent-in-suit, acknowledge whether that

25   contention is based on the use of any advertising

```
 1  present -- advertising presentation, products, or
 2  services provided by Google and specifically identify
 3  the product or service provided by Google that
 4  Beneficial intends to rely on to show infringement by
 5  any accused Google partner.
 6            Basically --
 7            THE COURT:  Mr. Trinh, I know you're
 8  reading, but you're going about 90 miles an hour.
 9            THE WITNESS:  I apologize.
10            THE COURT:  Your actual testimony has
11  slowed down quite nicely, but just remember you need to
12  read at the same speed you testify.
13            THE WITNESS:  Yes, sir.
14            MS. ANDERSON:  Thank you.
15      Q.   (By Ms. Anderson) So did you review Exhibit 12
16  in the course of your responsibilities at Google?
17      A.   Yes, ma'am.
18      Q.   Did you review the response given by
19  Beneficial to Google's question?
20      A.   Yes, ma'am.
21      Q.   Can -- where -- where do we see that located
22  in here?
23      A.   If we turn to the next page, please, this --
24  we have a paragraph here that begins with:  Plaintiff
25  responds as follows.
```

1    Q.   And what did you learn from reviewing

2 Beneficial's response about what was its position as to

3 whether or not it was suing Google customers for the use

4 of Google products?

5    A.   I learned that Beneficial would not -- was not

6 excluding Google products or services.  They were not

7 excluding DoubleClick.

8    Q.   What about the response led you to that

9 conclusion?

10    A.   So this paragraph -- in this paragraph, they

11 explained that their contentions are based -- their

12 infringement theories are based on the use of

13 advertising presentations.

14         And the answer is -- and it goes on to read:

15 This contention is not based specifically on their use

16 of any particular Google product or service or more

17 generally on the use of any particular ad server

18 technology.

19         And then it goes on, but at the end, it says:

20 Whether the advertising presentations are served by

21 Google, some other third party, or by the Defendant

22 itself does not change the analysis.

23         This was Beneficial's position.

24    Q.   Now, has Google itself done analysis of

25 whether its customers sued in 2011 were actually using

1  the '702 or '943 patent inventions on their websites?

2      A.   No, ma'am.

3      Q.   Why hasn't Google done that?

4      A.   Because they're licensed.

5      Q.   Okay.  And what, if any, relationship did

6  Beneficial's statements about what it believed was

7  covered by its inventions have to Google's decision to

8  not -- to do an analysis of customer products?

9      A.   Beneficial's infringement allegations were so

10 broad that they encompassed what our DoubleClick

11 customers did and what we instructed them and -- and

12 helped them do.

13     Q.   Thank you.

14          Do you have a view as to whether or not

15 Beneficial breached the settlement agreement with

16 Google?

17     A.   Yes, I do.

18     Q.   What is your view?

19     A.   Absolutely.

20     Q.   Why do you believe that?

21     A.   By suing our customers for the use of our

22 products, they deprived -- they deprived us of the peace

23 and the resolution that we bargained for.  They -- if

24 these products actually infringed, they would be

25 licensed.  If they weren't, there'd be no reason to sue

1  them.

2      Q.    In your experience working with Google,

3  can dealing with lawsuits be disruptive to businesses?

4      A.    Yes, ma'am.

5      Q.    Now, you have an understanding as to whether

6  or not Beneficial ended up resolving or settling some of

7  its claims against some of the sued Google customers?

8      A.    I -- I am aware.

9      Q.    And what is your understanding?

10      A.    My understanding is they -- the customers in

11  this case have settled.

12      Q.    Does that affect your view in any way as to

13  whether or not Beneficial breached the contract with

14  Google?

15      A.    Not at all.

16      Q.    And why is that?

17      A.    The customers should never have been sued in

18  the first place, if they didn't -- if their use of our

19  products didn't actually infringe.

20      Q.    And, again, are you -- are you taking the

21  position that Beneficial couldn't sue Google customers

22  for the use of other company's products?

23      A.    Not under our license, no.

24      Q.    Now, do you have knowledge as to approximately

25  how many hours of employee time Google has spent devoted

1  to dealing with Beneficial's 2011 lawsuit against

2  customers?

3             MR. ADAMS:  Your Honor, objection.  May

4  we approach?

5             THE COURT:  You may approach.

6             (Bench conference.)

7             MR. ADAMS:  Your Honor, the objection is

8  that this question is beyond the scope of anything

9  that's been disclosed in this case.  To the extent --

10  and I think this is going to show either harm or

11  damages, Your Honor.

12             They have never made any theory of harm

13  or damages that's related at all to the time spent by

14  any employee on this.  In fact, their initial position

15  was they were trying to get damages based on the

16  attorneys' fees that they incurred in bringing this

17  lawsuit.

18             Judge Payne has dismissed that from the

19  case.  So I just -- I didn't want this question to be

20  answered.

21             THE COURT:  What's the relevance,

22  Counsel?

23             MS. ANDERSON:  Your Honor, the disruptive

24  nature of the lawsuits, that Google employees have been

25  dealing with this when they should not have because of

1  the peace they bought through the settlement agreement.

2              THE COURT:  So you're not -- you're not

3  offering this to support some kind of monetary amount of

4  damages?

5              MS. ANDERSON:  Not at all in any way,

6  Your Honor.

7              MR. ADAMS:  Your Honor, harm under the

8  contract -- we asked them in discovery, provide us with

9  how you've been harmed or damaged.  They've only

10  provided us with one theory, Your Honor, and that's

11  because they've paid fees to allow them now to suggest

12  some measure of harm that's based on a theory they've

13  never disclosed.

14              THE COURT:  Has that theory been

15  disclosed?

16              MS. ANDERSON:  Well --

17              THE COURT:  Business disruption?

18              MS. ANDERSON:  Business disruption as a

19  theory of damages, no, because we're not seeking that.

20              THE COURT:  That's a theory of harm.

21              MS. ANDERSON:  It's a theory of harm.

22  I'm not aware of what Mr. Adams is referring to, but

23  what we have said consistently and said it in the last

24  hearing with Judge Payne is, the problem with what has

25  happened is the depravation of peace.  Whether or not

1  there's harm, we're only seeking 1 dollar of damage.

2  So whether or not harm -- if the jury finds there's a

3  breach, we're entitled to recover $1 under that

4  particular provision of California law.

5            So it is -- it is explaining to the jury

6  that there has been a breach because we did not have the

7  litigation peace that we bargained for here.

8            MR. ADAMS:  Your Honor, just -- again,

9  there are two issues.  One is damages; one is harm.

10  They have never disclosed -- and we've asked them to

11  describe how you've been harmed, because that's an

12  element of the breach-of-contract claim.

13            They have never disclosed an element of

14  harm as the disruption of business.  They've always

15  pointed to their attorneys' fees in every discovery

16  response in their disclosures.

17            This is the first time, Your Honor,

18  they're disclosing to us that disruption of business

19  environment is a measure of harm.  In fact, Your Honor,

20  just like I -- I thought they were going another route.

21  I thought they were going to say that getting the

22  indemnity letters -- because that was a dispute that we

23  had with the Court as to whether or not they disclosed

24  the indemnity letters to us timely, and we've --

25            THE COURT:  Let's not talk about what you

1   thought.  The question is --

2               MR. ADAMS:  This has never been brought

3   to our attention, Your Honor.

4               THE COURT:  The question, Ms. Anderson,

5   has the disruption of Google's business been disclosed

6   to the Defendant as a basis for you meeting your burden

7   of proof that harm has resulted from the alleged breach?

8               MS. ANDERSON:  I can't say that I know

9   off the top of my head a question about harm that has

10  been responded to with that information.

11              THE COURT:  Unless -- unless somebody can

12  represent to me affirmatively that it's been disclosed,

13  then to avoid the possibility of an ambush or

14  sandbagging, I'm going to sustain the objection.

15              MS. ANDERSON:  Okay.  Thank you, Your

16  Honor.

17              THE COURT:  Okay.

18              MS. ANDERSON:  Thank you.

19              (Bench conference concluded.)

20              THE COURT:  All right.  That's -- that

21  objection is sustained based on the bench conference.

22              Let's proceed.

23              MS. ANDERSON:  Thank you, Your Honor.

24      Q.   (By Ms. Anderson) Mr. Trinh, you said earlier

25  that Google learned about the 2011 because of certain

1  complaints.

2       A.   Yes, ma'am.

3       Q.   I'd would like to draw your attention to

4  Exhibit 31.

5             MS. ANDERSON:   If we could display that,

6  please.

7       Q.   (By Ms. Anderson) What is Exhibit 31?

8       A.   It's a complaint letter from one of -- from

9  the lawyers for one of our customers.

10      Q.   And which customer was that?

11      A.   This would be Advance.

12      Q.   Was Advance one of the companies sued in the

13  2011 lawsuit?

14      A.   Yes, ma'am.

15      Q.   And would you identify for the jury the date

16  of the letter?

17      A.   It's here on the top right, May 20th, 2011.

18      Q.   Did you have any job responsibilities related

19  to this letter?

20      A.   Yes, ma'am.

21      Q.   I'd like to now turn, please, to Exhibit 32 in

22  your binder.  Do you recognize Exhibit 32?

23      A.   Yes, ma'am.

24      Q.   What is Exhibit 32?

25      A.   This is another complaint letter from

1  customers sued in this case.

2      Q.   Which customers sent this complaint letter?

3      A.   This is a joint complaint letter from Advance

4  Publications, ALM Media Properties, American Media,

5  Inc., and Autotrader.com, Inc.

6      Q.   Okay.  And would you please identify for the

7  jury the date of the letter.

8      A.   Yes, ma'am.  June 29th, 2011.

9      Q.   And to whom was it addressed?

10     A.   That's -- that's me right there --

11     Q.   Okay.

12     A.   -- Michael Trinh.

13     Q.   Now, would you please turn to Exhibit 37?

14     A.   Yes, ma'am.

15     Q.   What is this exhibit?

16     A.   This is another complaint letter from a

17  customer.

18     Q.   All right.  And which customer sent this

19  Exhibit 37?

20     A.   This is outside counsel for Autotrader.com.

21     Q.   All right.  And to whom was this letter

22  addressed?

23     A.   Jennifer Polse.

24     Q.   Okay.  And what is the date of the letter for

25  the jury?

1      A.   This is September 19th, 2013.

2                MS. ANDERSON:  I have no further

3  questions, Your Honor.

4                Thank you.

5                THE COURT:  You pass the witness?

6                MS. ANDERSON:  Pass the witness.  Thank

7  you.

8                THE COURT:  Cross-examination by the

9  Defendant.

10               MR. ADAMS:  Yes, Your Honor.

11               MR. RAMBIN:  May I approach, Your Honor?

12               THE COURT:  You may approach.

13               (Pause in proceedings.)

14               MR. ADAMS:  Your Honor, may I proceed?

15               THE COURT:  You may proceed, Counsel.

16                     CROSS-EXAMINATION

17 BY MR. ADAMS:

18     Q.   Mr. Trinh, good afternoon.

19     A.   Good afternoon.

20     Q.   We've met before, correct?

21     A.   Yes, we have.

22     Q.   In fact, during the underlying litigation, you

23 and I participated in some of the discussions with the

24 settlement of the lawsuit, correct?

25               MS. ANDERSON:  Objection, Your Honor.

1   Motion in limine.

2                   THE COURT:  Approach the bench, Counsel.

3                   (Bench conference.)

4                   THE COURT:  Specifically, what is it,

5   Counsel?

6                   MS. ANDERSON:  There's an agreed upon

7   motion in limine there will be no discussions about

8   negotiation of the settlement agreement.

9                   I believe that was the tenor of your

10  question.

11                  MR. ADAMS:  And I appreciate the

12  objection, Your Honor.  I don't intend to get into those

13  conversations.

14                  THE COURT:  You're just identifying that

15  you had the conversation?

16                  MR. ADAMS:  Yes, yes.

17                  THE COURT:  Unless he's going to ask

18  questions about the substance of the discussion, I think

19  we're fine.

20                  MS. ANDERSON:  Thank you, Your Honor.

21                  MR. ADAMS:  Thank you.

22                  THE COURT:  Let's move along.

23                  (Bench conference concluded.)

24                  THE COURT:  All right.  Let's go forward.

25                  MR. ADAMS:  Thank you, Your Honor.

1    Q.   (By Mr. Adams) Would you consider yourself a

2   patent lawyer, Mr. Trinh?

3    A.   Of sorts.

4    Q.   By of sorts, you mean you're familiar with the

5   procedural rules that apply in patent litigation, right?

6    A.   Yes, sir.

7    Q.   Because your role at Google is that you manage

8   and oversee their litigation matters, including the

9   patent litigation, right?

10    A.   I did, but yes.

11    Q.   Well, you did at the time that -- when you

12   started in Google at the 2008 timeframe?

13    A.   Yes, sir.

14    Q.   Does Google file its own patent infringement

15   cases?

16    A.   Very rarely, but yes.

17    Q.   Have they done so in the time that you were

18   overseeing patent litigation matters?

19    A.   No.

20    Q.   Are you familiar with any of their patent

21   litigation cases that they filed?

22    A.   No.

23    Q.   Based on your sort of understanding of the

24   procedural rules, do you understand how sort of a patent

25   case starts, right?

1       A.   Yes, sir.

2       Q.   And it starts with a patent owner filing a

3  complaint against a potential infringer, right?

4       A.   Yes, sir.

5       Q.   Do you -- is it your testimony that a

6  complaint that makes allegations in a patent case

7  establishes that the accused Defendant is, in fact,

8  infringing?

9       A.   No, it's not my belief.

10       Q.   You know the opposite of that, right?

11       A.   Can you explain?

12       Q.   Sure.  You know that the allegations in the

13  complaint says absolutely nothing about whether or not

14  those allegations are true, right?

15       A.   That's not right.

16       Q.   Sir, you understand that the mere fact that a

17  Plaintiff files a complaint that says that a product is

18  being infringed says nothing about whether or not that

19  product actually is infringing, right?

20       A.   No.

21       Q.   The complaint allegations merely state what

22  the patent holder believes to be the case at a

23  particular period of time, right?

24       A.   That's true.

25       Q.   Now, in the case of the lawsuit regarding the

1  '702 and the '943 patent, you know that when the

2  complaint was filed, it was done at a time when the

3  patent holder did not receive any documents or discovery

4  about how, for example, Google's system worked, right?

5       A.   Yes, sir.

6       Q.   In fact, Google's documents, the ones that

7  show how their website operates, those are confidential

8  documents, right?

9       A.   Yes, sir.

10      Q.   So the only way for -- for example, Beneficial

11 Innovations to actually know if your website is

12 infringing is to get your confidential information,

13 right?

