```
IN THE UNITED STATES DISTRICT COURT
    FOR THE EASTERN DISTRICT OF TEXAS
              MARSHALL DIVISION

GOOGLE, INC.                    *    Civil Docket No.
                                *    2:11-CV-229
VS.                             *    Marshall, Texas
                                *
                                *    January 22, 2014
BENEFICIAL INNOVATIONS, INC.    *    8:40 A.M.
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

APPEARANCES:

```
FOR THE PLAINTIFF:     MS. CHRISTA ANDERSON
                       MS. JENNIFER HUBER
                       Keker & Van Nest
                       633 Battery Street
                       San Francisco, CA   94111


                       MR. MICHAEL JONES
                       MR. ALLEN GARDNER
                       Potter Minton Firm
                       110 North College Street
                       Suite 500
                       Tyler, TX    75702
```

APPEARANCES CONTINUED ON NEXT PAGE:

```
COURT REPORTERS:       MS. SHELLY HOLMES, CSR
                       MS. SUSAN SIMMONS, CSR
                       Official Court Reporters
                       100 East Houston, Suite 125
                       Marshall, TX    75670
                       903/935-3868
```

(Proceedings recorded by mechanical stenography,
transcript produced on CAT system.)

APPEARANCES CONTINUED:

FOR THE DEFENDANT:     MS. JULIEN ADAMS
                       Dovel & Luner
                       201 Santa Monica Blvd.
                       Suite 600
                       Santa Monica, CA   90401

                       MR. DAVID ROSEN
                       Murphy Rosen
                       100 Wilshire Blvd.
                       Suite 1300
                       Santa Monica, CA   90401

                       MS. ELIZABETH DERIEUX
                       MR. JEFF RAMBIN
                       Capshaw DeRieux
                       114 East Commerce
                       Gladewater, TX   75647


            ************************************************


                   P R O C E E D I N G S


            (Jury out.)

            COURT SECURITY OFFICER:  All rise.

            THE COURT:   Be seated, please.

            All right.  Is the Plaintiff prepared to

read into the record a rendition of those documents from

the list of preadmitted exhibits used and published

before the jury as a part of yesterday's portion of the

trial?

            MS. HUBER:  Yes, Your Honor.

            THE COURT:  Please proceed to the podium

1   and do so, Counsel.

2              MS. HUBER:  Exhibit 1, 2, 3, 4, 8, 9, 12,

3   22, 23, 29, 30, 31, 32, 37, 38, 43, 44, 48, 49, 57, 62,

4   114, 115.

5              THE COURT:  For purposes of clarity, I

6   assume those are all Plaintiff's exhibit numbers.

7              MS. HUBER:  Yes, Your Honor, that's

8   correct.

9              THE COURT:  All right.  Does the

10  Defendant have any objection to that rendition by the

11  Plaintiff?

12             MR. RAMBIN:  Good morning, Your Honor.

13  No, we do not.

14             THE COURT:  Does the Defendant have a

15  similar list to read into the record?

16             MR. RAMBIN:  Yes, we do, Your Honor.  The

17  only additional exhibits offered by the Defendants were

18  Defendant's Exhibits 501 and 517.

19             THE COURT:  Does the Plaintiff have any

20  objection to that rendition by the Defendant?

21             MS. HUBER:  No, Your Honor.

22             THE COURT:  All right.  Thank you,

23  Counsel.

24             Also before we bring the jury in and

25  continue with the evidence, at the close of the day

1   yesterday, Counsel raised an issue regarding Defendant's

2   assertion that Plaintiff was taking advantage of a

3   surprise with regard to undisclosed theories of harm.

4   And as you'll recall, I directed each side to file a

5   short position paper on the same overnight, which I have

6   read and reviewed.  So I'm prepared to give you a ruling

7   and some direction on that issue.

8                  With regard to the evidence adduced

9   through Mr. Trinh that Google employees have spent many

10  hours of employee time dealing with Beneficial's

11  lawsuit, I sustained that objection at the bench, and I

12  am precluding the Plaintiff from offering any similar or

13  supporting evidence of that nature going forward.  I do

14  find that that was not disclosed, and I do find that it

15  was properly objected to, brought to the Court's

16  attention and dealt with during the trial yesterday.

17                 With regard to whether Google has lost

18  any customers as a result of Beneficial's conduct, that

19  was brought into the trial through the cross-examination

20  of Mr. Bellack yesterday.  The Court finds that the

21  parties are in agreement.  That is a separate issue from

22  time devoted to dealing with the lawsuit as I've

23  addressed.

24                 And given that second and separate issue,

25  the loss of any customers by Google, the Court finds

1  that -- two things:  That given that is separate, the

2  Defendant opened the door to it; and secondly, when the

3  Plaintiff revisited it, the Plaintiff failed to timely

4  object.  Therefore, I'm going to overrule Defendant's

5  objection with regard to the evidence relating to

6  Google's loss of a customer.

7             I do assume, Counsel, that those issues

8  have been covered, and we will not be going into them

9  further.  But that's -- that's my ruling with regard to

10 those two matters.

11            Any questions?

12            MR. JONES:  None from the Plaintiff, Your

13 Honor.

14            MR. ADAMS:  No questions, Your Honor.

15            THE COURT:  All right.  I don't see our

16 witness.  Is he available to return to the witness

17 stand?

18            MS. ANDERSON:  Yes, Your Honor.  He is

19 here waiting outside.

20            THE COURT:  All right.  Let's get him and

21 get him to the witness stand.

22            And, Mr. Rosen, return to the podium to

23 continue your examination.

24            When they're in place, Mr. McAteer,

25 please bring in the jury.

1                    COURT SECURITY OFFICER:  Yes, sir.

2                    THE COURT:  If you'll come forward,

3  Mr. Bellack, and return to the witness chair.

4                    THE WITNESS:  Thank you, Your Honor.

5                    THE COURT:  I'll remind you that you

6  remain under oath.

7                    THE WITNESS:  Yes, Your Honor.

8                    THE COURT:  All right.  Mr. McAteer, if

9  you'll bring in the jury.

10                    COURT SECURITY OFFICER:  All rise for the

11  jury.

12                    (Jury in.)

13                    THE COURT:  Welcome back, Members of the

14  Jury.  Please be seated.

15                    Counsel, please be seated as well.

16                    We'll continue with the cross-examination

17  by the Defendant of Mr. Bellack.

18                    You may proceed, Mr. Rosen.

19  JONATHAN BELLACK, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

20                    CROSS-EXAMINATION (CONTINUED)

21  BY MR. ROSEN:

22      Q.   Good morning, Mr. Bellack.

23      A.   Good morning.

24      Q.   Yesterday afternoon we were talking about the

25  DoubleClick ad-serving process.  Do you recall that?

1        A.    Yes.

2        Q.    I just want to close out that, and I want to

3   show you Exhibit 49.  And 49, this is a document that

4   you were shown yesterday in your examination, I believe.

5   And this is part of the -- sort of the documents that

6   are provided to Google's customers to explain to them

7   how DFP, DoubleClick for Publishers, works, correct?

8        A.    Yes, sir.

9        Q.    And this is part of the getting-started guide

10  that you talked about, right?

11       A.    Yes, sir.

12       Q.    And you can see -- and I've highlighted it

13  here -- explaining ad tags, and it says:  When a page

14  explaining an ad tag is rendered, the following sequence

15  of events occur.  And it lists three or four things.

16            Do you see that?

17       A.    Yes, sir.

18       Q.    When the document makes reference to a page

19  containing an ad tag is rendered, that goes back to what

20  we talked about yesterday, meaning when the HTML

21  document that's transmitted from the website to the user

22  is rendered, right?

23       A.    Yes, sir.

24       Q.    Okay.  All right.  So I want to switch gears a

25  little bit.  So we've talked about the ad-serving

1  process, the manner in which DoubleClick serves ads on

2  these websites.

3          Another thing DoubleClick does is it assists

4  in the process of -- of just creating the ad tags

5  themselves, right?

6      A.   Yes, sir.

7      Q.   Okay.  So -- and what DoubleClick does in that

8  regard is it instructs its customers so they can make

9  their own ad tags, right?  That's one thing?

10     A.   So that they can make additional DoubleClick

11 ad tags according to the formats that we specified.

12     Q.   Right.  So -- so the first thing you'll do is

13 you'll provide them some -- I think you used the word

14 syntax.  You'll provide them some syntax, which is

15 essentially sample ad code, right?

16     A.   Yes, sir.

17     Q.   And then they can build off that sample ad

18 code and start to develop their own ad code; is that

19 fair to say?

20     A.   Yes, sir, within the bounds of what they're

21 allowed to change.

22     Q.   And ad code -- an ad tag, that's just a

23 snippet of code, right?

24     A.   In -- in -- essentially, yes.

25     Q.   Okay.  And there's different kinds of codes --

1  different types of tags besides the ad tags, right?

2       A.   Yes, sir.

3       Q.   And they're all just snippets of code --

4       A.   Yes, sir.

5       Q.   -- that do -- that do different things?

6       A.   Yes, sir.

7       Q.   So an ad tag is a snippet of code that is

8  involved in the ad process, right?

9       A.   Yes, sir.

10      Q.   Okay.  Google didn't invent tags, did it?

11      A.   No, sir.

12      Q.   Didn't invent ad tags, did it?

13      A.   No, sir.

14      Q.   And you -- you talked yesterday about other

15  third-party ad servers that are out there.

16      A.   Yes, sir.

17      Q.   They use ad tags also, right?

18      A.   Yes, sir.

19      Q.   And -- and sometimes a website serves its own

20  ads, right?

21      A.   Yes, sir.

22      Q.   And when a website serves its own ads without

23  using DoubleClick or any of these other companies, they

24  also use ad tags?

25      A.   Yes, sir.

1    Q.   Now, the ad tag, and you talked about this a
2 little bit yesterday, the ad tag contains different
3 variables that you can put in there, right?

4    A.   Yes, sir.

5    Q.   And you showed us an example with the
6 different numbers and letters.  And -- and as you change
7 those variables, it changes the ad, right?

8    A.   It changes the options for what ad could serve
9 on that page.

10    Q.   Right.  So you can change a variable that will
11 move.  Maybe now the ad's going to show on the top
12 rather than the bottom, that sort of thing, right?

13    A.   Yes, sir.

14    Q.   You can change a variable so the ad will be
15 smaller versus larger, right?

16    A.   Yes, sir.

17    Q.   And one of the variables you can change is
18 whether the ad is going to appear on the display next to
19 the service or as a pop-up ad, right?

20    A.   I'm sorry.  Could you repeat that question?

21    Q.   Yeah.  One -- so one of these variables that
22 you can add into these ad tags is to make it pop up like
23 a pop-up ad.

24    A.   Technically speaking, the ad tag itself
25 doesn't cause it to be a pop-up ad.  The ad tag says, as

1  well -- at least in DFP, it says, as well as it being

2  possible to show an ad on the page, if there is a pop-up

3  ad available, that is also allowed to serve.

4     Q.   All right.  So let's look at Exhibit 46, which

5  I believe -- I -- I don't believe you saw this

6  yesterday.  So I'll ask you to take a look at this.

7         And Exhibit 46, this is also something from

8  the documents that Google provides to its...

9     A.   Okay.  I don't -- just -- I -- looks like I

10  don't have it in my book.  Is that okay?

11     Q.   Well, I can get you a copy, but I can also put

12  it up here.

13     A.   That's fine.

14         THE COURT:  Is it not on the monitor in

15  front of you?

16         THE WITNESS:  Yeah, it is on the monitor

17  in front of me.

18         THE COURT:  Okay.  Let's continue.

19         MR. ROSEN:  Thank you, Your Honor.

20     Q.   (By Mr. Rosen) So this is a document that

21  describes to Google customers how to show a pop-up ad,

22  right?

23     A.   Yes, sir.

24     Q.   And it explains that in order for these

25  creatives to serve an ad tag, the tag needs to include

1  the reserve key value DCOPT=IST, right?

2      A.   Yes, sir.

3      Q.   So that's a piece of code that you would --

4  you would write those letters, and you'd insert that

5  into the ad tag, right?

6      A.   Yes, sir.

7      Q.   And that's what would let the ad tag know that

8  there was a pop-up ad.

9      A.   Yes.  But technically speaking, as it says,

10  that that is letting -- it is having that ad tag let the

11  server know that a pop-up ad is allowed to serve.

12      Q.   Correct.  Now, Google -- well, let me take a

13  step back.

14          We talked yesterday about the process of

15  creating this HTML document, about how you use these

16  programmatic elements to combine service-related

17  information with ad-related information.

18          Do you recall discussing that yesterday?

19      A.   Yes, sir.

20      Q.   Google does not insert the ad tag into this

21  HTML document, does it?

22      A.   No, sir.

23      Q.   That's the job of the website.

24      A.   Yes, sir.

25      Q.   Google also does not provide the software

1  that's used to combine the service-related information

2  with the advertising-related information, correct?

3      A.   In the case of DFP, no, sir.  In the case of

4  DE, there are some technologies that could be involved

5  in that.

6      Q.   Okay.  But as a general matter in the case of

7  DoubleClick for Publishers, which is the system where

8  Google acts as the ad server, Google does not provide

9  that software that combines the service-related

10 information with the ad-related information, correct?

11     A.   No, sir.

12     Q.   No, sir, meaning Google -- Google doesn't

13 provide --

14     A.   Google does not, yes.  I'm sorry.

15     Q.   Now -- so the user's device reads that ad tag,

16 and it sends a -- transmits a message to DoubleClick, to

17 the DoubleClick servers to display an ad, right?

18     A.   Yes, sir.

19     Q.   And in response to that transmission to

20 DoubleClick, the DoubleClick servers are going to return

21 something to the user's device, right?

22     A.   Yes, sir.

23     Q.   They're going to return some -- some data,

24 right?

25     A.   Yes, sir.

1       Q.    But the data that DoubleClick returns to the

2  user's device, that's data that is going to result in

3  the display of the ad, correct?

4       A.    Yes, sir.

5       Q.    It is not data that's going to result in the

6  display of the service that the user has requested,

7  correct?

8       A.    No, sir.

9       Q.    In other words -- I keep asking double

10 negative questions.

11      A.    Yeah.  Sorry.

12      Q.    Does the data that DoubleClick sends to the

13 user's device to display to the ad also result in the

14 service being displayed?

15      A.    It does not.

16      Q.    DoubleClick -- so we talked yesterday about

17 cookies, right?  And -- and some websites put cookies on

18 their -- transmits cookies to the user's device, right?

19      A.    Yes, sir.

20      Q.    DoubleClick does not read those cookies,

21 right?

22      A.    No, sir.

23      Q.    Does DoubleClick read those --

24      A.    Sorry.

25      Q.    No.  It's my fault, a hundred percent my

1  fault.

2          Does DoubleClick read those cookies?

3      A.    No, sir.

4      Q.    Does DoubleClick -- DoubleClick have access to

5  the publishers, these websites' systems?

6      A.    Not directly, no.

7      Q.    In fact, for the websites that use

8  DoubleClick, there's no interface between Google's

9  servers and the website's servers, correct?

10     A.    There are none.

11     Q.    Now, you also talked yesterday about how

12 DoubleClick itself will sometimes put cookies on the

13 user's device, right?

14     A.    Yes.

15     Q.    Now, when DoubleClick puts a cookie on the

16 user's device, the only use for that cookie is to

17 improve advertising, correct?

18     A.    Yes, sir.

19     Q.    All right.  I'm going to --

20          MR. ROSEN:  Jan, I'm going to try

21 something.  I may not -- I may not succeed.  Let me

22 figure out how to use this.  I'm sorry, Ms. Lockhart.

23     Q.    (By Mr. Rosen) All right.  Can you -- can you

24 see that?

25     A.    Yes, sir.

1    Q.   All right.  So this is the -- the picture of

2 the website that you talked about yesterday, right?

3    A.   Yes, sir.

4    Q.   Okay.  So on this Country Weekly site, you

5 know, we can see the -- up there it talks about the

6 January 13th George Strait concert, and particular --

7 presumably that's a link that you can click on, right?

8    A.   Yes, sir.

9    Q.   So you click on that link, and you'd get more

10 information about the George Strait concert, right?

11    A.   Yes, sir.

12    Q.   So that's the service that's being provided by

13 this website in that instance, right?

14    A.   Yes, sir.

15    Q.   Now, I guess the bottom right, that redeem

16 your card now, that's an ad provided by DoubleClick,

17 right?

18    A.   Served by DFP, yes.

19    Q.   Okay.  So this is the ad served by DFP, and

20 this is the -- the service requested by the user, right?

21    A.   Yes.

22    Q.   And -- and the way -- and I think -- I think

23 you said this yesterday, early on in your testimony

24 yesterday, the way -- what DFP does, what it -- sort of

25 the reason to be with respect to serving ads on websites

1   is to serve an ad alongside the service, right?

2       A.   Yes, sir.

3       Q.   But DFP does not generally serve an ad on top

4   of the service, does it?

5       A.   Not generally, but sometimes.

6       Q.   But as a general rule, the point is the

7   website wants its content to be seen, right?

8       A.   Yes.  And I -- I apologize.  The reason I'm --

9   I'm not sure I would say generally is that there's a

10  type of ad that's becoming a little more common called

11  an interstitial where the user has to sort of see the ad

12  or click something to close it before they do see the

13  content.

14          So it's not incredibly common, but I don't

15  know if I'd say, as a rule, that never happens.

16      Q.   Okay.  But you'll agree with me, just as a

17  general matter, on an average website like Country

18  Weekly or -- you listed a bunch of websites yesterday --

19  the Viacom websites, on those websites, you have the

20  content on the page, and then alongside the content, you

21  have the ad.  They don't -- they don't -- they're not on

22  top of each other.  Half the ad doesn't cover the

23  content, right?

24      A.   Not usually, no.

25              MR. ROSEN:  So, Ms. Lockhart, can I

1  switch back now?

2                 Thank you.

3       Q.   (By Mr. Rosen) So let me show you -- so this

4  is -- I -- I want to -- we looked a little bit at the

5  '702 patent yesterday.  Now I want to show you a little

6  more of the '943 patent.

7            And I'm just going to high -- this is Claim 1

8  of the '943 patent.  I'm just going to highlight one

9  part of it here.

10           And one of these elements of the '943 patent

11  is:  Overlapping with a display of said one of the

12  display presentations, P1.

13           Do you see that?

14      A.   Yes, sir.

15      Q.   So if I had the -- that screenshot on the

16  board, so that that George Strait article, that would

17  be, you know, P1.  That's a presentation, Presentation

18  No. 1.

19      A.   Okay.

20      Q.   Overlapping with a display of said one of the

21  said display presentations, P1, at the user node is a

22  display of a first one or more advertising presentations

23  for providing information relating to one or more of a

24  product or service.

25               So if I had that screenshot on the board, we'd

1  see that iTunes article.  So we'd have overlapping with

2  a display of the George Strait article is a display of

3  an advertising for iTunes, okay?

4       A.   Okay.

5       Q.   Now -- now, I want to show you how the Court

6  construed the term overlapping.  The Court construed the

7  term overlapping -- and I apologize; this is sort of a

8  mess.

9            You can see the Court construed the term

10  overlapping to be extending over or past and covering

11  part of.  So using this definition of overlapping, the

12  general way that DoubleClick works is the ad does not

13  overlap the service in the way that this term has been

14  construed, correct?

15       A.   No, not by this definition.

16       Q.   All right.  So by this definition, the ad does

17  not overlap the service, right?

18       A.   No, it does not.

19       Q.   I want to switch gears a little bit, and I

20  want to talk to you about the instruction and

21  encouragement that you give to your customers in the use

22  of DoubleClick.

23            First of all, we -- we just -- I just showed

24  you the '943 patent.  You'll agree with me that Google

25  never even became aware of the '943 patent until it got

1  sued by Beneficial, right?

2     A.   Yes, sir.

3     Q.   In other words, before -- before Google was

4  sued and saw that they're being sued of infringement of

5  the '943 patent, they never heard of the '943 patent?

6     A.   That is my understanding.  Yes.

7     Q.   And the same is true for the '702 patent.

8  Before Google got sued for infringing the '702 patent,

9  they never even heard of the '702 patent?

10    A.   I believe so.

11    Q.   Now, you testified, you know, for a while

12  yesterday about all the -- the -- I think you identified

13  four different types of training that you do for -- for

14  your users and your customers, and that's all training

15  to teach your customers how to use DoubleClick, right?

16    A.   How to use DoubleClick and how to set up the

17  ad tags required to call DoubleClick.

18    Q.   All right.  So those are the two primary

19  focuses of the trainings:  How to use DoubleClick.  And

20  when you say how to use DoubleClick, you're talking

21  about how to use all the software and to input all the

22  information into the computer so that DoubleClick knows

23  what kinds of ads you want to serve and what advertisers

24  you have, that sort of information, right?

25    A.   Yes, sir.

