```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
 2                   MARSHALL DIVISION

 3  GOOGLE, INC.                    *    Civil Docket No.
                                    *    2:11-CV-229
 4  VS.                             *    Marshall, Texas
                                    *
 5                                  *    January 22, 2014
    BENEFICIAL INNOVATIONS, INC.    *    1:00 P.M.
 6
                    TRANSCRIPT OF JURY TRIAL
 7       BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP
                 UNITED STATES DISTRICT JUDGE
 8

 9  APPEARANCES:

10  FOR THE PLAINTIFF:    MS. CHRISTA ANDERSON
                          MS. JENNIFER HUBER
11                        Keker & Van Nest
                          633 Battery Street
12                        San Francisco, CA   94111

13
                          MR. MICHAEL JONES
14                        MR. ALLEN GARDNER
                          Potter Minton Firm
15                        110 North College Street
                          Suite 500
16                        Tyler, TX    75702

17

18  APPEARANCES CONTINUED ON NEXT PAGE:

19

20

21  COURT REPORTERS:      MS. SHELLY HOLMES, CSR
                          MS. SUSAN SIMMONS, CSR
22                        Official Court Reporters
                          100 East Houston, Suite 125
23                        Marshall, TX    75670
                          903/935-3868
24

25  (Proceedings recorded by mechanical stenography,
    transcript produced on CAT system.)
```

APPEARANCES CONTINUED:

FOR THE DEFENDANT:     MS. JULIEN ADAMS
                       Dovel & Luner
                       201 Santa Monica Blvd.
                       Suite 600
                       Santa Monica, CA   90401

                       MR. DAVID ROSEN
                       Murphy Rosen
                       100 Wilshire Blvd.
                       Suite 1300
                       Santa Monica, CA   90401

                       MS. ELIZABETH DERIEUX
                       MR. JEFF RAMBIN
                       Capshaw DeRieux
                       114 East Commerce
                       Gladewater, TX   75647


           * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


                            P R O C E E D I N G S


           (Jury out.)

           COURT SECURITY OFFICER:  All rise.

           THE COURT:  Be seated, please.

           All right.  Is the Defendant prepared to

call their first witness?

           MR. ROSEN:  Yes, Your Honor.

           THE COURT:  Is there anything the Court

needs to be aware of before we bring the jury in?

           MR. ROSEN:  No, Your Honor.

           THE COURT:  Then let's bring in the jury,

1  Mr. McAteer.

2                    COURT SECURITY OFFICER:  Yes, sir.

3  All rise for the jury.

4                    (Jury in.)

5                    THE COURT:  Hope you had a good lunch,

6  ladies and gentlemen.  Welcome back.  Please be seated.

7                    Counsel, be seated as well.

8                    Defendant, call your first witness.

9                    MR. ROSEN:  Your Honor, Defendant calls

10  Nicholas Rockwell by videotape.

11                    THE COURT:  All right.  How long do you

12  anticipate this deposition witness to be?

13                    MR. ROSEN:  We have three deposition

14  witnesses.  The first is approximately, I believe, four

15  minutes.

16                    THE COURT:  What about the others?

17                    MR. ROSEN:  They're all around that.  I

18  think the total of the -- I think the total of the three

19  is -- is under 15 minutes.

20                    THE COURT:  All right.  Let's proceed

21  then.

22                    MR. ROSEN:  Should I announce each as

23  I -- as I get to the first one?

24                    THE COURT:  Yes, that's fine.

25                    MR. ROSEN:  So first we'll play Nicholas

1  Rockwell.

2                  THE COURT:  All right.  Proceed.

3                  MR. ROSEN:  Thank you.  Yeah, I think I'm

4  not getting sound.

5                  COURTROOM DEPUTY:  Do you have the pin

6  plugged in?

7                  MR. ROSEN:  Yeah, it says the pin built

8  into.  I'm happy to go to the podium if that's -- if

9  that's easier.

10                  THE COURT:  It's your witness, Counsel.

11                  MR. ROSEN:  All right.  Thank you very

12  much.

13                  (Video clip playing.)

14                  QUESTION:  What's your position at Conde

15  Nast?

16                  ANSWER:  I'm an SVP of digital

17  technology.

18                  QUESTION:  Okay.  What -- what are

19  your -- how long have you had that position?

20                  ANSWER:  Since April 15th of 2012.

21                  QUESTION:  Is that when you started at

22  Conde Nast?

23                  ANSWER:  Yes.

24                  QUESTION:  All right.  And what are your

25  duties as senior vice president of digital technology?

```
 1                    ANSWER:  Managing technical product
 2  development for Conde Nast digital businesses.
 3                    QUESTION:  Do you know how long Conde
 4  Nast has been using DoubleClick as its primary ad
 5  server?
 6                    ANSWER:  I don't, except that it's been a
 7  long time.
 8                    QUESTION:  Has there been a time when
 9  Conde Nast served ads itself?
10                    ANSWER:  Not to my knowledge.
11                    QUESTION:  Did Google instruct Conde Nast
12  on how to use DART for Publishers?
13                    ANSWER:  There's documentation that's
14  made available by Google.
15                    QUESTION:  So did -- and the
16  documentation made available by Google is information
17  that's obtained through Google's website, correct?
18                    ANSWER:  Yes.
19                    QUESTION:  Is there any documentation
20  specific to Conde Nast that's provided by Google in
21  terms of how to use the products?
22                    ANSWER:  There may have been at the time
23  of the initial implementation.  I do not know.  I do
24  know that in the AdSense implementation, which was done
25  more recently, that there was some guidance done by
```

1  Google.

2              QUESTION:  And specific guidance specific

3  to Conde Nast?

4              ANSWER:  Yes.

5              QUESTION:  In what sense?  What guidance

6  was that?

7              ANSWER:  Specifically where to put the ad

8  placements, how to implement them, best practices for

9  optimizing those ad placements.

10             QUESTION:  And was that -- what form was

11  that document in?

12             ANSWER:  I don't -- I don't -- I don't

13  know.  I know that there was -- there were meetings and

14  there was oral communication.  I don't know if

15  documents -- I believe the documents were provided that

16  may or may not have been specific to Conde Nast, but I'm

17  not certain.

18             QUESTION:  Okay.  I'm just trying to

19  understand.  So this is more in the form of training?

20             ANSWER:  It was really more in the form

21  of training, and to some degree, negotiation around a

22  minimum commitment.  So Google would -- I'm not sure if

23  I can actually speak too much about this, but -- but in

24  the course of that negotiation, there were

25  recommendations made to optimize the value of those ad

1 placements.

2     QUESTION:  We talked before about how

3 Conde Nast maintains -- stores user-identification

4 information obtained during the registration process.

5     Has Google ever encouraged or instructed

6 Conde Nast to do that?

7     ANSWER:  No.

8     QUESTION:  Has Google instructed or

9 instructed Conde Nast to transmit registration cookies

10 to the user's device?

11     ANSWER:  Registration cookies, no.

12     QUESTION:  Has Google encouraged or

13 instructed Conde Nast to transmit any first-party

14 cookies to a user's device?

15     ANSWER:  No, I don't think so.

16     QUESTION:  Has Google encouraged or

17 instructed Conde Nast to set up a system where users

18 register on the websites?

19     ANSWER:  No.

20     QUESTION:  Has Google encouraged or

21 instructed Conde Nast to set up a system where

22 registration is needed to access certain functionality

23 on a website?

24     ANSWER:  No.

25     QUESTION:  Has Google encouraged or

1  instructed Conde Nast on how to create an HTML document?

2              ANSWER:  In the context of AdSense, they

3  instructed us on what they thought the optimal layout of

4  an HTML document was.

5              QUESTION:  Okay.  Anything besides that?

6              ANSWER:  In general, Google does provide

7  a great deal of advice through all sorts of things that

8  they do regarding best practices.

9              QUESTION:  In terms of ad tags?

10             ANSWER:  Well, also in terms of site

11  optimization.

12             QUESTION:  Okay.  But I'm focusing on

13  just sort of the process of creating that HTML document,

14  you know, that we talked about before, about how was it

15  actually done, what software is used, what hardware is

16  used.

17             Does Google get involved in that aspect?

18             ANSWER:  No.

19             QUESTION:  Has Google encouraged or

20  instructed Conde Nast to have a controller for providing

21  users with access to services offered by the website?

22             ANSWER:  Yeah.  I -- I don't know what

23  that means and wouldn't describe our system -- any

24  aspect of our system in that way.

25             QUESTION:  Has Google encouraged or

1  instructed Conde Nast at all with respect to the process

2  by which Conde Nast provides content to users separate

3  and apart from the advertisements?

4             ANSWER:  Not really.  Not really.  The

5  one thing that comes to mind is they do provide search

6  engine optimization guidelines which do include

7  performance criteria.

8             QUESTION:  Okay.  Anything besides that?

9             ANSWER:  No.

10            QUESTION:  Does Google encourage or

11 instruct Conde Nast on how to transmit an HTML file to a

12 user?

13            ANSWER:  No, and we don't do that -- or

14 not -- I wouldn't use those terms to describe that.

15            QUESTION:  I'll make it broader then.

16 Does Google encourage or instruct Conde Nast on how to

17 transmit an HTML file to Akamai or any other

18 content-delivery network?

19            ANSWER:  No.  And, again, I wouldn't -- I

20 wouldn't use the word transmit.  It's not a word that's

21 used in the context of HTML.

22            QUESTION:  Does Google encourage or

23 instruct Conde Nast in any way on how to respond to an

24 HTTP get request?

25            ANSWER:  No.

1        (End of video clip.)

2                MR. ROSEN:  All right.  And the -- the --

3    the next witness we're going to call by deposition is

4    Christopher Kulinski.

5                THE COURT:  All right.  Proceed.

6                (Video playing.)

7                QUESTION:  Have you done -- first of all,

8    you're currently employed at Autotrader, correct?

9                ANSWER:  I'm employed at Autotrader.

10               QUESTION:  And what's your position?

11               ANSWER:  My title is enterprise

12   architect.

13               QUESTION:  And how long have you had that

14   position?

15               ANSWER:  I've been an enterprise

16   architect at Autotrader.com since 2006.

17               QUESTION:  How long have you been at

18   Autotrader?

19               ANSWER:  I've been employed at

20   Autotrader.com for almost 10 years.  It will be 10 years

21   in June.

22               QUESTION:  And what are your

23   responsibilities as enterprise architect?

24               ANSWER:  I'm generally responsible for

25   the technical systems at Autotrader, our technical

1  strategy, decision-making around platform selection, and

2  general technical understanding of Autotrader.com

3  systems.

4           QUESTION:  In other words, using that

5  definition of going through DoubleClick, do all -- do

6  all of the ads served go through DoubleClick?

7           ANSWER:  Generally, in most cases, they

8  do in that definition.  There have probably been some

9  small instances when we have not utilized this product

10  directly, but those have been in the small one-off

11  cases.

12           QUESTION:  Okay.  Does Google instruct

13  Autotrader how to use DART for Enterprise?

14           ANSWER:  Google provides Autotrader with

15  documentation about how to operate the DoubleClick

16  Enterprise system.  It also provides us with operational

17  support, and when requested, consulting services about

18  how to operate and use the DoubleClick system.

19           QUESTION:  Did Google encourage or

20  instruct Autotrader to maintain a store for storing user

21  identification?

22           ANSWER:  I'm not aware of Google's

23  encouragement for us to support registered users.

24           QUESTION:  We talked before about the --

25  Autotrader the -- Autotrader's use of the My ATG cookie

1  for authentication of users.

2                  Do you recall that?

3                  ANSWER:  Yes.  The My ATC cookie?

4                  QUESTION:  Yes.

5                  Did Google encourage or instruct

6  Autotrader to use that My ATC cookie?

7                  ANSWER:  I'm not aware of Google

8  instructing Autotrader to use the My ATC cookie.

9                  QUESTION:  Did Google encourage or

10  instruct Autotrader to set up a system where users

11  register for My ATC?

12                  ANSWER:  I'm not aware of Google

13  instructing Autotrader of a registered user system.

14                  QUESTION:  Did Google encourage or

15  instruct Autotrader to set up a system where

16  registration is needed to access certain services on the

17  Autotrader.com website?

18                  ANSWER:  I am not aware of Google

19  encouraging Autotrader to set up a registration service

20  for users on its website.

21                  QUESTION:  We talked before about the

22  process that Autotrader uses to assemble the HTML

23  document and the rendering agent.

24                  Do you generally recall testifying

25  about -- I'm sorry -- the rendering engine.  Do you

1 generally recall testifying about that?

2                  ANSWER:  Yes, I do.

3                  QUESTION:  Did Google instruct Autotrader

4 on how to assemble an HTML document?

5                  ANSWER:  Google did not instruct us on

6 the specific mechanism of how to render an HTML

7 document.  They do provide us with documentation about

8 how to communicate information to the ad-serving system.

9                  QUESTION:  Okay.  But I'm just talking

10 about the assembly of the HTML document.  Did Google

11 provide any encouragement instruction in connection with

12 the assembling of that HTML document?

13                  ANSWER:  Not that I can recall, no.

14                  QUESTION:  Okay.  Does Google -- does

15 Google provide any encouragement instruction in terms of

16 how to transmit that HTML document to a user?

17                  ANSWER:  Google, that I'm aware of, does

18 not provide any instruction about how to transmit HTML

19 documents to users.

20                  (End of video clip.)

21                  MR. ROSEN:  All right.  And the last

22 witness we would call by deposition is Dale Hannon.

23                  THE COURT:  State that name again.

24                  MR. ROSEN:  Dale Hannon, H-A-N-N-O-N.

25                  THE COURT:  All right.  Let's proceed.

1      MR. ROSEN:  Thank you, Your Honor.

2      (Video playing.)

3      QUESTION:  What is your position at

4  Viacom?

5      ANSWER:  I am the vice president of video

6  player ads and reporting.

7      QUESTION:  How long have you had that

8  position?

9      ANSWER:  The vice president position is a

10  relatively recent promotion from December, but I've been

11  with the company 10 years doing more or less the same

12  kind of work.

13      QUESTION:  Okay.  And if you can just

14  generally describe for me the work that you do for

15  Viacom.

16      ANSWER:  I lead a team of client-side

17  developers that do ad integration, reporting

18  integration, and maintain the client code for the video

19  players for -- for Viacom's publish-facing digital

20  properties and applications.

21      QUESTION:  And is that generally what

22  you've been doing at Viacom since you've been there?

23      ANSWER:  It is.  Well, video players are

24  new.  They came with the promotion.

25      QUESTION:  Okay.

1          ANSWER:  But ads and reporting, I've been

2    doing for 10 years.

3          QUESTION:  Does Google provide Viacom

4    with ongoing training on how to use DoubleClick?

5          ANSWER:  It -- well, we -- I suppose we

6    should clarify what -- what kind of training you're

7    talking about and for -- for -- for whom, what kind of

8    end user, right?  Are we talking about technical, or

9    what are we talking about?

10          QUESTION:  Let me ask it this way:

11    Viacom has access to all of the various documentation on

12    DoubleClick that Google has online, correct?

13          ANSWER:  Sure.  Yes, it does.

14          QUESTION:  Is there any other

15    documentation regarding the operation or use of

16    DoubleClick that Google has provided to Viacom beyond

17    just those resources that are available online?