14      A.   No.

15      Q.   Why do you say no to that?

16      A.   Because a Plaintiff is -- can go to publicly

17 available sources of information and do its own

18 investigation before filing suit.

19      Q.   And you understand, sir, that that's, in fact,

20 what happened in this case, right?

21      A.   Yes, sir.

22      Q.   Well, you understood that when the complaint

23 was filed, the complaint was based on the information

24 that was publicly available to Beneficial Innovations

25 about how Google's website worked and how all of the

1  other websites worked, right?

2      A.   Yes, sir.

3      Q.   You also know that one of the allegations in

4  this -- withdrawn.

5           One of the elements in one of the claims had

6  to do with computer code that was being used at a

7  particular website, right?

8      A.   Yes, sir.

9      Q.   That information is information that's

10  confidential to Google, correct?

11      A.   In the case of Google, yes, sir.

12      Q.   So in order for Beneficial to actually know

13  whether or not Google infringed, Beneficial needed to

14  get Google's internal confidential documents in order to

15  actually prove infringement, true?

16      A.   Yes, sir.

17      Q.   Because of that, when Google -- when

18  Beneficial filed its complaint, are you suggesting to

19  the jury that Beneficial's mere allegations established

20  at that moment that Google was infringing?

21      A.   No, sir.

22      Q.   In fact, even today, Google denies that it

23  infringes any of Beneficial's patents, right?

24      A.   Correct.

25      Q.   And this is after Google has not only seen the

1  complaint, not only seen the infringement contentions,

2  but Google has actually had the ability to look at

3  expert reports that have been done by experts that

4  analyze your system and the patent, and Google believes

5  that it doesn't infringe the patent, right?

6       A.   Yes, sir.

7       Q.   Knowing that, sir, you are not telling this

8  jury that one -- withdrawn.

9            You understand that in order for Beneficial to

10  have breached the settlement agreement, it has to be the

11  case that Google providing DoubleClick to its customers

12  would constitute indirect infringement by Google, right?

13      A.   Yes, sir.

14      Q.   In order for Google to be -- to be indirectly

15  infringing, there has to be some finding of somebody,

16  some website that's actually infringing, right?

17      A.   I don't believe that to be the case.

18      Q.   All right.  Let's put it this way:  As you sit

19  here today, Mr. Trinh, you have zero evidence of any

20  website that's actually infringing either the '702

21  patent or the '943 patent, correct?

22      A.   No, sir.

23      Q.   You have evidence of infringement?

24      A.   Yes, sir.

25      Q.   The evidence that you have, Mr. Trinh, that's

1    based on the allegations in our complaint in our

2    infringement contentions, right?

3         A.   Yes, sir.

4         Q.   Let's put that aside for a moment.  We'll talk

5    about those.

6              Other than the infringement contentions, other

7    than the complaint, do you have any other evidence, any

8    other piece of documents that you can present to this

9    jury to establish any of the websites that we've accused

10   and we've filed complaints against infringe the '702 and

11   the '943 patent?

12        A.   No, sir.

13        Q.   I want to have you take a look at the

14   infringement contentions that you've sort of pointed to.

15   And in -- in your binder, I think Exhibit No. 8 --

16   Exhibit No. 8 is one of those contentions, correct?

17        A.   Yes, sir.

18        Q.   Now, did you review Exhibit 8 in this case?

19        A.   Yes, sir.

20        Q.   And your testimony was you reviewed these

21   infringement contentions very, very carefully, right?

22        A.   Yes, sir.

23        Q.   Let's take a look at the -- the very top of

24   the second page of Exhibit 8.  It says:  This disclosure

25   is based on the information available to Beneficial

1  Innovations -- I think it's cut off there.  Let me see

2  if I can take it...

3  MS. ANDERSON:  Give me one minute, Your

4  Honor?

5  THE COURT:  You may have a minute.

6  Q.   (By Mr. Adams) Let's try one more time.

7  This disclosure is based on the information

8  available to Beneficial Innovations as of the date of

9  this disclosure, and Beneficial Innovations reserves the

10  right to amend this disclosure to the full extent,

11  consistent with the Court's rules and orders.

12  Do you see that, sir?

13  A.   Yes, sir.

14  Q.   You understood that when Beneficial

15  Innovations filed or served these contentions, it was

16  before Beneficial Innovations had received any

17  information in discovery from any of the parties,

18  including Google, and the ones that are the part of this

19  case, true?

20  A.   Yes, sir.

21  Q.   Now, take a look at Page 5 of this document.

22  Do you have that in front of you, sir?

23  A.   Yes, sir.

24  Q.   Now, what's identified at Page 5 --

25  MR. ADAMS:  Blow up a little part of

1   this.

2        Q.    (By Mr. Adams) This represents the -- what's

3   known as the accused instrumentalities, right?  The

4   things that Beneficial was accusing of infringing,

5   right?

6        A.    Yes, sir.

7        Q.    And this sort of chart is included in each of

8   the infringement contentions, right?

9        A.    Yes, sir.

10        Q.    You understood that every step of the way,

11   when Beneficial filed or served its infringement

12   contentions, it was accusing websites of infringing a

13   patent, right?

14        A.    Yes, sir.

15        Q.    At no point did Beneficial ever accuse a

16   component of a website, right?

17        A.    That's not -- no.  No, sir.

18        Q.    You believe Beneficial accused a -- a specific

19   part of a website of infringing?

20        A.    Yes, sir.

21        Q.    And where would you have found that, sir?

22        A.    In the -- the claim charts, sir.

23        Q.    The claim charts, they break down

24   element-by-element where the infringing parts of the

25   website are, right?

```
 1        A.    Yes, sir.
 2        Q.    So, for example, Claim 53 that we've seen
 3   requires that there be a -- an apparatus for a service,
 4   right?
 5        A.    Yes, sir.
 6        Q.    And the apparatus has to have several
 7   different things, true?
 8        A.    Yes, sir.
 9        Q.    And in order to infringe, a website needs to
10   have all of the limitations, right?
11        A.    Yes, sir.
12        Q.    So, for example, if the website fails to have
13   the store-for-store user identification, but it has
14   everything else, that website doesn't infringe, right?
15        A.    Yes, sir.
16        Q.    Correct?
17        A.    Correct.
18        Q.    In that fashion, Beneficial can't just say you
19   infringe because you have a store-for-store user
20   identification, right?
21        A.    Not just by itself, no, sir.
22        Q.    It needs -- Beneficial needs to accuse all of
23   the different components combined in the way that the
24   claim requires it to be combined in, right?
25        A.    Yes, sir.
```

1      Q.    And that's what happened in this case,

2  correct?

3      A.    Could you ask that again?

4      Q.    Well, that's what happened in this case.   When

5  Beneficial filed its complaint and when it's filed its

6  infringement contentions, it accused websites of meeting

7  all of the limitations in the claims as opposed to

8  accusing one specific product of infringing, true?

9      A.    Yes, sir.

10      Q.    One of the things that you -- you said was

11  that the rog responses that were submitted by Beneficial

12  accused Google of contributory and induced --

13  contributory infringement and inducement; is that

14  correct?

15      A.    Yes.

16      Q.    Take a look at -- at Exhibit 23.   Exhibit 23

17  is the rog response that you pointed to, which is

18  Interrogatory No. 7.

19          Do you have that, sir?

20      A.    Yes, sir.

21      Q.    When you were asked questions about this

22  interrogatory, did you intend to suggest to the jury

23  that the response that was provided by Beneficial

24  Innovations meant that Beneficial Innovations was

25  accusing Google of either infringement by contributory

1  infringement or infringement by inducement, based on

2  their providing DoubleClick to their customers?

3        A.   Yes.

4        Q.   Are you certain about that, sir?

5        A.   Can you ask that question again --

6        Q.   Sure.

7        A.   -- please?

8        Q.   You pointed us to the third paragraph.

9        A.   Yes, sir.

10       Q.   And you read this to the jury, and you pointed

11  specifically to the section that says that Beneficial

12  seeks an injunction restraining and enjoining Defendants

13  from any further acts of infringement, contributory

14  infringement, or inducement of infringement of the '366

15  and the '702 patent.

16            Do you see that?

17       A.   Yes, sir.

18       Q.   Do you intend to suggest to the jury that when

19  this was set forth in the interrogatory that what

20  Beneficial was doing was seeking an injunction against

21  Google to prevent them from contributory infringement or

22  inducement based on their providing DoubleClick to their

23  customers?

24       A.   Yes, sir.

25       Q.   When did Google acquire DoubleClick?

1     A.    It closed sometime in 2008.

2     Q.    So the very first time that Google could have

3  infringed by providing DoubleClick would have been after

4  it acquired DoubleClick, right?

5     A.    Correct.

6     Q.    Do you see the bottom of this -- this document

7  that's on the screen?  Do you see that date there?

8     A.    I do.

9     Q.    That date is prior to Google acquiring

10  DoubleClick, right?

11     A.    This date on this page is.  Yes.

12     Q.    December 7 -- I mean -- I'm sorry -- December

13  5th, 2007, right?

14     A.    That's the date printed on this page.

15     Q.    Is there a different date?

16     A.    If you turn to the next page --

17     Q.    Sure.

18     A.    -- or two pages further up, on, I guess it's

19  Page listed as 29.

20     Q.    Yes.

21     A.    It's the certificate of service, and that date

22  reads December 5th, 2008.

23     Q.    All right.  Just so we're clear -- let me pull

24  this up here.  I'm going to blow up the full bottom of

25  this.  You see it says dated 5 -- December 5, 2007, and

1  then there was a signature block on there.

2          Do you see that?

3      A.   Yes, sir.

4      Q.   You recognize that subject block to be my

5  name, correct?

6      A.   Yes, sir.

7      Q.   Are you suggesting to the jury that the date

8  that's on this page is the date that was not the date

9  that this document was served?

10     A.   Yes, sir.

11     Q.   And that's based on the fact that you looked

12  at the certificate of service, right?

13     A.   I'd also look at the caption of -- of this

14  page.

15     Q.   By the caption of the page, you mean what?

16     A.   Sorry.  The -- sorry.  The caption of this

17  document for that on Page 1.

18     Q.   All right.  And how does that help you?

19     A.   So it lists Beneficial Innovations v the

20  Defendants.  It includes Google and YouTube.

21     Q.   Yes.

22     A.   This complaint wasn't filed against Google or

23  YouTube until December 20th, 2007.  So for this caption

24  to be right, the document had to be -- the certificate

25  of service date must be correct.

1    Q.   Well, your belief is, is that this document --

2 well, withdrawn.

3         You understood that there was a litigation

4 going on that included a bunch of other Defendants prior

5 to this, regarding these two patents, correct?

6    A.   Correct.

7    Q.   Did any of the -- let's just cut to the chase.

8 None of the infringement contentions that were served in

9 this case by themselves establishes the fact that any of

10 the Defendants infringe, correct?

11   A.   Correct.

12   Q.   The only thing that they establish is

13 Beneficial Innovations' belief at a particular moment in

14 time about their case, right?

15   A.   Yes, sir.

16   Q.   Beneficial hired an expert in this case?  I'm

17 sorry.  Withdrawn.

18        Google hired an expert in this case?

19   A.   Yes, sir.

20   Q.   When Google hired the expert, Google had the

21 ability to have that expert contact any of the accused

22 partners and get information about how the accused

23 partners' website worked to then come before this Court

24 and offer testimony that those accused partners'

25 websites infringed, correct?

1      A.   I think -- yes, sir.

2      Q.   And, in fact, when Google intervened in the

3 case, Google intervened on behalf of those partners,

4 right?

5      A.   Yes, sir.

6      Q.   That is, you were stepping into the shoe of

7 the -- of each of the accused partners that you've

8 talked about, right?

9      A.   No.

10      Q.   Well, with respect to -- when you say you

11 intervene on behalf of, what does that mean?

12      A.   We were asserting -- we were trying to get

13 clarification on the license that would flow down to

14 them.

15      Q.   Well, when you intervene, you filed -- you

16 filed an answer, right?

17      A.   Yes.

18      Q.   Meaning, Beneficial sued your partners and you

19 intervened on behalf of those partners, and you filed an

20 answer on behalf of those partners, right?

21      A.   They remained in the case, but yes, sir.

22      Q.   And you filed affirmative defenses on behalf

23 of the partners, right?

24      A.   Yes, sir.

25      Q.   In that respect, you were stepping into the

1    shoes of the partners, right?

2              MS. ANDERSON:  Objection, Your Honor.

3    Court's order.  May I briefly approach?

4              THE COURT:  You may approach.

5              (Bench conference.)

6              THE COURT:  What's your objection,

7    Counsel?

8              MS. ANDERSON:  Your Honor, I'm afraid

9    we're getting -- the reason that the affirmative

10   defenses were asserted is all about the exhaustion

11   defense, which has been excluded from the case.  I'm

12   concerned that to answer the questions the witness would

13   need to explain.

14             We -- we stepped -- we asserted in the

15   answer Defendants on behalf of customers, but that's the

16   affirmative defense of exhaustion.

17             We're here today talking about the

18   breach-of-contract claim.  I'm a little bit worried that

19   to -- for him to explain these questions, he'd have to

20   explain the exhaustion defense and defenses that are not

21   before the jury, because the customers were dismissed

22   and the Judge has excluded -- Your Honor has excluded

23   exhaustion.  I'm just a little worried it's getting

24   close.

25             THE COURT:  All right.

1            MR. ADAMS:  Your Honor, I don't intend to

2   get into any specific defenses or the affirmative

3   defenses, but I just want to note for the record that

4   they alleged a bunch of different defenses, including

5   license, so...

6            THE COURT:  Well, we're not going to

7   disrupt the trial and come up to the bench every time

8   somebody's worried somebody might be thinking about

9   getting into something.  If somebody crosses the line,

10  raise your objection.  Otherwise, I'm not going to give

11  advisory opinions from the bench.

12            MS. ANDERSON:  All right.  Your Honor --

13            THE COURT:  Okay.  Let's move on.

14            (Bench conference concluded.)

15            MR. ADAMS:  May I proceed, Your Honor?

16            THE COURT:  You may proceed.

17     Q.   (By Mr. Adams) Mr. Trinh, in order for it to

18  establish the breach of contract in this case, it needed

19  to prove infringement, correct?

20     A.   No.

21     Q.   Well, it needed to present this jury with some

22  evidence that somebody infringed the patents, right?

23     A.   Yes, sir.

24     Q.   And Google had full opportunity to have the

25  expert that it hired in this case do an infringement

1    analysis, right?

2         A.    Yes, sir.

3         Q.    Google didn't do that, did it?

4         A.    Correct.

5         Q.    Take a look at Exhibit 9.  And I want you to

6    turn to Page 43 of that document, sir.