```
 1        Q.    So that's part one.

 2              And then part two is to teach the customers

 3    how to use the ad tags themselves?

 4        A.    Yes, sir.

 5        Q.    And Google provides -- you went into it

 6    yesterday -- Google provides documentation on how to do

 7    this, right?

 8        A.    Yes, sir.

 9        Q.    By the way, I just want to -- as an aside,

10    you've heard of Conde Nast?

11        A.    Yes, sir.

12        Q.    Conde Nast is a customer of DoubleClick,

13    right?

14        A.    Yes, they are.

15        Q.    And Conde Nast is a division of Advance

16    Publications, right?

17        A.    I'm not actually sure about that.

18        Q.    All right.  Let me just show you Exhibit 520.

19    And if you have it in your book, it may just be easier

20    to do that, because this may turn -- I thought this

21    might happen.

22        A.    Okay.

23        Q.    But Exhibit 520, that's a spreadsheet that you

24    prepared of various customers of --

25        A.    Yes.
```

 1      Q.    -- of DoubleClick, right?

 2      A.    Yes.

 3      Q.    And you see there, does this refresh your

 4  recollection that if you look under the Advance

 5  Publications listing, one of the portions or one of the

 6  parts of Advance Publications is Conde Nast?

 7      A.    Yes, sir.

 8      Q.    Now, in all of this teaching of customers how

 9  to use DoubleClick -- take a step back.

10          One thing cookies can be used for that you're

11  aware of is to identify a user when a user returns to a

12  website, right?

13      A.    Yes, sir.

14      Q.    So, for example, if I sign in on a website and

15  register, when I close down my browser and come back the

16  next day, if I go to that website, it may say, you know,

17  hi, David or welcome, David.  That's because of an

18  identification cookie, right?

19      A.    Yes, sir.

20      Q.    When Google teaches and instructs its

21  customers on how to use DoubleClick, Google does not

22  encourage its customers to transmit identification

23  cookies to its users, does it?

24      A.    Not as part of that training, no.

25      Q.    Well, let me be more specific then.  We've

1 been talking in this case about these five Defendants

2 that Google filed this lawsuit on behalf of.  Google did

3 not encourage or instruct any of these five Defendants

4 to transmit identification cookies to their users, did

5 they?

6     A.   I could not say for sure, because I have

7 spoken publicly several times about the importance of

8 establishing an ongoing relationship with users that

9 tend to involve log-ins, and some of these customers may

10 have been in the audience.

11     Q.   Now, other than that very general statement

12 you may have made in that, you don't teach -- in your

13 documentation, you don't teach websites to transmit

14 identification cookies to users, do you?

15     A.   No, we do not.

16     Q.   And -- and focusing on these five Defendants

17 that are -- we're talking about in this case, Google has

18 never encouraged or instructed those Defendants to set

19 up a system where users register on their website,

20 right?

21     A.   We -- we haven't instructed them, but we may

22 have encouraged them through the -- the kind of speaking

23 that I mentioned.

24          MR. ROSEN:  I'd like to read from --

25 actually play a clip from the witness' depo.  Your

1  Honor, I'll just read it to shorten the clip.

2    Q.  (By Mr. Rosen) From Page 174, Lines 2 through

3  5:

4      QUESTION:  -- you recall I took your

5  deposition, Mr. Bellack, some time ago, right?

6    A.  Yes, sir.

7    Q.  And when you sat for that deposition, you

8  understood that you were under oath, right?

9    A.  Yes, sir.

10    Q.  And as a matter of fact, when you attended

11  that deposition, you weren't -- you appeared as a

12  representative of Google, right?

13    A.  Yes, sir.

14    Q.  In other words, we asked Google -- we didn't

15  ask Google to please produce Mr. Bellack for deposition.

16  We said:  Google, please produce a witness that can

17  answer questions for us on specific categories of

18  testimony, right?

19    A.  Yes, sir.

20    Q.  And you were the person that Google delivered

21  to us, correct?

22    A.  Yes, sir.

23    Q.  Okay.  And in -- is it correct that in that

24  deposition, I asked you the following question and you

25  gave the following answer?

1      A.   Yes, sir.

2      Q.   QUESTION:  And you did not -- you do not

3  instruct publishers to require -- to set up a

4  registration system for users to register, correct?

5           ANSWER:  No, we do not.

6      A.   Yes, sir.

7      Q.   And that was your testimony in deposition,

8  right?

9      A.   Yes, it was.

10      Q.   And, in fact, for any of the Defendants, those

11  five parties that are at issue in this case, you -- can

12  you identify for us any of the documents that were

13  provided to those customers in order to teach them how

14  to use DoubleClick?

15      A.   Not specifically, no.

16      Q.   In your examination yesterday, you were shown

17  Exhibit 115, which is this DART Webmaster's Guide.

18           Do you recall that?

19      A.   Yes, sir.

20      Q.   And this is the manual that are for people at

21  the website responsible for inserting ad tags into this

22  combined file that we've talked about, right?

23      A.   Yes, sir.

24      Q.   And I think you even commented that this

25  document is more than a hundred pages, right?

1      A.   Yes, sir.

2      Q.   It's very comprehensive, right?

3      A.   Yes, sir.

4      Q.   And nowhere in that manual, Exhibit 115,

5  Mr. Bellack, does Google teach its customers how to use

6  cookies to identify a user, correct?

7      A.   No, sir.

8      Q.   Is there anything in that manual that teaches

9  customers to use cookies to identify a user?

10      A.   No, there is not.

11      Q.   Is there anything in that manual that teaches

12  customers that they need to have a store for storing

13  user identification information?

14      A.   I'm sorry.  Could you -- could you rephrase

15  that question?

16      Q.   Is there anything in that manual that teaches

17  customers that they need to set up a store for storing

18  user identification information?

19      A.   Are you asking did we tell them that it is

20  required anywhere?

21      Q.   Yes.  Anywhere in that manual.

22      A.   No, we do not say it's required.

23      Q.   And you also saw Exhibit 114, which was an

24  administrator's guide for DE?

25      A.   Yes.

1      Q.    Which was DoubleClick Enterprise, correct?

2      A.    Yes, sir.

3      Q.    And this is the manual for website

4   administrators responsible for -- for managing

5   DoubleClick Enterprise, right?

6      A.    Yes, sir.

7      Q.    And this is more than -- this is close to a

8   hundred pages, right?

9      A.    Yes, sir.

10     Q.    And, again, is there anything in this manual

11  that teaches customers to use cookies to identify a user

12  or provide access to a service?

13     A.    To be honest, I have not read this entire

14  manual end-to-end, so I couldn't say.

15     Q.    But as you sit here today, is there anything

16  in that manual that you can identify that provides that?

17     A.    I cannot identify, no.

18     Q.    You will agree, though, that both of these

19  documents are -- were intended to be comprehensive

20  manuals to teach your customers, whether it's the

21  Webmaster or other people within the website, how to use

22  the DoubleClick products?

23     A.    For the particular parts of DoubleClick that

24  these documents were focused on, yes.

25     Q.    You mentioned yesterday ALM no longer being a

1  customer.

2      A.   Yes, sir.

3      Q.   You -- you didn't -- as part of your

4  testimony, you didn't show us any documents on that

5  subject, correct?

6      A.   No, sir.

7      Q.   Now, when Google instructs its customers how

8  to use -- whether it's DFP or DE, did Google have the

9  affirmative intent to cause the customers to infringe

10 the -- the Beneficial patents?

11     A.   I'm sorry.  Because I'm not a lawyer, I

12 couldn't say.

13          MR. ROSEN:  Your Honor, I'd like to play

14 the witness' deposition, Page 163, Line 8 through 165

15 Line 12.

16          THE COURT:  For impeachment purposes?

17          MR. ROSEN:  Yes.

18          THE COURT:  Proceed.

19          (Video clip playing.)

20          QUESTION:  If you look at the list of

21 Defendants again, at -- at some level, whether it's

22 through online training or providing documentation or --

23 or -- or otherwise, did Google actively encourage or

24 instruct each of those Defendants on how to use DFP or

25 DE?

1          ANSWER:  Yes.

2          QUESTION:  When Google did so, when --

3    did it have the affirmative intent to cause those

4    Defendants to infringe the '702 patent?

5          ANSWER:  Yeah, I can't answer that

6    question.  I don't know.

7          QUESTION:  So you don't know one way or

8    the other whether -- when Google encouraged or

9    instructed the Defendants on how to use DFP or DE,

10   whether Google had the affirmative intent to cause the

11   Defendants to infringe the '702 patent?

12         ANSWER:  I know the kinds of things we do

13   when we are helping publishers get started using our

14   products.  I'm not a lawyer, so I can't speculate as to

15   what that means relative to the patents in question.

16         QUESTION:  Right.  But I guess -- I don't

17   think -- I want to make sure -- maybe you can't answer

18   the question, and that's fine, but I want to make sure

19   we're not hung up on something different.

20         You may know what constitutes patent

21   infringement or not or -- I'm not asking anything like

22   that.  I'm -- I'm just asking, did Google intend to have

23   these Defendants infringe a patent.

24         ANSWER:  I -- I don't know how -- I don't

25   know the answer to that question.