18          ANSWER:  Google makes available

19    documentation that's specific to the DART interface.

20    I'm not sure how current it is or -- you know, they're

21    going through a process of upgrading, so that's not my

22    forte.  That would be something that people who book ads

23    concern themselves with.

24          QUESTION:  Has Google provided Viacom

25    with any documentation specific to Viacom?

1    ANSWER:  To the best of my knowledge,

2  they -- they haven't.  You know, they're providing us

3  with a system and documentation of how to use the

4  system.

5    QUESTION:  Has Google ever encouraged or

6  instructed Viacom to transmit cookies to users on the

7  Viacom websites?

8    ANSWER:  I'm sorry.  Has Google ever

9  instructed Viacom to transmit cookies?

10    QUESTION:  Yes.

11    ANSWER:  No.  I can't -- I can't -- I

12  can't see what the utility of that would be.

13    QUESTION:  Has Google ever encouraged or

14  instructed Viacom to maintain a store for storing user

15  identification?

16    ANSWER:  Again, I'm -- I'm not -- I'm not

17  aware of anything like that ever occurring.  Google is

18  just providing us with an ad-serving platform.

19    QUESTION:  Has Google ever encouraged or

20  instructed Viacom to set up a system where users

21  register for websites?

22    ANSWER:  I'm unaware of any conversations

23  Google might have had with anybody to that effect.  I'm

24  not aware of that happening anywhere.

25    QUESTION:  Has Google ever encouraged or

1   instructed Viacom to set up a system where registration

2   is needed to access certain services available on a

3   website?

4            ANSWER:  Again, you know, I'm not -- not

5   privy to any -- any such request from Google.  As far as

6   I know, that's none of their business.

7            QUESTION:  Has Google ever instructed

8   Viacom on how to assemble an HTML file?

9            ANSWER:  No.  No.  I mean, are you asking

10  if Google has ever made a specific recommendation about

11  how we do it?

12           QUESTION:  Yeah.

13           ANSWER:  No.

14           QUESTION:  Has Google ever instructed

15  Viacom how to transmit an HTML file to a user?

16           ANSWER:  Again, I'm -- I'm just -- I'm --

17  I'm pausing because, you know, the -- the way that

18  requests for HTML files get made and HTML files get

19  returned is sort of part of the Internet.  It's not --

20  not something that Google has specific -- can make

21  specific recommendations about.

22           QUESTION:  And it's nothing they've ever

23  sat down and told you how to do, is it?

24           ANSWER:  Google does not involve itself

25  in how we -- how we build our websites.

 1              (End of video clip.)

 2              MR. ROSEN:  Thank you, Your Honor.

 3              THE COURT:  All right.  Having seen those

 4  three witnesses by deposition, Defendant, call your next

 5  witness.

 6              MR. ADAMS:  Thank you, Your Honor.  The

 7  Defendant calls Dr. Kevin Almeroth.

 8              THE COURT:  All right.  You've been

 9  previously sworn, correct?

10              THE WITNESS:  Yes, Your Honor.

11              THE COURT:  Please have a seat.

12              Mr. Adams, unless you intend to use this

13  chart, would you turn the page to a clean sheet, please?

14              MR. ADAMS:  Yes, Your Honor.

15              THE COURT:  Thank you.  And you may

16  proceed when you're ready.

17              MR. ADAMS:  Ms. Lockhart, I don't need it

18  on right now.  As soon as I want it on, I'll ask you to

19  do that.

20              COURTROOM DEPUTY:  Okay.

21              MR. ADAMS:  Thank you very much.

22              MR. RAMBIN:  And also, Your Honor, for

23  the record, the binder for this witness was the binder

24  that was inadvertently distributed.

25              THE COURT:  So it's already been

```
 1  distributed.  Thank you.

 2                 Let's proceed.

 3   KEVIN ALMEROTH, Ph.D., DEFENDANT'S WITNESS, PREVIOUSLY

 4                        SWORN

 5                   DIRECT EXAMINATION

 6  BY MR. ADAMS:

 7      Q.   Dr. Almeroth, good afternoon.

 8      A.   I don't have that binder.

 9      Q.   It's a black binder.  It should be --

10               THE COURT:  Well, let's wait just a

11  minute.  I'm sure the trusty paralegal has a duplicate

12  somewhere.

13               All right.  Now let's proceed.

14      Q.   (By Mr. Adams) Good afternoon, Dr. Almeroth.

15      A.   Good afternoon.

16      Q.   Can you tell us why you are here today?

17      A.   I'm here today on behalf of Beneficial

18  Innovations, and I'm here to provide a rebuttal opinion

19  with respect to the testimony and the report offered by

20  Dr. Alexander.

21      Q.   Before we get to the opinions that you've

22  offered in this case, can you tell us a little bit about

23  yourself?  What do you do for a living?

24      A.   I am a professor in the department of computer

25  science at the University of California in Santa
```

1 Barbara.

2     Q.   How long have you been a professor?

3     A.   A little more than 16 years, about 16 and a

4 half years at UCSB.

5     Q.   Tell us a little bit about your educational

6 background.

7     A.   Certainly.  I spent nine years at Georgia Tech

8 in Atlanta.  I earned an undergraduate degree, a

9 bachelor's of science in computer science in 1992 and

10 then a master's of computer science in 1994 with a

11 specialization in networking and multimedia systems.

12       And then in 1997, I earned a Ph.D. in computer

13 science also from Georgia Tech, and it was right after I

14 finished my Ph.D. that I started at UCSB.

15     Q.   And, Dr. Almeroth, are there any aspects of

16 your education or your professional experience that you

17 think are particularly relevant to the opinions that you

18 intend to offer in this case?

19     A.   Yes, sir.

20     Q.   Can you share a few of those with us?

21     A.   Certainly.  What I do at the university --

22 sometimes there's some confusion over what faculty do,

23 but it really boils down to three groups of things.  The

24 first is teaching.  The second is running a research

25 lab.  And then the third is with respect to service.

I teach at UCSB.  I do about the same amount of teaching today that I do -- or that I did when I first started. I teach undergraduate networking courses; I teach graduate networking courses.  In those courses, we usually talk about the protocols used in the Internet.

You've heard HTTP.  We talk about cookies and HTTP get messages and web servers, web clients, all forms of -- of how communications in the Internet take place.

With respect to research, I run a research lab called the networking and multimedia systems lab.  And to a certain extent, it's -- it's a small business.  I have to bring in funding for my students.  I mentor those students, and those students can be Ph.D. students themselves.  For example, I've had students graduate and go on to become faculty or to join startups or to join industrial research labs.  I have master students; I have undergraduate students that mentor.

And this is really to give one-on-one individual training, sort of an apprenticeship to training them to do the kinds of research that we do in the lab.  I have to run it like a small business.  I consider these people to be my employees.  I give them jobs.  We work together to figure out what we want to do.

1          And largely, I produce educated students and

2   also a series of publications.  Some of the work that

3   we've been doing in the networking and multimedia

4   systems lab is -- is in the same general area as the

5   patents-in-suit here.  So, for example, in the early

6   '90s, about 1994, one of the projects that I worked on

7   as a Ph.D. student was something similar to -- to what's

8   being called TiVo today.

9          And the idea was, we understood that the

10  Internet was going to evolve and be able to do things

11  like video services, and we wanted to see how we could

12  get those services into the home.  And so I did research

13  and published papers and offered ideas on how to make

14  that happen.

15         And really, the general theme of the lab is

16  this idea of we want to continue to evolve the -- the

17  network, the Internet, and give it special capability to

18  do things like deliver audio and video and -- and

19  webpages.  And if you consider that the Internet was --

20  was in its infancy basically in the '70s and '80s and it

21  really took off with the development of the web and you

22  look at where it exists now where you can have a mobile

23  device and you can be on the Internet, it really has

24  blossomed in terms of its functionality.

25         At the same time, our lab in my research looks

at how to build applications on top of the Internet,
things like how to do Voice over Internet Protocol, how
to make telephone calls over the Internet, how to have
mobile devices that can go to webpages or that can share
information.

One project that we did, for example, was you
have a cell phone and if you drive by Wendy's, for
example, it might pop up an advertisement and say, hey,
come by for lunch; I've got -- there's a coupon for 50
cents off a cheeseburger.

Well, one of the things we envisioned is
everyone starts to share this kind of information using
HTTP gets cookies and some of the technologies that
you've heard about.

One of the things that you can do is you can
go to the office and your friend has a cell phone and
that person can get the coupon from you, and then you
can take that coupon and go to Wendy's and Wendy's says,
oh, you got this coupon from your friend; I should give
them a little bit of credit for -- for relaying the
coupon to you.

So it's this idea that you can use the
Internet for -- for collaboration, interaction, and
applications beyond just sort of simple sharing of
webpages.  So I've really been doing research in the lab

1  for about the last 16 and a half years.

2         On the service side, most of this is fairly

3  boring kind of stuff, serving on university committees

4  or journal publication boards or things like that.  But

5  one of the things that I've done over the course of my

6  career is I have appointments in other departments.

7         So, for example, the technology and management

8  program that looks at how technology is developed and

9  how it can be incubated into real products that

10  advantage people in their everyday lives.

11         Another thing that I've done is to be the

12  associate dean for the college of engineering, to; look

13  at things like the college's website, how we try and

14  recruit students.  Once we recruit students, how do we

15  retain them.  And then once they graduate, how we can

16  keep them interested in being part of the university.

17         So those are some of the things that I've done

18  in the last 16 and a half years as a professor.

19    Q.   And over the years as -- you worked as a

20  professor, have you also consulted with companies and

21  offered your expertise as an expert in areas that are

22  relevant to this case?

23    A.   Certainly.  I've -- I've done internships at

24  companies at IBM Research, for example.  I've been on

25  the boards of advisors for startups and technology areas

1    related to this, how to efficiently get video and

2    content across the Internet.  I was even on the board of

3    directors for a small company at one point in time.

4            And so I -- I continue to have this

5    interaction with industry.  I mean, one of the measures

6    that I use as success for me as -- as a professor is not

7    just publishing papers and graduating students.

8    Certainly those things are important.

9            But the watchword is impact, that with my

10   research, to be able to do things in the community that

11   have a really tangible impact, that companies see what I

12   do and are interested in following up both with me and

13   then also hiring my students as well.

14       Q.   Have you had the opportunity to act as an

15   expert witness in the patent infringement case?

16       A.   Yes, I have.

17       Q.   Have you testified in federal court as an

18   expert witness in patent infringement cases?

19       A.   Yes, I have.

20       Q.   Have you ever testified in a federal court

21   here in the Eastern District of Texas?

22       A.   Yes, I have.

23       Q.   How many times?

24       A.   In the Eastern District, I believe I've

25   testified a couple of times.  One was to do with

1  tutorial for a court, and another instance was actually

2  in Beaumont I testified in -- in a case.

3      Q.   How many times do you think over the years

4  that you've testified or qualified as an expert in a

5  case on patent infringement matters?

6      A.   I would say about a half a dozen times.

7              MR. ADAMS:  Ms. Lockhart.

8  Thank you.

9      Q.   (By Mr. Adams) Dr. Almeroth, I've put on the

10 board a slide that has a topic that says Task, and then

11 there are two bullet points there.  The first is

12 determine whether DoubleClick has substantial

13 non-infringing uses.

14          Do you see that?

15     A.   I do.

16     Q.   Now, in this case, did you form an opinion

17 regarding this topic?

18     A.   Yes, I did.

19     Q.   Was your opinion reduced to a written report?

20     A.   It -- yes, that's correct.

21     Q.   Now, in your written report, were your

22 opinions solely related to this, or did you offer other

23 opinions in the case?

24     A.   I did offer other opinions.  As I said, one of

25 the -- the things I was asked to do was to review the

1   opinions that Dr. Alexander had offered and to provide

2   rebuttal opinions.  And so I covered the gamut as to

3   what the things he said in his report.  And really, that

4   first report is only one aspect of what I've done.

5        Q.   In forming your opinions regarding the first

6   topic, did you review the patents that are in this case?

7        A.   Yes, I did.

8        Q.   And -- and why did you do that?

9        A.   It's -- it's part of the exercise of what I

10  need to do to understand what's required by the patent.

11  You've heard some of the description of the patent.  As

12  I understand, there's a juror notebook, and you have it

13  there.  I've -- I've got the patent in front of me.

14  I think you've seen testimony where you've walked

15  through the front page, and then there's the

16  specification, and -- and then what you see here on the

17  screen is one of the claims from the '702 patent.  This

18  is Claim 53.  And it -- it lays out some limitations as

19  to a particular claimed aspect of the invention, things

20  that have to be done to -- to meet this particular

21  limitation and to practice this claimed invention of the

22  patent.

23       Q.   Now, in the case -- in this case, we've heard

24  about the '702 patent and we've also heard about the

25  '943 patent.

1        In your discussions today, do you intend to

2   discuss the -- the '943 patent?

3        A.   If you ask me questions, I'm certainly

4   prepared to do so.  But I'll primarily focus on the '702

5   patent.

6        Q.   Now, do you have an understanding as to

7   whether or not the '943 patent at some point had been

8   dismissed from the litigation?

9        A.   That's correct.  I understand it was dismissed

10  because the -- the parties that it had been asserted

11  against had settled.

12       Q.   Did you have any understanding as to whether

13  or not that dismissal came before or after claim

14  construction?

15       A.   I understand that that dismissal came after

16  the Court had issued its ruling on claim construction

17  for the '943 patent.

18       Q.   Now, when we look at Claim 53, on the board,

19  there are some green boxes.  It starts with the letters

20  P-R-E, and then they are enumerated A through I.

21            Do you see that?

22       A.   I do.

23       Q.   Can you explain to the jury what the P-R-E

24  stands for and then what each of the letters in green

25  stand for?

1      A.    Certainly.   The P-R-E stands for the preamble.

2   It's the first part of the claim.   And then the

3   divisions, the -- the -- I think they're blue lines --

4   delineate limitations of the claim.   And there's a lot

5   of words here on the page.   I'll try and go through some

6   of them so that you understand what the claim is really

7   requiring.

8          But the idea of understanding what the claim

9   requires is -- it's often helpful to go through and

10  divide them up by the limitations, to -- and the

11  limitations really set forth different requirements for

12  what in this case the -- the apparatus must be able to

13  do.

14     Q.    In forming your opinions regarding whether or

15  not DoubleClick had substantial non-infringing uses, did

16  you have to understand each of the limitations that are

17  contained in Claim 53?

18     A.    That's correct.   And each of the limitations

19  are important.   As -- as the questions earlier alluded

20  to, I have done infringement reports and -- and it's

21  common practice when you do an infringement analysis,

22  you look at each of the limitations.   You consider the

23  Court's constructions, and you determine if each of

24  those limitations are met.

25          In fact, it's -- it's a requirement for

infringement that every single one of the limitations

must be present in the system.  If there's even one

limitation that's not present, then there's no

infringement of that claim.  So that means the -- the

claim, the words of the claim, the limitations of the

claim are -- are really very important.

Q.   And -- and as you say that, Dr. Almeroth, and

you talk about the words of the claim, you also mention

the concept of claim construction, right?

A.   That's correct.

Q.   And in your binder and in the binders that the

jury has, there are a couple of charts that includes the

Court's constructions.

Do you have that in front of you, sir?

A.   I do.  There's -- there's one page for the

'702 claim constructions, and there's another page for

the '943 claim construction.