7         A.    Give me a second, please.

8         Q.    Yes.

9         A.    Yes, sir.

10        Q.    Now, this is one of the infringement

11   contentions that were filed or served in one of the

12   cases, correct?

13        A.    Yes, sir.

14        Q.    Did you read this section of the infringement

15   contentions, sir?

16        A.    Yes, sir.

17        Q.    In the infringement contentions, and --

18   withdrawn.

19             You've read more than -- more than one

20   infringement contention that -- that was served in this

21   litigation, right?

22        A.    Yes, sir.

23        Q.    Would you agree with me that for each of the

24   infringement contentions that were served, it included a

25   section just like this section in which Plaintiff

1  explained the claim charts that you say set forth their

2  theories, right?

3      A.   Yes, sir.

4      Q.   Before each of the claim charts -- and those

5  are the charts that you say somehow -- you say that

6  Google or Beneficial sets forth the accusations against

7  DoubleClick.

8           You understood that the position of Beneficial

9  at the time was specifically identified in subsection

10 (i) of this section, right?

11     A.   Yes, sir.

12     Q.   And what Beneficial Innovations said in this

13 claim chart and in all other claim charts is that their

14 position on infringement of specific claims will depend

15 on the claim construction adopted by the Court.  Because

16 said construction -- because said construction has not

17 yet occurred, Plaintiff cannot take a final position on

18 the bases for infringement of the asserted claims.

19          Do you see that?

20     A.   I do.

21     Q.   What is claim construction?

22     A.   In general, it's the process by which the

23 Judge defines certain words in the patent claims.

24     Q.   In the cases that you've litigated and

25 managed, every patent litigation goes through a process

1  called a Markman hearing, right?

2      A.    Yes, sir.

3      Q.    And that's the point in time where, when I

4  showed, for example, Exhibit -- Claim 53, it has a bunch

5  of words.  Some of those words the parties may dispute

6  what they mean, right?

7      A.    Yes, sir.

8      Q.    And when there's a dispute about what a word

9  or phrase means in a patent claim, the parties bring

10  that dispute to the Court, right?

11      A.    Yes, sir.

12      Q.    And the Court then basically tells the

13  parties, this is what that term means, right?

14      A.    Yes, sir.

15      Q.    There are times when a Plaintiff will file

16  infringement contentions based on that Plaintiff's

17  understanding of what those words mean, but then have

18  the Court later on say to the Plaintiff, no, those words

19  don't mean that; they mean something else.

20            That's occurred, right?

21      A.    Yes, sir.

22      Q.    In this case, there were two patents asserted

23  against the Defendants, right?

24      A.    Yes, sir.

25      Q.    One of the patents went away, right?  Well,

1  the -- the allegations with respect to one of the

2  patents was dismissed against the Defendants, correct?

3      A.    I'm -- I'll take your word for it.

4      Q.    Let the record reflect the '943 patent at some

5  point was dismissed from the case.

6          You know that, right?

7      A.    Yes, sir.

8      Q.    It was done after the Court issued the claim

9  construction order in this case, right?

10      A.    That sounds right.

11      Q.    You know, sir, that when the parties in a

12  patent litigation file their infringement contentions,

13  they typically do that before the parties have full

14  guidance regarding the scope of the patent claims,

15  right?

16      A.    Yes, sir.

17      Q.    And depending on that scope, it has a -- it

18  could have a very significant affect on whether or not a

19  product infringes or doesn't infringe, true?

20      A.    Yes, sir.

21      Q.    Meaning the Court can do something that

22  completely changes what the Plaintiff's theory of the

23  case and/or completely change whether or not the product

24  infringes the patent, right?

25      A.    Yes, sir.

1      Q.   And every time Beneficial served their

2  infringement contentions that you're relying on to show

3  infringement in this case, they explained to Google and

4  all of the partners, these were just our theories,

5  before the Court has set forth the full scope of the

6  claim language, right?

7      A.   Yes, sir.

8      Q.   I noticed that you were shown letters -- I

9  think they were Exhibits 31, 32, and 37 -- that

10  represent what you call complaints by Google partners

11  regarding the fact that they were sued, right?

12      A.   Yes, sir.

13      Q.   Can you explain to the jury why -- withdrawn.

14           When Google got those letters, did Google just

15  get them and put them in a file?

16      A.   No, sir.

17      Q.   Did Google look at them, tear them up?

18      A.   No, sir.

19      Q.   Did Google look at them and respond?

20      A.   Yes, sir.

21      Q.   Can you explain to this jury why it is no one

22  has shown you and you haven't presented any of your

23  responses?

24      A.   I'm not sure I can answer that without

25  checking with the Judge.

1    Q.   I'm not going to go any further.

2         Did you respond?

3    A.   Yes, sir.

4    Q.   At any point, did you -- withdrawn.

5         Did Google pay to any of the accused partners

6    any monies based on the fact that they complained?

7    A.   No.

8    Q.   At any point, did Google lose any partners

9    based on the fact that Beneficial filed a lawsuit

10   against them and they complained?

11   A.   Not to my knowledge.

12   Q.   All right.  In fact, as of the status -- as of

13   today, the only thing that's happened, based on the fact

14   that Beneficial filed a complaint against the accused

15   partners, is that they sent a letter to Google and

16   Google sent a response to them, right?

17   A.   Again, this -- I'm not sure I can answer that

18   in detail without checking with the Judge.

19   Q.   Let's do it this way:  In each instance where

20   there was a complaint, as you call it, served or sent by

21   a Google partner, Google sent a letter back, right?

22   A.   Yes, sir.

23   Q.   Google never paid any monies pursuant to those

24   complaints, right?

25   A.   Correct.

1      Q.   And Google never lost any customers or

2  partners because of that complaint, right?

3      A.   Correct.

4      Q.   Now, the key issue in this case is the

5  settlement agreement.  And I want you to take a look at

6  Exhibit 1.  I think this is the first document in your

7  binder.

8           Do you have that in front of you, sir?

9      A.   Yes, sir.

10      Q.   What role did you play in negotiating the

11  terms of this agreement?

12      A.   I was one of the Google attorneys involved.

13      Q.   And your role was just to be one of the

14  attorneys, or did you have a -- a more significant role?

15      A.   I worked on drafting this agreement, and like

16  I said earlier, my day-to-day supports was to be

17  responsible for these matters.

18      Q.   Part of your role was trying to get the best

19  license and deal that you could get for Google for the

20  money that Google was paying, correct?

21      A.   Yes.

22      Q.   And at the time that you were negotiating with

23  respect to the terms of this license agreement, did you

24  have in your mindset that you wanted to get the best

25  possible deal for Google's partners?

1    A.   Yes.

2    Q.   You understand that Beneficial -- Google has

3 accused Beneficial of breaching the contract because it

4 sued the partners, right?

5    A.   Yes, sir.

6    Q.   Take a look at Section 6 of the agreement.

7 It's at Page 4 of Exhibit 9.

8         Do you have that in front of you, sir?

9    A.   Yes, sir.

10    Q.   I'm just going to blow up the first section

11 here.

12         Now, it says covenant not to sue.  Do you see

13 that?

14    A.   Yes, sir.

15    Q.   You're familiar with that phrase?

16    A.   Yes, sir.

17    Q.   What does it mean?

18    A.   This is an agreement -- or this section covers

19 an arrangement between the parties not to sue each

20 other.

21    Q.   Well, I didn't ask you about the section.  I

22 asked but what does a covenant not to sue mean in the

23 context of a license agreement.

24    A.   Yes, sir.  It's an agreement not to sue.

25    Q.   Right.  It's -- it's a section where if the

1 parties wanted to, they could negotiate that one party

2 not sue anybody, right?

3     A.   In general, yes, sir.

4     Q.   If -- if Beneficial -- if Google wanted to and

5 they wanted to get the best possible deal for their

6 partners, one of the things Google could have done is

7 negotiate an agreement that said, Beneficial, you can't

8 sue any of our partners, right?

9     A.   That wasn't possible, no, sir.

10     Q.   Well, one of the things Google could have

11 tried to negotiate for was a covenant or a promise that

12 Beneficial not sue its partners, true?

13          MS. ANDERSON:  Objection.  Motion in

14 limine, Your Honor.

15          THE COURT:  Specify your motion in

16 limine, Counsel.

17          MS. ANDERSON:  To respond to the

18 question, the witness may need to address negotiations.

19          THE COURT:  Restate your question,

20 Counsel.

21          MR. ADAMS:  Sure.

22     Q.   (By Mr. Adams) Let's do it this way:  In the

23 covenant not to sue, Google negotiated for an agreement

24 by Beneficial not to sue certain entities, right?

25     A.   Correct.

1    Q.   It negotiated for an agreement that Beneficial

2  not sue its affiliated company called YouTube, right?

3    A.   Yes, sir.

4    Q.   And it negotiated an agreement that Beneficial

5  not sue NBC Universal, right?

6    A.   Yes, sir.

7    Q.   Now, was NBC Universal an affiliate of Google

8  at the time?

9    A.   No, sir.

10    Q.   All right.  It was a completely separate

11  company, right?

12    A.   Yes, sir.

13    Q.   And Google negotiated an agreement that

14  Beneficial not sue Google's other affiliates, right,

15  other than YouTube, right?

16    A.   Yes, sir.

17    Q.   Nowhere in Section 6 of this covenant not to

18  sue did Google or Beneficial agree that Beneficial would

19  sue Beneficial's partners, true?

20    A.   Correct.

21    Q.   So from the standpoint of what promises were

22  made and broken, there was no promise made by Beneficial

23  that it wouldn't sue Google's partners in the covenant

24  not to sue that was breached by Beneficial, correct?

25    A.   Not a covenant not to sue, that's correct.

1    Q.    The only complaint that you have is that there

2  was a breach of the agreement based on the license,

3  right?

4    A.    Yes, sir.

5    Q.    Now, you agreed, Mr. Trinh, that when

6  Beneficial and Google sat down and they negotiated the

7  terms of the license, Google had the opportunity at that

8  time to try to get the -- withdrawn.  Ask it another

9  way.

10         Google sought the -- to get the best license

11  it could get in this agreement, right?

12    A.    Yes, sir.

13    Q.    And the license that Google received was not a

14  blanket license for Google's partners, right?

15    A.    Correct.

16    Q.    But that doesn't mean it wasn't a license that

17  said we give you, Google's partners, a license to use

18  Google's products without any conditions, right?

19    A.    Correct.

20    Q.    The license was conditional, right?

21    A.    Limited, yes.

22    Q.    When you say limited, what do you mean by

23  that?

24    A.    They were -- there were boundaries placed on

25  that license.

 1        Q.    Let's take a look at Page 2 of the license

 2   agreement.  The limits that were placed on the

 3   agreement, they're found in both Section A and Section B

 4   of the license agreement, correct?

 5        A.    Yes, sir.

 6        Q.    When Google -- withdrawn.

 7              Section B, that's a for-avoidance-of-doubt

 8   section.  Do you see that?

 9        A.    Yes, sir.

10        Q.    And that means that what the parties were

11   doing in this subsection, they were clarifying what the

12   scope of that license to Google's partners was, right?

13        A.    Yes, sir.

14        Q.    And they did that because that was an

15   important concept in this license agreement, true?

16        A.    Yes, sir.

17        Q.    Now, one of the things that -- withdrawn.

18              Let's do it this way, sir:  I want you to

19   focus on Section (c) in the Provision B of this license

20   section.  It says:  The provision of those products or

21   services would not constitute direct or indirect

22   infringement by Google of Claim X, right?

23        A.    Yes, sir.

24        Q.    When you responded to the Google partners that

25   complained based on the Beneficial's lawsuit, did Google

1   explain to its customers that they were only liable --

2   withdrawn.

3           They were only licensed if Google's provision

4   of DoubleClick constituted indirect infringement by

5   Google?

6       A.   Yes, sir.

7       Q.   At the time that you did that, did Google

8   believe -- was Google's state of mind that the fact that

9   Google gave them DoubleClick meant that Google was

10  indirectly infringing the patent?

11      A.   Can you ask that question again?

12      Q.   Sure.  Let me refer back.

13          As of today, Google does not believe that it's

14  infringing the patent in any way, whether it's direct or

15  indirect, right?

16      A.   Correct.

17      Q.   In fact, Google's position is that the ad tag

18  that they provide by DoubleClick doesn't meet the claim

19  limitation in Claim 53, right?

20      A.   Can you ask that again?

21      Q.   Sure.  One of the things that Google asserted,

22  when the lawsuit was filed against them by Beneficial,

23  was that that Claim Limitation (h) that I put on the

24  board several times that requires the programmatic

25  elements for combining advertising-related information

1  with search-related information, Google's position has

2  always been that they provide ad tags, and those ad tags

3  do not meet the claim language advertising related

4  information, true?

5      A.   Correct.

6      Q.   And Google maintains that today, right?

7      A.   Correct.

8      Q.   When Google's partners sent a letter saying:

9  Look, you owe us indemnification.  As of that moment in

10 time, Google's mindset, their understanding was we don't

11 indirectly infringe this patent simply because we give

12 you DoubleClick, right?

13     A.   No.

14     Q.   Well, is it the case that Google thought, when

15 it got the letters, that Google, in fact, was committing

16 indirect infringement?

17     A.   No.

18     Q.   That's my question, sir.  Google's state of

19 mind, when they received the indemnification letters

20 from their customers, was that Google's provision of

21 DoubleClick did not constitute indirect infringement,

22 correct?

23     A.   Not quite, no, sir.

24     Q.   Why is that not quite?

25     A.   Those were our contentions; however,

Beneficial's infringement allegations, as we understood

them, would be so broad so that if Beneficial was right,

then they -- then they would indirectly infringe and,

thus, we'd be licensed.

    Q.   Right.   That's why I couched the question,

sir, not with respect to what Beneficial's contentions

were but what Google's state of mind was.

        Do you understand that?

    A.   Okay.

    Q.   Google's state of mind.   Google gets a letter.

Google reads it.   As of the time Google read those

indemnification letters, Google's state of mind was,

providing DoubleClick to you, Google partner, does not

constitute indirect infringement by us, because we don't

believe we infringe the patent, whether directly or

indirectly.

        That was Google's state of mind at the time,

right?

    A.   No.

    Q.   Google had a different state of mind?

    A.   Yes.

    Q.   And Google's different state of mind was,

well, if we believe Beneficial's allegations, then maybe

we could be liable, right?

    A.   Correct.

1      Q.   But from your perspective, based on the

2    analysis that you did and the expert that you hired in

3    the prior case, you knew that if push came to shove, you

4    would defend the case and your position would be we

5    don't infringe, right?