```
 1                    QUESTION:  Okay.  What about the '943
 2   patent?  Did Google, when it instructed the Defendants
 3   on how to use the products, affirmatively intend to
 4   cause those Defendants to infringe the '943 patent?
 5                    ANSWER:  I don't know.
 6                    QUESTION:  When Google was -- when Google
 7   was instructing the Defendants on how to use DFP and DE
 8   --
 9                    MS. HUBER:  Your Honor, we would object.
10   I'm not sure this is improper impeachment at this point.
11                    THE COURT:  Let's stop the clip.
12                    (Video clip paused.)
13                    THE COURT:  Counsel, state your
14   objection.
15                    MS. HUBER:  Your Honor, it's improper
16   impeachment.  It's the same answer that he gave in
17   response to Mr. Rosen's testimony -- or Mr. Rosen's
18   question here today.
19                    THE COURT:  Mr. Rosen?
20                    MR. ROSEN:  I don't -- the answer he said
21   three times in this depo clip is I don't know.  And
22   that's a factual answer.  That's different than the
23   answer he gave from the stand.
24                    THE COURT:  Well, whether it's the same
25   or not, we'll leave to the jury's determination, but
```

1    you've certainly covered it.  So let's move on.

2                MR. ROSEN:   Okay.

3        Q.   (By Mr. Rosen) Now, Mr. Bellack, when you were

4    asked this question by me in your deposition, again,

5    this was the same deposition where you were appearing

6    not in your personal capacity, but you were appearing as

7    a representative of Google, right?

8        A.   Yes, sir.

9        Q.   And one of the categories that we had asked

10   Google to produce a witness on was whether Google knew

11   that the encouragement or instruction it provided the

12   accused Google partners in how to use the products and

13   services would result in infringement of the '943 patent

14   or the '702 patent, right?

15       A.   Yes.

16       Q.   Okay.  So -- so you knew you were going to be

17   asked these questions when you were at your deposition,

18   right?

19       A.   My understanding at the deposition is I was

20   there to answer questions about the DoubleClick products

21   and how they worked and how we trained people, but not

22   to answer legal questions.

23       Q.   I want to make it very clear, and maybe I'll

24   ask it again and see if you change your answer.  I'm not

25   asking a legal question.  I want to know that if in your

1  head -- in your head -- when you're in a room with

2  customers and you're trying to train them in how to use

3  DoubleClick, in your head, are you thinking:  I intend

4  to cause these people to infringe a patent?

5      A.   I'm trying to help our publishers use our

6  products --

7      Q.   Are you --

8      A.   -- effectively.

9      Q.   In your head, are you intending to have them

10 infringe a patent?

11     A.   In my head, I'm not thinking about patents at

12 all in that moment.

13     Q.   When you -- when you train your customers in

14 the use of DFP, you're not even aware of the '702 or the

15 '943 patent, are you?

16     A.   I'm really not thinking about anything except

17 how to help the customer.

18     Q.   I'm not asking -- when you're training

19 customers, when you're -- you personally, Mr. Bellack,

20 in a room with customers --

21     A.   Yes, sir.

22     Q.   Okay.  You're -- you don't even know what the

23 '943 or the '702 patent set forth, do you?

24     A.   No, I do not.

25     Q.   So you personally, when you're training

1  customers, definitely do not have the intent to cause

2  them to infringe a patent, right?

3      A.   I guess if you're talking in terms of do I

4  have the patent in my head at the moment I'm talking

5  about the features, no.

6      Q.   Okay.  You have to know the patent in order to

7  intend to cause somebody to infringe the patent, right?

8      A.   I'm sorry.  Just not being a lawyer, I -- I

9  don't really understand the ins and outs of what

10  constitutes patent infringement.

11      Q.   Do you know what it means to intend to do

12  something?

13      A.   Yes, sir.

14      Q.   I intend to pick up this bottle of water right

15  now.  You understand I can have the intent to do that,

16  right?

17      A.   Yes, sir.

18      Q.   Okay.  If I don't know there's a bottle of

19  water on the desk, I can't have the intent to pick up

20  that bottle of water, can I?

21      A.   No, sir.

22      Q.   Okay.  So now my question to you is, when

23  you're training your customers in the use of -- maybe

24  let's talk about before your deposition when you learned

25  about these patents.

1          When you were training your customers, you

2  couldn't have had the intent to cause them to infringe

3  the patent because you didn't know about the patent,

4  right?

5      A.   Not intentionally, no.

6      Q.   So not intentionally meaning not intent,

7  meaning you didn't have the intent to cause them to

8  infringe the patent, right?

9      A.   No, sir.

10      Q.   Now, you must have suspected that when you

11  came to Court today that I was probably going to ask you

12  again whether Google intends to infringe the patent when

13  it instructs its customers, right?

14      A.   I guess it was possible.

15      Q.   Yeah.  You -- you -- look, you prepared for

16  today, right?

17      A.   Yes, sir.

18      Q.   You didn't just show up and take the witness

19  stand?

20      A.   No, sir.

21      Q.   You worked with your lawyers and you reviewed

22  your deposition transcript and you reviewed documents

23  and you came here today to testify, right?

24      A.   Yes, sir.

25      Q.   When you were doing that preparation, you

1 considered this whole notion of whether Google intended

2 to infringe the patent, didn't you?

3     A.   Since I was with my lawyers, I'm not sure if

4 I'm allowed to answer that.

5     Q.   Well, let me ask it this way then:  From the

6 time of your deposition until today, have you done

7 anything to try to figure out whether Google intends to

8 cause its customers to infringe the patent?

9     A.   Again, I'm not sure if I can talk about

10 conversations I had with our -- our legal team.

11     Q.   Well, let's put aside conversations with your

12 legal team.  Have you spoken to anyone within Google to

13 try to find out, look around, hey, guys, you know, does

14 anyone here -- when you're training, are any of you

15 intending to cause people to infringe this patent?

16     A.   No, sir.

17             MR. ROSEN:  Pass the witness, Your Honor.

18             THE COURT:  All right.  Further direct?

19             MS. HUBER:  Yes, Your Honor.

20             THE COURT:  All right.

21             (Pause in proceedings.)

22             THE COURT:  All right.  Ms. Huber, you

23 may continue.

24             REDIRECT EXAMINATION

25 BY MS. HUBER:

1       Q.    Good morning, Mr. Bellack.

2       A.    Good morning.

3       Q.    Do you recall that Mr. Rosen asked you some

4    questions yesterday about whether DoubleClick can be

5    used to serve ads on any website?

6       A.    Yes, sir -- yes, ma'am.  Sorry.

7       Q.    Are all websites DoubleClick customers?

8       A.    No, they are not.

9       Q.    Do all websites use DoubleClick to serve ads?

10      A.    No, they do not.

11      Q.    Mr. Rosen also asked you some questions about

12   whether DoubleClick could be used to serve ads on video

13   game consoles, and I think he even asked you about

14   gas -- gas station monitors.

15            Do you recall that?

16      A.    Yes, I do.

17      Q.    Is that something that many of your customers

18   do?

19      A.    Gas station pumps, I think that happened one

20   time with DART Enterprise years ago.  We almost use it

21   as a joke about how flexible the products are.

22            Video game consoles, not a lot, but because

23   the newer ones can serve video, we sometimes do serve

24   video ads there.

25      Q.    Please describe what a customer would have to

1  do to make DFP work on a video console or a gas station

2  console.

3      A.   Because those involve -- it -- it can vary.

4  Some of those environments have web browsers built into

5  them, so it works very much like showing a web page.

6  It's just set up so it's in a gas station or on a video

7  game console.

8          Sometimes it's also inserting the ads into an

9  application, like a video game or if you were watching

10 Netflix to watch movies online.

11         And there you need an additional piece of

12 software called an SDK, that means software development

13 kit, which is -- which is letting that particular

14 application make a call back to the ad server.

15         What's interesting about that is the call that

16 the SDK ultimately makes ends up looking like an ad tag.

17 It's just sort of generated in a different way.

18     Q.   Are those different features of the product

19 from what we discussed yesterday with respect to serving

20 ads on websites?

21     A.   It's -- as I said, it is a little bit

22 different about how the call is generated and how the ad

23 is displayed once it's returned, but the process that

24 the DFP ad server takes is pretty similar.

25     Q.   Do you recall that you were asked some

1    questions about whether DoubleClick could be used by a

2    website that doesn't use cookies?

3           Do you remember that?

4       A.    Yes, ma'am.

5       Q.    Based on your experience with customer use,

6    are you aware of any DoubleClick customer that doesn't

7    use cookies?

8       A.    I -- I've personally never met a DoubleClick

9    customer who does not use cookies.

10      Q.    Now, do you recall Mr. Rosen asked you a

11   slightly different question about whether DoubleClick

12   could be used to serve an ad to a user who has disabled

13   cookies on their computer?

14          Do you remember that?

15      A.    Yes, ma'am.

16      Q.    Does the disabling of cookies affect how

17   DoubleClick works?

18      A.    Yes, it does.

19      Q.    Can you describe that?

20      A.    A lot of features of DFP, like the frequency

21   capping example I mentioned yesterday, stop working

22   without the cookies.  So it really limits what the

23   system can do.

24      Q.    Do you recall yesterday when you and I were

25   discussing some of the common issues with DoubleClick

1    that arise for your publisher customers?

2         A.   Yes, ma'am.

3         Q.   Please describe whether users disabling

4    cookies is one of those issues.

5         A.   It is not something that's been brought up to

6    me as a -- as something of concern.

7         Q.   Mr. Bellack, both yesterday and today, you

8    were asked some questions about the '702 and '943

9    patents; is that right?

10        A.   Yes, ma'am.

11        Q.   When was the first time that you reviewed

12   those patents?

13        A.   I saw some pieces of it in the context of the

14   deposition that Mr. Rosen was playing.

15        Q.   Had you ever read a patent before that?

16        A.   No, ma'am.

17        Q.   Have you ever performed any analysis to

18   determine whether DoubleClick's customers infringe the

19   patents?

20        A.   No, ma'am.

21        Q.   And you were also asked some questions today

22   about whether Google specifically intends its customers

23   to infringe the '702 and '943 patents.

24             Do you remember that?

25        A.   Yes, ma'am.

1    Q.    We saw some video on that today, right?

2    A.    Yes, ma'am.

3    Q.    Why don't you know that?

4    A.    Because I'm not a lawyer, so I don't really

5    understand patent law.

6    Q.    Do you know how Google intends its DoubleClick

7    products to be used by its customers?

8    A.    Yes, ma'am.

9    Q.    How does Google intend its products to be

10   used?

11   A.    To serve advertisements alongside content and

12   services.

13                  THE REPORTER:  What services?

14                  THE WITNESS:  Content and services.

15   Sorry.

16   Q.    (By Ms. Huber) Do you recall that Mr. Rosen

17   asked you about when Google found out by the '702 and

18   '943 patents?

19   A.    Yes, ma'am.

20   Q.    And you testified that you understood that

21   happened when Google was sued by Beneficial for these

22   patents.

23   A.    Yes, ma'am.

24   Q.    After Google found out about those patents in

25   2007 and 2009 when those lawsuits were filed, did Google

1  make any major changes in the way it teaches its

2  customers how to use its products?

3      A.    No, we did not.

4      Q.    Mr. Rosen started the -- his examination today

5  by asking you some questions about the ad-serving

6  process, and specifically how a request to an ad server

7  doesn't begin until the user's browser requests an ad.

8          Do you remember that?

9      A.    Yes, ma'am.

10     Q.    What -- what is it that causes the user's

11 browser to make that request?

12     A.    The inclusion of the ad tag in the code of the

13 page.

14     Q.    And even before this ad-serving process that

15 Mr. Rosen was focusing on, does a publisher need to do

16 anything to make that ad tag work?

17     A.    They need to insert it in their page, and they

18 need to follow the syntax that we've told them are

19 required for an ad tag.

20     Q.    Mr. Rosen also asked you some questions about

21 whether you could point to the specific documents that

22 the customers at issue in this case had seen.

23          Do you remember that?

24     A.    Yes, ma'am.

25     Q.    All of that training documentation that we

1   discussed yesterday, who does Google make that available

2   to?

3        A.    All of our customers.

4        Q.    Do you have any reason to believe that these

5   customers weren't provided with that same information?

6        A.    I have no reason to believe that, no.

7        Q.    And this ongoing customer support that we

8   discussed at length yesterday, who does Google provide

9   that to?

10        A.    All of our customers.

11        Q.    Do you have any reason to believe that the

12   customers that Beneficial sued weren't provided with

13   that same training --

14        A.    No, I have no --

15        Q.    -- and support?

16        A.    I have no reason to believe that.

17              MS. HUBER:  Let's go back to that first

18   slide of the Country Weekly.  Sorry, Ben.  I didn't give

19   you a lot of warning.

20        Q.    (By Ms. Huber) So this Brad Paisley ad that

21   appears at the top, that -- that comes from the

22   DoubleClick ad server; is that right?

23        A.    Yes, ma'am.

24        Q.    And what causes that ad to appear?

25        A.    The ad tag that's part of the page.

1    Q.   And if it weren't for that tag or if the tag

2  wasn't working properly, would the advertisement still

3  appear on that website?

4    A.   No, it would not.

5         MS. HUBER:  I'll pass the witness, Your

6  Honor.

7         THE COURT:  Further cross, Mr. Rosen?

8         MR. ROSEN:  Yes, very briefly.

9              RECROSS-EXAMINATION

10 BY MR. ROSEN:

11   Q.   Just very briefly, Mr. Bellack.

12        MR. ROSEN:  Your Honor, if I may proceed?

13        THE COURT:  Yes, you may.

14   Q.   (By Mr. Rosen) You were asked about disabling

15 cookies.  So it is true that DoubleClick can be used to

16 serve ads on users that have blocked or disabled

17 cookies, right?

18   A.   Yes, sir.

19   Q.   And you said something to the effect that the

20 process is materially different, right?

21   A.   I'm sorry.  Could you say that again?

22   Q.   You said something that if the user disables

23 cookies, then DoubleClick works in a different way.

24   A.   A lot of the features of DFP don't work.

25   Q.   Thank you.  That's -- I apologize.

1          You said the features work in a different way,

2   but the ad-serving process is the exact same, right?

3      A.   The process is the same, but the outcomes are

4   different.

5      Q.   In other words --

6          MR. ROSEN:  And, Ms. Lockhart, if I can

7   just put this on.

8          I appreciate it.  Thank you.

9      Q.   (By Mr. Rosen) In other words, we saw this

10  exhibit that described the ad-serving process, that all

11  stays the exact same, whether a user has enabled cookies

12  or disabled their cookies, right?

13     A.   Yeah.  It's -- it's sort of an example of

14  what -- what's different.  Like with that frequency cap

15  example yesterday, if an ad is configured for frequency

16  capping, if no cookie is available, we actually do not

17  serve that ad at all, because we'd say, if we don't know

18  if the frequency cap has been exceeded, we'd like to err

19  conservatively and just not show it.

20     Q.   So, in other words, when you disable cookies,

21  the process of serving ads is the same, but the way

22  Google does it and its effectiveness is changed?

23     A.   Yes, sir.

24     Q.   Thank you very much.

25         MR. ROSEN:  No further questions.  Pass

1   the witness.

2                   THE COURT:  Further direct?

3                   MS. HUBER:  No, Your Honor.

4                   THE COURT:  All right.  You may step

5   down, Mr. Bellack.

6                   THE WITNESS:  Thank you, Your Honor.

7                   THE COURT:  Plaintiff call your next

8   witness.

9                   MS. HUBER:  Your Honor, we have just one

10  request, that Mr. Bellack be excused.  We've addressed

11  this with defense counsel prior to his testimony, and we

12  understand they don't have an objection.

13                  MR. ROSEN:  No objection, Your Honor.

14                  THE COURT:  All right.  You're released

15  from the Rule, and you're either free to stay or go.

16  It's your choice.

17                  THE WITNESS:  Thank you, Your Honor.

18                  THE COURT:  Call your next witness.

19                  MS. HUBER:  Your Honor, at this point, we

20  have discovery responses to read into the record.

21                  THE COURT:  Approach the bench, please.

22                  (Bench conference.)

23                  THE COURT:  What do you have in mind, Ms.

24  Huber?

25                  MS. HUBER:  We have a single

1    interrogatory, and we have requests for admission.

2              Now, there were two requests for

3    admission for each of the five Defendants.  The parties

4    have agreed that we can simply read two of them and

5    explain the same RFA was propounded for each Defendant

6    and the same response was given.

7              MR. ADAMS:  We agree.  We don't have a

8    problem with that.  They're exhibits, so -- I just don't

9    appreciate how they're going to get in.

10              THE COURT:  Well, I mean, typically,

11    exhibits come in through a witness, and you -- so I'm

12    going to tell the jury that the parties have agreed

13    simply to read these into the record.

14              Is that -- is that what you're asking me?

15              MR. ADAMS:  Yeah.  Right.  Correct.

16              THE COURT:  Okay.  And then you're ready

17    to call a witness after that?

18              MS. HUBER:  After that, we will be

19    playing a video of Mr. Goldberg's deposition testimony.

20              THE COURT:  All right.  And how long do

21    you anticipate those clips to be?

22              MS. HUBER:  I believe it is a little over

23    30 minutes.

24              THE COURT:  Okay.  All right.  Let's

25    return to your places, and we'll do this.

```
 1                 MS. HUBER:  Okay.

 2                 MR. JONES:  Thank you, Your Honor.

 3                 MS. HUBER:  Thank you.

 4                 (Bench conference concluded.)

 5                 THE COURT:  Ladies and Gentlemen, the

 6   parties have agreed to read into the record some

 7   exhibits that have been pre-admitted.  Ordinarily, these

 8   would be presented through a witness, but to save some

 9   time, they've agreed to do it by simply presenting it

10   into the record.

11                 So with that agreement, you may proceed

12   with that, Ms. Huber.

13                 MS. HUBER:  Thank you, Your Honor.

14                 Exhibit 12, Plaintiff's Request --

15   Plaintiff's Responses to Google's First Set of

16   Interrogatories.

17                 Plaintiff Beneficial Innovations, Inc.,

18   responds to Google's first set of interrogatories under

19   Rule 33 of the Federal Rules of Civil Procedure as

20   follows:

21                 Interrogatory No. 1:  To the extent that

22   Beneficial contends that the accused partners infringe

23   any claim of the patents-in-suit, acknowledge whether

24   that contention is based on the use of any advertising

25   presentation, products, or services provided by Google
```

1 and specifically identify the product or service

2 provided by Google that Beneficial intends to rely on to

3 show infringement by any accused partner.

4          Plaintiff responds as follows --

5 Beneficial responds as follows:  Plaintiff Beneficial

6 contend that each of the accused Google partners

7 infringes the patents-in-suit.

8          That contention is based, at least in

9 part, on their use of advertising presentations.  This

10 contention is not specifically based on their use of any

11 particular Google product or service or more generally

12 on the use of any particular ad server technology.

13          Plaintiff's infringement contentions are

14 based in part on the fact that the accused Google

15 partners combine information for an interactive service

16 with advertising-related information resulting in

17 advertising presentations being presented at the user

18 node, along with the display presentation of the

19 service.

20          Whether the advertising presentations are

21 served by Google, some other third party, or by

22 Defendant itself does not change the analysis.

23          Plaintiff's Exhibit 13.  Plaintiff

24 Google's -- excuse me -- Beneficial's responses to

25 Google's first set of requests for admission.

1          Beneficial Innovations responds to

2   Google's first set of requests for admission under

3   Rule 36 of the Federal Rules of Civil Procedure as

4   follows:

5          Google's request for Admission No. 1:

6   Please admit that Beneficial's allegations of

7   infringement against Advance Publications, Inc., are

8   based, at least in part, on Advance Publications, Inc.,

9   use of an advertising presentation, product, or service

10  provided by Google including but not limited to

11  DoubleClick.

12          Beneficial responds as follows:

13  Beneficial admits that its infringement contentions are

14  based, at least in part, on the Defendant's use of

15  advertising presentations.

16          Beneficial's infringement contentions are

17  based in part on the fact that the Defendant combines

18  information for an interactive service with

19  advertising-related information resulting in advertising

20  presentations being presented at the user node, along

21  with the display presentation of the service.

22          Whether the advertising presentations are

23  served by Google, some other third party, or by

24  Defendant itself does not change the analysis.

25          Accordingly, Plaintiff denies that its

infringement contentions are specifically based on the

Defendant's use of any particular Google product or

service or more generally on the use of any particular

ad server technology.

Requests for Admission No. 2:  Please

admit that Beneficial's allegations of infringement

against Advance Publications, Inc., are not based, at

least in part, on Advance Publications, Inc.'s use of

advertising product or service provided by Google

including but not limited to DoubleClick.

Beneficial responds as follows:

Beneficial admits that its infringement contentions are

based in part on the Defendant's use of advertising

presentations.

Plaintiff's -- Beneficial's infringement

contentions are based in part on the fact that the

Defendant combines information for an interactive

service with advertising-related information resulting

in advertising presentations being presented at the user

node, along with the display presentation of the

service.

Whether the advertising presentations are

served by Google, some other third party, or the

Defendant itself does not change the analysis.

Accordingly, Plaintiff denies that its

infringement contentions are specifically based on Defendant's use of any particular Google product or service or more generally on the use of any particular ad server technology.

The same two requests as Requests for Admission 1 and 2 were made regarding Beneficial's allegations of infringement against ALM Media Properties; American Media, Inc.; Autotrader, Inc.; and Demand Media, Inc.  Beneficial provided the same responses for each of these Defendants.

Request for Admission No. 11:  Please admit that DoubleClick advertising presentation product or services are used on websites to display advertisements.

Beneficial responds as follows:  Though Beneficial has no personal knowledge on this matter, Beneficial is informed and believes that DoubleClick is ad server technology that serves ads on websites.

Beyond that, Beneficial lacks sufficient knowledge or information to admit or deny this request.

Request for Admission No. 12:  Please admit that DoubleClick advertising presentation products or services are used on websites to display ads -- advertisements in response to data related to the user of the website.

1               Response to Request for Admission No. 12.

2   Beneficial responds as follows:  Though Beneficial has

3   no personal knowledge on this matter, Beneficial is

4   informed and believes that DoubleClick is ad server

5   technology that serves ads on websites.

6               Beyond that, Beneficial lacks sufficient

7   knowledge or information to admit or deny this request.

8               Thank you, Your Honor.

9               THE COURT:  All right.  Proceed with your

10  next witness, Plaintiff.

11              MS. ANDERSON:  At this point, Your Honor,

12  Plaintiff would like to play a deposition excerpt of Mr.

13  Goldberg's testimony.

14              THE COURT:  All right.  You may proceed

15  to do that.  Before you do, though, I simply want to

16  instruct the jury with regard to the materials that were

17  just read to you.

18              There may have been a different alignment

19  of the parties at the time those were generated.

20  Beneficial may have been referred to as the Plaintiff

21  there when they're the Defendant here, and Google may

22  have been referred to as the Defendant there when

23  they're the Plaintiff here.

24              The -- the content of the case, the

25  number of the parties in the case, and the alignment of

1  the parties has changed between earlier stages of this

2  case and the trial.

3            For this trial, we've clearly designated

4  Google as the Plaintiff and Beneficial as the Defendant.

5  To the extent what you may have just heard varies from

6  that, you should make sure that you allocate what Google

7  said to Google and Beneficial said to Beneficial,

8  regardless of what their labels may have been or their

9  party designations may have been at that time.  I don't

10  want that to be confusing to the jury.

11            Now, with that explanation, you may

12  proceed to present your witness by video.

13            MS. ANDERSON:  Thank you, Your Honor.

14            (Video playing.)

15            QUESTION:  Good morning, Mr. Goldberg.

16            ANSWER:  Good morning.

17            QUESTION:  Do you understand that you are

18  testifying under oath today?

19            ANSWER:  Yes.

20            QUESTION:  And you have been deposed

21  before; is that right?

22            ANSWER:  Yes.

23            QUESTION:  Okay.  Can you tell me briefly

24  about your education, starting with college?

25            ANSWER:  Let's see.  I got my BA at

1  Colorado University, University of Colorado, 1955 to

2  '59, and then immediately began law school -- '59 to '62

3  at University of Colorado.  I received an LL.B, which

4  turned into a JD, and I was a -- I then went with the

5  Internal Revenue Service out here in LA in '62 and

6  received the agent's training.

7             QUESTION:  Have you had any other formal

8  education?

9             ANSWER:  No, other than the continuous

10  legal ed that you all get.

11             QUESTION:  As -- as a practicing lawyer,

12  is that what you're referring to?

13             ANSWER:  Right.

14             QUESTION:  Your undergraduate degree,

15  what -- what field was that in?

16             ANSWER:  Political science.

17             QUESTION:  Have you ever taken any

18  classes related to the Internet?

19             ANSWER:  No.

20             QUESTION:  Have you ever taken any

21  classes in advertising?

22             ANSWER:  I can't name any formal classes

23  I had.  No.

24             QUESTION:  Any formal classes in

25  marketing?

1              ANSWER:  No.

2              QUESTION:  If you go up to the paragraph

3  under the heading commercial success, if you could just

4  read that paragraph to yourself.  It says Commercial

5  Success.

6              ANSWER:  Okay.

7              QUESTION:  I'm going to ask you

8  specifically about the last sentence there, which is:

9  The use of this patented method makes advertisements

10  displayed on Defendant's sites more effective because,

11  among other things, users of the site are unable to

12  disregard the advertisement by blocking, parentheses,

13  and therefore completely ignoring, close parentheses,

14  the advertisements being offered.

15             ANSWER:  Okay.  That's a given.

16             QUESTION:  And my question is, do you

17  agree with that sentence?

18             ANSWER:  Yes.

19             QUESTION:  So it's your understanding

20  that if a website uses your patented invention, users

21  will be unable to block the advertisements on the site?

22             ANSWER:  Yes.

23             QUESTION:  So your understanding is,

24  using your patented method, a website will transmit an

25  advertisement together with a service?

1          ANSWER:  Well -- and, again, to be really

2   technical, it's the advertising data and the -- and the

3   service data, would be more correctly put, but that's

4   the resulting effect.

5          QUESTION:  Good morning, Mr. Goldberg.

6   How are you?

7          ANSWER:  Good morning.

8          QUESTION:  Have you ever been deposed

9   before?

10          ANSWER:  Yes.

11          QUESTION:  About how many times?

12          ANSWER:  Numerous times.

13          QUESTION:  Have you been deposed -- do

14   you understand that you're here today and testifying

15   both as an individual and on behalf of Beneficial

16   Innovations?

17          ANSWER:  Yes.

18          QUESTION:  What's your relationship with

19   the company, Beneficial Innovations?

20          ANSWER:  Well, in effect, I'm the sole

21   owner.

22          QUESTION:  Well, just so we're clear, the

23   two patents that I'm talking about in this case are U.S.

24   Patent 6,712,702.

25          Let's go ahead and mark this one as

1  Exhibit 2.

2              You get the ones with numbers written on

3  them.  Thank you.

4              And let's mark as Exhibit 3, U.S. Patent

5  No. 7,496,943.

6              Okay.  So, Mr. Goldberg, when I -- when I

7  refer to the patents at issue in this case, do you

8  understand that I'm referring to the patents that we've

9  now marked as Exhibits 2 and 3?

10             ANSWER:  Yes.

11             QUESTION:  Have you personally, not

12  Beneficial -- but have you personally been involved in

13  identifying potential licensees for either Exhibit 2 or

14  Exhibit 3?

15             ANSWER:  I believe that I have.

16             QUESTION:  And what did you do -- you

17  personally do to identify a license -- potential

18  licensees for either Exhibit 2 or Exhibit 3?

19             ANSWER:  I'm constantly on the Internet,

20  and I make note of websites that appear to be violating

21  the patent.

22             QUESTION:  How do the advertisements get

23  into that display?

24             ANSWER:  They can get into that display

25  by -- under my patent anyway, by having a code that --

1  that requests that ad.

2              QUESTION:  You mentioned one of the

3  documents that you reviewed was interrogatory responses

4  in this case; is that correct?

5              ANSWER:  That's correct.

6              QUESTION:  Let's mark as Exhibit 4

7  Beneficial's responses to Google's first set of

8  interrogatories.

9              Mr. Goldberg, you've seen what we've now

10  marked as Exhibit 4 before?

11             ANSWER:  Yes.

12             QUESTION:  If you turn to the next page,

13  Page 4, in the -- in part of the response, you'll see

14  that there's a -- the first full paragraph that begins

15  with Plaintiff's contend -- Plaintiff contends.  I'm

16  sorry.

17             Do you see that?

18             ANSWER:  Yes.

19             QUESTION:  And it says:  Plaintiff

20  contends that each of the accused Google partners

21  infringes the patents-in-suit.  Did I read that

22  correctly?

23             ANSWER:  Yes.

24             QUESTION:  Okay.  And the next sentence

25  says:  That contention is based, in part, on their use

1  of advertising presentations.

2             Did I read that correctly?

3             ANSWER:  Yes.

4             QUESTION:  What -- what is -- what is

5  your understanding of what that sentence means?

6             ANSWER:  First of all, your term accused

7  Google partners, I assume those are the Defendants in

8  the main suit, right?

9             QUESTION:  That accused Google partners

10 is defined not in this document, but I will represent to

11 you is a subset of people -- a subset of -- of the

12 Defendants in this case.

13            ANSWER:  Okay.  And your question is?

14            QUESTION:  The sentence that says, quote,

15 that contention is based, at least in part, on their use

16 of advertising presentations.

17            ANSWER:  Okay.

18            QUESTION:  What does that mean to you?

19            ANSWER:  That they use advertising.

20            QUESTION:  That -- that website -- the

21 accused websites use advertising?

22            ANSWER:  The website uses -- yeah, these

23 Defendants use advertising presentations.

24            QUESTION:  Okay.  When it comes to your

25 patents, does it matter where the advertisement comes

1    from that's displayed?

2             ANSWER:  In response to your question,

3    your specific question, I can't say.  I don't know.

4             QUESTION:  You don't know?

5             ANSWER:  I don't know.

6             QUESTION:  Okay.  The -- the -- the next

7    sentence reads:  Plaintiff's infringement contentions

8    are based, in part, on the fact that the accused Google

9    partners combine information from an interactive service

10    with advertising-related information.

11             Did I read that correctly?

12             ANSWER:  You didn't read the entire

13    sentence, right?  You just stopped?

14             QUESTION:  I did stop.  We'll -- we'll

15    get to the second half, but I want to do it in two parts

16    because there's a lot of it.

17             ANSWER:  Okay.  And your question is?

18             QUESTION:  Did I read -- so far, have I

19    read it correctly?  Plaintiff's infringement contentions

20    are based, in part, on the fact that the accused Google

21    partners combine information from an interactive service

22    with advertising-related information.

23             ANSWER:  You read that correctly.

24             QUESTION:  Earlier, we were talking

25    generally about ad servers getting advertisements onto a

1  user's website or webpage, and you referenced that

2  there's code that can -- that can make that happen.

3                    Do you recall that?

4                    ANSWER:  Yes.

5                    QUESTION:  Okay.  And am -- am I correct

6  that the -- the claims that we're talking about at issue

7  in this case deal with the display of an advertisement,

8  along with website information at the same time to the

9  user?

10                    ANSWER:  In general, you're quite

11  correct.

12                    QUESTION:  Okay.  And then unfortunately,

13  we're going to have to do all three of them at the same

14  time.  So in Exhibit 5, which we marked that one, if

15  you'll flip to Page A-1.

16                    At the bottom of the 1, they'll go

17  through a series of numbers and then they'll start

18  having a prefix.  There'll be Page No. A, as in alpha,

19  1.

20                    ANSWER:  Oh, I see.  Okay.

21                    QUESTION:  And in -- in this document,

22  you'll see two columns.  In the left column is a

23  quotation of claim language.  Do you see that?

24                    ANSWER:  Yes.

25                    QUESTION:  Okay.  And you recognize that

1  as being words from the various patent claims?

2             ANSWER:  Appears to be.

3             QUESTION:  Okay.  And in the right-hand

4  column, you'll see the heading is called Accused

5  Apparatus.  Do you see that?

6             ANSWER:  Yes.

7             QUESTION:  And then below it is -- are

8  things written by Beneficial that explain why the

9  accused websites meet the various limitations.  Do you

10 see that?

11            ANSWER:  You're telling me it was written

12 by Beneficial.  I -- I don't -- I don't know who wrote

13 this.

14            QUESTION:  Let's go back to the front

15 page of the document, front page of the Exhibit 5?

16            ANSWER:  Okay.

17            QUESTION:  Okay.  You see at the bottom,

18 pursuant to Patent Rule 3-1, Plaintiff, Beneficial

19 Innovations, submits the following disclosure of

20 asserted claims and infringement contentions.

21            Do you see that?

22            ANSWER:  Yes.

23            QUESTION:  Okay.  So do you understand

24 that this is Beneficial's contentions of what infringe

25 your patents?

```
 1                    ANSWER:  It's just you took me to the
 2   middle of a page and --
 3                    QUESTION:  That's fine.
 4                    ANSWER:  -- I'm assuming what you're
 5   saying.  That's all.
 6                    QUESTION:  Okay.  But now -- but now,
 7   we're on the same page as to what this is?
 8                    ANSWER:  Okay.
 9                    QUESTION:  Is that a yes?
10                    ANSWER:  Yes.
11                    QUESTION:  Does the advertisement that's
12   shown to the user have to be based on that user
13   identifiable information?
14                    ANSWER:  I don't know.  I don't know if
15   there's anything in there that says that.
16                    QUESTION:  Say that again?
17                    ANSWER:  I don't know.  I don't know if
18   there's anything in here that says that.
19                    QUESTION:  Well, let's look at the
20   element that deals with combining, okay?
21                    ANSWER:  Okay.
22                    QUESTION:  So if you go to Column 40
23   about Line 30, you'll see it says:  One or more
24   programmatic elements for combining advertising,
25   relating information with service-related information to
```

1   obtain a resulting con -- combination that is in a

2   format.

3                   And it goes on.  Do you see where I'm

4   talking about?

5                   ANSWER:  Yes.

6                   QUESTION:  Okay.  Is this the aspect of

7   your claim that deals with that combination of service

8   information and advertising information that's displayed

9   to a user?

10                   ANSWER:  Yes.

11                   QUESTION:  Okay.  Is there anything about

12  this that requires that the advertisement be related to

13  the user identification that's stored in the store?

14                   ANSWER:  I don't know how to answer your

15  question.

16                   QUESTION:  So you talked about combining.

17  You said an important aspect of your invention was

18  combining service information with advertisement

19  information and displaying it to the user.

20                   ANSWER:  Correct.

21                   QUESTION:  Okay.  Is it an aspect of your

22  invention that that advertisement has to be targeted at

23  the user based on user identification?

24                   ANSWER:  I don't know.  I can't say it

25  does.

1          QUESTION:  It -- wouldn't it have to say

2   something like the advertisement related to the user or

3   associated with the user identification in order to

4   require that?

5          ANSWER:  Let's see.  I'm not competent to

6   say, you know, anymore than I've told you, what I've

7   learned about talking to patent attorneys.  I don't -- I

8   don't know if it would or not.

9          QUESTION:  Okay.  So you don't know if

10  that's required?

11         ANSWER:  No.

12         QUESTION:  But it is required that it

13  combine the ad and display it?

14         ANSWER:  Yes.

15         QUESTION:  Okay.  You said that part of

16  it is combining service with an ad, displaying it to the

17  user, and the user not being able to avoid seeing it.

18         ANSWER:  Correct.

19         QUESTION:  Okay.  What -- what part of

20  the claim deals with that?

21         ANSWER:  Well, it's the -- as it says, I

22  guess the programmatic elements for combining, because

23  prior to this, the -- an ad can be coming from two

24  separate places, and it could be, you know, the --

25  although the user wouldn't know one -- one way or

1 another where it was coming from.

2                    This combination, planning it on the --

3 on the provider's -- if I'm using the correct

4 language -- on the provider's server, it then -- the --

5 it's by, technically, the whole -- the entire service.

6 And the ad come in as one thing, and, therefore, they --

7 it cannot be changed.  Because the user -- user and no

8 software, as I understand, has any way to define

9 what's -- what's the service and what's just an ad.  So

10 they can get rid of the ad, they probably would.

11                    QUESTION:  So what your invention was

12 distinguishing is you get one webpage that has service

13 and ad information on it as opposed to a webpage that

14 has a service on it and, for example, a pop-up that is a

15 separate window that is distinct from the combined

16 website?

17                    ANSWER:  That's one -- one -- but only

18 one.

19                    QUESTION:  Okay.  So what -- what --

20 what's another aspect other than that?

21                    ANSWER:  It has to be combined at the

22 entire page is combined, you know, the ad and the -- and

23 the server.

24                    QUESTION:  Right.  Into one webpage?

25                    ANSWER:  Yes.

1                       QUESTION:  Got you.  Okay.

2                       ANSWER:  Whereas the pop-up you described

3    was not.

4                       QUESTION:  And that -- that's what I

5    said.  That's distinguishing between your invention

6    and -- and what might have existed at the time?

7                       ANSWER:  One of them is also such thing

8    as under-ads that come up where it hides the page.

9    That's also a separate and distinct ad.

10                      QUESTION:  Again, because it's not

11   combined in the same webpage?

12                      ANSWER:  Right.  Right.

13                      QUESTION:  Okay.  Earlier today, I asked

14   you a question about if the webpage that gets returned

15   from the provider doesn't have advertisement information

16   on it, would it relate to your patent claims.  And now

17   that we've spent a little more time understanding what

18   your patent claim covers, I'm going to ask that question

19   again.

20                      If a website was returned to you that did

21   not have a combined advertisement service on it, would

22   -- would it relate to this patent claim?

23                      ANSWER:  Probably not --

24                      QUESTION:  Before the break,

25   Mr. Goldberg, we were talking about code that's used to

1  generate and display a website to a user.  My question

2  to you was, is there anything in Claim 53 that describes

3  a -- a new code different from, say, HTML that builds

4  webpages?

5            ANSWER:  I don't know.  There -- I don't

6  know as there is.  I can't say there is.

7            QUESTION:  Again, what your Claim 53

8  relates to is a webpage that's displayed to a user that

9  contains a combination of advertisement information and

10  service?

11           ANSWER:  Yes.

12           QUESTION:  Do you think the claim

13  requires that that advertisement information be related

14  to the user identification stored at the provider?

15           ANSWER:  As I read this claim, possibly.

16  I just have a hard time understanding what you're

17  saying.  I really can't answer you.

18           QUESTION:  You don't -- possibly is what

19  I think your answer is.  You -- you don't see anything

20  that makes it a requirement?

21           ANSWER:  What I see is an assumption in

22  there.  I don't see a must, like you're asking.

23           QUESTION:  Okay.  Okay.  Does your patent

24  require that cookie information be used as part of what

25  ads to display to the user?

1          ANSWER:  And, again, I -- I guess I've

2  answered that.  Appears to me to be an assumption in

3  there, and I don't know.  I can't state that.

4          QUESTION:  How about this:  Just explain

5  to me your understanding of how third-party ad servers

6  go about putting advertisements on a user's website.

7          ANSWER:  I would guess that there's a --

8  there's a code that requests it.

9          QUESTION:  And the code that requests it

10  comes from where?

11          ANSWER:  From the, I guess, website.

12          QUESTION:  The -- the provider website?

13          ANSWER:  Yes.

14          QUESTION:  Okay.  What's the purpose of

15  an ad server?

16          ANSWER:  I would respond as a layman, to

17  serve ads.

18          QUESTION:  Okay.  To serve -- to serve

19  ads where?

20          ANSWER:  In the case -- in our context, I

21  guess serve ads on -- on websites.

22          QUESTION:  Okay.  Would there be any

23  purpose of an ad server other than to serve ads on

24  websites?

25          ANSWER:  I couldn't say.

1          QUESTION:  Part of your -- what's

2    described in your '702 patent would be using cookies

3    for -- for reasons other than displaying advertisements?

4          ANSWER:  Okay.

5          QUESTION:  Do you agree with that?

6          ANSWER:  Sure.

7          QUESTION:  But you would agree that HTML

8    is a common mechanism for generating a website?

9          ANSWER:  Well, it was.  I don't know

10   about even today.  It may not be today.

11         QUESTION:  Have you had a chance to read

12   Claim 1 of the '943 patent that you're a co-inventor on?

13         ANSWER:  Yeah, I read it.

14         QUESTION:  Okay.  So what I want to do

15   here is -- is contrast this claim a little bit with the

16   claim we went through in the -- in the '702, okay?

17         So my question is, does this claim

18   require that the providing website store information

19   about the user?

20         ANSWER:  It doesn't appear so.

21         QUESTION:  Does Claim 1 of the '943

22   patent require information stored at the user node such

23   as a cookie as we saw in Claim 53 of the '702 patent?

24         ANSWER:  I don't see it here now, no.

25         QUESTION:  So if -- if it doesn't have

1 those two things, as you did with Claim 53 of the '702

2 patent, can you explain to me what Claim 1 of the '943

3 patent is describing about your invention?

4            ANSWER:  I believe this is one that --

5 that does unrequested ads.

6            QUESTION:  What does that mean?

7            ANSWER:  Where an ad -- where ads are

8 presented without the user requesting another ad, you

9 know --

10            QUESTION:  What would be the situation?

11            ANSWER:  -- automatically.

12            QUESTION:  -- in which a user would

13 request another ad?

14            ANSWER:  If he clicks on an ad and then

15 more information would come up then.

16            QUESTION:  Okay.  So this automatically

17 displays more ads, even if you don't click on them?

18            ANSWER:  Well, it looks like one of the

19 things anyway.

20            QUESTION:  When you say it looks like one

21 of those things, what are you -- what are you looking

22 at?

23            ANSWER:  Well, there's also the combining

24 of the information for the interactive service and the

25 advertising-related information for use in presenting

1    the ads.

2                    THE REPORTER:  I'm sorry?

3                    ANSWER:  For use in presenting the ads.

4                    QUESTION:  That's a similarity to the --

5    Claim 53 of the '702, right, the aspect of combining the

6    advertisement with the -- with the provider-related

7    service information?

8                    ANSWER:  Yes, that's similar.  Correct.

9                    QUESTION:  Okay.  So, again, could you --

10   could you describe generally for me what aspect of -- of

11   your invention this Claim 1 of the '943 patent is

12   discussing?

13                   ANSWER:  As I said, as I look at it right

14   now, it appears -- it appears to be the presentation of

15   unrequested ads.

16                   QUESTION:  But there's nothing in here

17   about the -- the service that is provided by the

18   providing website, storing information about the user?

19                   ANSWER:  Oh, no.  It definitely requires

20   a service.

21                   QUESTION:  It definitely requires a

22   service?

23                   ANSWER:  Oh, yeah.  Sure.  The Internode

24   (sic) -- even the (c) here, the Internode (sic), the

25   user node, receives -- the user node receives via the

1  providing node said information for said interactive

2  service.  And it talks about the service, I think, in

3  the previous paragraphs too.

4           QUESTION:  But the providing -- the

5  website provider that gives the information related to

6  the interactive service, it doesn't need to store

7  information about the user, correct?

8           ANSWER:  It doesn't talk about storage

9  here.  I don't know what it needs to do, but this

10 particular claim doesn't look like it talks about

11 storage.  No.

12          QUESTION:  Okay.  And it doesn't talk

13 about information stored at the user node, such as

14 cookies either, does it?

15          ANSWER:  Correct.

16          QUESTION:  Okay.  There's nothing in

17 Claim 49 of the '943 patent that talks about storing

18 information about the user on the provider's website?

19          ANSWER:  This talks about storing on the

20 user node.

21          QUESTION:  Okay.  But not the provider

22 website?

23          ANSWER:  It doesn't indicate providing --

24 provider network site.  No.

25          QUESTION:  But are you aware -- given

1 that -- our conversation before, that all of those types

2 of data could count as user identification stored by the

3 provider, are you aware of any website that shows

4 advertising where the underlying web server stores no

5 data about its user?

6        ANSWER:  Again, personally, I'm not aware

7 of it.

8        (End of video clip.)

9        THE COURT:  Does that complete your

10 witness by deposition, Counsel?

11        MS. ANDERSON:  Yes, Your Honor.  That's

12 the completion of Mr. Goldberg's testimony.

13        THE COURT:  All right.  Let's turn the

14 lights up in the courtroom, please.

15        Counsel, approach the bench, please.

16        (Bench conference.)

17        THE COURT:  Who do you have next,

18 Ms. Anderson?

19        MS. ANDERSON:  We have Dr. Peter

20 Alexander, and that will be our final witness, Your

21 Honor.

22        THE COURT:  How long do you expect your

23 direct to go?

24        MS. ANDERSON:  I think it will be 45

25 minutes perhaps, Your Honor.