Q.   And when you talk about the -- that the

product or the device has to meet the words of the --

the patent, is it the case that you just look to the

words of the patent or -- withdrawn.

Let me ask this question:  How does the

Court's claim construction play into the requirement

that you have to match the words of the patent to the

infringing device?

1    A.   Certainly.  In -- in some cases, there are

2  words that are used in the claim that -- that need

3  definition, and usually you look through and -- and

4  analyze a claim from -- from a person of ordinary skill

5  in the art at the time of the invention, somebody

6  who's -- who's not an expert, who has a Ph.D.

7  necessarily, but somebody who's of ordinary skill, who

8  could read the specification and understand it,

9  understand what was being claimed, and then follow along

10  and try and implement the -- the claim, for example, if

11  they had a license.

12         So part of what the -- the Court does is it

13  gives instructions on what some of those particular

14  terms mean, and that's used as a guide by -- by me, by

15  experts, to understand whether or not a particular

16  accused system meets a particular limitation.

17    Q.   For determining the issue that you are opining

18  about today, which is whether or not DoubleClick has

19  substantial non-infringing uses, did you look to the

20  infringement contentions or the allegations that were

21  made in the complaint in rendering your opinion?

22    A.   No, I didn't.  I didn't have to look at the

23  infringement contentions.  What -- what I really focused

24  on was what DoubleClick was doing, and then as it

25  relates to some of these limitations.

1        Q.    And you mean some of the limitations as

2   they've been construed by the Court, correct?

3        A.    That's correct.

4        Q.    All right.  Let's walk through these

5   limitations, and let's start with the preamble.

6              Can you tell us what's described,

7   Dr. Almeroth, on the board?

8        A.    Sure.  I -- I've been in the courtroom for the

9   testimony so far, and -- and I don't think anyone has

10  really walked through the words of the claim to give the

11  jury a sense of what the claim is actually requiring.

12             So what I want to try and do is -- there's --

13  there's a lot of words here.  If I were to do an

14  analysis, it's a complex analysis, and I'd have to sit

15  down with the evidence and do that analysis.  But what I

16  really want to do, by walking through this claim at this

17  point, is to give you some -- some high-level sense,

18  some -- as non-technical as I can make it, understanding

19  of what -- what the claims really require.

20             So this first claim shows the preamble.

21  There's -- there's a small number of words, so it should

22  be a little bit easier to dissect.  But it's asking

23  about an apparatus for a service.  It's claiming an

24  apparatus for a service on a communications network.  So

25  typically, this might be, for example, a website and it

includes the web servers and the other machines that are
typically required to make that service happen.

And what you'll see is, the term service is
highlighted, and you'll see in the upper right where it
provides the Court's definition of what a service is.  A
service could mean lots of different things, even in the
context of the patent.

So the Court has -- has understood it to mean
a beneficial activity provided to a user.  So I used
that Court's construction to understand whether or not a
website is providing a beneficial activity provided to a
user.  In these slides, not all the Court's
constructions are shown, but certainly it's the case
that when I do an analysis that I go through and
consider all of the Court's constructions as -- as
they're described there.

At the end of the day, what this is really
trying to describe at a high level is a website, and it
provides some sort of access to videos or articles or
shopping or some kind of beneficial activity provided to
a user.

Q.   The next claim or limitation is Limitation
(a), and on the board, it just says store user
information.  Tell us why you short-circuited it to say
that.

1    A.   All right.  This -- this is a good example.

2  As we get into some of these longer limitations, if --

3  if you see -- I've got the patent in front of me, and

4  you can sort of follow along.

5         But the full language is:  A store for storing

6  user identification for first and second users said

7  store accessible by a service-providing

8  network-accessible node, S-P-N-A-N.  It's a

9  pronounceable acronym sometimes a SPNAN.

10        A lot of words there.  What it's really saying

11 is, there has to be a store for storing user

12 information.  At a high level, one of the limitations

13 that's required is a store for storing user information.

14 And that's really a summary of what that first

15 limitation is.

16    Q.   Now, it's not on the board, but do you have a

17 -- a recollection as to whether or not the limitation is

18 a store for storing user identification was construed by

19 the Court?

20    A.   I believe part of it was.

21    Q.   And can you tell us what that construction

22 was?

23    A.   Certainly.  In my binder, which is a summary

24 of the Court's construction, it says:  A medium that

25 stores data used to identify a user.  So that provides

some additional guidance on how that limitation is to be
understood.

    Q.   Now, on the -- on the slide, you have an
image.  Can you tell us why you put that image there?

    A.   Sure.  One -- one example of a way to have a
store for storing user identification where it stores
the identity of a user is -- is really simply just to
have a registration for a webpage.

        There are some webpages that have
registration.  You can input an email address or a
member ID or -- or something that identifies the user.
And then that information would be stored.

        And then also by extension, by this SPNAN,
which is it's a service-providing network-accessible
node.  So it provides service and it's accessible on the
network.  So even though it has this long acronym
definition, again, it's really referring to this kind of
website.

    Q.   Let's go to the next slide.  The next slide
has -- I don't know if the jury can see it, but it's
Limitation (b)-(e) and then (i).

    A.   That's correct.  And -- and it might be
helpful -- could you go back to the slide that just had
all of the claim language on it?

    Q.   Sure.

1      A.    It looks like it's No. 3.

2           Right.  So this is (b) through (e) and then

3  (i).  So this is covering one, two, three, four, five

4  limitations.  And so with this up on the screen, I can

5  sort of walk through the claim and some of the language

6  and what it requires.

7           So in order to infringe this claim, that

8  Element (b) says you need a network interface for

9  transmitting first information related to communication

10 between the SPNAN.  SPNAN, and a first

11 network-accessible node.  So, again, that's really

12 saying that you need a network interface for

13 communication between a user, a first network-accessible

14 node and the website.  So that's sort of what Limitation

15 (b) covers.

16          Then Limitation (c) is:  Wherein said first

17 information is utilized in subsequent network

18 communication between the SPNAN and the first

19 network-accessible node.  So in that instance, it says

20 if the user goes back to the website or communicates

21 with the website again, that that information is

22 utilized in a second subsequent network communication.

23          The next one says:  Wherein said network

24 interface receives via the network first responsive

25 network information -- sorry -- first responsive

information indicative of said first information being

present on first said network-accessible node.

So just listening to me speak, I presume

everybody in the courtroom is completely lost.  It's --

it's the kind of thing where you have to look at the

words and understand what each piece could be and then

do that kind of analysis.

Q.   Now, Dr. Almeroth, because I think your slides

will show, let's -- let's walk through visually sort of

your understanding as to how these claim limitations fit

together, okay?

A.   Sure.

Q.   So what I've put on the board, can you explain

to us what we have on the board here?

A.   Sure.  At the high level, you have the user,

the first network-accessible node, and you have the

website, which is the SPNAN.  And you've heard the

concept of a cookie, but now I'm trying to tie that with

the actual language of the claim as an example of what

it's talking about.

And it's saying first information is provided

from the website to the user.

Q.   So I just clicked and that yellow piece of

paper that has cookie on it went from the right to the

left?

1        A.    It went from the website to the computer.

2        Q.    And what is that intended to depict?

3        A.    It depicts that when the user communicates

4   with the website, one of the things that the website

5   does is it returns a cookie.  And you've heard a little

6   bit of an example of -- of what cookies are.  It's

7   really just pieces of information, and they can take on

8   many different forms.  They're highly variable.

9            I'm not always a big fan of analogies, but let

10  me try this one.  A cookie could be something like a

11  Social Security number where you go to the government;

12  you have a baby that's born; and the government gives

13  you the Social Security number.  You don't get to pick

14  it.  They tell you what the Social Security number is,

15  and then you get it.

16           And the next time you go back to the website,

17  some government service, you give them your Social

18  Security number.

19       Q.    And so what we'll do is I'll click the slide,

20  and we've got the cookie going from the user back to the

21  website, correct?

22       A.    That's correct.

23       Q.    Is this something that's required by the

24  claim?

25       A.    And that is required by the claim.  On the

1  subsequent network communication, the responsive

2  information is provided back to the SPNAN.  Now, the

3  flexibility of cookies allows you to associate

4  information with that cookie or not.  It's, you know,

5  whether you do or not.

6          In some instances, there's maybe a name

7  associated with the cookie.  So back to the Social

8  Security number example.  I had a baby who was born.  We

9  had -- you know, we named her, details of where she was

10  born.  All of that went into the registration

11  information that's associated with her Social Security

12  number.

13          In other instances, the cookie could just be a

14  random string of characters that doesn't have much

15  meaning.  And if the user didn't register at the

16  beginning, then that cookie isn't associated with any

17  information that identifies the user.  Remember, the

18  Court's construction from an earlier limitation that

19  required identifying the user.

20          But at least in this instance, this slide now

21  shows that if I send the cookie back to the website, if

22  the web server has understood that cookie to be

23  associated with me and I've registered and provided some

24  information, then when I go back to that website and I

25  provide that cookie back to the website, the website can

1   display on here, oh, hi, Kevin.  I see that you've come

2   back.  That's because I gave you the cookie, associated

3   Kevin with the cookie, sent it to you, and when you came

4   back to the website, I sent the cookie back.  And now it

5   knows it was me.

6       Q.   And on this slide, Dr. Almeroth, there's a --

7   a red circle around here.  Can you -- can you tell us

8   what that circle is for?

9       A.   Sure.  That that's an example that you -- when

10  you go back to a website it says, oh, you know, hello.

11      Q.   Whoever?

12      A.   Whatever the name is.  And how does it know

13  that?  Well, because of this underlying cookie process

14  that happens between the browser and the server.

15      Q.   So as part of the limitation of Claim 53, is

16  it the case that there has to be a -- a -- an

17  information that's transferred from the user's node back

18  to the website that allows the website to identify the

19  user?

20      A.   That's correct.  If -- if you walk through

21  those Limitations (b) through (e), all of what's

22  required is this cookie being established, sent to the

23  user, and then when the user sends -- connects to that

24  website, then that cookie information is sent back.

25      Q.   All right.  I just went back a slide and you

1  wrote on the slide:  Provide access to service and

2  identify the user.

3          Do you see that?

4      A.   That's correct.

5      Q.   Why did you write the words provide access to

6  service there?

7      A.   There's another limitation in (e) which says:

8  Wherein said first responsive information is used for

9  one or more of -- and then the first option is:

10  Providing the first user with access to a service

11  offered by the SPNAN or the website.

12          So here are words.  They're part of the claim.

13  It's a requirement.  What has to happen is, based on

14  that information, the user is provided access to a

15  service.

16      Q.   To move forward, there's a Limitation (h) that

17  we put on the board, and there's -- there are words

18  here:  Has computer-readable instructions for combining

19  advertising-related information with service-related

20  information.

21          And then the second bullet point:  Transmit

22  combined data to user for concurrent display of service

23  of ad.

24          Do you see that?

25      A.   That's correct.

1    Q.   Can you explain how those words sort of relate

2  to the claim limitation page?

3    A.   Sure.  This one, let me go through a little

4  bit more quickly.  This one really has been the focus of

5  various parts of the testimony earlier today and then

6  also yesterday.

7         In fact, one of the -- the key points here is,

8  there's a lot of other limitations here that you have to

9  consider.  But at least with respect to (h), you have to

10 have this combination of service information and

11 advertising-related information.  And it's that

12 combination that gets sent back to the user.

13        So there's an animation here that that --

14 Mr. Adams, if you click on, will show the

15 service-related information and the advertising-related

16 information.

17   Q.   Now, before we click further, we've got

18 advertising-related information here.  There's been a

19 lot of talk about ad tags.

20        In looking at the claim and looking at the

21 construction, was there any -- either part of the claim

22 or any part of the Court's construction that identified

23 the specification type of advertising-related

24 information that would be necessary to meet this claim?

25   A.   I don't believe so.  Let's see.  Right.

 1    There's an advertising presentation, but I don't believe

 2    there's one for advertising-related information.

 3        Q.    Take a look at the -- do you have the claim

 4    chart?

 5        A.    Oh, wait.  I'm sorry.  Second from the bottom.

 6    Right.  It says:  Data that is processed into the

 7    advertising presentations.

 8        Q.    All right.  Does that suggest to you, one of

 9    ordinary skill in the art, that it has to be a

10    particular type of data?

11        A.    No.  And, in fact, anything in a system that

12    would meet this limitation, an ad tag or something else,

13    some kind of specific description, the advertising

14    information, as long as it met the Court's construction

15    for advertising information, then it would at least meet

16    that part of the limitation, and then you progress from

17    there to all of the words that are in the limitation.

18        Q.    So now if I click on the slide, something's

19    happened, right?

20        A.    That's right.  There's -- there's combined

21    data, and you'll see in the first bullet point here

22    is -- it has computer-readable instructions for

23    combining those two things.

24            And so that combination of things has to --

25    has to happen, and there's a construction that's related

1  to this.  The Court has said that programmatic elements

2  means computer-readable instructions to perform a

3  specific function.  And that specific function is

4  combining that data.

5          And then the last part of the limitation is

6  that this combined data then has to go to the user's

7  computer, the first network accessible node.

8      Q.   And that's what's been depicted as we move the

9  data from the website over to the user's computer?

10     A.   That's what the animation shows.

11     Q.   Tell us what the next line tells us and how it

12 relates to Limitation (h)?

13     A.   Sure.  Part of Limitation (h) is that these

14 advertising and service-related information are

15 displayed concurrently.  And let me find the specific

16 information.

17         That the combined data is processed by the

18 first network accessible node -- that's the user's

19 computer -- so that as a consequence of such processing,

20 a display of advertising presentation corresponding to

21 said advertising information is provided on said first

22 network accessible node, said display occurring

23 concurrently with a display of one of the corresponding

24 service representations of the instance of the first

25 service.

1          In other words, you have to have the -- the

2  advertising and the service displayed concurrently.

3      Q.   Is your understanding, then, that in order for

4  there to be infringement and therefore issues of whether

5  or not there's substantial non-infringing uses, one has

6  to take a look at the claim as a whole and understand

7  all of the limitations of that claim?

8      A.   That's correct.  Understand all the

9  limitations, each and every limitation, the words of

10 each limitation, the Court's claim construction.  All of

11 those things have to be considered.

12         And -- and it's obviously not something

13 somebody just sort of sits down in an hour and whips

14 out.  It's a long process that requires some significant

15 work.

16     Q.   All right.  Dr. Almeroth, in this case,

17 there's an issue with respect to whether or not Google's

18 providing DoubleClick to its users constitutes indirect

19 infringement.  And the issues that have been raised in

20 the case have to do with whether or not it's

21 contributory or inducement.

22         Are you offering any opinions on the second

23 prong today of whether or not there is any evidence of

24 inducement?