6      A.   No.

7      Q.   Well, is it the case that if you had stepped

8    into the shoes of -- well, withdrawn.

9           When you intervene in this case, in this case,

10   you didn't intervene and say:  Well, yeah, we infringe,

11   and therefore, our -- our -- our -- and -- and the

12   reason why these Google partners are -- are not

13   infringing is because they're licensed, that wasn't the

14   position you took, was it?

15     A.   No, sir.

16     Q.   Right.  When you intervened in this case, you

17   filed an answer denying infringement, right?

18     A.   Yes, sir.

19     Q.   Not just based on license; you denied that you

20   were infringing the patent, correct?

21     A.   Correct.

22     Q.   Because that's the view that Google had from

23   day one up to today, right?

24     A.   Not quite.

25     Q.   Well --

1     A.   No, sir.

2     Q.   Well, the not quite, Mr. Trinh, is if you look

3 to what our beliefs are, right?

4     A.   No, sir.

5     Q.   Well, at some point, did Google form the

6 opinion that we infringe?

7     A.   No, sir.

8     Q.   And Google never formed the opinion that

9 providing DoubleClick means that we indirectly infringe,

10 right?

11     A.   Can you repeat that?

12     Q.   Sure.

13          Google has never formed the opinion that based

14 on their analysis of the claim language and their

15 analysis of the way their system works that providing

16 DoubleClick to any of its customers constitutes indirect

17 infringement by Google, right?

18     A.   Correct.  We have never reached that.

19     Q.   When Google executed the settlement agreement

20 that's part of this case, in that agreement, Google

21 maintained its denial of infringement, right?

22     A.   Correct.

23     Q.   By that, I mean Google paid money to get a

24 license, right?

25     A.   Correct.

1    Q.    And at the same time, Google said:  You know

2  what; we're paying this money, but we're not admitting

3  that we infringe any of your patents, right?

4    A.    Correct.

5    Q.    At the time that Google settled and Google

6  executed the settlement agreement, there was another

7  Defendant still in the case, right?

8    A.    Yes, sir.

9    Q.    That was the New York Times, right?

10   A.    Yes, sir.

11   Q.    And they had a website, NewYorkTimes.com,

12  correct?

13   A.    Yes, sir.

14   Q.    And the NewYorkTimes.com uses DoubleClick,

15  right?

16   A.    I -- I don't know that.

17   Q.    What about Amazon.com?  Does Amazon.com use

18  DoubleClick?

19   A.    Yes, sir.

20   Q.    Does -- Amazon.com is a customer, right?

21   A.    Yes, sir.

22   Q.    Amazon.com is a -- was a Defendant in this

23  lawsuit, correct?

24   A.    Yes, sir.

25   Q.    And you know that Amazon.com today is still

1    contesting infringement, right?

2        A.   Yes, sir.

3        Q.   How did Google treat Amazon.com in the

4    settlement agreement?  Withdrawn.

5            Let me ask it a different way.

6            You want to tell -- withdrawn.

7            You've testified to the jury that what you

8    were trying to do was get peace so that no further

9    lawsuits can be brought against your customers, right?

10       A.   Yes, sir.

11       Q.   And at the time you executed the settlement

12   agreement, you knew that Amazon was one of your

13   customers, right?

14       A.   I don't know that, actually.

15       Q.   You know today that Amazon is a customer,

16   correct?

17       A.   Yes, sir.

18       Q.   How did Google treat Amazon in the settlement

19   agreement?

20       A.   Could you clarify what you mean by that?

21       Q.   Sure.  Take a look at Page 2 of the settlement

22   agreement.

23       A.   Yes, sir.

24       Q.   You see the Section D at the top?

25       A.   I do.

```
 1        Q.   You were part of the negotiation of this
 2   section, right?
 3        A.   Yes.
 4        Q.   You understood what it meant --
 5        A.   Yes.
 6        Q.   -- right?
 7             It says:  Excluded parties.
 8             Do you see that?
 9        A.   It does.
10        Q.   And what does excluded party -- what does it
11   mean?
12        A.   It's defined here, but it's a list of specific
13   customers -- or sorry -- specific parties.
14        Q.   One of the parties that was identified as an
15   excluded party from the license agreement was one of
16   your customers, right?
17        A.   It's Amazon, yeah, correct.
18        Q.   In the settlement agreement, Mr. Trinh, Google
19   bargained for a conditional license for its partners,
20   and for some of its partners, agreed that they weren't
21   covered at all, right?
22        A.   No.
23        Q.   Well, let's ask it another way.  In the
24   settlement agreement, Google bargained for a conditional
25   license for some of its partners, right?
```

1     A.    Correct.

2     Q.    And for others of its partners, Google

3  identified them as an excluded party from the settlement

4  agreement, true?

5     A.    Correct.

6     Q.    One of the -- one of the customers is a

7  company called Conde Nast, right?  That's a customer?

8     A.    I'm not aware of that.

9          MR. ADAMS:  Your Honor, I think I'm done.

10  If I can just have one moment to confer.

11          THE COURT:  Take a moment.

12          (Pause in proceedings.)

13          MR. ADAMS:  Okay.  Your Honor, I have no

14  further questions at this moment.  I pass the witness.

15          THE COURT:  Do you have redirect,

16  Ms. Anderson?

17          MS. ANDERSON:  Only very briefly, Your

18  Honor.

19          THE COURT:  All right.  Proceed.

20          MS. ANDERSON:  Thank you.

21               REDIRECT EXAMINATION

22  BY MS. ANDERSON:

23     Q.    Hello, Mr. Trinh.

24     A.    Good afternoon.

25     Q.    You were asked a series of questions about

1   your view as to whether or not Beneficial's allegations

2   of infringement and language in infringement contentions

3   had any value as evidence in this case.

4          Do you recall that line of questions?

5      A.   Yes.  Yes, ma'am.

6      Q.   Do you have a view as to whether or not

7   Beneficial's words in infringement contentions matter in

8   this case?

9      A.   Yes.

10      Q.   What is your view in that regard?

11      A.   They do.  That's the -- the best statement of

12   their current beliefs and what they're going to try to

13   set out to prove to this Court or any Court.

14      Q.   Do you have a view as to whether or not the

15   words of Beneficial in their infringement contentions

16   matter as to whether or not customers are licensed under

17   the settlement agreement?

18      A.   Yes, ma'am.

19      Q.   And what is your view, sir?

20      A.   What the infringement contentions try to prove

21   or they -- the infringement theories set out to prove is

22   that the customers do infringe on these theories and --

23   and that Beneficial's right would be direct or indirect

24   infringement.

25      Q.   Thank you.

1          You were also asked a series of questions

2   about what you know about what Beneficial did or did not

3   do in preparing complaints in connection with the

4   lawsuits.

5          Do you remember that line of questions?

6     A.   Yes, ma'am.

7     Q.   Do you have knowledge as to what Beneficial

8   did or didn't do in preparing its words in accusing

9   Google and customers of infringement?

10    A.   I only know the Court requirements, ma'am.

11    Q.   Okay.  And what are those?

12    A.   The Court requirements require that a

13  Plaintiff, before setting -- or filing a lawsuit, do

14  their best investigation and -- and -- and -- and access

15  all publicly available information to state their case.

16    Q.   And is there some information available

17  publicly about DoubleClick?

18    A.   Yes, ma'am.

19    Q.   And for how long has information been

20  available publicly about DoubleClick?

21    A.   For as long as DoubleClick's been a product.

22  That's all before my time at Google.

23    Q.   You were also asked some questions about

24  whether or not Google lost any partners as a result of

25  Beneficial's lawsuit?

1       A.   Yes, ma'am.

2       Q.   Are you the person at Google who would know

3  whether or not a customer was lost as a result of the

4  lawsuit?

5       A.   No, ma'am.

6       Q.   And why is that?

7       A.   I'm on the legal side of -- the sales people

8  who handle the day-to-day relationships with the

9  customers in their -- that organization would be

10  better -- better positioned.

11       Q.   Okay.  You were also asked some questions

12  about the language in the settlement agreement called a

13  covenant not to sue and whether or not there were

14  promises not to sue certain partners.

15            Do you remember those questions?

16       A.   Yes, ma'am.

17       Q.   Do you have a view as to whether or not the

18  license provisions in the settlement agreement provide

19  any protection against lawsuits to anyone?

20       A.   Yes, ma'am.

21       Q.   And why is that?

22       A.   There are two different things.  The license,

23  as we discussed, is limited, whereas the covenant not to

24  sue is not.  The covenant not to sue is very broad,

25  covering any kind of infringement, patent or otherwise,

1  of any intellectual property right.

2        And so the covenants not to sue are covenants

3  not to sue -- sorry -- are much -- much broader than the

4  license.

5        Q.   And I would like to focus your attention

6  specifically on the license provision Section 2.  Did

7  those provisions provide any protection against lawsuits

8  against customers?

9        A.   Yes, ma'am.

10        Q.   And in what way?

11        A.   A license, like we've discussed, is permission

12  to use the product or use the -- sorry -- the -- the

13  claimed invention.  And that's -- that permission is why

14  you don't get sued.

15        Q.   Okay.  Thank you.

16        You were also asked some questions about

17  whether or not Google admitted infringement.

18        Do you recall those lines of questions?

19        A.   Yes, ma'am.

20        Q.   All right.  Are there any provisions in the

21  settlement agreement governing whether or not Google had

22  to admit infringement to have the benefit of the license

23  within the settlement agreement?

24        A.   Yes, ma'am.

25        So in Section 15 that we've discussed

1  before --

2              MS. ANDERSON:  If we could please display

3  Exhibit 1, Section 15, Ben.

4              Thank you.

5      A.   That's between -- again, between Pages 6 and

6  7.

7      Q.   (By Ms. Anderson) Let's just show the top of

8  Page 7.

9      A.   Yes, ma'am.

10     Q.   I think it will be easy to see.

11     A.   Yes, ma'am.

12     Q.   Thank you.

13     A.   This is the provision that governs their

14  agreement on that question.

15     Q.   Okay.  You were also asked a lot of questions

16  about Google's mindset at certain points in time about

17  whether or not it believed Google's customers infringed.

18          Do you remember that general line of

19  questioning?

20     A.   Yes, ma'am.

21     Q.   I'd like to point your attention to the

22  license agreement in the -- in the settlement agreement

23  at Page 2, Section A, and specifically direct your

24  attention to the little -- little (ii) section that

25  starts in the middle that you identified as the

1  customer's license.

2      A.   Yes, ma'am.

3      Q.   And you read through that language before, but

4  I'd like to particularly draw your attention to the last

5  part where it says:  Would constitute direct or indirect

6  infringement of a claim of the licensed patents by

7  Defendants or affiliates but for the license.

8          Do you have that in mind:  Would?  Starting

9  with:  Would?

10          MS. ANDERSON:  If we could have that

11  highlighted.

12          Thank you.

13      A.   Yes, ma'am.

14      Q.   (By Ms. Anderson) And going on to the end.

15  Does this language I've identified have any relationship

16  one way or another with the answers you were giving to

17  the questions about Google's mindset as to whether or

18  not it believed any of our customers infringed?

19      A.   Yes, ma'am.

20          So like I said, this -- this entire agreement

21  was about resolving the disputes between the parties,

22  and -- and this language is there because the -- the

23  reason Beneficial would sue us or our partners is for

24  direct or indirect infringement of their patents.

25      Q.   Okay.  And what, if any, relationship does the

1  word would or but for this license have to the -- to the

2  answers you are giving to questions about Google's

3  mindset as to whether or not there was infringement?

4      A.   Yes, ma'am.

5          It was never my -- it was never my mindset

6  that a customer would have to go through a -- a legal

7  process and get a finding of infringement before it was

8  licensed.

9          MS. ANDERSON:  Thank you, Your Honor.  I

10 pass the witness.

11         THE COURT:  Further cross-examination,

12 Mr. Adams?

13         MR. ADAMS:  Briefly, Your Honor.

14 If I could have the same slides on the board.

15         THE COURT:  All right.  Proceed.

16             RECROSS-EXAMINATION

17 BY MR. ADAMS:

18     Q.   Mr. Trinh, you -- when -- when the parties

19 negotiated that portion of the license agreement, you

20 understood that in order for there to be some resolution

21 as to whether or not the -- the partners were licensed,

22 there has to be some -- some determination, right, as to

23 whether or not providing that product would constitute

24 either direct or indirect infringement, right?  Right?

25     A.   No.

1    Q.   Well, did -- the parties didn't negotiate

2  words that had no meaning, did they?

3    A.   They did not, no, sir.

4    Q.   All right.  Did Google bargain for a -- a

5  license that said:  The parties are licensed if

6  Beneficial believes the product would constitute

7  indirect infringement?

8    A.   The language doesn't have that in it.

9    Q.   It just says, it would constitute, right?

10   A.   That's what it -- yes, sir.

11   Q.   At the very least, Mr. Trinh, you agree that

12  from some source, there has to be some evidence to

13  suggest or to show that providing DoubleClick would

14  constitute indirect infringement.

15        You agree with that?

16   A.   Yes, sir.

17   Q.   Now, if it's the case that just pointing to

18  Beneficial's allegations are not sufficient to show that

19  DoubleClick or providing DoubleClick would constitute

20  indirect infringement, you would agree that there's no

21  other evidence that you can point to in this case that

22  would establish this, right?

23   A.   Can you ask -- ask that again?

24   Q.   Sure.

25        If it's the case that it's not enough to just

1  point to Beneficial's beliefs and their contentions

2  early in the case to show that providing DoubleClick

3  would constitute indirect infringement, you would agree

4  that you have no other source of evidence to point to

5  that would satisfy this condition, right?

6       A.   Correct.

7       Q.   You were asked some questions about the harm

8  issue.  Do you remember that?

9       A.   Yes, sir.

10      Q.   And one of the things I asked you on cross was

11 whether or not any of your customers left or you lost

12 business based on the lawsuits, right?

13      A.   Yes.

14      Q.   And on redirect, Counsel asked you whether or

15 not you were the person that would know that

16 information, right?

17      A.   Correct.

18      Q.   Who made the decision to appoint you to be

19 Google's representative here?  Was it you?

20      A.   Yes.

21      Q.   You yourself made the decision that says:  I

22 will represent and come here on behalf of Google, right?

23      A.   Yes.

24      Q.   Now, when you made that decision, you

25 understood Google's theories of the case, right?

     A.   Yes, sir.

     Q.   You understood how Google was intending to
show it was harmed, right?

     A.   Yes, sir.

     Q.   When -- when you -- when you made the decision
to be its representative and doing your full scope, you
didn't think:  Well, if I don't know if our customers
left, maybe I should find it out from someone?