```
 1                    THE COURT:  All right.  Then we'll take a
 2   recess now, and we'll start with him after the recess.
 3                    MS. ANDERSON:  Thank you.
 4                    (Bench conference concluded.)
 5                    THE COURT:  Ladies and gentlemen, before
 6   we call or before the Plaintiff calls the next witness,
 7   we're going to take a morning recess at this time.  You
 8   may leave your notebooks in your chairs, if you like.
 9                    Take an opportunity while in the jury
10   room to stretch your legs, get a drink of water, but
11   don't discuss the case among yourselves.  We'll be back
12   in here shortly and continue, but you are excused for
13   recess at this time.
14                    COURT SECURITY OFFICER:  All rise.
15                    (Jury out.)
16                    THE COURT:  All right.  Court stands in
17   recess.
18                    (Recess.)
19                    COURT SECURITY OFFICER:  All rise.
20                    THE COURT:  Be seated, please.
21                    All right.  Let's bring in the jury,
22   Mr. McAteer.
23                    COURT SECURITY OFFICER:  All rise for the
24   jury.
25                    (Jury in.)
```

```
 1                    THE COURT:  Be seated, please.

 2                    Plaintiffs call your next witness.

 3                    MS. ANDERSON:  Thank you, Your Honor.

 4    Google calls Dr. Peter Alexander.

 5                    THE COURT:  All right.  Dr. Alexander, if

 6    you'll come forward.  My recollection is that you have

 7    been sworn; is that correct?

 8                    THE WITNESS:  Yes, Your Honor.

 9                    THE COURT:  Please have a seat.

10                    We need to pass out some notebooks,

11    Counsel?

12                    MS. ANDERSON:  May we approach, Your

13    Honor, and do that?

14                    THE COURT:  Proceed.

15                    MS. ANDERSON:  Thank you.

16                    (Pause in proceedings.)

17                    THE COURT:  All right, Counsel.  You may

18    proceed when you're ready.

19                    MS. ANDERSON:  Thank you, Your Honor.

20         PETER ALEXANDER, Ph.D., PLAINTIFF'S WITNESS,

21                         PREVIOUSLY SWORN

22                       DIRECT EXAMINATION

23    BY MS. ANDERSON:

24         Q.   Good morning, Dr. Alexander.

25         A.   Good morning.
```

1    Q.   Would you please introduce yourself to the

2  jury.

3    A.   Yes.  My full name is Peter Alexander.

4    Q.   Can you please tell the jury a little bit

5  about yourself.

6    A.   Yes.  I live in Southern California in Orange

7  County, and I am married with two adult children.  And

8  I've been married to the same gal for 49 years now.

9    Q.   And where are you from, Dr. Alexander?

10    A.   I was born and raised in New Zealand.

11    Q.   When did you -- did you live in New Zealand

12  all your life, or did you ever come to move to somewhere

13  else?

14    A.   Well, my wife and I actually arrived on the

15  shores here in the United States in 1966.

16    Q.   All right.  How long have you lived in the

17  United States, Dr. Alexander?

18    A.   Except for three or four years when I was

19  outside the country, I have been here continuously.

20    Q.   And where do you live today?

21    A.   Southern California.

22    Q.   And are you a United States citizen?

23    A.   Yes.

24    Q.   For how long?

25    A.   We became -- my wife and I became citizens in

1  1980.

2      Q.   Thank you.

3           Where have you gone to school, Dr. Alexander?

4      A.   My undergraduate degree was in New Zealand at

5  the University of Canterbury, and I did a Bachelor of

6  Science degree in electrical engineering.

7           And following that degree, I was awarded a

8  Fulbright Scholarship, which is an academic award for

9  students from other countries to study in the U.S., but

10  it's also for American students to study abroad.

11          And do you wish me to continue?

12     Q.   Are you finished with your educational

13  background?

14     A.   No.

15     Q.   Okay.

16     A.   So with that Fulbright Scholarship, I came to

17  the United States and was a graduate student, and I

18  studied at the University of Illinois with a Master of

19  Science degree in electrical engineering, and

20  subsequently spent four years at MIT where I completed

21  the Ph.D. degree in 1971.

22     Q.   Thank you.

23          And have you worked over the years since

24  earning your degree?

25     A.   Yes.  I -- after finishing the Ph.D. degree, I

1  -- I spent three or four years as a university

2  professor, and I was teaching computer engineering,

3  basically.

4         And then I returned to the United States and

5  started working in essentially the defense industry.

6  We -- in -- in this time period, we were developing

7  software systems and computer systems generally for the

8  defense department.

9     Q.   And when you say the defense department, for

10  which country?

11     A.   Yes, the United States.

12     Q.   And can you give the jury some examples of the

13  agencies you worked for in connection with your defense

14  industry work.

15     A.   Yes.  I -- I worked on many projects.  I had a

16  security clearance, of course, and I worked -- worked on

17  projects for the Naval Underwater System Center, Naval

18  Research Labs, what was called the Defense

19  Communications Agency at the time.  And another one was

20  Rome Air Development Center.  That's in -- up in New

21  York State.

22     Q.   Did the focus of your work change at some

23  point in time away from the defense industry?

24     A.   Yes.  Actually, some of that early work

25  involved the National Security Agency.  And in one of

1   the projects we had with them, we developed a very

2   high-speed computer, at least high speed at the time.

3          And the -- with the approval of NSA, we

4   actually commercialized them as -- as a product.

5   And so I started a company in the 1980s, and we

6   developed a commercial version of this computer with a

7   lot of software and sold it to various organizations,

8   defense organizations, for radar and sonar systems,

9   image processing.

10          And we also sold it to organizations doing

11  seismic research for, you know, discovery of new oil

12  resources, and image processing, generally for medical

13  applications.

14      Q.    Thank you.

15          Did you ever do any work in connection with

16  Internet technologies?

17      A.    Following the -- the -- the acquisition of our

18  company -- our company was acquired, and so in 1989, I

19  actually started on a new portion of my career, which

20  was to do with Internet technology.

21          And of course, most people aren't really aware

22  that the Internet had been in existence already some 20

23  years by the time I joined in.  So I wasn't really one

24  of the pioneers, but this was before the advent of the

25  web browser.

1          So it was Internet technology that used

2   basically textual representation data.

3       Q.   And what was the company you were working with

4   beginning in 1989?

5       A.   That company was called Fibronics

6   International.

7       Q.   What kind of work did you do with Fibronics?

8       A.   I managed a team -- I managed a team that was

9   developing router software.  Routers are the basic

10  building block for the Internet.  They allow for the

11  transfer of packets through the Internet across the

12  world.  And we developed software and hardware for

13  those.

14          We also developed software for transfer of

15  files and email.  Those were the big applications in

16  those days.

17          THE COURT:  Dr. Alexander, if you would

18  pull the microphone a little closer to you, please.

19          Thank you.

20          Continue.

21          MS. ANDERSON:  Thank you.

22      Q.   (By Ms. Anderson) Would you please describe to

23  the jury other experience you may have had with

24  Internet-related technology.

25      A.   Yes, certainly.

1          After -- after that experience, developing

2   essentially core Internet applications and core

3   infrastructure components, I spent some time developing

4   websites.

5          Starting around 1997, I was developing website

6   technology.  And I developed systems that were used

7   to -- used in business applications, in particular,

8   semiconductor manufacturing and construction industries

9   and also commercial -- or consumer-type websites

10  relating to job search, for example.

11     Q.   Thank you.

12          Did you turn your attention to a different

13  line of work following your work that you just

14  described?

15     A.   Yes.  Subsequently, I started to do work that

16  was related to forensic analysis.  I have a very

17  detailed understanding of how computers work.

18          So I -- I took on some projects as a

19  consultant to -- to examine the internal structure of

20  computers, to retrieve files that have been deleted.

21  That's sort of the nature of forensic analysis of

22  computer.

23     Q.   And has the work that you've done in that

24  regard involved providing expert opinions in connection

25  with cases?

1    A.    Yes.   Over a period of time, I -- I was called

2  upon, actually, by various organizations to contribute

3  to examination of software systems in regard to patent

4  cases.

5    Q.    Thank you.

6          Do you believe that you have any area of

7  expertise?

8    A.    Yes, I certainly do.   I've spent -- well, I

9  first started programming computers back in 1972 or '71.

10  So I have very deep expertise in computer software and

11  the -- the implementation of software systems.

12    Q.    What, if any, relationship does the area of

13  Internet website design have to software engineering?

14    A.    Well, website implementation is -- is really

15  just another type of software engineering.   It's

16  basically creating all of the mechanics of the -- the

17  server software that will deliver web pages whenever

18  your browser requests a page.

19    Q.    And, Dr. Alexander, have you testified as an

20  expert witness in court before?

21    A.    Yes, approximately 10 times.

22    Q.    And what was the general area of subject

23  matter on which you testified in those cases?

24    A.    It -- it's always been software and the

25  analysis of software.   The -- you know, the domains, the

1  subject matter varies conservatively, but my role was

2  always software development and -- and how the software

3  systems worked.

4      Q.   Thank you.

5          MS. ANDERSON:  Your Honor, Google would

6  offer Dr. Alexander as an expert in the area of computer

7  software engineering.

8          THE COURT:  Is there objection?

9          MR. ROSEN:  No objection.

10         THE COURT:  He will be so designated.

11         MS. ANDERSON:  Thank you, Your Honor.

12         THE COURT:  Continue.

13     Q.   (By Ms. Anderson) Dr. Alexander, are you being

14  compensated for the time you have spent working in

15  connection with this case?

16     A.   Yes.

17     Q.   And at what rate are you being compensated?

18     A.   I'm compensated at a rate of $350 per hour.

19     Q.   Now, are your opinions in this case affected

20  in any way by the amount you are being paid?

21     A.   No, not at all.

22     Q.   And is the amount you are being paid affected

23  in any way by what opinions you provide?

24     A.   No.

25     Q.   Dr. Alexander, would you describe to the jury

1 generally what you were asked to do in connection with

2 the case.

3      A.   Yes.  I was -- I was asked to provide tutorial

4 information on state-of-the-art technology as it relates

5 to the patents in the lawsuit.

6           I was asked to provide similar analysis and

7 tutorial information about how ads are delivered to a

8 web browser running on a client computer and how they're

9 presented and rendered, displayed, basically.

10           And I was asked to give some information about

11 how Google's DoubleClick products work and how they

12 relate to the state-of-the-art technology for ad

13 delivery, as well as how they relate to the patents.

14      Q.   Thank you.

15           Were you asked to give any legal opinions in

16 connection with this case?

17      A.   No, I was not.

18      Q.   And are you a lawyer?

19      A.   No.

20      Q.   Were you asked to give any opinions in this

21 case about whether or not there is infringement or

22 whether or not the patents are valid?

23      A.   No, I was not.

24      Q.   Were you asked to make any fundamental

25 assumptions in connection with the opinions that you --

1 you are going to give to us in this case?

2     A.    Yes.    The -- the -- the basic assumption I was

3 given was that Beneficial, having provided some

4 infringement contentions to the Court, I was told to

5 assume that those were accurate and complete documents

6 that describe the -- Beneficial's positions regarding

7 infringement by Beneficial's partners.

8     Q.    And so just to be clear, was part of your work

9 to -- to confirm whether or not Beneficial's statements

10 in the infringement contentions were actually true as an

11 opinion of infringement?

12     A.    No.    I didn't -- I didn't have to research the

13 validity of those statements.    I took them as truthful.

14     Q.    Now, did you review other materials in

15 connection with providing opinions in this case?

16     A.    Yes, I did.

17     Q.    All right.    And could you describe to the jury

18 generally the kinds of materials you relied on.    And for

19 your reference, if you need to refresh your memory about

20 that, you will see at the back of your binder

21 Exhibit 559, which should not be displayed.

22     A.    Yes.    Generally, I relied on a large number of

23 documents.    They included deposition transcripts, the

24 deposition transcript of Mr. Goldberg and Mr. Bellack.

25          I looked at a large number of archival

1   Internet documents, information that's been captured

2   over the last two decades regarding the Internet.  And I

3   looked at the -- the patents themselves, the '702 and

4   '943 patent.  I examined them in some detail.

5           And then I did also look at a large number of

6   documents relating to the case, in terms of motions for

7   summary judgment and similar documents.

8       Q.    Thank you.

9           MS. ANDERSON:  Now, Your Honor, at this

10  point in our examination, may we have permission to use

11  the -- the easel for drawing with the witness?

12          THE COURT:  You plan to use it with the

13  witness, Counsel?

14          MS. ANDERSON:  Yes, Your Honor.

15          THE COURT:  You may have leave to do

16  that.  My suggestion would be, with the assistance of

17  co-counsel, you move it adjacent to the bar, the

18  railing, and then Dr. Alexander will be able to step

19  down and reach it from there.

20          MS. ANDERSON:  Thank you.

21          Your Honor, would you like the witness to

22  stand on the side of the bar closer to me or --

23          THE COURT:  No.  I'd like to keep the

24  witness on that side of the railing.

25          MS. ANDERSON:  That side.  Thank you.

1          MR. JONES:  Is this where you want it?

2          THE COURT:  Why don't you move it a

3  little closer toward the jury.

4          MR. JONES:  Oh, I'm sorry.

5          THE COURT:  That's fine.

6          MR. JONES:  Excuse me.

7          THE COURT:  And that's a good position

8  for you, Dr. Alexander.

9          MS. ANDERSON:  Thank you, Your Honor.

10  Thank you.

11          THE WITNESS:  Your Honor, would you like

12  me to rotate it toward you?

13          THE COURT:  Well, let's wait until she

14  asks you what to do.

15          And, Mr. McAteer, we'll make the handheld

16  mic available for the witness as ell.

17          MR. ROSEN:  Your Honor, may I ask

18  permission to go to the corner over there?

19          THE COURT:  Absolutely.  Absolutely,

20  Counsel.  Feel free to position yourself so you can see.

21          MS. ANDERSON:  And, Your Honor, may I

22  have permission, when the drawing begins, to be able to

23  see, or shall I stay over here?

24          THE COURT:  No.  You may go to the side

25  of the easel as well.