25     A.   Not as part of my testimony right now.

```
 1        Q.    And why not?

 2        A.    I don't think I need to.  I think it's -- it's

 3   pretty clear from the testimony that -- that -- that has

 4   already been presented in the Court that there is no

 5   inducement.

 6        Q.    Well, did you hear any testimony from

 7   Dr. Alexander, who you are here to respond to, in which

 8   he offered an opinion that there was any inducement?

 9        A.    I did hear what he said, and he was very clear

10   that he was not offering opinions with respect to

11   inducement.

12        Q.    And because of that, you're not offering a

13   rebuttal opinion, correct?

14        A.    That's correct.  I am -- my focus here is

15   offering a rebuttal opinion to what he says.  And

16   typically, my charge is limited to those aspects of --

17   of what he said.

18        Q.    Now, with respect to contributory

19   infringement, Dr. Almeroth, in the case, the jury's

20   heard several things that need to be shown.

21             One is whether or not there is direct

22   infringement by a customer.  Another one is whether or

23   not there is suitable non-infringing uses.  Another one

24   is whether or not DoubleClick constitutes a material

25   part of the invention.
```

1          I've placed on the board only one of those

2    elements.  Can you tell us why that's the only one

3    that's there?

4          A.   Certainly.  It's -- it's the one where, at

5    least in some instances, Dr. Alexander has tried to

6    offer opinions about whether or not DoubleClick is

7    suitable for substantial non-infringing uses.

8          I mean, at least some of his testimony was

9    about, if you turned off cookies and how often that

10   happened based on a survey and that sort of thing.  So I

11   have opinions to offer and to rebut the kinds of things

12   that -- that he said earlier today.

13         Q.   In your report, did you offer opinions as to

14   substantial -- well, withdrawn.

15         Generally, tell us what you understand it to

16   be the case when you're talking about whether or not

17   DoubleClick is not suitable for substantial

18   non-infringing uses.

19         A.   Sure.  And -- and really the -- the -- the

20   test that -- that I was asked to use was whether or not

21   the use of the way that -- one of the uses of the ways

22   that DoubleClick can be used, whether it's not unusual,

23   whether it's not occasional, or whether it's not

24   experimental, whether it's the kind of use that -- that

25   might normally happen with a particular -- in this case,

1   DoubleClick.

2       Q.    In your opinions in your report, Dr. Almeroth,

3   did you identify any uses of DoubleClick that you

4   considered to be non-infringing uses because they were

5   not unusual, not occasional, not experimental?

6       A.    That's correct.  I've -- I've identified three

7   of them.

8       Q.    And what are those three?

9       A.    Well, the first has to do with whether or not

10  users can turn off cookies and then DoubleClick be able

11  to still serve ads.  And based on the other requirements

12  of the claim, there are elements of the claim that are

13  not met if a user turns off cookies.  So that's one.

14          Another one that's independent, if -- if what

15  I'm about to say users do, it's not unusual, occasional,

16  or experimental, that would be a separate independent

17  reason why the use of DoubleClick has substantial

18  non-infringing uses.

19          And that's that a website doesn't have any

20  registration or that -- that a user uses a website with

21  registration but then just doesn't register.

22          If there's no registration or the user doesn't

23  register and there's no identifying information for the

24  user, as required by the Court's construction, then you

25  don't meet all the limitations of the claim.

1          So that would be an instance where somebody

2    using DoubleClick wouldn't infringe because there

3    weren't substantial non-infringing uses.

4          And then there's a third reason, which is the

5    requirement to show the advertising and the service

6    information concurrently.  If there are instances where

7    DoubleClick can be used where that's not the case, and

8    those uses are not unusual or occasional or

9    experimental, that would be another independent third

10   reason why DoubleClick has substantial non-infringing

11   uses.

12         And so I think there are slides on each of

13   these three points to demonstrate some of the -- the

14   research and analysis that I did to make the

15   determination for each of those three points.

16   Q.    So let's move to the first.

17         In the first slide, tell us what's depicted

18   here.

19   A.    All right.  So what's depicted is there's a

20   bullet at the top that says -- the first one is:  Users

21   who have disabled cookies.

22         If there are instances where DoubleClick can

23   be used and users have disabled cookies, then there's at

24   least a portion of the use of DoubleClick that doesn't

25   infringe, and it's substantial.  It's a substantial

1  non-infringing use for users who have turned off cookies

2  to be able to go to a website and to be able to be

3  served ads from DoubleClick.

4      Q.   Now, in doing analysis and doing testing to

5  support your opinion as to whether or not there were

6  users who have disabled cookies?

7      A.   Yes.  Yes, I have.  Remember -- I'm going to

8  describe some of the testing that I did.  And I think

9  Dr. Alexander used the term forensic analysis, and I've

10  done some of that.

11          I think also I've been in the courtroom and

12  heard the testimony of the other witnesses, and I think

13  that they've pretty much admitted that what I'm showing

14  here is something that you can do with DoubleClick.

15          So this slide shows some testing that I did,

16  and I acted as the user, and I disabled cookies on my

17  machine, and then I tested to see what the result was.

18  What I was curious to see is whether or not, even if I

19  disabled cookies, and there was no way for DoubleClick

20  to identify me or the website to identify me, I would

21  still be served a DoubleClick ad.  That means

22  DoubleClick would be used for non-infringing uses, so --

23      Q.   On the left side, tell us what's depicted on

24  this slide.

25      A.   Sure.  The left side is a menu from the

1   Firefox web browser, and there's an option embedded here

2   that allows me to turn off the cookies.

3          And you'll see -- it's pretty hard to see, but

4   on the right side, there's something called exceptions

5   about halfway down the window.

6          If you move over to the left, there's a check

7   box next to the words:  Accept cookies from sites.  And

8   this shows that I unchecked that.  So I don't expect

9   cookies from websites.

10          The second piece, the screen on the right

11   is -- it shows all of the cookies that I'm currently

12   storing.  And to perform this experiment, I went through

13   and I deleted all the cookies that I currently had.

14          So it looks like a new computer with a new

15   browser that was going to the website for the very first

16   time, and I had configured it so it would not accept

17   cookies.

18     Q.   After you did that, tell us what -- what

19   happened.

20     A.   Next thing I did, I -- I told my browser to go

21   to Expedia.com.  And what you see here is, is

22   service-related information.  It's how to book a flight.

23   And then you also see advertisements on here as well for

24   Korea Airlines, for Groupon.  I think there's another

25   advertisement to the right of that.  So DoubleClick

1  provided advertisements to me.

2      Q.   Now, how did you determine that these ads came

3  from DoubleClick?

4      A.   Exactly.  So I had to do the next step, which

5  is to look at the source code for the page.  And I think

6  you've heard a little bit about the source code, the

7  HTML code, and within it is embedded an ad tag.

8          Well, what you can see here is there is an ad

9  tag.  And, Mr. Adams, if you could point to -- there's a

10 green block and a large blue block and then right below

11 that, there's another blue block.

12     Q.   This is the second blue block you're talking

13 about?

14     A.   That's right.

15         And the second line right there, it says

16 http://ad.doubleclick.net, and it provides some

17 identification information, and then there's some --

18 some other variables that get sent to DoubleClick when

19 this ad and this URL is fetched, retrieved, and

20 displayed on my web screen.

21         There's one final piece to the analysis here,

22 which is just --

23     Q.   Yes.  Tell us what's on this next slide.

24     A.   Sure.  This last piece is to go back to my

25 browser and to show the cookies that were stored on my

1  computer.  And because I had it configured not to accept

2  cookies, there were no cookies that were provided by

3  DoubleClick, by Expedia.  There were no cookies.

4      Q.  So now we have a slide, and the slide says:

5  DoubleClick is used to serve ads to users who have

6  disabled cookies.

7          Do you see that?

8      A.  I do.

9      Q.  Why did you put that there?

10     A.  It's exactly what the point on the slide says.

11  DoubleClick is used to serve ads to users who have

12  disabled cookies.

13         If that's the case, then not all the

14  limitations of Claim 53 are met.  Because of that, it's

15  a non-infringing use of the DoubleClick product, and

16  it's a substantial non-infringing use of the product.

17     Q.  And by that, you mean it's not unusual or not

18  experimental or occasional, right?

19     A.  Users disable cookies frequently.

20     Q.  Next slide, it has your opinion at the top.

21  Is that your opinion?

22     A.  That's correct.

23     Q.  And the next is Dr. Alexander does not

24  dispute.  Why do you have that there?

25     A.  And that's because really, if you look back to

1  Dr. Alexander's testimony, he's not offering opinions

2  about infringement and all of the limitations that he

3  said he was -- he was told to assume that what was in

4  the infringement contentions was correct, but he didn't

5  do any independent analysis, and he was very clear in

6  questions from Mr. Rosen that he was not offering

7  opinions with respect to contributory infringement and

8  whether or not there were non-infringing uses for

9  DoubleClick.

10      Q.   So we move to the next slide.  Can you tell us

11  what you've placed on this slide, sir.

12      A.   Sure.  This is -- this is the second point.

13  This is the no store for storing user information.  And

14  what I'm referring to here is this concept of

15  registration.

16          If you've got a website that has no

17  registration, then, clearly, it's an example of where

18  they're not storing user information.  But there's no

19  way for that website to know about its users through the

20  process that's described and required in the claim.

21  Or if a user goes to a website and chooses not to

22  register and chooses not to provide that information,

23  and in those instances, DoubleClick still provides

24  advertisements, that's another substantial way in which

25  DoubleClick can be used that doesn't meet all the

1  limitations of, for example, Claim 53 of the '702

2  patent.

3      Q.   Did you do testing the way you did it for the

4  other non-infringing use?

5      A.   That's correct.

6           So there's a website, MomsWhoThink.  We've got

7  a newborn occasionally that we look at these kinds of

8  websites.  Here's a website.  I've looked through the

9  whole series of web pages.  There's no place within

10 MomsWhoThink where a user can register, provide any

11 identifying information about that user, and yet there's

12 still an ad here.

13          The 249-dollar laptop from Google is an

14 advertisement on the right side.  The question next is:

15 Is this an ad that comes from DoubleClick?

16     Q.   And did you do any testing to make that

17 determination?

18     A.   Absolutely.  Looked at the source code of the

19 web page again, and in this instance, it's about five

20 lines down from the top, and it's toward the end of the

21 line and it starts with that same

22 http://ad.doubleclick.net.

23          It provides what Mr. Bellack was describing as

24 some of the variables that are required for a

25 DoubleClick ad tag on the next line.  And certainly,

1  the -- the Google 249-dollar laptop is an ad served by

2  DoubleClick, despite the fact that there's no

3  registration information on this web page.

4      Q.   Now, in your report, did you provide any

5  opinions or facts with respect to the percentage of time

6  that users either disable cookies or the times in which

7  a user who goes to a website that actually has a

8  registration uses the website but didn't register and

9  still gets an ad from DoubleClick?

10     A.   Yes, I did.  There's a variety of documents

11 that have been produced.  I've -- I've reviewed many --

12 or most of them or at least all the ones that are

13 relevant to my analysis.

14          And some of them include statistics about how

15 often a user who comes to a web page uses the -- the web

16 page and looks at the information on the web page, but

17 even if there's registration, an option to register,

18 doesn't register.

19     Q.   Is it your opinion, then, that DoubleClick is

20 suitable for a substantial non-infringing use because it

21 can be used on websites that either have a -- have no

22 store for storing user information, or it can be

23 served -- the ads can be served to users who go to such

24 a website with a store but don't register?

25     A.   Yes, that's correct.

1          And -- and this slide summarizes those points.

2    Each instance where DoubleClick is used to serve ads for

3    websites that do not have a store for storing user

4    information, where there's no registration is a

5    non-infringing use.

6          And each instance where DoubleClick is used to

7    serve ads on a user that has not provided user

8    information is a non-infringing use as well.

9    Q.    With respect to these two instances, would

10   this be experimental or unusual or occasional with

11   respect to DoubleClick's service?

12   A.    Absolutely not.  It's not experimental.  It's

13   the way many people use the Internet.  They will go to a

14   website, not register.

15         MomsWhoThink is not an experimental website.

16   There were sites like this, informational sites that

17   don't require registration and just allow a user to

18   access information.

19   Q.    Now, you have a -- a bullet point here that

20   says:  Dr. Alexander does not dispute.  What does that

21   refer to?

22   A.    Now, again, listening to the testimony from

23   Dr. Alexander, which was consistent with the report that

24   he had submitted earlier and that I looked at and was

25   providing rebuttal opinions to, he -- he did not dispute

1  these aspects that I have concluded.

2      Q.    And lastly, we're to deal with the issue that

3  you talked about, which is an instance where you can

4  serve an ad that's a pop-up or pop-under ad?

5      A.    That's correct.  And -- and included in this

6  group of pop-up or pop-under ads, or what were referred

7  to earlier as interstitial ads.  Those are basically ads

8  in time where the ads were displayed, but there's no

9  service-related information.  And then the ad is taken

10  down and the information is displayed.  It's almost like

11  a commercial on TV.

12        Now, we start to see commercials being

13  superimposed on the TV, but -- I don't know -- in the

14  old days, five or ten years ago, the only time you saw a

15  commercial was before the program started or halfway

16  through it when they stopped it.  Those are kinds of

17  interstitial ads or other examples where -- remember,

18  the claim language required concurrently displaying the

19  ad with the service information.

20        So if you have instances where an ad is

21  displayed not concurrently with the service information,

22  before the service information is displayed or under the

23  service information where it covers the service

24  information, then it -- it doesn't meet that limitation

25  of the '702, Claim 53.

1    Q.   And that would be a non-infringing use, in

2 your opinion?

3    A.   That would be a non-infringing use.  It does

4 not meet that limitation.

5    Q.   And did you do any testing to determine

6 whether or not DoubleClick was used to serve

7 interstitial ads, pop-up ads, or pop-under ads?

8    A.   Yes, I did.  I did my own analysis.  I think

9 you also heard the testimony from Google witnesses

10 earlier that, in fact, they do support pop-up ads and

11 pop-under ads and interstitial ads.

12         Here's one that I found for the website

13 budgettravel.com.  There's no service information on

14 this page.  It's purely an ad.  I have clicked on a link

15 on budget travel to see some -- some information and

16 instead provided this service ad.  After it's done

17 showing the advertisement, it will go on and show the

18 service information.

19         Yeah.  Same question:  How do I know that this

20 ad came from DoubleClick?

21         I can look at the source code for this

22 webpage, and it's got the same information, the same ad

23 tag from DoubleClick that's included.

24    Q.   And looking at this, you concluded that the

25 interstitial ad that you were served came from

1  DoubleClick?

2      A.   That's correct.

3      Q.   What do we have on the next slide?

4      A.   And -- and here's the -- well, this is the

5  next thing after the interstitial ad is displayed.  I

6  said that the service information was displayed.  Here

7  now, you have the service information that replaces that

8  interstitial ad.  The interstitial ad compared to the

9  webpage to the service information are not displayed

10 concurrently.

11     Q.   Is it your opinion that serving pop-up ads or

12 pop-under ads or interstitial ads by DoubleClick

13 constitute a substantial non-infringing use?

14     A.   Yes, that's correct.

15          MR. ADAMS:  Your Honor, I have no further

16 questions.  I'll pass the witness.

17          THE COURT:  Cross-examination by the

18 Plaintiff.

19          MS. ANDERSON:  Thank you, Your Honor.

20 May we distribute our binders?

21          THE COURT:  You may.

22          MS. ANDERSON:  Thank you.

23          MS. HUBER:  May I approach?

24          THE COURT:  You may.

25          MS. HUBER:  May I approach?

1          THE COURT:  You may.

2          Are we set, Ms. Huber?

3          MS. HUBER:  I think so, Your Honor.

4          THE COURT:  All right.  Let's proceed

5  then.