     A.   I can't know the future, sir.  No, sir.

     Q.   Well, all right.  So you know -- as you sit
here today, you know for sure no customers have left as
of today, right?

     A.   That's correct.

               MR. ADAMS:  No further questions, Your
Honor.

               THE COURT:  Additional direct?

               MS. ANDERSON:  Just briefly, Your Honor.
Thank you.

               THE COURT:  All right.

                    REDIRECT EXAMINATION
BY MS. ANDERSON:

     Q.   Mr. Trinh, you were asked questions about
whether it -- about Beneficial's infringement contention
allegations.  Do those contentions and allegations have
any value in your eyes in terms of proving that

1  Beneficial has breached the contract?

2           MR. ADAMS:  Objection, Your Honor.  It's

3  been asked and answered.

4           THE COURT:  I'll allow it.

5       A.   Yes, ma'am.

6       Q.   (By Ms. Anderson) And why is that?

7       A.   Because they establish what Beneficial is

8  setting out to do in the case.  That's what their

9  objective is in the lawsuit, and that's how they're

10  going to get there in a patent infringement lawsuit.

11      Q.   You were also asked questions about whether or

12  not you had done investigation into whether or not

13  customers had been lost as a result of the Beneficial

14  lawsuits.

15           Do you remember those questions?

16      A.   Yes, ma'am.

17      Q.   Did you receive information from Beneficial

18  informing you that you were going to be asked that

19  question today?

20      A.   No, ma'am.

21      Q.   Thank you.

22           MS. ANDERSON:  No question -- I pass the

23  witness, Your Honor.

24           THE COURT:  Additional cross?

25           MR. ADAMS:  No, Your Honor.

```
 1                    THE COURT:  All right.  You may step

 2  down, Mr. Trinh.

 3                    Ladies and Gentlemen, we're going to take

 4  another recess at this time.  I'm going to excuse you to

 5  the jury room.  Please take an opportunity to stretch

 6  your legs and get a drink of water.  We'll try to keep

 7  this about the same length as the preceding recess.

 8                    You may step down, Mr. Trinh.

 9                    You may leave your jury notebooks where

10  they are, and we'll have you back in here shortly and

11  move to the Plaintiff's next witness.

12                    But you're excused for recess at this

13  time.

14                    COURT SECURITY OFFICER:  All rise.

15                    THE COURT:  Don't discuss the case among

16  yourselves.

17                    (Jury out.)

18                    THE COURT:  All right.  Be seated,

19  please.

20                    Counsel, I want to remind you of one

21  thing just so that no one is caught by surprise.  Before

22  I bring the jury in in the morning, I'm going to ask

23  each side to go to the podium and read into the record

24  those exhibits that they've used during today's portion

25  of the trial that come from the pre-admitted exhibits.
```

1  And that way we will keep the record clear each morning

2  with what's been used from the list of pre-admitted

3  exhibits in the preceding day's portion of the trial.

4  And I will do that first thing before I bring in the

5  jury.  I think you probably all knew that, but just to

6  make sure there's no confusion, I want to make sure

7  that's clear.

8                    With that -- with that, we'll stand in

9  recess for the next 10 minutes.

10                    COURT SECURITY OFFICER:  All rise.

11                    (Recess.)

12                    (Jury out.)

13                    COURT SECURITY OFFICER:  All rise.

14                    THE COURT:  Be seated, please.

15                    Would you bring in the jury, please,

16  Mr. McAteer?

17                    COURT SECURITY OFFICER:  Yes, sir.

18  All rise for the jury.

19                    (Jury in.)

20                    THE COURT:  Please be seated.

21                    Plaintiff, call your next witness.

22                    MS. HUBER:  The Plaintiff calls Jonathan

23  Bellack.

24                    THE COURT:  All right.  If you'll come

25  forward, Mr. Bellack.  You have been sworn, correct?

1              THE WITNESS:  Not yet.

2              THE COURT:  Then come forward, and our

3    Courtroom Deputy will administer the oath to you.

4              (Witness sworn.)

5              THE COURT:  If you'll come around and

6    have a seat here at the witness stand.

7              MR. JONES:  Your Honor, could I approach

8    to give binders to the opposing counsel and the witness?

9              THE COURT:  Yes, you may.

10              All right.  Ms. Huber, you may proceed.

11        JONATHAN BELLACK, PLAINTIFF'S WITNESS, SWORN

12                    DIRECT EXAMINATION

13   BY MS. HUBER:

14        Q.   Good afternoon, Mr. Bellack.

15        A.   Hi.

16        Q.   Please introduce yourself to the jury.

17        A.   Sure.  My name is Jonathan Bellack.  I'm a

18   director of product management for Google.

19        Q.   Can you tell the jury a little bit more about

20   yourself?

21        A.   Sure.  I'm 41 years old.  I live in Montclair,

22   New Jersey, and I have a five-year-old son and a

23   three-month-old son at home enjoying the snowstorm right

24   now.

25        Q.   Where did you go to school?

1    A.   I went to high school outside of Philadelphia,

2  undergraduate at Yale University, and graduate school

3  for business at New York University.

4    Q.   You testified that you work at Google.  How

5  long have you worked there?

6    A.   For almost six years.

7    Q.   How did you come to join Google?

8    A.   I worked for a company called DoubleClick that

9  was purchased by Google in 2008.

10    Q.   How long were you with DoubleClick before it

11  became a part of Google?

12    A.   I joined DoubleClick in May of 2004.

13    Q.   And what is DoubleClick?

14    A.   DoubleClick is a company that provides

15  software and services that help buyers and sellers of

16  online advertising work together more effectively.

17    Q.   In the course of your work, have you come to

18  understand why Google acquired DoubleClick?

19    A.   Yes, I have.

20    Q.   Please tell the jury what you know about that.

21    A.   DoubleClick was a specialist in a type of

22  online advertising called display advertising, which was

23  a business that Google was interested in entering.  So

24  Google bought DoubleClick for our expertise and

25  technologies to help them compete in the display

1  advertising business.

2      Q.    And how long have you been a director of

3  product management at Google?

4      A.    For a little over four years.

5      Q.    And what was your position at DoubleClick

6  before you were a director of product management?

7      A.    The structure was a little different.  It was

8  a smaller company.  There I was a vice president of

9  product management.

10     Q.    And as a director of product management, what

11 products are you responsible for?

12     A.    I am responsible for our ad-serving products

13 for publishers called DoubleClick for Publishers and

14 DoubleClick Enterprise, and also our ad network benefits

15 for smaller publishers called AdSense.

16     Q.    Tell us about your responsibilities as a

17 director of product management.

18     A.    A product manager is responsible for making

19 sure that the products we offer meet the needs of our

20 customers.  So we meet with our customers very

21 frequently to understand what they are trying to do and

22 then work with the engineers in Google to design and

23 build products that will help those customers out.  And

24 then we explain to the customers what changes and

25 improvements we've made to help them.

1          Q.    What was your position -- excuse me.  I'd like

2    to talk -- actually, switch gears and talk a little bit

3    about why we're here.

4                Do you know that this case involves some of

5    Google's customers?

6          A.    Yes, I do.

7          Q.    What do you know about Beneficial's claims

8    against those customers?

9          A.    I understand that there are some lawsuits

10   involved but not much more.

11         Q.    Do you know about how DoubleClick products

12   work?

13         A.    Yes, I do.

14         Q.    Is that something you need to know for your

15   job?

16         A.    It is a requirement of my job.

17         Q.    Please describe for the jury what the

18   DoubleClick for Publishers product is that you

19   mentioned?

20         A.    Sure.  DoubleClick for Publishers is what we

21   call an ad server.  And the way it works is, for

22   example, if you're looking at a website like the website

23   for Country Weekly Magazine, when that publication wants

24   to show ads alongside the content or service that they

25   offer, DFP is the technology they use to get those ads

1  to show up and to try to show ads to people that are

2  likely to like them.

3       Q.   So if I'm on the Internet and I go to a

4  website that shows advertising, what role does

5  DoubleClick play in that?

6       A.   So DoubleClick is effectively providing the

7  plumbing.  So we have a connection so that the publisher

8  can cause the DoubleClick ad server to be called.  Say

9  these are the kinds of things that I would like in the

10 ad, and we also provide a user interface, a software

11 tool for the publisher to say what advertising contracts

12 they have entered into.

13          For example, we have a deal with Ford to show

14 ads for trucks or cars to certain kinds of people.

15      Q.   As part of your job, have you become familiar

16 with how advertisements appear on a customer's website?

17      A.   Yes, I have.

18      Q.   Prior to you -- to your testimony today, were

19 you asked to locate a website with an advertisement that

20 was served through DoubleClick?

21      A.   I was.

22      Q.   And what did you do to find that?

23      A.   I looked at lists of companies that were

24 customers of ours, went to their websites, and used a

25 software tool to look at the code of that page, which

1  are sort of the instructions about what to display, to

2  find a page that had the code to call DFP, which is

3  called an ad tag.

4       Q.   Can you take a look at the two slides inside

5  your notebook there?

6       A.   Yes.

7       Q.   Is this a fair and accurate depiction of what

8  you observed on the website in terms of the

9  advertisement that you saw?

10      A.   Yes, it is.

11           MS. HUBER:  Your Honor, we would ask

12  permission to show this to the jury for demonstrative

13  purposes only.

14           THE COURT:  Unless there's objection,

15  proceed.

16      Q.   (By Ms. Huber) Mr. Bellack, can you describe

17  what we're looking at here?

18      A.   Yes.  We're looking at a picture of the

19  homepage of the website of Country Weekly Magazine.  And

20  the two key things here sort of on the left is a lot of

21  their content, the article about George Strait and

22  George Jones, links to news and videos.

23           Then in the top right and lower right are two

24  online advertisements.  Those are the black rectangles,

25  one with Brad Paisley's album cover and the other with

1  the Johnny Cash on the cover.

2      Q.   You also mentioned a product called DART

3  Enterprise.  What is that product?

4      A.   DART Enterprise is also an ad server.  It

5  works a little bit differently.  DFP, the first product

6  I mentioned, is a product where Google operates all of

7  the servers that make the product work.  So we take care

8  of serving the ads, maintaining the hardware, making

9  sure everything works well.  Sort of like if you go to

10  Facebook or YouTube on your computer, you're contacting

11  their servers.

12          DART Enterprise is what was called an

13  installed software ad server, which means we provide the

14  software and the instructions on how to use it, but the

15  publisher actually installs it on their own computers to

16  make it operate, more like if you buy a copy of

17  Microsoft Word or a video game, you get a CD or you

18  download it and you install it on your own computer.

19      Q.   As far as you know, are DoubleClick for

20  Publishers and DART Enterprise used for anything other

21  than to display advertisements on websites?

22      A.   They are not.

23      Q.   Describe whether that's how Google intends its

24  products to be used.

25      A.   That is how they were intended to be used.

1     Q.   I'd like to talk to you a little bit about who

2  your customers are, and I'd like to start just by asking

3  generally who the customers are of DoubleClick.

4     A.   Sure.  It's really anyone who is in the

5  business of selling online advertisements alongside

6  content or services.  So that could involve magazine or

7  newspaper companies.  Like American Media, Incorporated,

8  is the company that owns Country Weekly, or Scripps,

9  which is a newspaper chain.  It could involve companies

10 who offer different kinds of online services, like

11 Expedia, which provides travel-booking services, or Auto

12 Trader, which provides information on new and used cars.

13 It could even be TV companies that have websites that go

14 along with it, such as Viacom, the owner of Nickelodeon

15 and MTV.

16    Q.   Do you deal directly with your customers as a

17 product manager?

18    A.   I meet with them very frequently.

19    Q.   Describe what Google has discovered its

20 customers want out of DoubleClick?

21    A.   Sure.  Publishers are looking for a few

22 things.  They are looking for a very reliable ad-serving

23 service.  They are looking for a large number of

24 features and options about what kind of online

25 advertisements they can serve.

1          And very importantly, they are looking for

2   help and advice and guidance and instruction about how

3   to use an ad server and how to get ads to appear on

4   their site, because these products are quite complicated

5   and very hard to use without that kind of help.

6          Q.   Are there any competitors of Google

7   DoubleClick in this area?

8          A.   Yes, there are.

9          Q.   Who are they?

10          A.   Some examples would be a company in California

11   called OpenX that sells ad serving.  There is an

12   international ad agency called WPP, which has a

13   subsidiary called 24/7 that offers an ad server.  And up

14   until quite recently, Yahoo! also offered an ad server

15   mostly for newspaper companies, for example.

16          Q.   Have you come to learn whether your companies

17   used more than one ad server, say DoubleClick and OpenX,

18   as you mentioned?

19          A.   Yes.  There are two reasons why a company

20   would use more than one ad server.  A lot of our

21   customers own multiple media properties.  So if you own

22   many magazines or many newspapers, different magazines

23   might use different ad servers.  The second reason is to

24   do specialized advertising.

25          For example, we have a lot of customers that

use DFP, but also use a company called FreeWheel for

serving video advertisements, and other ones might use

different ones for advertising on smartphones like the

iPhone.

Q.   Mr. Bellack, let's turn to Exhibit 2.

A.   Okay.

Q.   -- in your binder, please?

A.   Yep.

Q.   Have you seen this document before?

A.   Yes, I have.

Q.   You see at the middle of this document, it

says complaint for patent infringement.  And just above

that, there is a list of companies.

A.   Yes.

Q.   Do you know whether some of these companies

are customers of Google DoubleClick products?

A.   Yes, I do.

Q.   How do you know that?

A.   That is part of my responsibility as a product

manager is to know our customers.

Q.   And do you know what DoubleClick product these

customers use?

A.   Yes, I do.

Q.   How do you know that?

A.   I need to know which product they are using so

1  when I meet with them, I understand the context of their

2  requests.

3      Q.   Can you please identify for the jury which of

4  these companies listed on this complaint are customers

5  and what product they use?

6      A.   Yes.   Advance Publications uses DFP.   ALM

7  Media Properties did use DFP, but, unfortunately, they

8  are no longer a customer.   Amazon.com uses DFP.

9  American Media, Inc., uses DFP.   Autotrader.com was

10  using DE, the DoubleClick Enterprise product I was

11  talking about.   They are in the process of moving to

12  DFP.   Dell does not use our products.   Demand Media uses

13  DFP.   Expedia is also a customer who was using DE and is

14  in the process of using to DFP.   Rodale uses DFP.

15  Scripps Interactive uses DE.   Viacom uses DFP.   And

16  Village Voice is not a customer.

17      Q.   Mr. Bellack, when you refer to DFP, what does

18  that mean?

19      A.   Oh, I'm sorry.   That's the DoubleClick for

20  Publishers ad server.   We use DFP and DE for short

21  because the names are long.