```
 1              MS. ANDERSON:  Thank you, Your Honor.
 2         Q.   (By Ms. Anderson) Dr. Alexander, so we can
 3    understand a bit about the work you've done in
 4    connection with this case, would you explain to the jury
 5    a bit about what happens when someone tries to look at a
 6    page on the Internet?
 7         A.   Yes, certainly.
 8              THE COURT:  Let me interrupt just a
 9    second.  If the witness is going to be using the easel
10    to answer the question, then he's perfectly fine there.
11    If he's going to give answers that don't require the
12    easel, he should be at the -- the witness stand until
13    the easel is going to be used.
14              MS. ANDERSON:  Agreed, Your Honor.  And
15    if -- with permission of the Court, the response to this
16    particular question would be an easel drawing.
17              THE COURT:  That's fine.
18              MS. ANDERSON:  Thank you.
19              THE COURT:  I just want to be clear.
20              MS. ANDERSON:  And we'll return.
21              THE COURT:  Okay.  Go ahead,
22    Dr. Alexander.
23              THE WITNESS:  Thank you.
24         A.   So what -- what I'm about to explain is really
25    the mechanics of what happens with a web browser when
```

1    it -- when you use it at home or at your office.

2           So life starts with a web browser.  And

3    this -- this is really running on what's typically

4    called a client computer.  So that's -- that's really

5    the computer itself.  The web browser is a piece of

6    application software that you probably are familiar with

7    that runs on the computer, and its -- its role is to

8    talk to web servers.

9           So I can draw a web server over here.  It's --

10   it's also sometimes referred to as a website, so if I

11   use that -- again, there's hardware, and then there's

12   software that represents the website.

13          So the -- the action begins when you click on

14   a -- a hyperlink.  And so this might be something that

15   says www.ebay.com.  And you can also type it into the

16   text block, and you may have done this.

17          What happens as a consequence of clicking on

18   that hyperlink is that there is a message that goes to

19   the web server, and the web server receives this

20   so-called HTTP message.  It's a request.

21          And that's -- there's a little packet of

22   information, and it's got inside it some instructions

23   really for the web server to -- to do something.  And

24   the typical response is that back comes a document.

25   And this is called an HTML document, and the HTML

1  reference there is hypertext markup language.  It's --

2  it's sort of the language you heard a little bit about

3  this morning that web browsers understand.

4       It's just another language like Italian or

5  French.  It's -- it's just that the web browser knows

6  how to interpret the words in the document.

7       So an important -- this is the response, by

8  the way.

9       So an important aspect of that response

10  document, the HTML document, is it has things called

11  tags.  And they are normally shown with an angle

12  bracket, and they can be tags like image, and it can

13  have a source equals, and it can have another tag,

14  video, if you ever have watched video on a -- on a web

15  browser, the tags are seen by the -- the browser when it

16  reads this document, and it -- it treats them as

17  instructions to do something.

18       So, for example, on the -- on the case of an

19  image tag, the brow -- oh, I should have mentioned that

20  there's a person over here, of course, running this

21  browser, and that person is -- is doing all the action

22  of clicking on the hyperlink.

23       But once they've done the clicking on the

24  hyperlink, the rest sort of flows automatically.  And

25  the image tag -- when the browser recognizes the image

1  tag, it goes off into another server, which is able to

2  provide image information, typically another document or

3  another set of data.

4          And so, you know, that might be an image of

5  something, a person.  It comes back, and that is

6  displayed -- that's displayed on the browser's window,

7  along with other content.

8          So the -- there may be -- there may be text

9  that's inside this HTML document that's displayed, and

10 then the -- the request for an image from this image

11 server gives back an image, if it's -- if it's

12 requested, if it's part of the -- the HTML document.

13         And what happens is all of these pieces --

14 typically, if you look at -- look behind the scenes,

15 there will be hundreds of different tags, and there are

16 hundreds of different kinds of tags too.

17         But the -- the reference that they make to

18 these sources, they point to a location around the

19 world.  It's not the same location as this eBay server.

20 They can come from lots of different places.

21         And typically, there will be tens of hundreds

22 of pieces of information that flow into the browser over

23 a period of time.  They just sort of flow in as they --

24 as they arrive.

25         And if you've ever used a browser and had a

1  slow connection, you probably understand what I'm

2  talking about, because sometimes they also appear in

3  uncertain points in time.

4       And so eventually everything arrives and is

5  displayed or rendered on the browser.

6       Q.   (By Ms. Anderson) Thank you.

7       And we'll get a little bit later in the

8  discussion today a discussion about DoubleClick.  But

9  for the jury's sake, can you indicate for the jury where

10  a DoubleClick ad tag would show up on the drawing you

11  have here?

12      A.   Yes, I can.  Well, there will be -- something

13  you heard about ad tags is, there are certain kinds of

14  tags that relate to bringing ads to the browser.  And

15  one example would be like -- I just got it in, but there

16  will be a tag which might be a script tag, which

17  represents an ad tag, and it will have parameters.  This

18  one will have something like source equals

19  ad.DoubleClick.net.  So that's -- that's a reference to

20  a server.

21      The -- the ad part of it is the name of a

22  computer, and the DoubleClick.net is like a street

23  address.  So you're going to a particular server in a

24  particular location around the world.  And that's --

25  that's the nature of the ad tag.

1              Do you wish me to continue or --

2         Q.   No, you can sit down now.

3              MS. ANDERSON:  Your Honor, would you like

4    me to move the easel back?

5              THE COURT:  Yes.

6              All right.  Continue, Counsel.

7              MS. ANDERSON:  Thank you, Your Honor.

8         Q.   (By Ms. Anderson) Dr. Alexander, thank you for

9    the drawing.

10             Could you please tell the jury what a cookie

11   is?

12        A.   A cookie is just a small piece of information.

13        Q.   All right.  And can you give us an example

14   about how a cookie might be used in connection with a

15   website?

16        A.   Yes.  A cookie, its primary value is that

17   it -- it holds information about a previous visit to a

18   website.  So when you're using a browser and it's

19   maintaining some knowledge of your previous visit.  And

20   an example might be shopping carts.  You probably all

21   had the experience where you selected something to buy

22   and gone away from the computer and you come back, and

23   day's later, it somehow remembers a lot of things.  So

24   that's the shopping cart example of a cookie.

25        Q.   Thank you.

1          Can you please give the jury some examples of

2    the kind of information that might be kept in -- through

3    cookies?

4        A.    Yes.  Well, following that example, cookies

5    can have any kind of information, really.  There's no

6    real restriction, but, you know, the common usage is

7    something like products or an identifier of a -- of an

8    individual.

9          For example, an identification of a shopping

10   cart and the contents, the products, the product IDs

11   that you've selected, whether you're going to -- whether

12   you've actually, you know, decided to buy them or -- or

13   they're just things that you're thinking about buying.

14       Q.    Thank you.

15         Do you have an opinion about whether or not a

16   cookie has to contain explicit user-identifying

17   information like a name in order to provide a web server

18   with information that relates to identifying a user?

19       A.    No, it -- it doesn't.

20       Q.    Just to clarify my question, do you have an

21   opinion on that subject?

22       A.    Yes, I do.

23       Q.    Okay.  And what is your opinion in connection

24   with that?

25       A.    I think my opinion is that if you're providing

1  user-related information or something identifying a

2  user, it doesn't have to be a person's name.  Very

3  typically, it's something like just an ID that uniquely

4  identifies an individual.

5       Q.   Is there something called a session ID,

6  Dr. Alexander?

7       A.   Yes.  That's one -- one form of cookie

8  identifier.

9       Q.   Could you please explain to the jury what a

10  session ID cookie is?

11      A.   Well, in its broadest form, a session ID is

12  just to maintain a relationship with a server so that it

13  knows who you are when you come back.

14           For example, you may have typed in shopping

15  cart information, and it -- it wants -- you -- you -- if

16  you go away from the computer and come back, you need to

17  be sort of related to that information again.  So

18  it's -- it's just an identifier.

19      Q.   And is the session ID a name?

20      A.   No, it's not.  It's -- it's like a long --

21  typically, it's a long string of characters, random

22  characters or numbers.

23      Q.   Thank you.

24           Is there such a thing as disabling cookies?

25      A.   Yes.

1      Q.   Would you please tell the jury what that is?

2      A.   Yes.  Well, the manufacturers of browsers

3  generally allow users to not accept cookies on their

4  computers.  They -- they have a switch, and you can turn

5  it off, if you don't want to have cookies saved on your

6  computer.

7      Q.   Do you have an opinion as to whether or not it

8  is common for computer users to disable all cookies?

9      A.   Yes, I do.

10      Q.   And what is your opinion?

11      A.   Well, based on my own experience and own

12  knowledge and also based on some analysis I did, it's an

13  extremely small percentage of users who disable cookies.

14      Q.   And did you review materials in your field to

15  determine whether or not your opinion was correct in

16  that regard?

17      A.   Yes, I did.

18      Q.   And what did you review?

19      A.   There's a document that's --

20      Q.   Well, actually, Dr. Alexander, can you

21  describe your recollection of the nature of what you

22  reviewed?

23      A.   Oh, yes.  The -- there was -- there's -- apart

24  from my own knowledge, there was one document in

25  particular that I looked at.  It automated the

```
 1  measurement of whether users had disabled cookies.  In

 2  other words, it did it in a machine-automated way.

 3          And so it -- it examined a large population of

 4  users.  It was a very scientific study, particularly

 5  since it addressed a large community of different users.

 6  It was also scientific, I thought, because it -- it was

 7  careful to take out false parameters.

 8          For example, many times in these -- in these

 9  examinations or these analysis exercises, there are

10  things called robots that are involved.  They're like

11  client computers, and, you know, the idea was they are

12  not part of the study of whether humans turn off

13  cookies.  So the study carefully removed a lot of

14  extraneous, irrelevant information.

15      Q.   Thank you.

16          Let's turn our attention to DoubleClick.

17  We've heard testimony in the case from Mr. Bellack about

18  how DoubleClick works.

19          Did you rely on Mr. Bellack's testimony and

20  deposition in any way in connection with the work that

21  you did in this case?