6          MS. ANDERSON:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8  BY MS. ANDERSON:

9      Q.   Good afternoon, Dr. Almeroth?

10     A.   Good afternoon.

11     Q.   As you know, I'm Christa Anderson, counsel for

12 Google.  Nice to see you again.

13     A.   Thank you.

14     Q.   Dr. Almeroth, you know from your familiarity

15 with this case that this was filed originally by

16 Beneficial in 2011, correct?

17     A.   I believe that's correct.

18     Q.   And you know that Beneficial sued a number of

19 companies in that lawsuit, right?

20     A.   That's what I understand.

21     Q.   And you know that those companies included

22 companies like ALM and Advance and Amazon, right?

23     A.   Yes.

24     Q.   And you know that that lawsuit was a lawsuit

25 in which Beneficial accused those companies of

```
 1   infringing the '702 and the '943 patents, correct?

 2        A.    Yes.

 3        Q.    And you know that Amazon is a customer of

 4   Google's DoubleClick products, correct?

 5        A.    That's correct.

 6        Q.    And you know that because you have prepared

 7   your own expert report opinion of infringement in that

 8   case against Amazon; is that right?

 9              MR. ADAMS:  Your Honor, I want to

10   interpose an objection, and if I can approach the Court.

11              THE COURT:  All right.  Approach the

12   bench, Counsel.

13              (Bench conference.)

14              THE COURT:  What's your objection?

15              MR. ADAMS:  Your Honor, the questions I

16   suppose are leading towards his opinions regarding

17   infringement of Amazon's website.  They're outside the

18   scope of his expert report in this case, number one.

19              Number two, they're wholly irrelevant to

20   this case.  The issue in this case is whether or not

21   serving DoubleClick to the five accused websites

22   constitutes indirect infringement by Google.  It has

23   nothing to do with whether or not serving DoubleClick to

24   Amazon constitutes infringement or indirect

25   infringement.
```

1          THE COURT:  Well, let me hear from the

2 Plaintiff.

3          MS. ANDERSON:  Thank you, Your Honor.

4          THE COURT:  I'm not sure you're not

5 guilty of the same thing they were yesterday of trying

6 to anticipate where they're going before they get there.

7 But let me hear from the Plaintiff.

8          MS. ANDERSON:  Thank you, Your Honor.

9 Your Honor, this witness prepared an opinion of

10 infringement of the '702 patent based on the website's

11 use of the DoubleClick ad products and services.  It's

12 the same company that among the Defendants named in the

13 infringement contentions that are at the heart of the

14 case with respect to which Beneficial is trying to

15 distance itself in this case.

16          This witness has opined in this case

17 facts supporting Beneficial's arguments that there's no

18 infringement, no indirect infringement, yet at the same

19 time, pending now is a report in which he opines the use

20 of DoubleClick is, in fact, infringement of the patent.

21          So it both goes to credibility and it's

22 at the heart of the infringement contentions evidence in

23 this case.

24          THE COURT:  Where is this contradictory

25 report?

```
 1                    MS. ANDERSON:  Where is the report, Your

 2  Honor?

 3                    THE COURT:  Is it in this case?

 4                    MS. ANDERSON:  No, and I'm not offering

 5  it in evidence at all, only to establish that he has

 6  this opinion, and it's based on the use of DoubleClick

 7  ads.  And I'm not submitting any portion of the report

 8  in evidence, Your Honor.

 9                    MR. ADAMS:  Your Honor --

10                    THE COURT:  Well, his testimony is bound

11  by his report in this case.

12                    MS. ANDERSON:  Indeed.

13                    THE COURT:  But what his opinion has been

14  in other cases is not relevant, and I'm not going to

15  permit you to try to impeach him with what his opinion

16  may have been in other cases, whether they involve the

17  same technology or not.

18                    MS. ANDERSON:  Okay.  And may I ask Your

19  Honor, am I permitted to request -- to ask the witness:

20  Have you reached opinions that websites using

21  DoubleClick infringe this patent?  May I ask that

22  question, or is that beyond what Your Honor is --

23                    THE COURT:  Well, you're well-aware of

24  his report in this case, and you're well-aware of his

25  opinions in this case.  And both his direct and his
```

1  cross are going to be limited to that, and unless you

2  can show me that the Defendant has opened the door to

3  something.

4          MS. ANDERSON:  Thank you, Your Honor.

5          THE COURT:  All right.

6          MR. ADAMS:  Your Honor, I just wanted to

7  pose a prejudicial objection as well as it's beyond the

8  scope.  And the prejudicial, Your Honor, is this:

9  Unless he can establish that every website including,

10  you know, the ones that they're accusing operate in the

11  same way, then to ask him whether or not just using

12  DoubleClick is using an infringing website is completely

13  prejudicial, Your Honor, because other websites -- the

14  claim is not just about DoubleClick.

15          There were a lot of different

16  limitations, and so unless they can establish that he's

17  done that analysis and -- including DoubleClick, it's

18  prejudicial to just ask him, you know, whether or not --

19          THE COURT:  Let me say this, again,

20  Counsel.  Your examination both on direct and cross of

21  this expert witness is going to be confined by what's

22  disclosed in his report.  And once cross-examination has

23  been completed, then you may revisit those issues on

24  direct again, and they may recross again.  But we're

25  going to operate within the universe of his report.

1          MR. ADAMS:  Understood, Your Honor.

2          MS. ANDERSON:  Yes, sir.

3          THE COURT:  Everybody understand?

4          MS. ANDERSON:  Yes.  But may I ask one

5     further clarification?  And I don't want to cross the

6     Court's ruling here.

7          This witness has been hired as an expert

8     for Beneficial before in the prior cases, and I was

9     going to ask the witness questions to establish he's

10    been a witness for Beneficial in the past.

11         THE COURT:  I have no objection to that.

12         MS. ANDERSON:  Thank you, Your Honor.

13         THE COURT:  I have no problem with that.

14         MS. ANDERSON:  Thank you, Your Honor.

15         THE COURT:  All right.  Let's proceed.

16         (Bench conference concluded.)

17         THE COURT:  All right.  Let's proceed.

18         MS. ANDERSON:   Thank you, Your Honor.

19     Q.   (By Ms. Anderson) Dr. Almeroth, you are aware

20    that Beneficial has sued on the '702 and '943 patents in

21    the past, correct?

22     A.   Certainly they have sued on the '702 in the

23    past.  I'm not sure about the '943.

24     Q.   You are aware of the prior suit on the '702

25    patent, because you have served and been hired as an

1  expert for Beneficial before, right?

2      A.    That's correct.

3      Q.    And in that lawsuit, Beneficial hired you as

4  an expert witness to give an opinion on infringement; is

5  that right?

6      A.    That was part of my responsibilities.

7      Q.    And in that case, you gave an expert opinion

8  that Google was infringing the '702 patent, correct?

9      A.    That's correct.  Some of the -- the webpages

10  that Google was -- was offering.

11      Q.    And is it fair to say, then, when -- when you

12  prepared your opinion in this case, you don't recall

13  ever checking to see what, if anything, you said about

14  Google in those prior opinions, correct?

15      A.    It's generally correct.  I -- I didn't go back

16  and check my opinions in that case.  Generally, the

17  opinions I offer are -- are the same based on the facts.

18  I didn't need to go back and double-check any

19  information from that case.

20      Q.    And -- but you were aware that Beneficial had

21  accused Google in that case of -- of both direct and

22  indirect infringement, right?

23      A.    It might have been the case that there was an

24  accusation of indirect infringement, but I don't believe

25  I submitted opinions with respect to indirect

1    infringement.

2        Q.    Now, Dr. Almeroth, you're aware that the

3    question of whether or not Google induces or contributes

4    to infringement of the '702 patent is at issue in this

5    case as well, right?

6        A.    I -- I understand there's an issue.  I don't

7    think it's the same issue.  There was a difference of --

8    of who the websites were.  I mean, there was the

9    DoubleClick portion that's owned by Google, and then in

10   the other case, it was really the -- the Google websites

11   that -- that was the focus of -- of infringement.

12       Q.    Dr. Almeroth, I'd ask you to focus on the

13   question.

14            Are you aware that in this case, the issue of

15   whether or not Google indirectly infringes the patent,

16   is at issue?

17       A.    Yes.

18       Q.    All right.  And you are aware that your

19   opinion has been identified by Beneficial in support of

20   Beneficial's arguments in this case, right?

21       A.    I -- I've offered the opinion I've offered.

22   And presumably, Beneficial or -- or Google would use

23   those opinions however they see fit.

24       Q.    All right.  And in this case, you're not

25   offering an opinion to the effect that Google infringes,

1  right?

2       A.   What do you mean by Google infringes?  What --

3       Q.   You have -- you haven't offered any opinion in

4  this case that Google infringes by virtue of the

5  DoubleClick products, right?

6       A.   No, in fact, the opposite.

7       Q.   And you haven't offered any opinions in this

8  case that Google indirectly infringes the patents,

9  right?

10       A.   That's correct.

11       Q.   And, in fact, in this case, you are offering

12  opinions to the effect that there are substantial

13  non-infringing uses with respect to DoubleClick, right?

14       A.   Yes, I am.

15       Q.   And you know that's in relation to the

16  argument by Beneficial that Google does not contribute

17  to infringement by customers, right?

18       A.   That's correct.

19       Q.   And Beneficial is paying you $500 an hour for

20  your work in connection with this case, right?

21       A.   Yes.

22       Q.   And you are not aware of how much Beneficial

23  has paid you over the years that you worked for it,

24  right?

25       A.   No.  I -- I think in answer to your question

1  in the deposition, I -- I don't have a specific

2  recollection of exactly what the amount is.

3      Q.   You don't know whether it was more or less

4  than a hundred thousand dollars, right?

5      A.   Over the course of the years, I don't -- I

6  don't know specifically one way or the other.

7              THE COURT:  Dr. Almeroth, would you speak

8  up or either pull the microphone a little closer to you?

9              THE WITNESS:  Sure.

10             THE COURT:  I want to make sure we hear.

11  Okay.  Continue, Ms. Anderson.

12             MS. ANDERSON:  Thank you.

13     Q.   (By Ms. Anderson) And of the approximately

14  $2 million you've earned from expert work over the last

15  5 years, you couldn't precisely identify how much you've

16  been paid by Beneficial, correct?

17     A.   That's correct, not precisely.

18     Q.   Now, just a moment, please, Dr. Almeroth.  I

19  apologize.

20         You would agree with me that one of the

21  elements of Claim 53 of the '702 patent is the

22  requirement of combining information, right?

23     A.   That's correct.  That's the Limitation (h)

24  that we've been talking about.

25     Q.   All right.  And you are aware that the

1 advertising related information that a website is

2 supposed to combine with service content, when you're

3 talking about the Claim 53 of the '702 patent, that can

4 be satisfied through ad tags, right, the

5 advertising-related information?

6      A.   Yes.  One way of satisfying at least the

7 advertising-related information of that part of the

8 limitation is through ad tags.

9      Q.   All right.  So you would agree with me that

10 Google's DoubleClick ad tags can serve as the

11 advertising-related information that can constitute that

12 which is combined with service-content information as

13 part of the Claim 53 of the '702 patent, right?

14      A.   Sorry.  Could you reword that?

15      Q.   Sure.  You can satisfy that part of Claim 53

16 of the '702 patent through the use of Google's

17 DoubleClick ad tags, right?

18      A.   That's correct.  Through the use of ad tags,

19 you can certify at least the -- that part of the

20 limitation that relates to advertising-related

21 information.

22      Q.   And, in fact, you agree with me that without

23 an ad tag, there is no display of advertisement on a

24 website and, hence, no concurrent display of

25 advertisement on a website, right?

1        A.    I would disagree.

2        Q.    All right.

3               MS. ANDERSON:  Your Honor, I would ask

4  permission to play a portion of the witness' deposition

5  as impeachment.  Page 110, Line -- Lines 12 through 23.

6               THE COURT:  Proceed.

7               (Video clip playing.)

8               QUESTION:  And so for this analysis, the

9  ad tag is the advertising-related information that

10  you're talking about getting combined, right?

11               ANSWER:  Yes.

12               QUESTION:  And without that ad tag, there

13  isn't going to be a concurrent display of advertisement?

14               ANSWER:  If -- if there is no ad tag,

15  we're sort of in the realm of a hypothetical, then there

16  would have to be something else representing advertising

17  information.  But assuming that wasn't there and there

18  was no advertising-related information, then the

19  limitation wouldn't be met.

20               QUESTION:  Right.

21               (End of video clip.)

22        Q.    (By Ms. Anderson) Let's turn our attention to

23  some of your testimony on the subject of substantial

24  non-infringing uses.  You said as part of your testimony

25  today that you believed DoubleClick has substantial

1    non-infringing uses, correct?

2        A.    That's correct.

3        Q.    And to be clear, you mentioned earlier that

4    you were -- your testimony was going to be about

5    Claim 53 of the '702 patent, right?

6        A.    I -- I think it was generally about Claim 53.

7    That's correct.

8        Q.    You gave no testimony today about Claims 1,

9    49, 67 of the '943 patent, right?

10       A.    I don't recall mentioning those claims

11   specifically, but I think there are certain aspects of

12   the claims that overlap.  And so to the extent there are

13   non-infringing uses is the required or -- or as you

14   would identify them for Claim 53, they would also apply

15   to the other claims of the '943 patent.

16       Q.    Well, actually Dr. Almeroth, you're only

17   somewhat familiar with the '943 patent, right?

18       A.    I -- I think I am somewhat familiar compared

19   to the '702 patent.

20       Q.    Right.  So during the course of your testimony

21   today, you didn't mention the '943 patent when you were

22   discussing which claims had not -- substantial

23   non-infringing uses when it came to Google's

24   DoubleClick, correct?

25       A.    I think it was discussing non-infringing uses

1  of DoubleClick generally.

2      Q.   All right.  So is it your testimony,

3  Dr. Almeroth, that when you do an analysis of whether or

4  not a product has substantial non-infringing uses that

5  you don't need to pay attention to the particular

6  language of a given claim?

7      A.   No.  That's not what I've said.

8      Q.   All right.  And isn't it, in fact, the case

9  that when you do an analysis as an expert to try to

10  figure out if a product has substantial non-infringing

11  uses, that's something you do on a claim-by-claim basis,

12  right?

13     A.   Generally, it's on a claim-by-claim basis, but

14  sometimes to save time, if there are overlapping

15  limitations among the claims, then the same analysis of

16  one claim will apply to other claims as well.

17     Q.   But you gave no testimony about that, right?

18     A.   Again, I was primarily focused on the '702

19  patent.

20     Q.   Right.  Because, in fact, there are

21  differences between the claims in this case, right?

22     A.   There are differences -- certainly there are

23  differences among the claims.

24     Q.   And so it's important when you're talking

25  about whether or not there are substantial

1  non-infringing uses that you pay attention to

2  differences in the claim language, right?

3      A.   Certainly pay attention to differences and

4  certainly pay attention to similarities as well.

5      Q.   Right.  So, for example, in one claim, if it

6  requires a particular element be practiced to do the

7  invention, and if in another claim, it does not require

8  that, that difference really matters, right?

9      A.   It does really matter if the aspect that's the

10  non -- the non-substantial use, that is related to the

11  differences of that limitation.

12          Again, there are similarities between Claim 53

13  of the '702 patent and Claims 1, 49, and 67 of the '943

14  patent.