22      Q.   And just for clarity, what does DE refer to?

23      A.   DoubleClick Enterprise.

24      Q.   Thank you.

25          Are you familiar with how long these companies

1  have been customers?

2       A.   I don't know all the dates exactly, but I know

3  roughly how long.

4       Q.   Tell us about that.

5       A.   They've been pretty much all been customers

6  for over five years, and some of them, like Auto Trader,

7  Expedia, and Viacom have been customers back to at least

8  2000/2001; some of them even the late '90s.

9       Q.   Have you lost any of these customers because

10 of this lawsuit?

11      A.   Unfortunately, yes, we have.

12      Q.   Which one?

13      A.   ALM Media.

14      Q.   I'd now like to ask you to take a look at

15 what's been preadmitted as Exhibit 38.

16      A.   All right.

17      Q.   Do you recognize this document?

18      A.   Yes, I do.

19      Q.   What is it?

20      A.   This is a contract from 2001 between

21 DoubleClick and Auto Trader for the DE, DoubleClick

22 Enterprise product.

23      Q.   I'd like to ask you just a few more questions

24 about DoubleClick's customers, specific customers.

25           Is NBC Universal a DoubleClick customer?

1        A.    Yes, they are.

2        Q.    And was NBC Universal a customer in 2007?

3        A.    Yes, they were.

4        Q.    Is Tribune Interactive a Google DoubleClick

5   customer?

6        A.    Yes, they are.

7        Q.    And were they a customer in 2007?

8        A.    Yes, they were.

9        Q.    What about YouTube?  Does YouTube use

10  DoubleClick to display advertisements on its website?

11       A.    Yes, they do.

12       Q.    And was YouTube doing that in 2009?

13       A.    Yes, they were.

14       Q.    Are you familiar with whether YouTube displays

15  advertising from its website through the use of just

16  DoubleClick, or does it use other ad-serving technology?

17       A.    They use both DoubleClick and some other

18  internal Google ad-serving technologies.

19       Q.    Now, I'd like to ask you some questions about

20  how your customers use DoubleClick.

21            In the course of your work, have you learned

22  how your customers use your products?

23       A.    Yes, I have.

24       Q.    And what is it that your customers use your

25  products for?

1    A.    They use it for specifying where on their

2  websites they would like ads to show up and to specify

3  to whom they would like to try to show which ads.

4    Q.    Do all of your customers use DoubleClick in

5  the way you've just described?

6    A.    Yes, they do.

7    Q.    And is that how Google intends DoubleClick's

8  products to be used?

9    A.    Yes, it is.

10    Q.    Mr. Bellack, let's go back to that screen shot

11  of Country Weekly.

12         What is it that a customer like Country Weekly

13  would do to make this ad appear on their website?

14    A.    They would do two things.  The first, they

15  would do is -- following our instructions, they would

16  place a piece of code into the code of their webpage

17  called an ad tag that specifies where they want the ad

18  to show up and information about what kind of ad they

19  would like to appear.

20         They would then use the user interface tool of

21  DFP to record that they had a contract to serve, in this

22  case, an ad for an iTunes gift certificate, with

23  information about whom they would like to show that ad

24  to.

25    Q.    Let's take a look at the second slide.  Can

1   you describe to the jury what -- what this slide shows?

2       A.   Sure.  This slide has most of the page grayed

3   out to highlight the ad with the Brad Paisley album

4   cover at the top.  And what is at the bottom is the

5   software tool that I mentioned that is actually showing

6   part of the code that are the instructions that are

7   causing your browser to display that page.

8            And what has been highlighted and enlarged is

9   the DoubleClick ad tag.

10      Q.   And when you say part of the code, what do you

11  mean?  What code?

12      A.   So code -- the code is the set of instructions

13  that the publisher sends to your computer's browser that

14  tells your computer's browser how to display this

15  webpage.  So things like an image should go here; this

16  is the text for the link to the article; or the text of

17  the article itself, here's where to put the

18  advertisement; here's what color the background should

19  be; that sort of thing.

20      Q.   And does this picture show all of the code

21  for the website?

22      A.   No, it doesn't.  The code is very long, so

23  this is just a snippet.

24      Q.   And this code relates just to what?

25      A.   The ad tag that is causing that top ad to show

1   up.

2       Q.    And what -- what would the other code on the

3   website relate to?

4       A.    It would relate to displaying the content or

5   the service that is shown on the webpage as well as

6   instructions for other ads, if there are any.

7       Q.    Can you describe for us what it is that this

8   ad tag does?

9       A.    Sure.  This ad tag is telling your computer's

10  browser to call DoubleClick to get an ad.  That's the

11  part that says ad.DoubleClick.net.  That is an URL very

12  much like if you typed www.google.com into your browser,

13  except it's an instruction for your computer to do it.

14          And then as you go to the right, it is sort of

15  the -- the instructions about where this ad should go

16  and what kind of ad.  So the section that says

17  ami.cw.home is sort of saying what page this should go

18  on.  A-M-I is short for ALM Media, Incorporated, the

19  owner of Country Weekly.  C-W is Country Weekly.  Home

20  means on the homepage.

21          Then just to show a couple more, P-O-S means

22  position in this case, and header means this is to show

23  an ad in the header of the page at a location.  And S-Z

24  means size.  And 728-by-90 are the dimensions of that

25  ad.  So it's saying what -- what size and shape of ad

1  it's looking for.

2      Q.   And how important is an ad tag like this to

3  the process of showing an ad on the website?

4      A.   It is required.  You can't show an ad without

5  an ad tag.

6      Q.   Do all of your web publishers show the same

7  advertisement to every person who visits a particular

8  website?

9      A.   They actually do not.  That is one of the big

10  differences between online advertising and, say, print

11  advertising.  When Country Weekly publishes their

12  magazine, they generally have to put the same ad on the

13  back cover for everyone.

14          With online advertising, there is technology

15  called targeting that lets the publisher share more

16  information about who is looking at an ad and specify

17  where a particular ad should be shown.  So, for example,

18  this ad could be targeted so that if someone is in

19  Texas, they are seeing country music album covers.  And

20  if somebody is in -- I don't know -- to be goofy, if

21  they're in Seattle, they see Glenn's music album covers.

22      Q.   How does a publisher make that targeting you

23  described work with DFP?

24      A.   They -- they do two things.  One part is that

25  they share any information they have about the user and

1  what the user is interested in as part of the ad tag,

2  and then in the user interface, they'll specify this

3  particular ad should be shown in Texas, or should be

4  shown to only to women or only to people of a certain

5  income or interested in travel to a certain location or

6  something like that.

7      Q.   Are those all the ways that a publisher makes

8  targeting work?

9      A.   There are additional features that we offer

10 that can target ads better that are specific to how DFP

11 operates.

12     Q.   I'd like to just keep focusing on the

13 publishers.

14     A.   Okay.

15     Q.   Are -- beyond what you've described in terms

16 of the information that's contained in the ad tag, are

17 there other ways that -- that publishers achieve this

18 targeting?

19     A.   Oh, yeah.  The way that publishers try to know

20 their audience better is by putting little snippets of

21 text -- basically strings and letters and numbers called

22 cookies -- on people's browsers.  And what that lets

23 them do is remember when you're looking at the same site

24 again and again that it's the same browser.

25          So if you've registered with a site, they

1 could store information and know, hey, this is -- this

2 is Bob coming back or Judy coming back, so I know what

3 gender the person is; or if they've told me something

4 about where they live, I know that from registration.

5 People can also -- publishers can also use that sort of

6 technique to derive what someone is interested in.  So

7 if a browser is going to a lot of news articles about

8 new cars, there's a reason to think that this computer

9 browser would like to see more ads about cars, or if

10 they are looking at a lot of articles about moving and

11 mortgages, they might be interested in seeing real

12 estate or mortgage ads.

13      Q.   Is there a name for this string of text that

14 you've just described?

15      A.   Yes, there is.  There is a fairly silly name

16 for it.  It is called a cookie.

17      Q.   Based on your experience, are you aware of any

18 DoubleClick customer that doesn't use these cookies

19 you've described?

20      A.   I am not.

21           MR. ROSEN:  Objection.  Objection.  Lack

22 of foundation.

23           THE COURT:  You mean, in effect, you're

24 calling for speculation?

25           MR. ROSEN:  Yes.

1           THE COURT:  I'll sustain as calling for

2    speculation.

3        Q.   (By Ms. Huber) Mr. Bellack, based on what you

4    know about your customers and their use of DFP, are you

5    aware of any customer that doesn't use these cookies

6    that you've described?

7           MR. ROSEN:  Objection, Your Honor.  Same

8    objection.  Speculation and also this as phrased would

9    call for hearsay.

10          THE COURT:  Overruled.  This is within

11   his personal knowledge.  He can answer the question.

12       A.   In my personal knowledge, I do not know of any

13   of our customers that do not use cookies.

14       Q.   (By Ms. Huber) Beyond what you've just

15   described about what a publisher might have to target,

16   is there anything else that DoubleClick does to achieve

17   this targeting?

18       A.   Yes.  We have our own DoubleClick cookie in

19   the DFP product that we use to provide some additional

20   ad-serving functionality.

21       Q.   And how is it that the DoubleClick cookie

22   works to target ads?

23       A.   The DoubleClick cookie is something that we

24   set on a computer whenever we serve an ad, and it is

25   passed back to the DFP ad server every time there is a

1 request to serve an ad so that we can, for example,

2 remember which ads were shown to a particular browser.

3     Q.   What kind of information is contained in the

4 DoubleClick cookie?

5     A.   The DoubleClick cookie itself is only a unique

6 identifier for that particular browser.  So it is just a

7 set of numbers and letters that only appear on that

8 particular computer's browser.

9     Q.   And you mentioned that it's a way to tell

10 whether an ad has been served more than once.  Is there

11 a name for -- for that?

12     A.   Yeah.  An example of what we do with this

13 DoubleClick cookie is something we call frequency

14 capping, and that is a very long way to say don't show

15 the same ad to the same person too many times.  A lot of

16 research has shown people don't like seeing the same ad

17 again and again.

18          So what a frequency cap does is we keep a -- a

19 store that is a record of how many times a particular

20 browser has -- via their cookie has seen a certain ad.

21 So if this Brad Paisley album cover ad was

22 frequency-capped to three times a day, the first time we

23 serve it, we say we've shown it once; then we've shown

24 it twice.

25          Once we've shown it three times, if another

1 request came back to the ad server to get an ad for the

2 homepage of Country Weekly, we would say, well, the

3 frequency cap has been met for this ad; we need to pick

4 a different ad to show that person.

5     Q.   Based on what you know about how your

6 customers use your products, how often is this frequency

7 capping used?

8     A.   Quite frequently.

9     Q.   Does DoubleClick work the same without the

10 DoubleClick cookie?

11     A.   No, it does not.

12     Q.   Can you describe that?

13     A.   A lot of features stop working when the cookie

14 is unavailable.

15     Q.   Describe what Google tells its customers about

16 the use of cookies?

17     A.   We explain the importance of the DoubleClick

18 cookie and that a lot of features don't work without it.

19 And we have -- especially more recently, have been

20 encouraging our publisher customers to have closer

21 relationships with their users so they can do a better

22 job of serving ads that their users are going to like.

23     Q.   Now, I'd like to stay on the subject of how

24 your customers use your products, but ask you about a

25 different topic, which is the kind of advertisements

1  that your customers serve.

2        Have you ever heard of the term pop-up in

3  connection with your work?

4        A.   Yes, I have.

5        Q.   What's a pop-up?

6        A.   So a -- a pop-up ad is an online ad that

7  instead of showing up in the same window as the content,

8  shows up in an additional window that shows up on top of

9  or next to the content.

10       Q.   Do you know whether DoubleClick is used by

11  your customers to serve pop-up ads?

12       A.   It is sometimes.  Yes.

13       Q.   What does a customer need to do to serve a

14  pop-up ad?

15       A.   They need to make specific changes to how DFP

16  is set up.  They need to turn on the features for

17  pop-ups.  They need to add a special piece of code to

18  their ad tag that says:  This ad tag is eligible to

19  serve a pop-up.  And they have to set up the ads in DFP

20  a little bit differently to enable them to be displayed

21  as a pop-up when they are selected.

22       Q.   Are you aware of any customer of yours that

23  serves only pop-up ads through DoubleClick?

24       A.   No, I'm not aware of any customer that does

25  that.

1    Q.   Do you know whether it's possible to use

2    DoubleClick to serve only pop-up ads?

3    A.   It might be theoretically possible, but since

4    I've never heard of anyone doing it, I've never tried.

5    Q.   Please describe whether DoubleClick is

6    intended to be used for displaying pop-up ads.  Excuse

7    me.  I'll rephrase that.

8         Can you describe whether DoubleClick is

9    intended to be used for just displaying pop-up ads?

10   A.   Definitely not.

11   Q.   What does Google tell its customers about

12   pop-ups?

13   A.   We tell them to please not show pop-ups.

14   Q.   And why is that?

15   A.   Users hate pop-up ads.  They're really

16   annoying, and generally counterproductive.

17   Q.   I'd now like to ask you some questions about

18   how it is that your customers learn to use your

19   products.

20        Are you familiar with whether Google teaches

21   its customers to use DoubleClick?

22   A.   Yes, I am.

23

24   Q.   Can you describe for the jury how Google does

25   that?

A.   Yes.   There are actually four things that we do, because these products are pretty complicated.   The first step in teaching our customers actually starts before they are even customers.

Our salespeople are very trained on our products, and when they meet with a publisher, they try to understand a publisher's business and present ideas about how DFP could be used as a good solution to their advertising business or even suggest new ideas that the publisher has not -- not thought of before.   That is part of how we convince them we are a good partner and a good company to work with.

The second step is, once a publisher has decided to use DFP, we have employees who are technical experts on the product who will meet with the publishers a lot and often even go to the publisher's place of business to sit with their employees to help design the setup of DFP.

So in the case of something like the ad tags, our experts are usually helping design the ad tags and giving the publishers the first example ad tags that they can use on their site and modify as they grow.

The third way is through classroom training where we actually will have employees of the publisher come to a Google office or deliver training over the

1  Internet where we teach the people at the publisher who

2  will be using the DFP tool all of the features and

3  capabilities, such as how to target ads in the way I

4  mentioned before.

5        And the fourth way is we provide a very large

6  amount of written documentation and user manuals that

7  describe all of the features of the product in detail,

8  which the publisher can read and refer back to as they

9  are learning how to use it.

10     Q.   Focusing on these written materials that

11 you've described, can you give us a little bit more

12 flavor on what types of documents Google provides to its

13 customers?