22      A.   Yes.

23      Q.   Okay.  And you indicated on the drawing

24  earlier the DoubleClick ad tag on the diagram.  Can you

25  describe to the jury just generally what DoubleClick
```

1   does in connection with your diagram?

2          And you should stay seated for this.

3      A.   Yes, certainly.

4          The -- I drew on the diagram a tag which would

5   be understood by people in this field as one kind of ad

6   tag.  And it -- the -- the use of the DoubleClick system

7   follows that kind of approach, which is the publisher --

8   the website publisher puts this ad tag onto their HTML

9   document page.  Just as I showed you in my diagram,

10  there's an HTML document.

11         So they paste it in, and the -- the ad tag,

12  when it's received by this client computer, the browser,

13  the browser recognizes it as requiring access to one of

14  the DoubleClick servers.  That's why I wrote up the

15  ad.DoubleClick.net that says to the browser go to a

16  DoubleClick server and get ad -- ad-related display

17  information.

18     Q.   And in relation to your description of how

19  DoubleClick works, can DoubleClick ad tags be used

20  communicating with the website server in connection with

21  that?

22     A.   Could you repeat the question?

23     Q.   Sure.  Are DoubleClick ad tags used in

24  connection with displaying ads on websites as you've

25  described here?

1        A.    Yes, yes, yes.

2             So to finish it off, you know, the ad tag

3    is -- is digested by the browser, and that results in an

4    ad being displayed on the browser in conjunction with

5    the content that came from the website.

6        Q.    Thank you.

7             Let's turn our attention to the subject of

8    in-page ads.  Dr. Alexander, would you describe for the

9    jury what an in-page ad is?

10       A.    The -- the easiest way to think of an in-page

11   ad is that it's sort of a reserved section of space on

12   the page that's going to be displayed.  And once the --

13   it's a block.  In other words, usually a piece of real

14   estate in the page.

15            And once the browser sees the ad tag and gets

16   the ad information, it will plug that advertisement into

17   the -- into the slot that's reserved when -- when it

18   arrives.

19       Q.    Is there such a thing called interstitial ads,

20   Dr. Alexander?

21       A.    Yes indeed.

22       Q.    Please discuss what that is.

23       A.    Well, these are ads that typically differ from

24   the in-page ads.  They -- they either appear before the

25   display of the content and -- or they are displayed over

the top of the content, like a pop-up ad.

Q.   And can they cover some or all of the website?

A.   Yes.  They -- they -- in the case of a pop-up, for example, they cover some of the -- the news or graphics that are underneath on the webpage.

Q.   Thank you.

Now, are the ad tags for in-page ads, when it comes to DoubleClick, the same as the ad tags for interstitial ads?

A.   No, they're not -- not the same.  There are different parameters that distinguish ad tags from interstitial ad tags.

Q.   What do you mean by parameters?

A.   Well, there's -- there's one that -- I think it was the DCOPT parameter.  These ad tags have a bunch of different parameters that are tucked into the -- the tag.  And the DCOPT, I think it is, can be set to say interstitial, IST.

Q.   Thank you.

Now, let's turn our attention to the patents in this case.  Can you please identify to the jury which patent claims you were considering as part of your work in this case?

A.   Yes.  So for the '702 patent, there was just Claim 53.  The '943 patent, I considered the Claims 1,

1  49, and 67.

2      Q.   And do you have a view as to whether or not

3  Claim 53 is generally representative of the three claims

4  of the '943 patent?

5      A.   Yes, I do.

6      Q.   And why is that?

7      A.   Well, the -- the claims -- the Claim 53 of the

8  '702 patent describes essentially the -- the combining

9  of ad-related information with content-related

10 information.  And then the display of the -- the ad at a

11 user's browser and the claims of the '943 patent follow

12 that same basic idea.

13     Q.   Now, when you say the same, are you saying

14 that Claim 53 is identical to the other three claims of

15 the '943 patent?

16     A.   No, no.  The claims are different and

17 distinct, so there are some differences.  Yes.

18     Q.   Could you give the jury just a few examples of

19 some differences?

20     A.   Certainly.  The -- the most notable is --

21 particularly to people in -- involved with patents is --

22 the '702 patent is an apparatus claim.  Claim 53 is an

23 apparatus claim.  That just means it involves a system

24 of some kind.

25          The claims that are at issue here for the '943

1  patent are called method claims, which convey a number

2  of steps that have to be performed and not necessarily a

3  system.

4       Q.   Thank you.

5            And can you give the jury a couple other

6  examples of differences between the claims?

7       A.   Certainly.  When you get down to the -- the

8  actual claim language, which is what defines the

9  invention, the -- the '702 patent, Claim 53, involves

10  something called first information, which is generally

11  being discussed in terms of cookies.  And it -- it also

12  recites the use of storing user information on a website

13  server.  Now, that's the '702 patent, Claim 53.

14            When you go look at the claims at issue for

15  the '943 patent, Claim 1 of the '943 patent doesn't

16  involve that first information.  It doesn't involve

17  cookies.

18            And then all of the claims of the '943 patent

19  that are at issue, 1, 49, and 67, none of them require

20  the storage of information of user information on a

21  website server.  And there is one other difference.  The

22  -- the term concurrent is used in the '702 patent, Claim

23  53, and it's not used in the '943 patent claims.

24       Q.   Thank you.

25            Now, I'd like to show you on the screen

1  Exhibits 29 and 30.

2           MS. ANDERSON:  Just the first page,

3  please, Ben.

4      Q.  (By Ms. Anderson) Exhibit 29 is before you,

5  Dr. Alexander.  What is this?

6      A.  Yes.  That's the -- that's the '702 patent,

7  the face page of it.

8      Q.  Thank you.

9           MS. ANDERSON:  And can we have 30 up,

10  please, Ben?

11     Q.  (By Ms. Anderson) What is Exhibit 30,

12  Dr. Alexander?

13     A.  That is the '943 patent cover page.

14     Q.  All right.  Did you review these in connection

15  with your work in this case?

16     A.  Yes, I did.

17     Q.  All right.  As part of the work that you did

18  in connection with this matter, did you ever describe

19  documents in which Beneficial discussed its view of how

20  claim limitations apply to websites doing advertising?

21     A.  Documents in which Beneficial --

22     Q.  Yes.

23     A.  -- claim?

24     Q.  Yes.

25     A.  Yes, I did it.  Certainly.

1    Q.    All right.  I'd like to show you Exhibits 8

2  and 9 in your binder.  Do you recognize Exhibits 8 and

3  9, Dr. Alexander?

4    A.    Yes, I do.

5    Q.    And what are they?

6    A.    They -- they are the documents that were

7  produced for the Court as part of the procedure of

8  patent litigation, and they represent the asserted

9  claims and infringement contentions that were written by

10  Beneficial.

11    Q.    And what are infringement contentions again?

12    A.    Quite simply, it's -- it's a -- it's

13  information about why the Plaintiff, which in this case

14  was Beneficial -- why they believe that certain accused

15  websites satisfy the claims.

16    Q.    Thank you.

17          Did you make any assumptions concerning

18  Exhibits 8 and 9, the infringement contentions from

19  Beneficial?

20    A.    Yes.  I was -- I took the assumption that --

21  that those documents were accurate, complete, and

22  provided a full analysis of all -- of why Beneficial

23  believed the accused websites satisfied the patent

24  claims.

25    Q.    All right.  Let's take a look at Exhibit 9,

1  please.  And we see here the front page of Exhibit 9.

2          Can you please tell the jury if there is a

3  portion of Exhibit 9 that goes through Beneficial's

4  discussion of the patent claims as applied to accused

5  products?

6      A.   Are you talking about the -- the asserted

7  claims?

8      Q.   Yes.

9      A.   Right.  So -- well, the first -- the first

10 portion of this document, which is 46 pages long, does

11 have information about the claims that are asserted, and

12 they are in the early pages, Page 2 and 3, I believe.

13     Q.   Uh-huh.  Thank you.

14          And is there an appendix to this document

15 that's a part of the document?

16     A.   Yes.  After -- after those first 46 pages,

17 there is an appendix which runs for some 180 pages, I

18 believe.

19     Q.   All right.  And what is this -- what is

20 contained in this appendix?

21     A.   It has the claim elements and discussion of

22 the accused products.

23     Q.   And where do we see the claim elements in

24 Appendix A?

25     A.   You can see from the -- the slide that on the

left-hand side, there is a particular claim element, and
it's from one of the claims, Claim 53 of the '702
patent.  And it says:  An apparatus for a service on a
communications network comprising.  So that's the early
part of the claim.

Q.   And what generally is contained in the
right-hand column of Appendix A?

A.   On the right-hand column, you see Beneficial's
discussion of why they think each of the websites that
were accused satisfies that particular claim element.

Q.   Okay.  And when you say that it contains the
discussion of why they think each of the websites
contain the claim element, who is the they you're
talking about?

A.   Beneficial.

Q.   All right.  And do you have an understanding
in this document as to who wrote Exhibit 9, whose words
they are?

A.   Well, my general understanding is that it
would have been the lawyers for Beneficial.

Q.   All right.  And so this is something that was
provided by Beneficial as part of the case.  Is that --

A.   Yes.  This -- my understanding is this is a
document that's required by the Court and has to be
submitted to the Court as part of the proceedings for an

1  infringement lawsuit.

2      Q.    All right.  Now, this is quite a long document

3  as you just described.

4          Are you able to give the jury an overview of

5  what Beneficial is saying in here are the features of a

6  website that infringes, for example, Claim 53?

7      A.    Yes.  As -- as a general sort of summary of

8  what's -- what's in the Beneficial statements, the kind

9  of website that they believe would satisfy the claim --

10  this is Claim 53 -- would include websites that have the

11  ability to store user information at the website,

12  websites that communicate with web browsers using this

13  cookie information, and in particular, result in storing

14  of the cookie information on a client computer, the

15  browser, and then the use of that same cookie

16  information when a -- a person, a user, returns to the

17  website at a later time.

18          And then towards the end of the claim, you see

19  that websites that satisfy Beneficial's statements here

20  would be websites that combine ad-related information

21  with service-content information, service-related

22  information.

23          And the combined information would flow to the

24  -- the browser and result in this concurrent display of

25  advertising presentations and -- and the -- the

1  service-related content.

2  Q.   Can Google's DoubleClick ad products be used

3  with websites that have that kind of functionality?

4  A.   Certainly.  You know, Google's DoubleClick

5  advertising products, they can be used with websites

6  that fit this set of parameters, and in particular, use

7  of cookies and displaying of advertising presentations,

8  display of advertisements that were the result of

9  combining at the website server, advertising-related

10  information with the service-related information.

11  Q.   Thank you.

12  Dr. Alexander, what is user registration as

13  relates to websites?

14  A.   User registration is -- is a step where you

15  normally provide information about yourself.  And you

16  may have heard about Target, for example.  If you were

17  to go to a website like Target and log in or register,

18  you would have to provide information about yourself,

19  maybe shipping address, maybe a billing address, perhaps

20  credit card information.  So that's -- that's the step

21  of registration.

22  Q.   Now, do you have an opinion about whether any

23  of the patent claims involved here require that user

24  information be stored at the website and come from a

25  user registration step?

1      A.   Yes, I do.

2      Q.   What is your opinion?

3      A.   It does not.  The claims do not require that.

4      Q.   Now, Dr. Alexander, is there something called

5 authentication in relation to websites?

6      A.   Yes.

7      Q.   What is that?

8      A.   Well, authentication is -- well, the meaning

9 of authentication is essentially verifying that

10 you've -- you are who you claim to be.  So in terms of

11 websites, it's -- it's verifying the identity of a user

12 or a machine, for that matter, connecting to a website.

13      Q.   Do any of the patent claims at issue here

14 require authentication of a user?

15      A.   No.

16      Q.   Now, you mentioned in your description of

17 Claim 53 earlier the concept of concurrent display.

18           Do you have an opinion about how a person of

19 skill in the field like yourself understands the term

20 concurrent as used in the patent claims?

21      A.   Yes, I do.

22      Q.   And what is your view?

23      A.   Well, my understanding of concurrent as -- as

24 it's used in the claim is that it's -- it's the result

25 of the flow of information that is -- is a consequence

1  of a user going to a website and asking for a webpage.

2  It's -- it's all the pieces coming together at the

3  browser.  That's how it's used in the claim language.

4      Q.   Does it mean that they all have to come and

5  show up to the user at the identical point in time?

6      A.   No.  I -- that's not a requirement, in my

7  opinion.

8      Q.   Now, let's turn our attention to the subject

9  of user-identifying information.  Based on your

10 experience in the field, do you have an opinion about

11 whether a website host or content provider would need to

12 be encouraged in any way to try to gather more

13 information about its users and keep that information?

14     A.   Yes, I do.

15     Q.   What is your opinion in that regard?

16          MR. ROSEN:  Objection, Your Honor.

17 Actually, can I have the question read back?

18               THE REPORTER:  Sure.

19               THE COURT:  You should have it there,

20 Counsel.

21               MR. ROSEN:  Yeah, I do.  Thank you.

22 I believe this is beyond the scope of the witness'

23 report.

24               THE COURT:  Well, the witness is bound by

25 the scope of his report.

1          Ms. Anderson, do you have a response to

2    the objection?

3          MS. ANDERSON:  I do, Your Honor.  I

4    believe in Paragraph 129 of the report that is

5    addressed.

6          THE COURT:  Do you maintain your

7    objection, Mr. Rosen?

8          MR. ROSEN:  Your Honor, I'll withdraw the

9    objection.

10          THE COURT:  All right.  Well, let's move

11    along, and let's -- let's be as certain as possible

12    before we impose these kind of interruptions on the

13    process in the future.

14          Go forward, Counsel.

15          MS. ANDERSON:  Thank you, Your Honor.

16    Q.    (By Ms. Anderson) Dr. Alexander, do you have

17    an opinion about whether a website host or content

18    provider would need to be encouraged to try to gather

19    more information about users and keep that information?

20    A.    Yes, I do.

21    Q.    Please tell the jury what your opinion is.

22    A.    Well, my opinion, which is based on my own

23    extensive experience with website development, is

24    website -- website owners.  The publishers need no

25    encouragement to collect user information.  They do it

1  all the time, and they have since the beginning of

2  websites in the early '90s.

3      Q.   All right.  And do you have a view about

4  whether or not the use and insertion of ad tags into

5  HTML documents is a commonly known practice in your

6  field?

7      A.   Yes.  It's -- it's a commonly known practice

8  and it's -- it's as simple as what I showed you.  And

9  that is, writing a tag into an HT -- HTML document or a

10  piece of an HTML document.  It's well-understood and

11  easy to do in terms of placing it in the page.

12      Q.   Thank you.

13              MS. ANDERSON:  Your Honor, I pass the

14  witness.

15              THE COURT:  Cross-examination?

16              All right.  Proceed when you're ready,

17  Mr. Rosen.

18              MR. ROSEN:  Thank you very much, Your

19  Honor.

20                   CROSS-EXAMINATION

21  BY MR. ROSEN:

22      Q.   Good morning, Dr. Alexander.

23      A.   Good morning.

24      Q.   Now, you've been in Court for the entire

25  proceeding so far, correct?

1    A.   Well, I came in at lunch -- after lunch

2  yesterday.

3    Q.   Right.  So you heard the opening statements

4  and the witnesses?

5    A.   Yes.

6    Q.   Okay.  So you -- you understand that the issue

7  that the jury is going to decide here is -- is whether

8  the customer's use of DoubleClick constitutes indirect

9  infringement by Google but for the license, right?

10    A.   No, I'm not sure I do.

11    Q.   Well -- well, as a matter of fact, you -- you

12  showed up today with some charts, didn't you?

13    A.   (No response.)

14    Q.   You came to Court today holding some charts,

15  right?

16    A.   No, I think you must be mistaken.

17    Q.   The charts in the back, were you -- did you

18  not bring those?

19    A.   No.

20    Q.   All right.  You've looked at the settlement

21  agreement in this case, right?

22    A.   No, I don't think so.

23    Q.   You've never seen the settlement agreement in

24  this case?

25    A.   I think there were portions of it in the -- in

1  the Court presentation, but I've never seen the document

2  in front of me.

3      Q.   Okay.  So you've never even seen the document

4  that this jury is going to decide whether it was

5  breached, right?

6      A.   That's correct, yes.  I have not seen it.

7      Q.   You understand -- you've -- you've testified

8  in trial, you said, 10 times?

9      A.   At least 10.

10     Q.   At least 10 times.  On issues of infringement?

11     A.   Yes.

12     Q.   Sometimes you've testified that parties

13  infringe a patent, I take it?  Is that fair to say?

14     A.   Not yet.  I may soon --

15     Q.   Okay.

16     A.   -- but not yet.

17     Q.   Sometimes you testified that parties haven't

18  infringed a patent?

19     A.   That's correct.

20     Q.   Sometimes you've testified that a patent is

21  invalid?

22     A.   Yes.

23     Q.   Sometimes you've testified a patent is valid?

24     A.   Again, not yet.

25     Q.   Okay.  And -- and whether it's in court or in

1  a deposition in a report, sometimes you offer opinions

2  on direct infringement, correct?

3       A.   Yes.

4       Q.   And sometimes you offer opinions on indirect

5  infringement, correct?

6       A.   Yes, I have done that.

7       Q.   And you understand that indirect infringement

8  can be contributory infringement or inducement, right?

9       A.   Yes.

10      Q.   And you prepared a report in this case,

11  correct?

12      A.   Yes, I did.

13      Q.   About a 60-page report or so?

14      A.   That's correct.

15      Q.   In your report, you do not offer any opinions

16  on infringement, correct?

17      A.   That is correct.

18      Q.   You do not offer any opinions on whether

19  Google indirectly infringes the patent by contributory

20  infringement, right?

21      A.   That's correct, I did not offer such opinions.

22      Q.   Right.  And you didn't offer an opinion on

23  whether DoubleClick is a material part of the invention

24  for purposes of contributory infringement, right?

25      A.   No, I don't believe so.

1      Q.    Did you offer an opinion on whether

2 DoubleClick has non-infringing uses?

3      A.    It was discussed, but I don't think it was in

4 the form of an opinion.

5      Q.    Right.   In other words, you -- you couldn't

6 have offered an opinion on non-infringing -- what is or

7 is not a non-infringing use, because to offer an opinion

8 on what is or is not a non-infringing use, first, you

9 have to have an opinion on infringement, right?

10      A.    That's correct.

11      Q.    And in your report, you do not offer any

12 opinions on whether Google indirectly infringes the

13 patents by inducement; isn't that accurate?

14      A.    That's correct.

15      Q.    You do not offer any opinions on whether

16 Google intended to cause its customers to infringe the

17 patent, right?

18      A.    I -- I think I had some comments on that

19 subject, but I didn't form them as opinions, I don't

20 believe.

21      Q.    Right.   And the comments you had on that

22 subject is that Google encourages and instructs its

23 customers to use ad tags.

24      A.    Yes, that's certainly true.

25      Q.    Have you done reports or analyses for other

1  people on the issue of inducement?

2      A.   Yes.

3      Q.   So you know that for inducement, it's not

4  enough that Google intended its customers to use ad

5  tags; Google had to intend its customers to use ad tags

6  in a way that infringes the patents, right?

7      A.   Yes, that's correct.

8      Q.   You also understand that there cannot be

9  indirect infringement without some direct infringement

10 by somebody, right?

11     A.   Yes, that's correct.

12     Q.   In your report, you do not offer any opinions

13 on whether any of Google's customers directly infringe

14 the patent, correct?

15     A.   That is correct.

16     Q.   In fact, you have no knowledge of how any of

17 the -- of the Defendants, these underlying customers,

18 you don't know how any of their websites operate, do

19 you?

20     A.   No.  I -- I have not analyzed their websites.

21     Q.   All right.  And you were never even given

22 access to the documentation produced by these parties

23 that show how their websites operate, right?

24     A.   That is correct.

25     Q.   The things that I just talked about, opinions

1  on indirect infringement by Google and opinions on

2  direct infringement by Google's customers, those are

3  things that you are certainly capable of doing, right?

4      A.   Yes, that's -- that's certainly true.

5      Q.   And in this case, you were ready, willing, and

6  able to do those analyses if Google asked you to, right?

7      A.   I was able, if asked, but I was not asked.

8      Q.   Google did not ask you to do any infringement

9  analysis, right?

10     A.   That is correct.

11     Q.   Now, in preparing your opinions in this case,

12  you accepted as true Beneficial's infringement

13  contentions.  Did I -- is that a fair way to

14  characterize it?

15     A.   Yes, that was a starting point.  I assumed

16  that they were correct and complete and true.

17     Q.   And -- and so I don't want to oversimplify

18  this, but is this a correct characterization of what

19  you're saying:  That you've accepted Beneficial's

20  infringement contentions as true, and if you accept

21  Beneficial's infringement contentions as true, then the

22  customers infringe?

23     A.   No.

24     Q.   Okay.  That -- that's -- simply accepting as

25  true allegations doesn't make those allegations true,

1  right?

2      A.   That's correct.

3      Q.   Now, you've dealt with infringement

4  contentions in the past in other cases, right?

5      A.   Yes.

6      Q.   It's a document that you reviewed for other --

7  for other clients, correct?

8      A.   Yes.

9      Q.   And you understand that infringement

10  contentions is something that's prepared early on in the

11  case, right?

12      A.   Yes, that's -- that's the normal practice.

13      Q.   The -- the normal practice is they're prepared

14  before the -- the Plaintiff has received any of those

15  sort of confidential documents describing precisely how,

16  you know, in this case, the website operates, right?

17      A.   It varies a little, I think, but that's

18  probably the typical case.

19      Q.   Now, you identified some of the documents that

20  you reviewed in connection with your opinions.  Let me

21  ask you about some of the documents that you did not

22  review in connection with your opinions.

23          When you were formulating your opinions in

24  this case, Google did not provide you with copies of the

25  discovery responses that Google's customers provided to

1  us in this case, right?

2      A.    That is correct.

3      Q.    So -- but you're aware those exist, right?

4      A.    Generally, but I have no knowledge of the

5  details.

6      Q.    Okay.  So let me show you Exhibit 508.

7           MR. RAMBIN:  Oh, I'm sorry I don't think

8  we distributed notebooks, and I apologize for that, Your

9  Honor.  May I do that right now?

10           THE COURT:  Yes.

11           MR. RAMBIN:  May I approach, Your Honor?

12           THE COURT:  You may.

13           All right.  Let's proceed.

14           MR. RAMBIN:  Thank you.

15      Q.    (By Mr. Rosen) And I apologize for not having

16  given you that notebook first, Dr. Alexander, but if you

17  could look at Exhibit 508, Exhibit 508, these are Demand

18  Media's Supplemental Objections to Responses for

19  Beneficial Innovations.

20           Do you see that?

21      A.    No.  I'm a little confused.  Is this the

22  same --

23           THE COURT:  Doesn't appear you've

24  distributed everything you needed to, Counsel.

25           MR. RAMBIN:  That is correct, Your Honor.

1    I distributed the wrong witness binder.

2                    THE COURT:  All right.

3                    MR. RAMBIN:  We have the correct one.

4    May I approach now?

5                    THE COURT:  Yes.  Let's get this done

6    right.  We're wasting time.

7                    MR. ROSEN:  I apologize, Your Honor.

8         Q.   (By Mr. Rosen) Dr. Alexander, do you have

9    Exhibit 508?

10        A.   Yes, I do.

11        Q.   All right.  So Exhibit 508, these are Demand

12   Media's Supplemental Responses to Interrogatories,

13   right?

14        A.   Yes.  I've never seen them, but --

15        Q.   And these are the kinds of documents that you

16   would normally look at if you were doing a regular

17   infringement analysis, right?

18        A.   They would be available, but I don't always

19   depend upon them.

20        Q.   And in Exhibit 508, if you turn to the -- the

21   page that's down at the bottom that says 508-11.

22        A.   Yes, I see that.

23        Q.   You can see that -- that Demand Media was

24   asked this question, this interrogatory:  If you dispute

25   that you infringe or have infringed any claim of the

 1  '702 patent that is asserted against you, set forth in

 2  specific detail the complete basis for your contention,

 3  and then it goes on.

 4         And then if you look beginning on Page 11,

 5  Demand Media sets forth the reasons why it believes it

 6  doesn't infringe the '702 patent, correct?

 7     A.   Yes, I see that.

 8     Q.   And I -- I'm going to just run through these.

 9  If you look at Exhibit 509, 509 are Advance

10  Publications's Second Supplemental Discovery Responses,

11  right?

12     A.   That -- that would appear to be the case, yes.

13     Q.   Okay.  And if you turn to Page -- what's --

14  what's marked on the bottom as 509-17, you can see the

15  exact same interrogatory is asked of -- of this party.

16         And then, again, without going through it,

17  this -- Advance Publications then provides all the

18  reasons why they assert that they are not infringing the

19  patent, right?

20     A.   That's on Page 19, is it, the response?

21     Q.   Yes, exactly.

22     A.   All right.  I see that.

23     Q.   All right.  And if we look at Exhibit 510,

24  this is ALM Media's Supplemental Responses to Common

25  Interrogatories.

1            And if we go to the page that's marked at the

2    bottom 510-10, you can see here we have the same

3    interrogatory asked, and beginning on the Page 510-12,

4    this is where ALM Media gives all of their reasons why

5    they claim not to infringe the '702 patent, correct?

6        A.   That's apparently what -- what is set forth at

7    Page 12, yes.

8        Q.   And Exhibit 511, same thing for American

9    Media.  This is American Media's responses where

10   American Media sets forth its reasons why it does not

11   infringe the '702 patent, correct?

12       A.   Yes.

13       Q.   And then Exhibit 512, last one, Exhibit 512 is

14   Autotrader's Second Supplemental Responses to Discovery.

15   And on the page marked 512-17, this is where Autotrader

16   was asked to set forth why it believes it doesn't

17   infringe the patent, and Autotrader sets forth its

18   response as well, correct, beginning on Page 512-19?

19       A.   Yes.

20       Q.   And -- and none of these discovery responses

21   were -- you haven't seen them -- today is the first time

22   you were seeing these discovery responses, right?

23       A.   I believe so.

24       Q.   Now, you were in Court -- you heard

25   Mr. Trinh's testimony yesterday, right?

1      A.    Yes.

2      Q.    And you heard Mr. Trinh testify that even to

3   this day, Google does not believe that it directly or

4   indirectly infringes the '702 patent, right?

5      A.    Yes, I heard that.

6      Q.    You didn't take that into account in rendering

7   any of your opinions in this case, right?

8      A.    That Google claims they do not infringe, no, I

9   didn't take that into account.

10     Q.    You -- you -- in rendering your opinions, you

11  also didn't take into account the fact that Beneficial

12  had previously accused Google of infringement, right?

13     A.    No, I didn't.

14     Q.    Right.  So -- so you didn't take into account

15  that in the last action -- a couple of years ago, you

16  didn't take into account that Beneficial accused Google

17  of infringement, and you didn't take into account the

18  fact that Google denied the infringement.  Is that an

19  accurate characterization?

20     A.    I think that's accurate.

21     Q.    And the reason you didn't take into account

22  those two facts is because the case settled without any

23  resolution.  And so the fact that Google was accusing --

24  that Beneficial was accusing and Google was denying, it

25  just sort of washes itself out, right?

1       A.    Yes, that's apparently what happened.

2       Q.    But I'm saying -- my point is that's why you

3    didn't take it into account.  You didn't take into

4    account the fact that in the prior action, Google

5    accused -- Beneficial accused Google of infringement,

6    and Google denied infringement.

7            That wasn't an important fact to you, because

8    the case ultimately settled, there was no resolution,

9    and there's nothing to consider.

10      A.    I'm not sure what the question was.

11      Q.    I'm -- okay.  What I'm trying to understand,

12   Dr. Alexander, is why you didn't take into account the

13   fact that Beneficial had previously accused Google of

14   infringement and Google had previously denied

15   infringement.  So that's what the -- the sort of the

16   premise of my question is.

17           And -- and so what I'm asking you, isn't it

18   true the reason you didn't take into account those two

19   facts is because they essentially wash each other out

20   given that the case settled and there was never an

21   adjudication?

22      A.    Well, not quite.

23              MR. ROSEN:  Your Honor, I'd like to read

24   from the witness's deposition.

25              THE COURT:  Let's make sure he's finished

1  his answer.

2           MR. ROSEN:  My apologies.

3           THE COURT:  Is that your answer,

4  Dr. Alexander?

5      A.   Well, I -- I had understood that under the

6  license agreement, Google was authorized to use the

7  technology.  So I didn't -- I didn't -- I didn't think

8  of it as a washout.  That's all I'm saying.

9           MR. ROSEN:  Your Honor, I'd like to read

10  from the witness' deposition, Page 27, Line 14 to 28.

11          THE COURT:  All right.  You may proceed

12  for impeachment purposes.  Let's limit it to the

13  impeaching portion.

14          MR. ROSEN:  Well, it's a short clip, and

15  I think it probably covers it all, Your Honor.

16          (Video playing.)

17          QUESTION:  So is it fair to say that in

18  preparing Exhibit 360, you didn't take into account the

19  fact that Google had denied that it infringes the '702

20  patent either directly or indirectly?

21          ANSWER:  That's -- that's a true

22  statement.  I did not take into account the fact that

23  Google had denied infringement, and I did not take into

24  account the understanding I have that Beneficial

25  asserted that they did infringe.

1          So there were two parties, one claiming

2   infringement, the other claiming non-infringement, and a

3   settlement was reached, so I didn't -- there was nothing

4   to use.

5                    (End of video clip.)

6       Q.   (By Mr. Rosen) And, Dr. Alexander, isn't that

7   exactly the same as the current action?

8          In other words, Beneficial accused these

9   customers of infringement, these five customers; the

10  five customers denied infringement; the case settled;

11  there was no adjudication; so there's nothing to use?

12         Doesn't that same logic apply?

13      A.   I don't know.  I -- I don't know who settled

14  or if they've settled.

15      Q.   Google also did not provide you with a copy of

16  its own discovery responses from the prior lawsuit,

17  right?

18      A.   That's correct.

19      Q.   Okay.  So if you can look at Exhibit 549.

20         Now, Exhibit 549 are Google's responses to

21  interrogatories from the prior case.  And you can see on

22  the page that's at the bottom -- got the number on the

23  bottom, 549-11, you can see that Google was asked a very

24  similar question that we saw for the other customers,

25  which is:  Set forth in specific detail each fact,

1  opinion, argument, inference, and document that supports

2  your contention that you have not infringed any asserted

3  claim of the '702 patent.

4       Do you see that?

5    A.  Yes.

6    Q.  And then if you turn to the page label at the

7  bottom, 549-21, and this is the -- just the -- I'll just

8  tell you that this is the portion of the response where

9  Google is talking about YouTube, which is one of the

10  Defendants in this case.  And this is the portion of the

11  response where Google is addressing this notion of the

12  one or more programmatic elements for combining.

13       Do you see that?

14    A.  Yes.  I see the highlighted section, if that's

15  what you're referring to.

16    Q.  Right.  And so Google's position in the

17  underlying litigation was Google does not include one or

18  more programmatic elements for combining

19  advertising-related information with service-related

20  information to obtain a resulting combination.  And then

21  you can see it repeats the rest of the element.

22       And then below that, you can see that Google

23  says:  YouTube primarily relies on DoubleClick, AFC and

24  AFV -- which are products we haven't talked about in

25  this case -- to provides the users with advertisements.

1  Ad tags' snippets are included in YouTube webpages.

2          So you understand that Google is explaining

3  this is the reason why it doesn't meet this programmatic

4  element limitation, right?

5      A.   To be honest, I'm not sure what -- what is

6  being said here.  I haven't seen this document before.

7      Q.   Well, in any event, you did hear Mr. Trinh

8  testify yesterday that Google still believes that ad

9  tags do not meet this element of advertising-related

10 information, right?

11     A.   No.  I -- I don't think I have that conclusion

12 yet.  I just need to have more detail.

13     Q.   Okay.  You're aware that Beneficial dismissed

14 its claim of infringement regarding the '943 patent,

15 right?

16     A.   Yes, I had heard that.

17     Q.   So it's your understanding that Beneficial is

18 no longer asserting that any of those five customers or

19 the Defendants that were sued in the underlying lawsuit

20 infringe the '943 patent, right?

21     A.   I don't really know.  Actually, I don't know

22 the details.

23     Q.   But you continued to -- regardless of whether

24 you know the details, you understand the basic notion

25 that Beneficial dismissed its claims under the '943

patent, right?

    A.   No, I don't know that.

    Q.   Well, we talked about it in your deposition, didn't we?

    A.   Well, I generally know that -- that something like that happened, but I don't -- I don't have much understanding of the entire scope.

    Q.   Okay.  So you know generally something like that happened, meaning that Beneficial dismissed the '943 patent from the case?

    A.   Well, I don't know which case it was, but I had heard that at least in some Defendants, they had dismissed it.  I -- I didn't know if it was ever Defendant.

    Q.   But in any event, you continued to assume the truth of Beneficial's infringement contentions regarding the '943 patent, even though Beneficial doesn't even assert those anymore?

    A.   Yes.

    Q.   Let me ask you a few questions about ad tags.  You -- you agree that the way the ad tags get into the HTML file that you described is through a computer program that assembles various components together, right?

    A.   Could you repeat that, please?

1    Q.   Yeah.   The way the -- let me ask you -- how

2  does the ad tag get into the HTML file?

3    A.   Well, the -- I've done it myself personally.

4  You can type it in.   You can cut and paste, which is a

5  common approach.   Google would give you the ad tag as a

6  sample, and you can just copy it and paste it into an

7  HTML document or a portion of a document.   It's just

8  text.

9    Q.   DoubleClick does not perform that combining

10  step, correct?

11    A.   Oh, that -- that's correct.   They -- but

12  you're talking about combining in terms of the patent

13  claim element?

14    Q.   Correct.

15    A.   Right.

16    Q.   The programmatic elements for combining

17  advertising-related information and service-related

18  information, DoubleClick does not perform that combining

19  step?

20    A.   All right.   So I just want to restate, because

21  I thought you were talking about the mechanics of

22  inserting a tag into HTML.   But the actual combining of

23  the ad tag with content, service-related content, is not

24  performed by DoubleClick.

25    Q.   That's performed by the website?

1    A.    That's correct.

2    Q.    And DoubleClick also does not include this

3 software that's needed to perform that combining step,

4 correct?

5    A.    Yes, that's correct.

6    Q.    All right.  Now, you're aware that there are

7 websites that do not set cookies on a user's device,

8 right?

9    A.    It's pretty rare, but there have been some in

10 the past.

11    Q.    Well, one class -- well, let me give you an

12 example.  One class of websites that might not set

13 cookies are websites that are purely informational.

14    A.    You'd have to give me some specifics, but it's

15 a possibility.

16         MR. ROSEN:  Your Honor, I'd like to play

17 the witness' deposition Page 137, Line 17 through 24.

18         (Video clip playing.)

19         QUESTION:  Are there websites that do not

20 use cookies?

21         ANSWER:  Well, as I pointed out, you

22 don't -- the use of cookies is determined by the server

23 itself in the set cookie command.  So there are

24 certainly websites that don't set cookies and have no

25 need to.  I can't name any, but informational sites

1    would be the -- in that class.

2                    (End of video clip.)

3        Q.    (By Mr. Rosen) And, Dr. -- Dr. Alexander, you

4    have not been asked to form any opinions into this case

5    as to whether web -- websites that serve ads that do not

6    set cookies is a substantial non-infringing use,

7    correct?

8        A.    No, I don't believe I have.

9        Q.    And there are websites that do not store data

10   that is used to identify a user, right?

11       A.    That's certainly true.

12       Q.    And you have not been asked to offer any

13   opinions on whether ads served on websites that do not

14   store data that's used to identify a user is a

15   substantial non-infringing use, correct?

16       A.    No, I did not provide such an opinion.

17       Q.    You're aware that DoubleClick could be used to

18   serve ads on websites that use cookies but where users

19   have disabled the cookies, right?

20       A.    Yes.

21       Q.    And you are offering opinions in this case as

22   to whether that is a substantial use, correct?

23       A.    Yes, that was discussed in my report.

24       Q.    And in reaching your opinion, that users

25   disabling cookies is not common or substantial, you

1    relied on an article that came off the Internet, right?

2         A.   Yes.

3         Q.   Okay.  If you remember in your direct

4    examination, you tried to look at the document in your

5    book and -- and Ms. Anderson just said, no, just

6    describe the document for us.

7              Do you remember that exchange?

8         A.   Yes, I do.

9         Q.   Okay.  Let's actually take a look at the

10   document, Exhibit 563.  Exhibit 563 is that Internet

11   article that you were talking about, right?

12        A.   Yes.

13        Q.   You didn't find this article by yourself, did

14   you?

15        A.   No.

16        Q.   You did not discover this article while you

17   were performing a study on the number of users that

18   disable cookies?

19        A.   That's correct.

20        Q.   In fact, you never did perform a study to

21   determine the number of users that disable cookies, did

22   you?

23        A.   That's correct.

24        Q.   Google's lawyers gave you this article,

25   correct?

1     A.   Yeah -- yes, I believe it was part of a

2  deposition exhibit.

3     Q.   So your opinion about the number of users that

4  disable cookies is based on an article that Google's

5  lawyers gave you to look at, right?

6     A.   Yes, that and my own general knowledge.

7     Q.   You are certainly capable of performing a

8  study to determine the number of users that disable

9  cookies, aren't you?

10    A.   Yes, I think so.

11    Q.   It's within your skill set.

12    A.   Yes.

13    Q.   But you weren't asked by Google to perform

14 your own study of the numbers of users that disable

15 cookies, were you?

16    A.   No.

17    Q.   In fact, you never even asked Google whether

18 they have ever performed a study of the number of users

19 that have disabled cookies, did you?

20    A.   No, I don't think so.

21    Q.   Even to this day, you don't even know if

22 Google themselves have performed a study to determine

23 the number of users that disable cookies.  Is that fair

24 to say?

25    A.   That's correct.

1    Q.   And the article that Google's lawyers gave you

2  to look at is an article from smorgasbork.com.

3    A.   Yes.

4    Q.   Before Google gave you this article, you never

5  visited the website smorgasbork.com, have you?

6    A.   That's correct.

7    Q.   You'd never even heard of smorgasbork.com, had

8  you?

9    A.   Correct.

10    Q.   As far as you're aware, at least at the time

11  you rendered your opinions, smorgasbork.com was not a

12  website known among computer scientists to be a reliable

13  source for data, correct?

14    A.   I think that's correct.

15    Q.   And what this -- what this smorgasbork.com

16  website did to run this study was they ran the test on

17  users that visited the smorgasbork.com website during an

18  hour-long period on a Saturday, right?

19    A.   Yes.

20    Q.   So, in other words, they were able -- for

21  every user that went on to smorgasbork.com between this

22  one-hour period on a Saturday, they were somehow able to

23  look at that user and see if that user had cookies

24  enabled, right?

25    A.   Yes.  Yes.  They did various kinds of tests.

1    Q.   Okay.  And when you factor out the -- the

2  robots and all this other stuff, they got a sample of

3  about 13,000 users, right?

4    A.   Yes.

5    Q.   And I think you said you thought that was a

6  large sampling; was that right?  Am I mischaracterizing

7  your testimony?

8    A.   I think it's statistically significant based

9  on my knowledge of statistics.

10    Q.   How many people do you think visit Google.com

11  in an hour?

12    A.   I'd be guessing.

13    Q.   Do you have an educated guess that you think

14  you can give the jury about how many users you think

15  visit Google.com in an hour?

16    A.   No.  I -- I don't have any statistics, I'm

17  afraid.

18    Q.   More than 10 million?

19    A.   I don't know.

20    Q.   Would you agree that if Google has conducted a

21  test on the number of users that disable cookies, that

22  they'd have a much bigger population to judge it on?

23    A.   Yes, that's a fair statement.

24    Q.   By the way, the article this -- this -- this

25  Internet article, there's not even an author, is there?