15      Q.   Well, during your testimony, I believe you

16  mentioned that you believed there were three things that

17  you say are substantial non-infringing uses for

18  DoubleClick, right?

19      A.   That's correct.

20      Q.   And the first one of those is that you said

21  that DoubleClick can be used to serve ads to customers

22  whose users disabled cookies, right?

23      A.   That's correct.

24      Q.   Now, disabling cookies is something that a

25  user of a computer does at their own browser, right?

1      A.    That's correct.

2      Q.    And you, in fact, did that in your example,

3 right?

4      A.    That's correct.

5      Q.    And you were disabling cookies at your

6 computer in your browser, not at the website

7 MomsWhoThink -- or excuse me -- not at the website over

8 the Internet, right?

9      A.    That's right.

10     Q.    So the disabling of the cookie happens when

11 the user of the computer is not at the publisher

12 website, correct?

13     A.    That's correct.

14     Q.    All right.

15     A.    Then the important part is it's an impact on

16 the rest of the claim and how the system operate.

17     Q.    And I would ask you to focus on my question,

18 please, Dr. Almeroth.  Thank you.

19          Now -- so when you provided your report in

20 this case, you actually identified which claims you

21 believed that disabling of cookies was something that

22 created a substantial non-infringing use, right?

23     A.    I would have to go back and look at my report,

24 but if I recall correctly, that's the case.

25     Q.    All right.  Now, let's talk about Claim 53.

1  Claim 53 of the '702 patent is what we call an apparatus

2  claim, right?

3      A.   Yes.

4      Q.   All right.  Now, to show that somebody is

5  infringing an apparatus claim, you just have to show

6  that whatever it is you're claiming infringes is

7  capable, capable of performing the invention, right?

8      A.   That's correct.

9      Q.   All right.  It doesn't always have to be used

10  that way; it's just a question of whether it's capable,

11  true?

12      A.   That's correct.

13      Q.   And here the thing that you say is the

14  substantial non-infringing use is something that the

15  user is doing at their own browser on their own

16  computer, right?

17      A.   That's correct.

18      Q.   Okay.

19      A.   And has an impact on the system since the

20  browser is part of the system.

21      Q.   You agree with me, Dr. Almeroth, that the

22  browser is a computer -- is on the computer where the

23  user is, right?

24      A.   That's correct.

25      Q.   And the browser is not on the website, right?

1       A.    That's correct.

2       Q.    Thank you.

3             The list of claims that you identified in your

4   report that you say are the claims where DoubleClick has

5   substantial non-infringing uses because of disabling of

6   cookies, you did not include Claim 1 of the '943 patent,

7   true?

8       A.    I would have to double-check my report, but

9   I -- I don't have any reason to dispute that.

10      Q.    You agree with that, right?  You remember it

11  in the patent claims, correct?

12      A.    I do remember the patent claims.  I don't

13  remember in that particular section whether I had

14  identified claims with respect to the '943 patent.

15      Q.    All right.  So let's take a look just before

16  you -- and, please, we'll not display this at the

17  moment, but take a look at your report.  It's

18  Exhibit 554.  It should be in your binder and take a

19  look at Page 35.

20      A.    Which page?

21      Q.    Yes.  Sorry.  Page 35.  It should be the

22  middle of the page, the paragraph that begins:  As I

23  explain above...

24            Do you have that in front of you,

25  Dr. Almeroth?

1      A.   I do.

2      Q.   All right.  So you see there in your report,

3  you listed the claims that you thought applied to the

4  substantial non-infringing use of disabling cookies?

5      A.   Yes.

6      Q.   And you see there that you've listed Claim 53

7  of the '702 patent, Claims 49 and 67 of the '943 patent,

8  but you did not list Claim 1 of the '943 patent, right?

9      A.   That's correct.

10      Q.   And that's because that particular claim is

11  different when it comes to substantial non-infringing

12  uses by disabling of cookies.

13      A.   I'm not sure what you mean by it's different.

14  The --

15      Q.   You did not reach the opinion, sir, that the

16  substantial non-infringing use of DoubleClick being able

17  to be used with situations where users disable cookies,

18  that that does not apply when it comes to Claim 1 of the

19  '943 patent, true?

20      A.   That's correct.

21      Q.   And, in fact, Claim 1 of the '943 patent is

22  one of the claims that Beneficial sued Google customers

23  on, true?

24      A.   That's correct.

25      Q.   Thank you.

1          Let's turn now to the question of user

2    identification.

3          So the second reason that you said that

4    DoubleClick has substantial non-infringing uses is you

5    said that it can be used to serve ads to users who have

6    not provided user identification information, right?

7     A.    That's correct.  That was the second part of

8    what I said.

9     Q.    All right.  Now, let's clarify it a bit what

10   you mean by user identification information.

11         You agree, sir, that user identification

12   information is not limited to user registration, right?

13    A.    There could be examples -- other examples of

14   user identification information, but registration is --

15   is one.

16    Q.    Registration is one example of user

17   identifying information, true?

18    A.    That's correct.

19    Q.    And, in fact, you have no opinion on what else

20   user identifying information might be, correct?

21    A.    It's a complex answer.  You'd have to look at

22   what the information was and determine if it met the

23   Court's claim construction.

24    Q.    Well, you've never tried to answer that

25   question, have you?

1       A.   It's a hypothetical question.  You'd have to

2   give me some examples of what other information is, and

3   then I could determine, within the meaning of the

4   Court's claim construction and the limitation, whether

5   or not it met the requirement of user identification

6   information.

7       Q.   My question to you, sir, is:  Have you ever

8   tried to figure out what, besides user registration,

9   might qualify as user identifying information?

10      A.   No, I haven't needed to.

11      Q.   Now, in your report, you talk about the notion

12  of DoubleClick being used to serve ads to users who

13  haven't provided user identification information as

14  something that's a non-infringing -- a non-infringing

15  use when it comes to Claim 53, right?

16      A.   That's correct.

17      Q.   All right.  But you have offered no opinions

18  to the effect that that is a substantial non-infringing

19  use when it comes to the other three claims in the '943

20  patent, right?

21      A.   For that instance, that is correct.

22      Q.   All right.  So when it comes to providing the

23  user identification information, that -- that is not a

24  substantial non-infringing use when it comes to the

25  claims that have been asserted against Google's

1    customers in the '943 patent, right?

2        A.   That's correct, for that reason.

3        Q.   Okay.  You also testified that because

4    DoubleClick can serve an ad on a website that doesn't

5    store information, that means DoubleClick has

6    substantial non-infringing uses, right?

7        A.   Sorry.  Could you just repeat that question?

8        Q.   Sure.  One of the -- one of the reasons you

9    say that Google's DoubleClick has substantial

10   non-infringing uses is you say it can serve an ad on a

11   website that doesn't have the store for storing, right?

12       A.   That's correct.  That was the -- the first

13   prong of that second example, the MomsWhoThink website.

14       Q.   Right.  And the MomsWhoThink website was the

15   example that you described during your testimony,

16   correct?

17       A.   That's correct.

18       Q.   And you gave one example, right?

19       A.   That's correct.

20       Q.   You also testified that DoubleClick has

21   substantial non-infringing uses because you say it can

22   be shown on ads that allow registration but where a user

23   doesn't choose to register, right?

24       A.   That's correct.  That's the -- the second

25   prong of the -- the registration information.

1      Q.   All right.  But, again, you're only -- you're

2  talking about Claim 53 of the '702, correct?

3      A.   Right.  For those two parts, the alternatives,

4  for the second item I listed, that's only applicable to

5  Claim 53.

6      Q.   All right.  And so -- and, again, we talked

7  about this earlier.  Claim 53 is that particular kind of

8  patent claim they call an apparatus claim, right?

9      A.   That's correct.

10     Q.   It's a system, and -- and you satisfy the

11  claim as long as the -- the system is capable of

12  performing the claims, right?

13     A.   That's correct.

14     Q.   All right.  And so you admit that it's -- if

15  it's infringed, it's infringed as long as the website,

16  for example, is capable of doing the invention, right?

17     A.   It depends what kind of infringement.  So --

18     Q.   We're -- we're talking about Claim 53,

19  infringement of an apparatus claim.  And you agreed with

20  me earlier that as long as it is capable of performing

21  Claim 53, it is infringing, true?

22     A.   Sorry.  I was -- what I was trying to finish

23  was, there's direct infringement and indirect, and then

24  the two types of indirect.  And -- and the direct

25  requires all the limitations be present.  The -- the

1  indirect, the contributory or inducement requires some

2  additional.  So --

3      Q.    Thank you, Dr. Almeroth.  I apologize.  Finish

4  your answer.

5      A.    So the point here, with respect to

6  infringement, whether it's direct, is that for the

7  indirect aspect, there's a couple of additional tests

8  that are required.

9      Q.    Well, as we spoke about earlier, when it comes

10 to direct infringement of Claim 53 of the '702 patent,

11 that is an apparatus claim, right?

12     A.    That's correct.  For direct infringement, it

13 is.

14     Q.    Right.  And for there to be direct

15 infringement, all that needs to happen is that system

16 has to be capable of performing the claim, right?

17     A.    That's correct.

18     Q.    All right.  And your whole premise on the

19 subject of whether or not a website allows registration,

20 that whole premise is -- is -- is that it allows

21 registration, but some users choose not to register,

22 right?

23     A.    I disagree.

24     Q.    All right.  I'd like to turn your attention to

25 Exhibit 554 of your report at 31.

1          You have your report before you?

2     A.    I do.

3     Q.    All right.  And during the course of preparing

4 this report, you explained some analyses you had done

5 related to whether or not websites allowed registration,

6 right?

7     A.    Yes.

8     Q.    All right.  And in that report, you talked

9 about the notion of websites that allow them, but where

10 users choose not to register, right?

11    A.    That was one aspect of the second prong.

12    Q.    Thank you.

13          Now, the third reason that you said that

14 Google's DoubleClick ads have substantial non-infringing

15 uses is your argument that ad tags can result in showing

16 an ad to a user when interstitial ads show up, right?

17          Do you remember that?

18    A.    I do.

19    Q.    Okay.  Pop-up and pop-under ads, right?

20    A.    Right.

21    Q.    Okay.

22    A.    Well, pop-up or pop-under or interstitial,

23 those are examples.

24    Q.    Thank you.

25          But your opinion in that regard, to be clear,

 1  was limited to certain of the claims in this case,

 2  right?

 3      A.   It was.

 4      Q.   Okay.  So Google's DoubleClick ability to show

 5  pop-up, pop-under, and interstitial ads does not amount

 6  to substantial non-infringing use when it comes to Claim

 7  67 of the '943, right?

 8      A.   That's correct.  But the other three, it does.

 9      Q.   Thank you.

10          Now, during your presentation, you showed

11  Slide 20 --

12              MS. ANDERSON:  May we have Slide 20,

13  please?  Is it possible to get Slide 20?

14              Well, I'll just do it --

15              THE TECHNICIAN:  You can put the ELMO up.

16              MS. ANDERSON:  Oh, put the ELMO up.

17              Thank you.  Thank you so much.

18              See if I can get this oriented correctly

19  here.  Wrong way.

20              So I'm not sure that I can focus it.  I

21  apologize.  It's a little blurry, but --

22              THE COURT:  Those green buttons will

23  either --

24              MS. ANDERSON:  Oh, thank you, Your Honor.

25              THE COURT:  -- zoom in or zoom out.

 1            MS. ANDERSON:  Okay.  Thank you.  I

 2   apologize.

 3        Q.   (By Ms. Anderson) Okay.  Do you have in mind

 4   Slide 20 from your presentation, Dr. Almeroth?

 5        A.   I do.  I actually have it in front of me.

 6        Q.   Oh, great, that's even better.  Thank you.

 7        A.   It was in my binder.

 8        Q.   I just have a general question for you.

 9            Dr. Almeroth, from where did you -- from where

10   did you secure the information on Slide 20?  Where did

11   you get this?

12        A.   From the web page that's listed at the top.

13        Q.   And is this information that was available to

14   you publicly?

15        A.   Yes, it was.

16        Q.   All right.  Thank you.

17            MS. ANDERSON:  No further questions, Your

18   Honor.  I pass the witness.

19            THE COURT:  All right.  Additional

20   direct?

21            MR. ADAMS:  Briefly, Your Honor.

22            THE COURT:  Okay.  Proceed.

23            MR. ADAMS:  Thank you, Your Honor.

24                     REDIRECT EXAMINATION

25   BY MR. ADAMS:

1          Q.   Dr. Almeroth, I just want to clarify an issue

2    with respect to your opinions about the non-infringing

3    uses and the claims that they cover.

4               Can you --

5                    THE COURT:  Pull the microphone a little

6    closer to you --

7                    MR. ADAMS:  Thank you, Your Honor.  I'm

8    sorry.

9                    THE COURT:  -- please, Counsel.

10         Q.   (By Mr. Adams) Can you turn to your report,

11   Page 554, and go to -- I'm sorry -- Exhibit 554, and go

12   to Page 37.

13         A.   Yes, sir.  I'm there.

14         Q.   Okay.  Now, if you'd take a look to the

15   middle, it starts off:  As explained above.

16         A.   That's correct.

17         Q.   Can you generally either read or tell the --

18   the jury what your opinions were with respect to which

19   non-infringing uses apply to which claims?

20         A.   Sure.  I had mentioned the three

21   non-infringing uses.  There's a paragraph in my report

22   that describes each one.

23              The -- the four claims that are at issue are

24   Claim 53 of the '702 patent; Claims 1, 49, and 67 of the

25   '943 patent.  And this paragraph lays out my opinion

1  with respect to each of the three items for each of the

2  four claims.

3       And as I said earlier, if any one of these

4  hold to be true, it's a substantial non-infringing use.

5  It's not the case that all of them have to be true or

6  any -- anything like that.

7       Q.   Well, in fact, does it have to be the case

8  that, for example, for Claim 1 of the '943, that you

9  have to have all three of those non-infringing uses

10  apply to that claim?

11       A.   No.  Any one of those three would apply so

12  that the paragraph that I have for the first -- for the

13  first item, that it -- that DoubleClick can be used to

14  serve ads to users who have disabled cookies, that

15  applies to Claim 53 of the '702 patent; Claims 49 and 67

16  of the '943 patent.  So it covers those three claims.

17       For the second issue that has to do with

18  DoubleClick can be used to serve ads to users who have

19  not provided any identification information, for

20  example, through registration, that applies to Claim 53

21  of the '702 patent.

22       For the issue of serving ads non-concurrently

23  with the service presentation, the interstitials or the

24  pop-up or the pop-under, that applies to Claim 53 of the

25  '702, Claim 1 of the '943, and Claim 49 of the '943.

1              So all of the four claims at issue here are

2   covered by at least one of those three non-infringing

3   uses.

4                    MR. ADAMS:  No further questions, Your

5   Honor.  Pass the witness.

6                    THE COURT:  Further cross-examination?

7                    MS. ANDERSON:  No thank you, Your Honor.

8                    THE COURT:  All right.  You may step

9   down, Dr. Almeroth.

10                    THE WITNESS:  Thank you, Your Honor.

11                    THE COURT:  Approach the bench, Counsel.

12                    (Bench conference.)