14     A.   Sure.  There are a lot of kinds, but in

15 particular, we sometimes give very long guides that have

16 a lot of material together.  And we provide a lot of

17 shorter pieces of content that are actually available

18 online when you are using the tool, and we call that

19 help content.

20     Q.   Let's take a look at some of those.

21 Exhibit 115 --

22     A.   Okay.  Yes.

23     Q.   -- do you recognize this document?

24     A.   Yes, I do.

25     Q.   Could you tell us what it is?

1       A.    This is a guide to teach people at the

2   publisher who are responsible for setting up their web

3   pages how to include DoubleClick ad tags in those pages.

4       Q.    What's the purpose of a guide like this?

5       A.    To help people at a publisher get the ads to

6   show up where and how they want them to.

7       Q.    And does Google give this guide to DoubleClick

8   customers?

9       A.    Yes, we do.

10      Q.    And since the jury is only looking at the

11  screen, can you tell us about how many pages this

12  document is?

13      A.    It's long.  It's 108 pages.

14      Q.    Do you see the reference on the front cover to

15  Webmaster?

16      A.    Yes.

17      Q.    What does Webmaster mean?

18      A.    It is a -- another silly word of my

19  profession.  It is actually a job responsibility.  The

20  Webmaster is the person at a publisher who is

21  responsible for having the technical knowledge about how

22  to build and display web pages.

23      Q.    What do you know about how Webmaster has used

24  this guide?

25      A.    They use it as instruction and reference when

1  they are getting set up with DFP to make sure the ads

2  will show up.

3      Q.   Let's turn next to Exhibit 114.

4      A.   All right.

5      Q.   Do you recognize this document?

6      A.   Yes, I do.

7      Q.   What is it?

8      A.   This is an administrator's guide for the

9  DoubleClick Enterprise product.

10      Q.   And is this another document that Google would

11  give its customers?

12      A.   Yes, it is.

13      Q.   Why?

14      A.   I mentioned earlier that DoubleClick

15  Enterprise is installed software.  That means there are

16  a lot of extra steps the publisher has to take to get

17  the software on their computers, get it up and running,

18  and communicating properly.

19          The people at a company who do that would be

20  called administrators or system administrators.  And

21  this guide gives them the information about how to get

22  the software running.

23      Q.   And about how long is this document?

24      A.   Oh, this document is 95 pages.

25      Q.   Let's turn next to Exhibit 49.

1      A.    Okay.

2      Q.    Do you recognize this one?

3      A.    Yes, I do.

4      Q.    What is it?

5      A.    This is a page from the getting-started guide

6  for DoubleClick for publishers.

7      Q.    What's the getting-started guide?

8      A.    This is some of the content we give to new

9  publishers who are just beginning to use the product to

10 understand how it works and how to use it.

11     Q.    And, Mr. Bellack, when you refer to publisher,

12 what do you mean by that word?

13     A.    Those are the people who are customers of

14 DoubleClick for Publisher, so people in the business of

15 selling online advertising.

16     Q.    And the -- the customers that you identified

17 earlier, would those be a publisher?

18     A.    Oh, yes.  We refer to them all as publishers.

19     Q.    Can you please tell the jury a little bit

20 about what this document tells us?

21     A.    Yes.  This document is explaining what an ad

22 tag is and how an ad tag leads to an advertisement being

23 shown alongside the publisher's content or service.

24     Q.    And do you see where it says ad tags are

25 pieces of code?

1        A.    Yes.

2        Q.    What does code mean here?

3        A.    Code here means the technical instructions

4   that are transmitted to a user's browser to cause the ad

5   to appear.

6        Q.    And where does the code for the ad tag come

7   from?

8        A.    We provide the syntax, which is the acceptable

9   format of the tag, and often samples that the publisher

10  can then use on their site.

11       Q.    When Google gives a customer a sample ad tag,

12  what does it expect the customer to do with it?

13       A.    We expect them to copy it and place it inside

14  their web pages next to their content or service.

15       Q.    Does Google teach its customers how to place

16  the ad tag on a website?

17       A.    We really don't have to, because the people at

18  a publisher we are working with, part of their job

19  responsibility is knowing how to make changes and

20  additions to the code of a web page.

21       Q.    Let's turn to the document, Exhibit 62.

22       A.    Okay.

23       Q.    What is this document?

24       A.    This is another page from the getting-started

25  guide for DFP.

1    Q.   And what's described in this section of the

2  getting-started guide?

3    A.   This document has the syntax of the tag, which

4  is the -- the instructions about what is allowed to be

5  in them and how to build them.   And actually, this

6  document has sample tags at the end, as well as the

7  syntax.

8    Q.   Beyond providing these sample tags, does

9  DoubleClick have any feature that actually helps its

10  product -- excuse me -- helps its customers generate ad

11  tags?

12    A.   Yes.   We actually have a feature of the DFP

13  product that lets the publisher enter some information

14  like this is an ad for the homepage of a certain size,

15  and we automatically create the ad tag for the

16  publisher.

17    Q.   Please turn to Exhibit 44.

18    A.   Okay.

19    Q.   Do you recognize this document?

20    A.   Yes, I do.

21    Q.   What is it?

22    A.   This is another page from the getting-started

23  guide that explains how to use the tag generator feature

24  that I was just referring to.

25    Q.   And do you see at the very bottom -- we have

1   to go down -- the very bottom of the page where it says:

2   Send the tag on your web developer who can paste the tag

3   into the source code of the web page on which you want

4   the ad slot?

5   A.   Yes.

6   Q.   What is Google telling its customers here?

7   A.   We are telling the user of DFP to take the tag

8   we have generated and give it to the person at their

9   company who is responsible for updating the web pages.

10   Q.   And the -- the reference in that sentence to

11   the source code of the web page, what does that mean?

12   A.   Those are the instructions that are sent to

13   the user's browser to cause the web page to be

14   displayed.

15   Q.   Please turn to the document, Exhibit 43.

16   A.   Okay.

17   Q.   Do you recognize this document?

18   A.   Yes, I do.

19   Q.   What is it?

20   A.   This is a guide that explains to a publisher

21   how the DFP ad server takes information from the ad tag

22   and goes about the process of picking the best ad to

23   show to the particular user.

24   Q.   And is this another document that Google gives

25   to its customers?

1        A.   Yes, it is.

2        Q.   Describe what kind of instructions or guidance

3   is contained in this document.

4        A.   This document is educational.  It is teaching

5   the publisher how DFP goes about the process of

6   understanding what kind of ad has been requested and

7   picking the best ad to send back down to the user.

8        Q.   I have just one more document from this

9   getting-started guide, Exhibit 48.

10       A.   Okay.

11       Q.   Do you recognize this document?

12       A.   Yes, I do.

13       Q.   And what's described in this part of the

14   getting-started guide?

15       A.   These are the instructions to the users of DFP

16   about how to add targeting to one of the ads.

17            So in that example, I was saying earlier, if

18   the Brad Paisley album ad should only be shown to users

19   in Texas, this is giving me instructions on how to

20   specify that.

21       Q.   Do you have an understanding as to how these

22   instructions are used?

23       A.   Yes.

24       Q.   Please describe that.

25       A.   These are used by employees of the publisher

1  who are responsible for entering these targeting rules

2  accurately to understand how to operate our product in

3  order to add the targeting.

4      Q.   Now, beyond this initial training and written

5  documentation that we've been discussing, does Google

6  provide ongoing support to his customers?

7      A.   Yes, we do.

8      Q.   What kind of support?

9      A.   We have hundreds of employees in the United

10  States and around the world who are responsible for

11  helping publishers with problems.

12          So publishers can contact us either through

13  email or an online forum or even by phone and say:  Here

14  is what's not working right; will you please help me

15  out?

16      Q.   And what kinds of things do your customers

17  tend to need help with?

18      A.   They need help with a lot of things, but by

19  far the most common problem is I cannot get this ad to

20  show up correctly on my site; please help me figure out

21  the problem.

22      Q.   And what does Google do to help with that

23  problem?

24      A.   Just about anything we need to, because our

25  customers expect us to solve these problems.

```
 1              So we will look at the configuration of the
 2   ads inside our product and also very frequently, look at
 3   the source code of the web pages, like that example we
 4   showed, to see if there were any mistakes made or any
 5   changes in the ad tag that would cause it to work
 6   better.
 7        Q.   Please turn to the document, Exhibit 57.
 8        A.   Okay.
 9        Q.   Are you familiar with this?
10        A.   Yes, I am.
11        Q.   What is it?
12        A.   This is a document that we prepared after
13   Google purchased DoubleClick to explain how our ad
14   servers work and how we talk to our customers about the
15   products.
16        Q.   On the first page here, it says:  Intro to
17   DoubleClick's Publisher Platforms.  What is a publisher
18   platform?
19        A.   That's simply the term we use to refer to both
20   DFP and DE together.
21        Q.   And DART for Publishers, what's that?
22        A.   That is the name of the previous version of
23   DoubleClick for Publishers.
24        Q.   Let's turn to Page 934 in this document.
25        A.   Okay.  All right.
```

```
 1        Q.    What's described here?

 2        A.    This is one of the slides we would show to

 3   customers to explain all of the kinds of services and

 4   support we provide.

 5        Q.    And can you describe to the jury some of the

 6   things that we see here?

 7        A.    Sure.  I'll just do a few.

 8              The first big bullet, scalable, 24/7 support

 9   infrastructure is explaining that you can get ahold of

10   DoubleClick any time, day or night, to get help if you

11   have a problem.

12              It sort of indicates that we had, at that

13   time, 240 employees doing this, that we would respond

14   within 30 minutes to a problem and that our statistics

15   were showing that our customers liked what we did.

16              The second section about customer enablement,

17   this is a lot about how we helped customers learn the

18   product.  So you can see the reference to classroom

19   learning and training and the -- the different kinds of

20   documentation.

21                   And then the -- the third part is

22   consulting resources, which I didn't talk as much about.

23   This is the sort of times when we would give publishers

24   advice about what to do.

25                   These would be the cases like saying:
```

Please don't use pop-ups, and here's a new kind of

advertising that we think would do well, or you've just

purchased a whole bunch of new newspapers; here's some

advice about how to integrate them into your operations

and how to modify your ad tags to sell ads across all

the new properties, that kind of thing.

Q.   Mr. Bellack, I'd now like to focus on what are

the ways you teach your customers to use -- your

products have changed in any major ways over the years.

You described earlier that you began working at

DoubleClick in 2004?

A.   Yes.

Q.   And the products that we've been discussing

today, have you been working on those products

continuously since you began working for DoubleClick?

A.   I started working on some features within DFP

in 2004.   I became responsible for the entire product in

the beginning of 2005, and I took responsibility for DE

in early 2007.

Q.   During this time period, from 2004 or '5 when

you began working on DFP, to the present, has

DoubleClick and Google continuously taught and helped

its customers how to use its products?

A.   Yes, we have.

Q.   And are the things that DoubleClick did to

1  teach its customers when you began working at the

2  company the same kinds of things that Google does today?

3       A.   Yes, they are.

4            MS. HUBER:  I'll pass the witness.

5            THE COURT:  Cross-examination by the

6  Defendant.

7            MR. ROSEN:  Thank you, Your Honor.

8            MR. RAMBIN:  May I approach, Your Honor?

9            THE COURT:  You may.

10           (Pause in proceedings.)

11           THE COURT:  All right.  Counsel, you may

12 proceed.

13           MR. ROSEN:  Thank you very much, Your

14 Honor.

15                    CROSS-EXAMINATION

16 BY MR. ROSEN:

17      Q.   Good afternoon, Mr. Bellack.

18      A.   Hello.

19      Q.   Mr. Bellack, DoubleClick can be used to serve

20 ads on any website?

21      A.   Any website who was a customer of DoubleClick.

22      Q.   So, in other words, so long as DoubleClick and

23 the website can come to terms, some business

24 arrangement, there is no website that cannot displayed

25 ads served by DoubleClick, correct?

1        A.   Yes.

2        Q.   In your direct examination, you testified that

3   DoubleClick is only used to display ads on websites; is

4   that correct?

5        A.   Yes.

6        Q.   In fact, that's not correct.  DoubleClick can

7   be used to display ads on things other than websites,

8   correct?

9        A.   Yes.

10       Q.   So when you testified in direct examination

11  that DoubleClick can only be used to display ads on

12  websites, that testimony was wrong?

13       A.   I thought the question at the time was, is

14  DoubleClick used for any other purpose with websites

15  other than displaying ads.  So I might have just been

16  confused about the wording.

17       Q.   So let's be clear about it then.  DoubleClick

18  can be used to serve ads on things other than websites?

19       A.   Yes.

20       Q.   For example, DoubleClick can serve ads on

21  mobile applications?

22       A.   Yes.

23       Q.   DoubleClick can serve ads on digitally

24  connected television?

25       A.   Yes.

1      Q.   DoubleClick can serve ads on video game

2  consoles?

3      A.   Yes, it can.

4      Q.   DoubleClick can even serve ads on some of

5  those gas stations that have video displays.

6  DoubleClick can serve ads on video-displayed gas pumps,

7  right?

8      A.   Yes, it can.

9      Q.   In fact, you don't even need a web browser in

10  order for DoubleClick to be able to serve ads, right?

11      A.   Yes, in those case -- some of those cases.

12      Q.   DoubleClick can be used to serve ads on any

13  device that is capable of connecting to the Internet and

14  has the ability to send a request to DoubleClick.  Those

15  are the two requirements, right?

16      A.   Yes.

17      Q.   You've seen the -- the -- the patent in this

18  case, correct?

19      A.   No.  I've only seen portions of it when I was

20  being deposed.

21      Q.   So this is the '702 patent, and it's

22  Exhibit 501.  We've already seen it today.  And you can

23  see that Claim 53, which is the -- the asserted claim

24  here, is an apparatus for service on a communications

25  network comprising, and then it lists various things.

1           And the first element is:  A store for

2    storing.  Do you see that?

3        A.   Yes.

4        Q.   Okay.  DoubleClick can be used to serve ads on

5    a website that does not store information that's used to

6    identify a user, correct?

7        A.   Yes, sir.

8        Q.   DoubleClick can be used to serve ads on a

9    website that does not allow users to register on the

10   website, correct?

11       A.   Yes, sir.

12       Q.   DoubleClick can be used to serve ads on

13   websites that do not ask a user any information about

14   themselves, correct?

15       A.   Yes, sir.

16       Q.   Even on those websites that do allow users to

17   register, DoubleClick can be used to serve ads to users

18   who visit the website but don't register.

19       A.   Yes, sir.

20       Q.   Is that a large -- for Google, is that a large

21   population of users?

22           In other words, isn't it true that most users

23   of Google.com don't register?

24       A.   I don't work on Google.com directly, so I

25   don't know the statistics.  I'm sorry.