```
 1        A.    I think you're correct.

 2        Q.    We don't even know who wrote this thing,

 3  right?

 4        A.    Correct.

 5        Q.    We don't know what that person's credentials

 6  were, right?

 7        A.    That's correct.

 8        Q.    Now, in rendering your opinions about whether

 9  users disabling cookies is substantial, if I were to

10  give you a choice, Dr. Alexander, if I were to say, in

11  rendering your opinions, you can rely on a study

12  conducted by Google.com of the number of users that

13  visit Google.com disabling cookies or you can rely on a

14  study conducted by smorgasbork.com, you would have

15  chosen the smorgasbork.com study, right?

16        A.    No.  I think if -- if I'd had access to other

17  statistics, I would have used them.

18        Q.    Well, when I took your deposition and I asked

19  you that question, what you told me is you would rather

20  use the smorgasbork.com article because you need to

21  distance yourselves -- yourself from the parties in this

22  lawsuit, right?

23        A.    Yes, I think I did say that.

24        Q.    So you would have rather used the

25  smorgasbork.com article because you wanted to distance
```

1 yourself from studies that might come from the client.

2 That's what you told me in deposition, right?

3     A.   Yes.

4     Q.   But the very study you relied on, the

5 smorgasbork.com study, that came from your client.  That

6 was given to you by Google, right?

7     A.   It was.  I don't know what the origin of it

8 was, though.

9     Q.   And when you rendered your opinion based on

10 the smorgasbork.com article that not a lot of users

11 disable cookies, you didn't even take the time to go on

12 the Internet and see if you could find other articles

13 that talked about the number of users that disable

14 cookies, did you?

15     A.   I think I focused on that one.

16     Q.   That one meaning the one that Google gave you?

17     A.   Yes.

18          MR. ROSEN:  Nothing further.  I pass the

19 witness.

20          THE COURT:  Redirect?

21          MS. ANDERSON:  Thank you, Your Honor.

22              REDIRECT EXAMINATION

23 BY MS. ANDERSON:

24     Q.   Hello, Dr. Alexander.

25          Very briefly, you were asked some questions

1  about the article that you used in support of your

2  opinion concerning the disabling of cookies.  Do you

3  have that line of questioning in mind?

4      A.   Yes.

5      Q.   All right.  Did you rely solely on the article

6  that you were shown, Exhibit 55 -- 563 for your opinion?

7      A.   No.

8      Q.   Would you please explain to the jury what else

9  you relied on for your opinion that it is rare that

10  users disable all cookies?

11      A.   I relied on my own experience.  I've run

12  several high-volume websites and basically dealt with a

13  lot of people who have a need to understand the use of

14  cookies on those websites.  So I based it on my own

15  personal experience.

16      Q.   Did you have a view as to whether or not it

17  was reasonable for you to consult with Exhibit 563 and

18  rely upon it as part of your -- the basis for your

19  opinion?

20      A.   I'm sorry.  Could you repeat that?

21      Q.   Sure.  Do you have a view as to whether it was

22  reasonable for you to consider and rely on Exhibit 563,

23  the article, as part of the basis for your opinion at --

24  that it is rare that users disable all cookies?

25      A.   Yes.  I think it's a scientific study, so I

 1  did rely on it.

 2      Q.    And can you explain to the jury why you

 3  believe that?

 4      A.    Well, I touched on it earlier.  The fact is

 5  it's a good size sample.  It was performed with computer

 6  code to automatically register the -- the

 7  characteristics of browsers, and it was scientific in

 8  the sense of taking out irrelevant information.

 9      Q.    All right.  Thank you.

10            Turning your attention to an earlier line of

11  questioning, you had been asked whether or not you had

12  taken into account as part of your opinion a variety of

13  materials from prior actions on the subject of whether

14  or not Google infringes.

15            Do you remember those lines of questioning?

16      A.    Yes, I do.

17      Q.    All right.  Were you asked to give an opinion

18  of infringement in connection with this case?

19      A.    No.

20      Q.    All right.  Had you been asked to do so, are

21  those materials you would have looked to?

22      A.    I may have, yes.

23      Q.    All right.  Were you asked to make any

24  assumptions in connection with your opinion that relate

25  to why you didn't look to additional materials?

1        A.   Well, I was asked to take the assumption that

2    the Beneficial infringement contentions were complete

3    and detailed and truthful.

4        Q.   All right.  Thank you.

5             MS. ANDERSON:  Your Honor, I pass the

6    witness.

7             THE COURT:  All right.  Additional

8    cross-examination?

9             MR. ROSEN:  Nothing further, Your Honor.

10            THE COURT:  Okay.  You may step down, Dr.

11   Alexander.

12            All right.  Plaintiff, call your next

13   witness.

14            MS. ANDERSON:  Your Honor, at this point,

15   Plaintiff, Google, rests its case-in-chief.

16            THE COURT:  All right.  Ladies and

17   Gentlemen, this is a good place for us to break for

18   lunch.  I'm going to excuse you for lunch.

19            I'd like you back in the jury room

20   assembled and ready to go about five minutes until 1:00,

21   and we'll attempt to start at 1:00 o'clock.  That will

22   give you an hour and 15 minutes for lunch.

23            Please take your juror notebooks and

24   leave them on the jury table when you leave for lunch.

25            As you expect me to say, don't discuss

 1   the case among yourselves or with anyone else.  Have a

 2   good lunch, and we'll see you back here ready to go at

 3   1:00 o'clock.  You're excused at this time.

 4                   COURT SECURITY OFFICER:  All rise.

 5                   (Jury out.)

 6                   THE COURT:  All right.  Be seated,

 7   please.

 8                   Counsel, the Plaintiff having rested, to

 9   address the possibility that the Defendant may have a

10   motion to offer under Rule 50, I want to make it clear

11   that it's my practice, which I believe is well within

12   the timeliness requirements of the rule, to wait until

13   all the evidence has been presented, the Plaintiff has

14   either presented their rebuttal case or closed their

15   rebuttal case or failed to call a rebuttal case, and

16   then hear competing Rule 50 motions from both parties at

17   the same time.

18                   Clearly, that's before the case is

19   submitted to the jury and is completely timely based on

20   my reading of the rule.

21                   If anyone has a problem with now -- with

22   that, speak now or forever hold your peace.

23                   MR. ADAMS:  And, Your Honor, for the

24   Defendants, I understand that that's the Court's

25   practice.  Just for the record, I want to let the Court

```
 1  know that we do intend to bring the motions, and we're
 2  prepared to argue those motions now, but I understand
 3  it's the Court's practice, so we will reserve our rights
 4  and argue them at the time the -- the Court wants us to.
 5                  THE COURT:  All right.  Duly noted.
 6                  All right.  Unless there's something
 7  else, we stand in recess for lunch.
 8                  COURT SECURITY OFFICER:  All rise.
 9                  (Lunch recess.)
10                  * * * * * * * * * * * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

<u>CERTIFICATION</u>

        I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/s/_____                    ___1/22/14_____
SHELLY HOLMES, CSR                              Date
Official Court Reporter
State of Texas No.:  7804
Expiration Date  12/31/14

/s/_____               __1/22/14_____
SUSAN SIMMONS, CSR                              Date
Official Court Reporter
State of Texas No.:  267
Expiration Date  12/31/14