13                    THE COURT:  Who is your next witness?

14                    MR. ADAMS:  We rest, Your Honor.

15                    THE COURT:  All right.  Then I'll call

16   for that, and you can rest on the record, and then we'll

17   take a recess.

18                    MR. ADAMS:  Thank you.

19                    MS. ANDERSON:  Thank you.

20                    (Bench conference concluded.)

21                    THE COURT:  All right.  Defendant call

22   your next witness.

23                    MR. ADAMS:  Your Honor, Defendant rests.

24                    THE COURT:  All right.  Ladies and

25   Gentlemen, the Defendant having rested, this is a good

1  place for us to take an afternoon break.

2            I'm going to allow you to leave your

3  notebooks where they are in your chairs.  Take a few

4  minutes in the jury room to stretch your legs, get a

5  drink of water.

6            Don't discuss the case with each other,

7  and we'll be back out -- have you back out to continue

8  shortly.  But you're excused for recess at this time.

9            COURT SECURITY OFFICER:  All rise.

10            (Jury out.)

11            THE COURT:  Be seated, please.

12            Does the -- the Plaintiff have a rebuttal

13  case to put on?

14            MS. ANDERSON:  No, Your Honor.

15            THE COURT:  All right.  Then as far as

16  logistics, we'll take a brief recess.  We'll call the

17  jury back in.  I'll dismiss them for the day.  And then

18  I'll hear any motions under Rule 50(a) that either party

19  wishes to offer.

20            We stand in recess for the next few

21  minutes.

22            MR. ADAMS:  Your Honor, I'm sorry.  May

23  the witness -- Dr. Almeroth has asked that I request

24  that he be excused from the proceedings at this time.

25            THE COURT:  Given that the Plaintiff has

1    no rebuttal case, he is certainly excused.

2                    MR. ADAMS:  Thank you, Your Honor.

3                    THE COURT:  All right.  We'll stand in

4    recess.

5                    COURT SECURITY OFFICER:  All rise.

6                    (Recess.)

7                    (Jury out.)

8                    COURT SECURITY OFFICER:  All rise.

9                    THE COURT:  Be seated, please.

10                   Would you bring in the jury, please,

11   Mr. McAteer?

12                   COURT SECURITY OFFICER:  All rise for the

13   jury.

14                   (Jury in.)

15                   THE COURT:  Please be seated.

16                   All right.  The Defendant has rested.

17                   Does the Plaintiff have rebuttal evidence

18   to present?

19                   MS. ANDERSON:  No, thank you, Your Honor.

20                   THE COURT:  All right.  So both Plaintiff

21   and Defendant subject to final arguments rest and close;

22   is that correct?

23                   MS. ANDERSON:  Yes.  That is correct,

24   Your Honor.

25                   MR. ADAMS:  Yes, from the Defendants,

1 Your Honor.

2           THE COURT:  All right.  Ladies and

3 Gentlemen of the Jury, that completes the evidence in

4 this case.  And we have gotten here quicker than I

5 thought we would get here, so that all results in some

6 good news for you.  I'm going to release you for this

7 afternoon.  There are things I have to take up with

8 counsel outside of your presence, and I'm going to ask

9 you to have a leisurely morning and be ready to go at

10 11:00 o'clock tomorrow morning.

11           I think I can do all the things I need to

12 do with counsel and be prepared to give you my final

13 instructions and hear closing arguments starting at or

14 around 11:00.  I'm going to ask you -- just because this

15 is an estimate, let me revise what I said and ask you to

16 be in the jury room by 10:30.

17           It's possible we may be ready to go.

18 It's possible you may have to wait on us just a little

19 while.  That's my best estimate, but certainly you'll

20 have a later morning than the usual 8:30.  So if you'll

21 be assembled in the jury room at 10:30 tomorrow, we'll

22 proceed with final instructions and closing arguments

23 and then give the case to you to deliberate upon

24 thereafter.

25           As you go home this evening, please leave

```
 1  your juror notebooks on the table in the jury room.  As
 2  we're closing toward the end of the case, I remind you
 3  again how critical it is that you not receive any
 4  outside influences and, therefore, that you not
 5  communicate with anyone.  So keep that in mind
 6  overnight, and we'll see you at 10:30 in the morning.
 7                     You're excused at this time.
 8                     COURT SECURITY OFFICER:  All rise.
 9                     (Jury out.)
10                     THE COURT:  All right.  Be seated,
11  please.  Does Plaintiff have any motion under Rule 50(a)
12  to present at this time?
13                     MS. ANDERSON:  Yes, Your Honor, we do.
14                     THE COURT:  All right.  Proceed.
15                     MS. ANDERSON:  Your Honor, before I
16  begin, we're also happy to submit it in writing as well,
17  if that --
18                     THE COURT:  You're welcome to file a
19  written version as well, Counsel.  I want to hear from
20  you orally now.
21                     MS. ANDERSON:  Thank you, Your Honor.
22                     Your Honor, Plaintiff Google moves,
23  pursuant to Rule 50, for a judgment in its favor,
24  judgment as a matter of law.  Your Honor, Google is
25  entitled to judgment as a matter of law, because there
```

1  is no legally sufficient evidentiary basis to rule in

2  favor of Beneficial on any material issue here.

3            Google has proven each element of its

4  breach-of-contract claim.   There is an agreement.   There

5  is no dispute.   There's a settlement agreement in place

6  that is enforceable that both parties agree is governing

7  over the parties.

8            The parties agree and there is no

9  contradictory evidence suggesting that Google did

10  anything but pay the amount of money due under that

11  agreement it performed.

12            There is a license provision in that

13  agreement which provides a license pursuant to the terms

14  of the agreement, a license that covers not just Google

15  but also Google's customers as long as the Google

16  customers are using Google products, specifically Google

17  DoubleClick, and using them in a way that would

18  constitute indirect infringement by Google were it not

19  for the license.

20            Your Honor, in this case, there is no

21  dispute that with respect to Beneficial, Beneficial has

22  said and stated in the infringement contentions that are

23  Exhibits 8 and 9, as well as the complaint itself, that

24  in 2011, Beneficial sued Google's customers alleging

25  that they were infringing the '702 and '943 patents in a

1    way that -- in a way that they were using advertisements

2    on their websites.

3              That lawsuit, which is undisputed, is a

4    lawsuit that constituted a breach of the license because

5    that license afforded Google's customers peace,

6    providing they satisfied the terms of the license

7    provision.

8              There is no evidence suggesting anything

9    but that Beneficial has stated and provided evidence to

10   suggest that under its theory of infringement, those

11   customers infringe the patents.  And Google has provided

12   undisputed evidence of the instruction and encouragement

13   that it gives to its customers to use Google DoubleClick

14   ads and services in just the way that Beneficial says

15   infringes its patents.

16             Beneficial has done nothing to disprove

17   the truth of statements made by them, admissions by

18   them, evidentiary admissions by them as to what they

19   believed constituted infringement of their patents.

20   And Google has shown inducement through all the

21   instructions and encouragement to use DoubleClick

22   products in the way that Beneficial shows infringes.

23             The intention has been testified to.  We

24   have heard testimony undisputed from witnesses that

25   Google intends that its customers use those products in

1    the way that Beneficial says infringes.

2                    With respect to contributory

3    infringement, which is an alternative way of

4    establishing that Google indirectly infringes, pursuant

5    to Beneficial's theory, we have heard evidence through

6    Mr. Bellack and Dr. Alexander and others that what

7    Google does is provide Google DoubleClick products,

8    including an ad tag.  That ad tag is a material

9    component that is used by Google's customers to

10   advertise in just the way Beneficial says infringes its

11   patents.

12                   And so with -- with respect to

13   material -- with respect to contributory infringement,

14   we know that a material component of that invention,

15   according to Beneficial, is provided by Google towards

16   what Beneficial says is infringement.  And the evidence

17   that we have heard on the subject of whether or not

18   there are substantial non-infringing uses establishes

19   that those uses are neither substantial.

20                   For example, showing one example of a

21   store for storing, to suggest that's a substantial

22   non-infringing use is not a substantial number.

23                   With respect to the claims that are here,

24   there's Claim 53 of the '702 patent, Your Honor, and

25   then Claims 1, 49, and 67 of the '943, we heard from the

1  witness, Dr. Almeroth, who made clear that his opinion

2  about substantial non-infringing uses was not

3  across-the-board.  These claims are different.  And so

4  what might be a substantial non-infringing use for one

5  is not for another.

6            And what that means, for example, is that

7  where Dr. Almeroth was claiming that, for example, a

8  store for storing was required and that Google -- to the

9  extent could serve an ad where a website had no store

10  for storing, we heard Dr. Almeroth say that's a

11  substantial non-infringing use.

12            But that's not evidence of substantial

13  non-infringing use for other claims.  And what that

14  means is when Beneficial sued Google customers for doing

15  something that constitutes contributory infringement,

16  it's not an excuse that according to someone like

17  Dr. Almeroth there's a substantial non-infringing use,

18  because that doesn't apply to claims '943, and our

19  customers were sued on the claims of the claims of '943.

20            At the heart of this, Your Honor, is the

21  evidence that we heard that according to Beneficial,

22  they can sue customers, and they can sue customers and

23  as long as at the end of the day, they somehow settle.

24  Everything has gone away.  If they settle the case and

25  decided to back away, once they've taken settlement

1  monies, that that somehow satisfies things and they're

2  fine and they can continue to sue as much as they want.

3            Not so.  Not so, because what we have

4  here is agreement for peace.  And when customers are

5  doing something that would -- would constitute indirect

6  infringement by Google were it not for the license,

7  that's licensed conduct.

8            And what Beneficial was saying in those

9  contentions, and those contentions are undisputed

10  documents -- what they were saying in those contentions

11  is that this would constitute infringement under our

12  view.  That's evidence, and it's undisputed evidence in

13  this case.

14            So, Your Honor, we would move for a JMOL

15  under Rule 50 and would be happy to supplement with

16  additional written materials and cites to the record.

17            THE COURT:  Let me hear a response from

18  the Defendant.

19            MS. ANDERSON:  Thank you, Your Honor.

20            MR. ADAMS:  Your Honor, good afternoon.

21  Your Honor, I -- I prepared this case and I tried this

22  case in great part to you.  If there ever was a case

23  where a JMOL was warranted; that is, where Your Honor

24  steps in and says, we need to end this now; we shouldn't

25  let it go any further, this is the case.

1          The Plaintiffs presented their entire

2    case and their arguments to you as if somehow the -- the

3    Defendants have the burden of proving some things and we

4    don't.  The burden of proof squares solely at the feet

5    of Google.

6          Underlining the entire case is this

7    question:  Has any Google customer infringed any of the

8    claims?

9          And the reason I say that, Your Honor, is

10   this:  There is no question and no dispute that the

11   licensed agreement that we entered into says that the

12   customers are licensed only if Google is -- is guilty of

13   contributory infringement; that is, they're only

14   licensed if providing DoubleClick to their customers

15   constitutes either direct or indirect infringement by

16   Google.

17          And what that means, Your Honor, is that

18   in order for them to be indirectly infringing, there has

19   to be some evidence of direct infringement.  The jury

20   instructions that they've proposed, that we propose,

21   that's the instruction I suspect the Court is going to

22   give to the jury.

23          What evidence exists in this case to

24   suggest to show that any customer of those five

25   customers directly infringe any of the claims?

```
 1  The only evidence -- and I think they've said it
 2  numerous times, and they're bold in saying it.  The only
 3  evidence that they point to are our allegations in our
 4  complaint and our contentions in our infringement
 5  contentions.  That's it.
 6              As a matter of law, Your Honor,
 7  allegations in the complaint, contentions in the
 8  infringement, and the contentions by themselves are not
 9  evidence of infringement as a matter of law.
10              Because of that, Your Honor, this case,
11  on that ground, needs to go away, because they can't
12  prove the underlying infringement.
13              Now, what about the other elements?  What
14  about the other things that they need to prove?  Not us,
15  but they -- they need to prove?
16              What they need to prove, that in order
17  for them to be -- for there to be contributory
18  infringement, there has to be a case that the component,
19  DoubleClick, is a material part of the invention.  I
20  heard Counsel say it just now.  DoubleClick is a
21  material part of the invention.
22              I didn't hear those words; I didn't hear
23  that concept come out of any of the witnesses that they
24  put on the stand.  Mr. Trinh never opined about it.
25  Mr. Bellack never opined about it.
```

1            And Mr. -- Dr. Alexander specifically
2  told this Court that he had no opinions on infringement
3  and none about whether or not DoubleClick was a material
4  part of the invention.  That evidence never came out of
5  any of their witnesses.
6            Now, what about the substantial
7  non-infringing uses?
8            It's their burden to show that there are
9  no suitable non -- non -- no suitable substantial
10 non-infringing uses of DoubleClick.  They needed to
11 present evidence to this Court that DoubleClick's only
12 purpose, for example, is to infringe this patent.
13            Mr. Trinh didn't say that; Mr. Bellack
14 didn't say that; Dr. Alexander didn't say that.  So when
15 you -- if we stop there, Your Honor, I think JMOL would
16 have been appropriate, because they -- they -- they
17 presented no evidence of it.
18            But we went further, Your Honor, and we
19 presented undisputed, unrebutted testimony from
20 Dr. Almeroth that, in fact, DoubleClick has numerous
21 substantial non-infringing uses.
22            With that evidence, Your Honor, I believe
23 they failed to meet their burden on that level.
24            Now, what about inducement?  This is the
25 second prong.

1                    Well, again, DoubleClick has the burden

2      of showing not only that they instructed their customers

3      to use DoubleClick; they have to establish that when

4      they did what they did, when they gave their

5      instructions, they had the specific intent to induce

6      their customers to infringe the claims of the patent,

7      not as they've established in this case, the specific

8      intent to encourage their customers to use DoubleClick.

9      That's all this Court heard.  That's all the jury heard.

10     Yes.  We instruct them to -- to use DoubleClick.  But

11     when we asked their witnesses directly, none of them,

12     and including Mr. Bellack, who was the guy that goes out

13     and does the instructions, never instructed them:  We

14     want you -- we want to induce you to infringe this

15     patent.

16                    And then, Your Honor, we presented the

17     testimony of several of their customers, and we ran it

18     through.  And when we talk about the patent, we're not

19     talking about just one little part of one claim element.

20     They have to instruct on each of the elements.

21                    They have to instruct on the store.  They

22     have to instruct on how to build an HTML web page so

23     they had the programmatic elements.  That's what the law

24     requires.

25                    There was zero evidence.  In fact, Your

Honor, I don't even believe that they attempted to

produce that evidence.  When it comes to whether or not

there was indirect infringement in this case, Your

Honor, we spent -- we spent -- well, it's not a lot of

time.

We actually did this pretty quickly, but

all of the evidence points one direction, and that is,

they've got no evidence on that point.  None.  Zero.

And I think because of that, Your Honor, a judgment as a

matter of law is warranted.

And, Your Honor, we've got, I think, a

couple of other issues that we want to bring a judgment

as a matter of law on.

THE COURT:  Well, I assume, Mr. Adams,

that you've effectively not only responded to

Ms. Anderson's motion, but you've made your own motion

as well.  That's the way I take it.

MR. ADAMS:  Your Honor, I apologize.

THE COURT:  That's fine.

MR. ADAMS:  Yes.

THE COURT:  I think we can consolidate

the argument.