1     Q.   DoubleClick can be used to serve ads on

2  websites that don't use cookies, correct?

3     A.   Yes.

4     Q.   When -- when -- for websites that do use

5  cookies, when they -- those websites will transfer data

6  to the user's device, correct?

7     A.   Yes.

8     Q.   And that's called setting the cookie, correct?

9     A.   Yes.

10     Q.   DoubleClick can be used to serve ads on

11  websites that do not set cookies on a user's device,

12  correct?

13     A.   Yes, sir.

14     Q.   And even on websites that do place a cookie,

15  that do set a cookie on the user's device, DoubleClick

16  can be used to serve ads to that user even if the user

17  never returns that cookie, correct?

18     A.   I'm sorry.  Could you repeat the question?

19     Q.   Sure.  And maybe I should just explain this.

20         For those websites that do set a cookie on the

21  user's device, when the user reconnects to that website

22  or has another transmission with that website, the

23  user's device will transmit that cookie back to the

24  website, right?

25     A.   Yes.

1       Q.   Okay.  So even if it's the case that the

2   website set a cookie on the user's device --

3       A.   Uh-huh.

4       Q.   -- sometimes, for whatever reason, the user's

5   device doesn't return the cookie, right?

6       A.   Yes.

7       Q.   Okay.  In those instances where the user's

8   device doesn't return the cookie, DoubleClick can still

9   be used to serve ads, correct?

10      A.   Yes.

11      Q.   DoubleClick can be serve -- can be used to

12  serve ads to users that have blocked cookies, correct?

13      A.   Yes, sir.

14      Q.   DoubleClick can be used to serve ads to users

15  that have chosen to disable the cookie function on their

16  websites, correct?

17      A.   Yes, sir.

18      Q.   Now, I want to talk to you about the

19  ad-serving process, the process by which DFP serves ads.

20  And before I do that, I want to show you another part of

21  Claim 53 of the '702 patent, which is the claim that's

22  being asserted in this case.

23           And -- and I want to focus on one of the

24  elements, which we've -- I know you weren't here for the

25  opening statement, but which we have identified as

1    Element (h).

2           And Element (h) is this element that says:

3    One or more programmatic elements for combining

4    advertising-related information with service-related

5    information to obtain a resulting combination that is in

6    a format -- so we have -- stop there.

7           We have programmatic elements, which --

8    computer software that combines advertising-related

9    information with service-related information.

10          Do you understand that part of it?

11    A.    I think I do.  I'm not a patents expert.

12    Q.    Okay.  And then when that combination happens,

13    there's going to be a resulting combination that's in a

14    particular format, right?

15    A.    Okay.

16    Q.    And -- and you're familiar with, for example,

17    HTML files, right?

18    A.    Yes.

19    Q.    And an HTML file is a -- is a computer

20    document that combines advertising-related information

21    with service-related information, correct?

22    A.    Yes.

23    Q.    And programmatic elements are used to create

24    that HTML file, correct?

25    A.    They can be, yes.

1          Q.    And HTML files are transmitted to the user's

2     device, right?

3          A.    Yes.

4          Q.    This ad tag that we've been talking about,

5     that you were talking about in your direct examination,

6     that ad tag is part of the HTML file that gets sent to

7     the user's device, right?

8          A.    Yes.

9          Q.    So what happens is a user maybe goes to that

10    Country Weekly website that you showed us, and a user

11    wants to look at an article.  So we'll type something

12    into the bar up on top, and we'll go to the website,

13    correct?

14         A.    Yes.

15         Q.    And when the user does that, that's called an

16    HTTP get request, right?

17         A.    Yes.

18         Q.    And when the website gets this HTTP get

19    request, it responds to that request, right?

20         A.    Yes.

21         Q.    And this HTML document that we talked about,

22    that's the response to the HTTP get request, right?

23         A.    Yes.

24         Q.    And that -- that HTML file is in a format that

25    is acceptable for being transmitted over a network,

1 right?

2     A.    Yes.

3     Q.    And that HTML file is in a format that is

4 capable of being processed by the user's device --

5     A.    Yes.

6     Q.    -- correct?

7     A.    Yes.

8     Q.    And when we talk about an HTML file that has

9 this combined service-related information with an ad

10 tag, what's going to happen is the user's device is

11 going to process that HTML document, and as a result of

12 that processing, the user is going to see the web page,

13 with the service the user requested and the ad served by

14 DoubleClick, correct?

15     A.    I'm not -- I'm not sure I'd agree with that

16 specifically.

17     Q.    Why?

18     A.    I think the -- the user's device processes the

19 HTML file, and the ad tag is an instruction to call DFP

20 to get the ad.

21     Q.    Okay.  So let's follow -- let me follow up on

22 that.

23           You'll agree with me that the process by which

24 DoubleClick serves ad, the DFP ad-service process, that

25 doesn't even begin until after the website has

1  transmitted this HTML code to the user's device,

2  correct?

3        A.   Most of the time, yes.

4        Q.   All the time.

5        A.   There are alternate setups for our products

6  where the publisher's web server actually contacts the

7  ad server directly to get the ad.

8        Q.   All right.  I'm talking about with DFP.

9             With DFP, all the time, the ad doesn't get

10  served until the user's device processes the HTML code,

11  correct?

12        A.   Most of the time.

13        Q.   Okay.  It's generally the case.  You'll agree

14  with that?

15        A.   Yeah.  Generally, yes.

16        Q.   All right.  So now let's look at Exhibit 517.

17  And I --

18        A.   Okay.

19        Q.   And this is a document we've looked at, and I

20  believe it may have had a different exhibit number.  And

21  I apologize that I don't have, but I'll tell you, this

22  is the identical document you looked at in your direct

23  examination, correct?

24        A.   Yes.

25        Q.   And this document describes the functionality

1  of the -- of the DFP ad server, correct?

2       A.   Yes.

3       Q.   And it's an accurate description, right?

4       A.   Yes, sir.

5       Q.   And -- and, again, this document describes how

6  the process starts when the user requests an ad; isn't

7  that right?

8       A.   Yes, sir.

9       Q.   Overview of the ad-selection process.  DFP's

10 ad-selection process is designed to deliver the right ad

11 to the right customer at the right time.  Below is the

12 process that DFP follows to select an ad to serve.

13          Do you see that?

14      A.   Yes, sir.

15      Q.   And the first thing that happens is the user

16 requests ad, right?

17      A.   Yes, sir.

18      Q.   And if we look a little bit below in the

19 document, it describes how it is that the user will go

20 about requesting the ad, right?

21      A.   Yes, sir.

22      Q.   And the way that happens is the user's browser

23 reads a web page that contains the DFP ad tags, and

24 that's an accurate description, correct?

25      A.   Yes, sir.

1    Q.    And when Exhibit 517 talks about a user's

2  browser reads a web page that contains the ad tags,

3  that's referring generally to the HTML code, right?

4    A.    Yes, sir.

5    Q.    So before anything happens with regard to

6  DoubleClick serving an ad, first, the user has to

7  request a service from a website, right?

8    A.    Yes, sir.

9    Q.    Then the -- the website has to compile a

10  response to that request, right?

11    A.    Yes, sir.

12    Q.    And as part of that process, the website

13  combines advertising-related information with

14  service-related information, correct?

15    A.    Yes, sir.

16    Q.    And the website uses computer-readable

17  instructions and software to create that HTML response,

18  right?

19    A.    Yes, sir.

20    Q.    And the website then transmits that combined

21  HTML file to the user's device, right?

22    A.    Yes, sir.

23    Q.    And it's done so in a format that is capable

24  of being processed by the user's device, right?

25    A.    Yes, sir.

1    Q.    And when that combined document is received by

2 the user's device, the user's device will process that

3 ad tag, right?

4    A.    Yes, sir.

5    Q.    And only when all that happens does

6 DoubleClick serve an ad.

7    A.    Yes, sir.

8              THE COURT:  Counsel, approach the bench,

9 please.

10             (Bench conference.)

11             THE COURT:  Mr. Rosen, what do estimate

12 the remaining cross will take?

13             MR. ROSEN:  Probably a half hour or so.

14             THE COURT:  Okay.  Well, it's less than a

15 quarter to 6:00.  I think we'll break for the evening

16 here.  You can pick up in the morning, all right?

17             MR. ROSEN:  Thank you.

18             (Bench conference concluded.)

19             THE COURT:  Ladies and Gentlemen, this

20 cross-examination looks like it's going to go for some

21 additional period of time, and I'm not going to hold you

22 any longer this evening.  So we're going to recess for

23 the evening at this time.

24             I'm going to ask you to take your juror

25 notebooks and leave them on the table in the jury room

1  as you exit the courthouse.

2                Let me remind you that when you get home

3  tonight, that will be the most tempting time for

4  somebody to ask you about what you've been doing and to

5  violate my instructions.

6                So I remind you again, don't discuss the

7  case or anything about it with anyone else in any way,

8  including yourselves.

9                And travel safely.  Have a good evening.

10               If you'll be back in the jury room

11 assembled by about 8:20, we'll try to start about 8:30

12 in the morning.

13               Have a good evening.  You are excused for

14 the evening at this time.

15               COURT SECURITY OFFICER:  All rise.

16               (Jury out.)

17               THE COURT:  All right.  Be seated,

18 please.

19               Counsel, my practice is to be in chambers

20 by 7:30 each morning of trial.  If anything arises

21 overnight, you'll have an opportunity to take it up with

22 me before we begin with the jury at 8:30.

23               Again, have your renditions for the

24 record ready to read in with regard to pre-admit

25 exhibits used in today's portion of the trial.

1              Is there anything else from the Plaintiff

2 before we recess for the evening?

3              MS. ANDERSON:  No.  Thank you, Your

4 Honor.

5              THE COURT:  Mr. Adams, I assume you have

6 something.  You're popping up there.

7              MR. ADAMS:  Yes.  I'm sorry, Your Honor.

8 Your Honor, there -- there's a -- there's an issue in

9 the case and there's a -- a way of proceeding that's --

10 that's upsetting me, and here's what it is.

11             This case has been about whether or not

12 they can prove infringement; they can prove damages.

13 From the very beginning, Your Honor, the theory of harm

14 that they have expressed to us has been the theory of we

15 have to pay attorneys' fees.  That's all they disclosed

16 in their discovery responses, the initial disclosures.

17 Very late in the game, after all the discovery was done,

18 they then switched horses and said:  Well, we've got

19 these indemnity letters.

20             We filed a motion with Judge Payne, and

21 we argued to the Judge:  Look, this theory was disclosed

22 to us well after discovery.  Judge Payne allowed them to

23 introduce these indemnity letters.

24             Today during examination, they then

25 attempted to raise another issue of harm, which I

1  approached Your Honor. I objected. Your Honor

2  sustained the objection.

3          On direct examination with Mr. Bellack,

4  another -- withdrawn.

5          In my cross-examination of Mr. Trinh, I

6  got him to admit that they have not suffered any harm

7  from these indemnity letters because there has not been

8  any -- any customer that has ever left them because of

9  this. They have paid no monies.

10         For the very first time, Your Honor,

11 Mr. Bellack has come into this Court, and for the first

12 time, testifies that a customer has nothing. They have

13 never raised that, Your Honor. We've never heard that

14 theory.

15         I -- I'm -- I'm concerned that we're

16 being ambushed because they -- they -- they are

17 desperate to try to show harm in this case, Your Honor.

18 And for that, I -- I -- I apologize that Mr. --

19 Mr. Rosen didn't get up in time to object. I think it

20 was -- it just happened too quickly. He didn't object

21 to it.

22         But I just wanted to raise that with the

23 Court. I really believe that that testimony that came

24 in should be stricken, because it's another theory of

25 harm that has never been disclosed in this case, Your

1  Honor.

2          THE COURT:  All right.  Do you have a

3  response for me, Ms. Anderson?

4          MS. ANDERSON:  Yes.  Thank you, Your

5  Honor.

6          Your Honor, the question at issue that

7  Counsel's referring to is the question of whether or not

8  Google has lost customers who were sued as a result of

9  the lawsuit.

10          That was a topic that was raised for the

11  first time by Beneficial's counsel during

12  cross-examination of Mr. Trinh, a witness who doesn't

13  have knowledge.  It wasn't something we proffered on

14  direct in any way, shape, or form.

15          The witness was pressed several times to

16  answer questions about it.  He explained he's not the

17  person that would necessarily know.  He's not in that

18  department of Google.

19          But the -- the questions have now left

20  the jury with incorrect information because he is not a

21  person who would have known that.  We do know that, in

22  fact, a Google customer has -- has indicated they've

23  left because they were sued, and that made them quite

24  unhappy.

25          We're not claiming damages for it, but --

but the questions that were elicited from a witness

without knowledge and pressed as argument in this case

left the jury with incorrect information.

We did not open that door, but it is

something that was opened by Beneficial's counsel in

examining on cross a witness, Mr. Trinh.

THE COURT:  Well, if that's the first

time it came up, Ms. Anderson, then why were we at the

bench with Mr. Adams objecting, telling me that this was

the first time this had been raised and you told me at

the bench you could not tell me with certainty it had

been previously disclosed?

MS. ANDERSON:  That actually was a

different issue, Your Honor.  What we had been

discussing at the bench was a question I had asked about

how much time did our witness estimate that Google

employees spent dealing with the lawsuit.

And that was the question at issue, and I

was asked whether time spent by Google employees is

something that had been disclosed.  That was the

discussion at sidebar.  Had nothing to do with lost

customers in any way at all, Your Honor.

And it -- the only reason that we

corrected the record is because these were questions

pressed on cross by Beneficial of Mr. Trinh.

```
 1                    THE COURT:  Well, given what may be an
 2   untimely objection on the Defendant's part -- the Court
 3   takes seriously accusations of surprise and ambush --
 4   here's what I'm going to do:  I'm going to direct each
 5   of you to file this evening with me a written statement
 6   of your positions, not more than two pages each, and I
 7   will read them overnight, and in the morning, we'll take
 8   this up before the jury comes in.
 9                    MS. ANDERSON:  Thank you, Your Honor.
10                    THE COURT:  Is there anything else
11   counsel is aware of we should take up tonight?
12                    MR. ADAMS:  No, Your Honor.
13                    THE COURT:  All right.  We'll stand in
14   recess until tomorrow morning.
15                    COURT SECURITY OFFICER:  All rise.
16                    (Court adjourned.)
17                    * * * * * * * * * * * * * * * * * * * * *
18
19
20
21
22
23
24
25
```

<u>CERTIFICATION</u>

          I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.


/s/_____                    ___1/21/14_____
SHELLY HOLMES, CSR                              Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/14


/s/_____                  _____1/21/14_____
SUSAN SIMMONS, CSR                         Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/14