MR. ADAMS:  Yes.  If Your Honor will take

it as that, that's fine.  I don't have to do this again

on my motion if Your Honor will treat my response as

1   also my affirmative motion.  I think -- I think that

2   will be fine.

3                THE COURT:  All right.  Do you have

4   anything else for me?

5                MR. ADAMS:  Your Honor, we would also --

6   we also have two other grounds.  I don't know if the

7   Court wants Counsel to respond to my comments, and then

8   I can raise my other two motions separately --

9                THE COURT:  Well --

10                MR. ADAMS:  -- or two grounds separately.

11                THE COURT:  All right.  I'm not sure what

12   those are, but let me hear a response from Ms. Anderson.

13                MR. ADAMS:  Thank you.

14                THE COURT:  Then I'll hear further from

15   Mr. Adams.

16                MS. ANDERSON:  Thank you, Your Honor.

17                Beneficial claims that as a matter of

18   law, its own statements and infringement contentions in

19   this case are somehow not evidence.  That is untrue.

20                Your Honor, these are evidence before the

21   jury.  They are statements by the opposing party, and

22   they are statements describing the facts of why

23   Beneficial believes something infringes the patents.

24                They are at the heart of the kind of

25   evidence that goes to whether or not the terms of the

1  license agreement have been satisfied.

2           Brushing them aside in some kind of mere

3  allegations that don't count in a vacuum is not treating

4  them as they are in the context of this case.  They are

5  statements by an opposing party on an issue at the heart

6  of the case and they are core evidence and they are

7  evidentiary admissions of the party.

8           When we submitted -- I believe it was on

9  the 20th briefing on this subject, there's a case that

10 we cited to, Your Honor, Hardy versus Johns-Mansfield

11 that explained that there's a longstanding and

12 well-established rule that factual allegations in trial

13 court pleadings of a case may be admissible as

14 evidentiary admissions of that party.

15          THE COURT:  They've been admitted in this

16 trial.

17          MS. ANDERSON:  Thank you, Your Honor.

18          Second, Beneficial argues that somehow

19 there had to be an expert opinion on the subject of

20 materiality to satisfy the elements of contributory

21 infringement.  That is not true.

22          There has been substantial evidence

23 provided to the jury, including from Mr. Bellack, and

24 admissions by Mr. Goldberg on the subject of what was

25 the essence of the invention and what are important

1  parts of it.

2                    And even Dr. Almeroth talked about that.

3  Clearly, at the heart of the patent -- and we heard this

4  from Mr. Goldberg -- is the notion of taking

5  advertising-related information and combining with

6  service-related information to provide a concurrent

7  display of -- of an advertisement.

8                    And an ad tag is an essential element of

9  that, and Google provides those ad tags to DoubleClick.

10                    So there has been evidence before the

11 jury that Google provides a material component, and that

12 is an undisputed section of evidence that Google

13 provides those DoubleClick ads to make advertisements

14 appear on customer websites.

15                    Third, the subject of intent, there was

16 some argument from Beneficial's counsel on the subject

17 of whether or not there's been proof of intent.

18                    And we have submitted law on this subject

19 to the Court, including in the context of jury

20 instructions, but there can certainly be proof of intent

21 when it comes to something like indirect infringement,

22 circumstantial evidence.

23                    And so we heard questions during the case

24 where Beneficial suggested through its questions that

25 somehow a person had to believe at the time and say and

admit that I intended at that moment that infringement

occur.  But that's not the law.  The jury can find that

there is intent from circumstantial evidence.

And the undisputed evidence in the case

is that Google was aware of both patents no later than

2009 and that Google has continued to instruct and

encourage its customers through the years, including the

years when they were in the original Beneficial lawsuits

and then continuing on through today, instruct and

encourage them to use DoubleClick ads in just the way

that Beneficial infringes the patent and doing so

knowing and aware of the patents and a jury is certainly

entitled to find that intent has been satisfied there.

Also, Your Honor, there was argument from

Beneficial's counsel to the extent that -- that somehow

there has to be evidence of instruction as to each

element to prove inducement, and that is not the law,

Your Honor.  There doesn't have to be instruction as to

each element.

And this is part of the jury instructions

we provided to the Court, the ones that were filed on

January 18th.  There is an instruction on inducing

patent infringement.

And the agreed-upon section of this

particular instruction explains that in order to show

1  inducement, you have to show that Google actively

2  encouraged or instructed another person on how to use a

3  product or perform a process in a way that infringes.

4  So the instruction is not element-by-element, did you

5  instruct to do Element 1, Element 2; it's did you

6  instruct them on how to use it in a way that infringed.

7           Finally, Your Honor, in a nutshell, we

8  have a situation here where Beneficial admits there is a

9  license.  Beneficial admits that Google products are

10 involved.

11          There is no evidence contrasting or

12 contradicting the fact that Google customers were sued

13 for, among other things, using Google DoubleClick

14 products in a way that Beneficial claimed infringes.

15          We know from Exhibit 13, a response to a

16 request for admission, that Beneficial admits that

17 DoubleClick is the ad-serving technology of websites.

18 We know that.

19          We know from Exhibit 12 that Beneficial

20 has acknowledged that their infringement analysis

21 doesn't change here whether the advertising is done by

22 Google or by other companies.

23          We know from the infringement

24 contentions, admissions from Beneficial that they have

25 explained why they believe there is infringement by

1  customers.  And this is evidence that establishes that

2  that conduct was licensed.

3              Thank you, Your Honor.

4              THE COURT:  All right.  Given that we're

5  hearing these matters collectively, I'll hear further

6  from Mr. Adams on any additional matters you'd like to

7  seek judgment as a matter of law on at this time.

8              MR. ADAMS:  Yes, Your Honor.  I -- I just

9  wanted to know before I do that, can I -- can I respond

10 real quickly to the issue of the complaint --

11             THE COURT:  I've heard enough argument on

12 the dueling motions for judgment on the underlying

13 facts.

14             MR. ADAMS:  With respect to our remaining

15 issues, Your Honor, we would also -- Defendants would

16 also bring a motion under Rule 50, as a matter of law,

17 that Google has failed to allege any harm in this

18 case -- withdrawn -- provided sufficient evidence to

19 prove harm in this case.

20             In the complaint that they filed, the

21 only theory of harm that was alleged was that they

22 incurred costs and fees for bringing this particular

23 lawsuit.  That allegation was stricken by Judge Payne as

24 improper.

25             So they were -- they had not at any point

1   up to the pretrial conference provided to us any theory

2   of harm.  At the pretrial conference, they switched and

3   they said that harm was that they received the

4   indemnification letters.

5               At trial, they didn't present any

6   testimony that that harmed them.  And the reason we ran

7   into the problem, Your Honor, that we did, at least the

8   problem from my standpoint, was that up to the point

9   when Mr. Trinh testified, there was no evidence in the

10  case that they had either changed their position or

11  suffered any detriment to themselves because they

12  received those indemnification letters.

13              Their 30(b)(6) witness, their corporate

14  representative, Mr. Trinh, testified that they had not

15  paid any monies and he testified that they had not lost

16  any customers.  Then they brought in Mr. Bellack, who

17  purported to contradict the statements of their own

18  30(b)(6), their own corporate representative.

19              Now, Your Honor, as a matter of law, I

20  believe that it is improper for them to bring in another

21  witness to present testimony that directly contradicts

22  the testimony of their corporate representative.

23              But put aside that, Your Honor, the

24  question is:  Is the testimony that Mr. Bellack gave,

25  which is simply this:  Yes, we've lost a customer, is

1  that sufficient to show that they've been harmed, just

2  on its face?

3                  They didn't go any further.  They didn't

4  say:  We lost a customer, and because of that, our

5  business has been affected.  All they said is:  We filed

6  a complaint.  We lost a customer.

7                  The question is:  Is that sufficient

8  evidence of harm?  And I submit to the Court that it

9  isn't.

10                 So even putting to the Court this issue

11  that they do have some evidence and that's based on that

12  statement by Mr. Bellack, Your Honor, that evidence is

13  insufficient to show by a preponderance of the evidence

14  that they, in fact, suffered harm.

15                 And on that ground, we would move for

16  judgment as a matter of law.

17                 THE COURT:  Do you have any other

18  remaining grounds?

19                 MR. ADAMS:  The last one, Your Honor, is

20  this:  I'm not sure if this has come to the level of

21  Your Honor, but when we were with Judge Payne, there was

22  an issue that pervaded our pretrial conference about a

23  dec relief action.

24                 They argued -- Google argued that their

25  prayer for relief constituted a dec relief action, and

1 they were seeking to declare for all of their customers

2 that there was a breach of the contract or that their

3 products were licensed.

4          And, Your Honor, I'm not sure if that's

5 still live, but if it is, we're moving for judgment as a

6 matter of law here that their complaint does not state

7 a -- a cause of action for dec relief, and even if it

8 did, they have not presented sufficient evidence to

9 establish that.

10          THE COURT:  All right.  Response,

11 Ms. Anderson?

12          MS. ANDERSON:  Thank you, Your Honor.

13          With respect to the first motion, the

14 motion about the subject of harm, Your Honor, we have

15 alleged in this case and the harm that we sought to

16 prove through the course of this trial and did prove is

17 that Google and its customers were deprived of the

18 rights under the license.

19          Google bought rights under the license

20 for peace for itself and its customers, something that

21 Google values and paid almost $2-1/2 million for, peace

22 from being sued under the circumstances that satisfy the

23 terms of that license.

24          Beneficial had no right to sue when the

25 customers were licensed under those terms.  And the

1  moment that Beneficial did that and filed suit, suits

2  that dragged on for years, that was a breach of the

3  contract, that was harm, because it deprived Google of

4  the benefit of its bargain.

5          Moreover, under California law, as Your

6  Honor has also already instructed the jury, even were

7  the jury to decide that there was no harm in this

8  situation, it is still entitled to find breach and

9  conclude and award nominal damages, which is -- we're

10  only seeking 1 dollar in this case, as we have stated to

11  the jury.

12          So under either circumstance, Your Honor,

13  that motion, in our view, should be denied.  We are

14  certainly well within the scope of California law on

15  harm, as well as a circumstance where, were the jury to

16  find no harm, they are entitled to award nominal

17  damages.

18          THE COURT:  What's your position with

19  regard to the issue of declaratory relief?

20          MS. ANDERSON:  Yes.

21          And on declaratory relief, as we

22  discussed at length with Magistrate Judge Payne, the

23  prayer for relief -- and Magistrate Judge Payne found

24  that Sections 3 and 4 in the prayer for relief reflect a

25  request for declaratory relief from the Court.

1                And we would seek that relief, because

2   there has been a breach, and we would like a finding

3   that there has been a breach pursuant to a declaratory

4   relief framework.

5                There has been a breach of the contract,

6   pursuant to the license terms that have been discussed

7   during the course of the trial, for all the reasons that

8   we have been addressing during this motion.

9                THE COURT:  Anything further?

10                MS. ANDERSON:  No.  Thank you, Your

11   Honor.

12                THE COURT:  All right.  Anything further

13   from you, Mr. Adams?

14                MR. ADAMS:  No, Your Honor.

15                THE COURT:  All right.  Then with regard

16   to the motions urged by the competing parties for

17   judgment as a matter of law under Rule 50(a), the Court

18   denies all such motions.

19                The Court does not, by its denial, in any

20   regard hinder or limit the parties from reurging motions

21   for judgment as a matter of law after the return of a

22   verdict in this case as allowed by Rule 50(b).

23                But at this juncture, the Court's rulings

24   as to all matters under Rule 50(a) seeking relief in the

25   form of judgment as a matter of law prior to the return

1  of a verdict are denied.

2  Counsel, I -- with regard to -- with

3  regard to housekeeping matters going forward, a couple

4  of things I want to cover with you.

5  Number one, my understanding is that you

6  have 30 minutes a side for closing argument.  That's

7  what you should plan for tomorrow.

8  Plaintiff should use at least 50 percent

9  of that time in its first closing argument.  You may

10  reserve what amount you like, as long as you use at

11  least half of it in your first argument.

12  Also, before the jury is brought in

13  tomorrow, we will -- I will ask that you read into the

14  record any additional exhibits that were used during the

15  portion of the trial today so that we can clarify that.

16  I have done some work on your submitted

17  proposals regarding the final jury instructions and

18  verdict.  Given that the evidence came to a close

19  quicker than I anticipated, I'm not ready to hold an

20  informal charge conference with you this afternoon.  I

21  will be ready in the morning.

22  My plan is that sometime this evening, my

23  clerks will email you what I consider a revised version

24  of your joint submission, and I will take that up with

25  you informally in chambers at 9:00 o'clock in the

morning.

I do not believe that the -- we will have any problems completing the informal charge conference, then letting me reflect upon the discussions coming from that and giving you what I believe the final charge should be, and then hearing any remaining objections you have on the record in a formal charge conference such that we will not be able to begin final instructions and hear arguments beginning around 11:00 tomorrow.

And it's my hope that that being the case and given the time allocations for closing arguments, this case can be in the hands of the jury around 12:00 or 12:30 tomorrow.  That's my plan.

So I'm going to release you this afternoon.  You should look for an email from the Court this evening, and I will meet with you to review that informally in chambers at 9:00 o'clock in the morning.

All right.  With those instructions, is there anything further before we recess for the day from the Plaintiff?

MS. ANDERSON:  No.  Thank you, Your Honor.

THE COURT:  I'm sure there is from the Defendant as he walks to the podium.

MR. ADAMS:  I didn't want to waste time,

1  Your Honor.  I wanted to get here as soon as I could so

2  we could leave.

3              Your Honor, we informed the Defendants

4  that there was on one additional instruction that we

5  wanted to propose.  When we looked at the proposed

6  instructions, there was no instruction on direct

7  infringement.

8              THE COURT:  I'm aware of that.

9              MR. ADAMS:  So we have a proposal.

10             THE COURT:  You will have a proposal in

11 what comes to you this evening.

12             MR. ADAMS:  Okay, Your Honor.  And there

13 is -- there is -- we modified ours a little bit.  I just

14 wanted to submit it to the clerk so you can take a look

15 at it.

16             THE COURT:  You're welcome to leave what

17 you have with one of my law clerks.

18             MR. ADAMS:  Thank you, Your Honor.

19             THE COURT:  Is there anything further?

20             MS. ANDERSON:  No.  Thank you, Your

21 Honor.

22             MR. ADAMS:  Not from the Defendants, Your

23 Honor.

24             THE COURT:  All right.  Have a good

25 evening.  I will see you at 9:00 o'clock tomorrow

1   morning in chambers.  Until such time, we stand in

2   recess.

3                   COURT SECURITY OFFICER:  All rise.

4                   (Court adjourned.)

5                   * * * * * * * * * * * * * * * * * * * * * *

6

7

8

9                           CERTIFICATION

10

11           I HEREBY CERTIFY that the foregoing is a

12   true and correct transcript from the stenographic notes

13   of the proceedings in the above-entitled matter to the

14   best of my ability.

15

16

17   /s/_____            ____1/22/14_____
     SHELLY HOLMES, CSR                        Date
18   Official Court Reporter
     State of Texas No.:  7804
19   Expiration Date  12/31/14

20

21   /s/_____          ____1/22/14_____
     SUSAN SIMMONS, CSR                        Date
22   Official Court Reporter
     State of Texas No.:  267
23   Expiration Date  12/31/14

24

25